## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.,       :      CIVIL ACTION NO. 02-3212

      Plaintiff,              :

      vs.                  :

WHITEMARSH TOWNSHIP, et al.      :

      Defendants.         :

## ORDER

AND NOW, this     day of        , 2002, upon consideration of the Motion of Defendant Thomas Zarko to Dismiss and the opposition of Plaintiff Highway Materials, Inc. thereto, it is HEREBY ORDERED that the Motion is DENIED.

 

_____

                             Robert F. Kelly, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HIGHWAY MATERIALS, INC., | : | CIVIL ACTION NO. 02-3212 |
| Plaintiff, | : | |
| vs. | : | |
| WHITEMARSH TOWNSHIP, et al. | : | |
| Defendants. | : | |

## MEMORANDUM OF PLAINTIFF HIGHWAY MATERIALS, INC. IN OPPOSITION TO DEFENDANT THOMAS ZARKO'S MOTION TO DISMISS

### INTRODUCTION

Thomas Zarko's motion to dismiss is little more than a mishmash of legal truisms and a bland recital of events that fails to engage the well pleaded facts of the Complaint of Highway Materials, Inc. ("HMI"). As discussed below, however, the Complaint demonstrates that Zarko, the Whitmarsh Township Engineer, was a willing and key participant in a conspiracy to deprive HMI of constitutionally protected rights to develop its property. The defendants include numerous officials, who, like Zarko, acting under color of state law, perverted the land development process in Whitemarsh Township (the "Township") to prevent HMI from developing an office park permitted as of right. As alleged in the Complaint, the conduct of defendant Zarko and others violated HMI's constitutional rights to substantive due process (Count I), procedural due process (Count II) and equal protection of the laws (Count III). Accordingly, the motion to dismiss must be denied.

## FACTS

### A.    The HMI Property

HMI is the owner of a 309-acre tract of land adjacent to Stenton Avenue, Joshua Road and Flourtown Road in Whitemarsh Township, Pennsylvania (the "Property"), which is divided into three parcels. "Parcel 1" is 54 acres, the site of a quarry that had been already filled in when HMI acquired the Property. "Parcel 2", approximately 67 acres, consists largely of a quarry that is being filled, and a concrete production business. "Parcel 3," a 188-acre tract, is an active quarry and the site of a bituminous production business. (Complaint, ¶ 16.)

For many years, most of the Property had been zoned HVY-X Industrial. The only exceptions are a small corner of Parcel 1 (zoned AA Residential) and about one-third of Parcel 3 (zoned Limited-X or A Residential). (Complaint, ¶ 17.) The HVY-X Industrial zoning permitted a multitude of productive uses for the Property, except residential use or retail sales, and afforded reasonable opportunity for redevelopment. (Id.)

### B.    HMI's Development Plans Spawn Political Turmoil

Beginning in 1999, HMI, through its legal, planning and engineering representatives, sought to return Parcel 1 to productive use, and began to discuss the redevelopment with Township officials. (Complaint, ¶ 19.) HMI's intentions became known to the surrounding neighbors and the general public. (Id., ¶ 20.)

Learning that HMI and other owners of large parcels in the Township were considering plans to put their properties to productive use, several persons formed the Whitemarsh Township Residents Association ("WTRA") in Fall 2000 to oppose proposed development in the Township. (Complaint, ¶ 21.) WTRA members (and especially the WTRA leadership) expressed public opposition to HMI's as-of-right development of Parcel 1, going so

far as, on information and belief, to threaten Township Supervisors that they would be voted out of office at the next election if they disagreed with WTRA's agenda. (Complaint, ¶ 22.)

WTRA retained the law firm of Kaplin Stewart Meloff Reiter & Stein (the "Kaplin Firm"), which also represented a neighbor to the Property, Donald Cohan. Lawyers with the Kaplin Firm, including Marc Kaplin, prevailed upon the Township Board of Supervisors (the "Board") to use the zoning and development approval process to stop as-of-right development of the Property. (Complaint, ¶ 23.)

### C.    The Supervisors Improperly Rezone the Property

In a Board meeting on July 26, 2001, the Supervisors announced that they were submitting a request for proposals for a land use study on rezoning of the Property. (Complaint, ¶ 28.) The minutes of the July 26 meeting state that the land use study was to be part of a "process to evaluate the appropriate zoning for the [Property]." (Id., ¶ 29) (emphasis added). On September 10, 2001, HMI filed preliminary land development plans for an office park project to be known as "Creekside Commons," which were consistent with the HVY-X Industrial district regulations and approvable under Township ordinances (the "Preliminary Plans"). (Id., ¶ 30.) In what appears to be an act of retaliation, the Board at its meeting on September 20, 2001 repudiated the "process" announced at its July 26 meeting and announced that it was proceeding with a proposed rezoning of the Property. (Id., ¶ 31.)

On October 18, 2001, the Board rezoned the Property to a new and novel EX-Extraction District (the "Rezoning"), which purported to restrict development of Parcel 1 to single-family detached homes on one-acre minimum lots and to restrict Parcels 2 and 3 in the same fashion once quarrying ceased. (Complaint, ¶ 32.) The Rezoning targeted only the Property. (Id., ¶ 34.)

**D.    Defendant Zarko Enlists in a Plot to Reject HMI's Preliminary Plans**

Having submitted the Preliminary Plans in advance of the Rezoning, HMI was entitled under the Municipalities Planning Code to have its submission evaluated under the pre-existing HVY-X Industrial zoning regulations. (Complaint, ¶ 39.) Thus, in order to carry out their plan -- to prevent redevelopment of the Property under the previous zoning regulations which permitted the office park proposed by HMI -- defendants conspired to reject the Preliminary Plans. This step was essential to the defendants' scheme to prevent development because, once the Preliminary Plans were denied, HMI would be precluded from submitting any new plans based upon the old zoning and instead would be limited to the restrictive one-acre minimum lot, single family housing provided in the Rezoning. (Complaint, ¶¶ 39, 60.)

As Township Engineer, Zarko was central to this scheme. Under the Second Class Township Code, the Township Engineer is required to "furnish the board of supervisors with reports, information or estimates on any township engineering work or on questions submitted by the board of supervisors." 53 P.S. § 66202. Thus, Zarko was enlisted by the other defendants to assist in wrongfully denying the Preliminary Plans, in particular by providing the pretextual reasons for the denial. (Complaint, ¶¶ 39-40, 60-63.)

**E.    Defendant Zarko Withholds Cooperation On The Preliminary Plans**

The requirements for preliminary plans are set forth in the Township's ordinances. HMI's Preliminary Plans were prepared by a professional engineer highly regarded in the community and met the requirements in all material respects. (Complaint, ¶ 40.) If the Preliminary Plans did not satisfy certain technical preliminary plan requirements, the failure was a direct result of Zarko and the other defendants frustrating the normal land development process, especially by, on information and belief, directions from defendant Supervisors to Zarko

and others and Zarko's premeditated actions to withhold from HMI the customary good faith cooperation given to landowners and required under Pennsylvania law and to otherwise assure that approval would be denied. (Id.)

The normal and customary process in the Township (and as outlined in the Township ordinances) reflects the duty of cooperation: (a) the developer submits the plans to the Township Manager for review by the Township Engineer, the Parks and Recreation Department, the Zoning Officer, the Fire Marshal, the Shade Tree Commission and the Township Planner; (b) after review, the Township Manager reports back to the developer with any deficiencies in the plans; (c) the developer may revise the plans to address the deficiencies and resubmit the plans to the Manager; and (d) dialog continues until the preliminary plans are suitable for consideration by the Planning Commission. (Complaint, ¶ 42.)

Zarko, however, deviated from the customary process, refused to cooperate and shut the door on HMI. (Complaint, ¶¶ 40, 43.) HMI communicated on numerous occasions with Zarko, proposing to meet and discuss any and all aspects of the Preliminary Plans and in particular those aspects of the Preliminary Plans on which his input was critical. (Id., ¶ 43.) Although HMI repeatedly requested information and guidance from him in order to be in a position to comply with the Township ordinances, Zarko denied HMI the customary cooperation necessary to define and resolve these issues. (Id.)

F.    **Zarko and the Other Defendants Execute the Plot to Deny HMI's Preliminary Plans**

On March 8, 2002, HMI received a letter from the Township Manager stating that (a) the Preliminary Plans were scheduled "for action" by the Township Planning Commission on March 19, 2002, just eleven days later, and (b) that the matter was scheduled "for action" by the Board on March 21, 2002, just thirteen days later. (Complaint, ¶ 45.) The letter did not explain

why the Township may have needed to act on such short notice, nor why any action at all was then required.  (Id.)

By letter dated March 12, 2002, counsel for HMI, James Garrity, notified the Board and Township staff that the Preliminary Plans might not be ready "for action" because defendants, including Zarko, had withheld the customary and required cooperation necessary for the land development process.  (Complaint, ¶ 46.)  Accordingly, Mr. Garrity offered the Township a formal extension of time under Section 508 of the Municipalities Planning Code to provide the defendant Supervisors additional time to render their decision on the Preliminary Plans, but the Township did not respond.  (Id.)

In preparation for the Planning Commission Meeting and the Board Meeting, HMI's Engineer Tim Woodrow filed Revised Preliminary Plans (the "Revised Preliminary Plans") with the Township on March 19, 2002.  (Complaint, ¶ 47.)  The Township directed Mr. Woodrow immediately to deliver a copy of the Revised Preliminary Plans to Zarko, which he did on the morning of March 20, 2002.  (Id., ¶ 48.)

At 5:20 p.m. on March 21, only two hours before the Board meeting scheduled on HMI's project, Zarko faxed to HMI's counsel a seven-page letter purporting to describe deficiencies in the Revised Preliminary Plans.  (Complaint, ¶ 50.)  This letter is incorrect in numerous respects.  First, it wrongfully applies final plan requirements to HMI's Revised Preliminary Plans.  For instance:

> a.    In the case of sanitary sewer provisions, the Township ordinances for preliminary plans require only the submission of a one-page planning module application, which was duly filed by Mr. Woodrow.  Zarko's letter found HMI's plan deficient based on the lack of a full operational plan, a requirement for final plans. (Complaint, ¶ 56.a.)
>
> b.    HMI was faulted by Zarko's letter for not obtaining regulatory agency permits and approvals including water and

sanitary sewer service and road improvement permits. Under the Township ordinances, however, those permits and approvals are normally obtained only after preliminary approval of plans, and frequently are not obtained until after final approval. (Complaint, ¶ 56.b.)

c.    HMI was faulted by Zarko's letter for not submitting fire flow information relating to public water facilities. This is, however, a final plan obligation. (Complaint, ¶ 56.c.)

d.    HMI's Revised Preliminary Plans were faulted by Zarko's letter for not including copies of fully executed easement agreements. However, the preliminary plan process is meant to define what easements are necessary. The execution of easement agreements are final plan requirements. (Complaint, ¶ 56.d.)

e.    HMI's Revised Preliminary Plans were faulted by Zarko's letter for not including detailed construction plans pertaining to the proposed Stenton Avenue roadway improvements. However, once again, detailed construction plans are final plan requirements after Pennsylvania Department of Transportation approval. (Complaint, ¶ 56.e.)

Other conclusions in Zarko's March 21 letter are simply flabbergasting. One of the reasons offered by Zarko for denial of the plans was that a retention pond planned for a small piece of land zoned AA Residential did not comply with zoning, when in fact it did. (Complaint, ¶ 57.) Another "reason" he offered as a pretext for denial was that the plans did not provide for berms and chain link fencing around the perimeter of the site, notwithstanding that the Township ordinances do not require berms and fencing around an office park development. (Id.)

Finally, several "reasons" offered for denial stemmed from his and the Township's own actions and failures to act. (Complaint, ¶ 58.) For example, the Township failed to submit the Preliminary Plans to the Montgomery County Conservation District or the Whitemarsh Township Fire Marshall, and yet Zarko rejected the plans in part for lack of input from those two offices. (Id.) Perhaps most egregiously, defendants denied the Revised Preliminary Plans because HMI failed to obtain a highway occupancy permit from the

Pennsylvania Department of Transportation. (Id., ¶ 59.) The Township ordinances state, however, that the application to the Pennsylvania Department of Transportation for such a permit may not be submitted until after preliminary plan approval. (Id.)

Taken individually, and especially when viewed together, the bogus "reasons" Zarko offered for denial reveal that he and the other defendants were acting together in a concerted scheme to thwart HMI's constitutionally protected property rights to develop its Property in accordance with the applicable zoning. (Complaint, ¶ 60.)

The ensuing Board Meeting represented the culmination of the plot to thwart HMI's land development rights. First, while Mr. Garrity was afforded time to make a short presentation, the Supervisors had no comments and asked no questions at the conclusion of the presentation. Rather, the Township and the Board had arranged for the presence of a court reporter and, in unprecedented fashion, put the Revised Preliminary Plans "on trial." (Complaint, ¶ 51.)

With absolutely no notice to HMI, the Township proceeded to call "witnesses" against the Revised Preliminary Plans. Township Solicitor Ross Weiss conducted formal, sworn examinations of Township Managers Gregan and Zarko who, not surprisingly, testified consistently with his bogus denial letter. (Complaint, ¶ 52.) To HMI's knowledge, the Township had never before put preliminary plans "on trial" in a judicial-style administrative proceeding. (Id.) With no notice from the Township, HMI had no reasonable opportunity to call or prepare witnesses or exhibits to rebut the testimony of Zarko and Mr. Gregan in what was to become, in Township Solicitor Weiss's words, a "judicial" proceeding. (Id., ¶ 53.)

After the "trial," and with no deliberation nor discussion whatsoever, the Board unanimously rejected the Revised Preliminary Plans by passing Resolution 2002-17 (the "Denial

Resolution"). (Complaint, ¶ 54.) Importantly, the text of the Denial Resolution is taken virtually verbatim from Zarko's March 21, 2002 letter, which as set forth above purported to identify deficiencies in the Revised Preliminary Plans and had been faxed to HMI's counsel only two hours before the March 21 Board meeting. (Id., ¶ 55.) For the Court's information, and lest there be any doubt as to Zarko's complicity in the scheme to deny HMI its constitutionally protected rights, we have attached copies of Zarko's March 21, 2002 letter and the Denial Resolution hereto as Exhibits A and B.

## ARGUMENT

### A.    Applicable Standards

#### 1.    Federal Rule of Civil Procedure 12(b)(6)

When deciding a motion to dismiss under Federal Rule 12(b)(6), a "court must determine whether the party making the claim would be entitled to relief under any set of facts that could be established in support of his or her claim." Simril v. Township of Warwick, No. Civ. A. 00-5668, 2001 WL 910948, at *3 (E.D. Pa. August 13, 2001) (Kelly, J.). Therefore, dismissal is only appropriate in "those instances where it is certain that no relief could be granted under any set of facts that could be proved." Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990). The standard is well settled: "A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." Simril, 2001 WL 910948, at *3 (quoting Maio v. Aetna, Inc., 221 F. 3d 472, 482 (3d Cir. 2000)). In general, motions to dismiss are "viewed with disfavor and [are] rarely granted." Simril at *3 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at

321 (2d ed. 1990)). The "granting of a Rule 12(b)(6) motion to dismiss is highly disfavored." Id.

The standard of notice pleading under the Federal Rules is extremely lenient, and is liberally construed. Victory Outreach Ctr. v. Melso, No. Civ. A. 00-5185, 2002 WL 1560242, *1 n.1 (E.D. Pa. July 1, 2002) (citing Weston v. Pennsylvania, 251 F. 3d 420, 429-30 (3d Cir. 2001)). In connection with opposition to a motion to dismiss, courts view allegations together and will not consider the allegations as "completely unconnected." Thornbury Noble, Ltd., v. Thornbury Township, No. Civ. A. 99-6460, 2002 WL 442827, at *7 (E.D. Pa. March 20, 2002).

### 2.    42 U.S.C. § 1983

The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides in pertinent part:

> Every person who, under color of [law], . . . subjects, or causes to
> be subjected, any . . . person . . . to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured . . . .

42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that the conduct complained of was committed by a person acting under color of law and deprived the complainant of rights secured under the Constitution or federal law. Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970); Sameric Corp. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998). It is clearly established that private parties jointly engaged with state officials in prohibited actions are acting under color of law. Victory Outreach Ctr., 2002 WL 1560242, at *1 n.1 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)).

Here, taken as true as they must be within the context of a Rule 12(b)(6) motion to dismiss, HMI's allegations are sufficient to state claims against Zarko for deprivation of its constitutional substantive and procedural due process and equal protection rights under 42 U.S.C. § 1983.

**B.    HMI Has Stated Claims Against Defendant Zarko Under 42 U.S.C. § 1983 For Violations of Substantive and Procedural Due Process and Equal Protection of the Laws**

As a preliminary matter, HMI's Complaint clearly alleges, and Zarko does not dispute, that he was acting under color of law at all relevant times. (Complaint, ¶ 61.) Zarko actively participated with the other defendants in a protracted scheme targeting HMI and thwarting its land development aspirations, thereby violating HMI's constitutional rights to due process and equal protection. (Id., ¶¶ 19-64.) Indeed, Zarko acted throughout as Township Engineer, a position created and defined by state law. See 53 P.S. § 66202, supra. Therefore, HMI has stated the first element of a cause of action under 42 U.S.C. § 1983. See Adickes, 398 U.S. at 150; Sameric Corp., 142 F.3d at 590.[1]

**1.    HMI States a Claim Under 42 U.S.C. § 1983 Against Defendant Zarko for Violation of HMI's Substantive Due Process Rights (Count I)**

To state a claim for violation of substantive due process under 42 U.S.C. § 1983, HMI must demonstrate a protected property interest and allege that it was the victim of a "governmental action [that] was arbitrary, irrational, or tainted by improper motive." Woodwind Estates, Ltd. v. Gretkowski, 205 F.3d 118, 124 (3d Cir. 2000) (citations omitted). As the Court of Appeals observed, "one would be hard-pressed to find a property interest more worthy of substantive due process protection than ownership." DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 601 (3d Cir. 1995). In DeBlasio, the Third Circuit held that if a government decision impinges upon a landowner's use and enjoyment of property, the landowner states a substantive

---

[1]    Zarko argues that he may not be sued in his official capacity. (Defendant's Mem., pp. 6-7.) Because Zarko clearly has liability in his personal capacity, and because HMI has brought its claims against him in his personal as well as his official capacity, HMI will stipulate to the dismissal of any claims brought against Zarko in his official capacity.

due process claim where he or she alleges that the decision limiting the intended land use was arbitrarily or irrationally reached:

> We think it consistent with <u>Bello</u> to conclude that ownership is a property interest worthy of substantive due process protection. Indeed, one would be hard-pressed to find a property interest more worthy of substantive due process protection than ownership. <u>Thus, in the context of land use regulation, that is, in situations where the governmental decision in question impinges upon a landowner's use and enjoyment of property, a landowning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the intended land use was arbitrarily or irrationally reached.</u> Where the plaintiff so alleges, the plaintiff has, as a matter of law, impliedly established possession of a property interest worthy of substantive due process protection.

<u>Id.</u> at 600-01 (footnotes and citations omitted) (emphasis added).

Zarko himself acknowledges the dispositive force of <u>DeBlasio</u>, citing it for the proposition that "where a landowning plaintiff alleges that the decision limiting the intended land use was arbitrarily or irrationally reached, he has impliedly established a protected property interest." (Defendants' Mem., p. 11.) Faced with this clear statement of law, Zarko is reduced to mischaracterizing HMI's potential property interests as being limited to procedural rights in "cooperation" and in "having its offer of an extension accepted." (<u>Id.</u>, pp. 10, 11.) This attempt to minimize HMI's claim is without any legal basis whatsoever.

HMI is a "landowning plaintiff" in the Township. (Complaint, ¶¶ 15-16.) In addition, HMI has pled in detail how defendants "arbitrarily and irrationally" deprived HMI of its right to develop its land in accordance with the applicable zoning. (<u>Id.</u>, ¶¶ 1, 15-75.) Accordingly, under the governing authority of <u>DeBlasio</u>, HMI has clearly stated a claim for violation of its substantive due process rights.[2]

---

[2]    Zarko goes on to argue that HMI has no protected property rights in cooperation or obtaining extensions of time, and that Zarko had no ability to grant an extension in any
(continued...)

Zarko also attempts to play down his role in the Township's scheme to violate HMI's substantive due process rights by asserting that his only obligation under the Township's Subdivision Ordinance was to review the preliminary plans for the Township Manager. (Defendant's Mem., p. 10.) It is, however, precisely Zarko's actions in reviewing the plans and providing comments to the Township Manager that form the basis for HMI's claim against Zarko for violation of its substantive due process rights. Indeed, it is Zarko who gave expression to the "reasons" for the Board's rejection of HMI's Revised Preliminary Plans. (Complaint, ¶ 60.) He acted in bad faith and with improper motive throughout. He knowingly applied final plan requirements to preliminary plans. (Id., ¶ 62.) On several occasions pretext gave way to error. (Id., ¶¶ 57, 59.) The Complaint establishes Zarko's role was central to the scheme designed to deprive HMI of its constitutionally protected property interest. Simply stated, Zarko's "review" of HMI's plans is the keystone of the entire scheme.

### 2.    HMI Has Stated A Claim Under 42 U.S.C. § 1983 For Defendant Zarko's Violation Of HMI's Procedural Due Process Rights (Count II)

To state a claim under 42 U.S.C. § 1983 for violation of procedural due process, a plaintiff must allege that a person acting under color of state law deprived him of a protected property interest and that the procedure for challenging the deprivation does not satisfy the requirements of procedural due process, that is, notice and a meaningful opportunity to be heard. Leipziger v. Township of Falls, No. Civ. A. 00-1147, 2001 WL 111611, at *4 (E.D. Pa. Feb. 1, 2001); see also C&M Group, Inc. v. New Britain Township, No. Civ. A. 90-4375, 1991 WL

---

(...continued)

event. (Defendant's Mem., pp. 10-12.) These arguments are simply red herrings because, as discussed, HMI has not asserted these rights as bases for its substantive due process claims. Accordingly, we will not address these spurious points.

25684, at *2 (E.D. Pa. Feb. 14, 1991) (Gawthrop, J.). HMI has clearly alleged that Zarko and the other defendants acted under color of law to deprive it of constitutionally protected property interests without providing adequate or meaningful procedural due process. (Complaint, ¶¶ 77-83.) Therefore, HMI has stated a claim against Zarko under 42 U.S.C. § 1983 for violation of its procedural due process rights.

Zarko's sole argument in support of his motion to dismiss HMI's procedural due process claim is that so long as a state provides appellate (*i.e.*, post-deprivation) procedures to challenge a property deprivation, procedural due process is not violated no matter how grossly inadequate the pre-deprivation process. (Defendant's Mem., pp. 7-9.) This position misstates the law.

To the contrary, post-deprivation remedies are adequate to satisfy due process "only when the circumstances surrounding the deprivation require quick action by the state, or when pre-deprivation procedures are impractical." C&M Group, Inc., 1991 WL 25684, at *3 (citing Parrett v. Taylor, 451 U.S. 527, 539 (1981)). Clearly, within the context of zoning and land use plan review, there is no need for quick action by the state, nor are pre-deprivation procedures impractical. Id. (rejecting argument that post-deprivation appeal to Pennsylvania Common Pleas Court is adequate due process where pre-deprivation procedures may be provided, such as in the context of zoning review or the denial of a land-use permit); see also Littlefield v. City of Afton, 785 F.2d 596 (8th Cir. 1986) (overruled on other grounds). Quite simply, HMI's attempt to develop its Property did not present circumstances in which there was need for "quick action by the state" or in which it would have been impractical to afford HMI the benefit of meaningful pre-deprivation procedures.

The mere availability of a post-deprivation remedy was insufficient to satisfy procedural due process requirements in de Botton v. Marple Twp., 689 F. Supp. 477 (E.D. Pa. 1988). There, the township effectively denied the plaintiff's challenge to a zoning ordinance when it failed to conduct a hearing within the period required by the Pennsylvania Municipalities Planning Code. Id. at 481. Notwithstanding that the plaintiff in de Botton had an appellate process available to it to contest this denial (indeed, plaintiff actually prevailed on appeal), the court found that plaintiff had stated a claim for denial of its procedural due process rights. Id. at 479, 481.

This case is similar to de Botton because the "hearing" provided to HMI was no more than a pretext to deny the Revised Preliminary Plans and as a practical matter no better than no hearing at all. The counterpart to the hearing withheld from Mr. de Botton under the facts here is the preliminary land development process itself. Just as Mr. de Botton had a right to an administrative hearing before the Board of Commissioners on his claim that a Marple Township Ordinance was unconstitutional, here HMI was entitled to an administrative hearing before the defendant Supervisors on its request for preliminary plan approval. But, by the time of the formal hearing before the Board, HMI had lost any opportunity for a fair administrative review because of the actions of defendant Zarko and others. Thus, the process leading up to the March 21 "hearing" and the "hearing" itself was no more a "hearing" than that of which Mr. de Botton was deprived.

Moreover, adding insult to injury, HMI was not provided with adequate notice of the formal hearing, nor was it ever told that the Township planned to put HMI's plan on trial. (Complaint, ¶¶ 50-54.) Indeed, HMI's counsel did not receive Zarko's March 21 denial letter until two hours before the Board meeting at which the plans were denied. (Id., ¶ 50.) Having

had no notice of this highly unusual procedure and with Zarko's denial letter in hand only for only two hours, HMI was not prepared to either cross-examine the Township's witnesses (Township Manager Gregan and Zarko himself) or to call witnesses of its own. (Id., ¶ 53.) In any event, however, the decision had been pre-ordained -- purporting to rely on Zarko's pretextual denial letter, the Supervisors denied the Revised Preliminary Plans. (Id., ¶¶ 54-55.)

Finally, even if Zarko's argument regarding post-deprivation procedures held water, which it does not, there are no statutory appellate procedures in Pennsylvania that permit HMI to challenge in full measure the specific conduct alleged here. HMI does not merely challenge the denial of its preliminary plans, but rather pleads an overarching scheme to deprive HMI of its property rights that consisted of a wrongful rezoning followed by the rejection of pre-existing plans. (Complaint, ¶¶ 1, 26-64.) While Pennsylvania provides an appellate procedure in the Court of Common Pleas to challenge the denial of land development approval[3] and a separate procedure in the Zoning Hearing Board to challenge spot zoning,[4] it does not provide a single statutory appeal to challenge in one forum a scheme that incorporates both actions. Therefore, the post-deprivation procedures Zarko relies upon fail to provide adequate process to satisfy the Due Process Clause of the Constitution.

**3.    HMI Has Stated a Claim Under 42 U.S.C. § 1983 Against Defendant Zarko for Violation of HMI's Equal Protection Rights (Count III)**

To state a claim for relief for violation of equal protection rights, a plaintiff must allege that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech,

---

[3]    53 P.S. §§ 11001-A, et. seq.

[4]    53 P.S. §§ 10909.1.

528 U.S. 562, 564 (2000); see also Marchese v. Umstead, 110 F. Supp. 2d 361 (E.D. Pa. 2000)
(finding plaintiff's allegations that others were permitted to engage in certain activities without
land development plans sufficient to state a claim for denial of equal protection). The Supreme
Court has further stated that:

> the purpose of the equal protection clause of the Fourteenth
> Amendment is to secure every person within the State's jurisdiction
> against intentional and arbitrary discrimination, whether
> occasioned by express terms of a statute or by its improper
> execution through duly constituted agents.

Village of Willowbrook, 528 U.S. at 564 (citations omitted) (emphasis added).

Zarko does not contend that HMI has failed to plead that it was intentionally
treated different from others. Rather, Zarko claims that none of HMI's allegations connects him
(as opposed to the other defendants) to this mistreatment. (Defendant's Mem., p. 13.) Zarko is
wrong.

To the contrary, the Complaint clearly states that Zarko, acting as an agent and
officer of the Township under the Second Class Township Code, treated HMI differently from
similarly situated landowners. He withheld the customary cooperation afforded in the review of
the Preliminary Plans, he knowingly applied final plan requirements to HMI's Preliminary Plans,
and he found reasons for denial where none existed. (Complaint, ¶¶ 40, 43, 55-60.) All of this
conduct was intended to, and did, provide the pretextual reasons for the Township and the Board
to reject the Revised Preliminary Plans at the sham "trial" on March 21, 2002. (Id., ¶¶ 43, 55-63,
85-86.) Thus, taking the allegations of the Complaint as a whole, HMI has alleged that Zarko
discriminated against HMI through "improper execution" of his statutory and common-law
duties. Village of Willowbrook, 528 U.S. at 564.

**C.    Zarko's Actions Are Not Protected By The Doctrine Of Qualified Immunity**

The doctrine of qualified immunity exists to protect government officials who act properly in executing discretionary functions, not those who knowingly violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Thornbury Noble, Ltd., 2002 WL 442827, at *14 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).   When considering a claim of qualified immunity, a court must consider whether the official's actions (a) violated a constitutional right and (b) whether the right was clearly established at the time of the alleged violation and the defendant government official reasonably knew that his or her actions were unlawful.   Thornbury Noble, Ltd., 2002 WL 442827, at *14 (citing Saucier v. Katz, 533 U.S. 194 (2001)).   At the time of the violation, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." Id. at *16 (quoting Anderson v. Creighton, 483 U.S. 635, 636-37 (1987)).

Importantly, a defendant is not entitled to qualified immunity on a motion to dismiss unless the immunity is established on the face of the complaint. See Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996) (qualified immunity will only be granted when the immunity is established on the face of the complaint).   See also Leveto v. Lapina, 258 F.3d 156 (3d Cir. 2001).   Similarly, the United States District Court for the Eastern District of Virginia has stated:

> [I]t is important to remember the office of Rule 12(b)(6) and the scope of its inquiry, which is to test only the legal sufficiency of the Complaint. Where the qualified immunity defense is presented under Rule 12(b)(6), the motion to dismiss will be granted only if the basis for the grant of such immunity appears on the face of the complaint . . . .   To prevail at this stage, however, the defendants must identify how the defense is established by the allegations set forth in the Complaint.

McWalters v. Rick, 195 F. Supp. 2d 781, 789 (E.D. Va. 2002) (citations omitted). Zarko does not and cannot meet this stringent standard.

As discussed at length above and in the Complaint, Zarko's actions clearly violated HMI's established substantive and procedural due process and equal protection rights. Therefore, Zarko cannot establish the first prong of the qualified immunity analysis. Zarko also cannot establish the second prong of the qualified immunity analysis because he had reason to know that his actions violated HMI's constitutional rights. (Complaint, ¶ 69.) Indeed, as also discussed above, the contours of the constitutional rights he allegedly violated are all clearly established. See Village of Willowbrook, 528 U.S. at 564 (landowner has equal protection right to be treated consistently with similarly situated landowners); DeBlasio, 53 F.3d at 598 (substantive due process property right in land development); Thornbury Noble, Ltd., 2002 WL 442827, at *16 (same); and C&M Group, Inc., 1991 WL 25684, at *3 (right to meaningful, pre-deprivation procedural due process).

Moreover, Zarko's claim that he did not know his conduct violated HMI's rights is wholly without merit and improper on a motion to dismiss since HMI plainly alleges both that he intentionally misapplied the Township's ordinances to give the Township the pretext it needed to reject HMI's preliminary plans and that in so doing he "knew, or reasonably should have known, that his conduct violated HMI's clearly established rights." (Complaint, ¶¶ 55, 60, 69.) These allegations, especially when viewed in the context of the other allegations of the Complaint, suffice to demonstrate that Zarko knowingly and intentionally violated HMI's clearly

established rights. Accordingly, he is not entitled to qualified immunity. See Thornbury Noble, Ltd., 2002 WL 442827, at *16.[5]

## CONCLUSION

For the foregoing reasons, HMI respectfully requests that defendant Zarko's motion to dismiss be denied.

Michael Sklaroff
Walter M. Einhorn, Jr.
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

Attorneys for Plaintiff

Dated: September 4, 2002

---

[5]    Zarko makes a curious final point. He asserts that if his March 21, 2002 letter was "in error, then the decision of the Board . . . will presumably be reversed on appeal." (Defendant's Mem., pp. 14-15.) It is not clear how this procedural point relates to Zarko's claim of qualified immunity, especially in light of HMI's allegations that Zarko knowingly and in bad faith misapplied the Township's ordinances to HMI's Preliminary Plans to create a pretext for their denial. In any event, the assertion that Zarko's unconstitutional actions may be undone on appeal is of no moment. See de Botton, supra.

**CERTIFICATE OF SERVICE**

I, Walter M. Einhorn, Jr., hereby certify that, on September 4, 2002, I caused copies of the foregoing Memorandum of Law in Opposition to Defendant Thomas Zarko's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) to be served via first-class mail, postage prepaid, upon the following:

> Harry G. Mahoney, Esquire
> Deasey Mahoney & Bender Ltd.
> 1800 John F. Kennedy Boulevard, Suite 1300
> Philadelphia, PA  19103-2978


> Jonathan K. Hollin, Esquire
> Powell Trachtman Logan Carrle Bowman and
>  Lombardo, P.C.
> 475 Allendale Road, Suite 200
> King of Prussia, PA  19406



                                    _____   _____
                                    Walter M. Einhorn, Jr.

# EXHIBIT A

Mar 21 02 05:10p       CKS ENGINEERS, INC.        215-340-1655          p.2

# C K S

CKS Engineers, Inc.
88 South Main Street
Doylestown, PA 18901
215/340-0600 • FAX 215/340-1655

David W. Connell, P.E.
Joseph J. Nolan, P.E.
Thomas F. Zarko, P.E.

March 21, 2002
Ref: #5536

Whitemarsh Township
616 Germantown Pike
Lafayette Hill, PA 19444-1821

Attention:    Robert A. Ford, Assistant Township Manager

Reference:    Creekside Commons
              Major Land Development - Stenton Avenue
              Township File SLD #5-00
              Second Revised Preliminary Plan Review

Dear Rob:

We have received the second revised preliminary plans for the above-referenced major land development ("Project"), plans consisting of 30 sheets prepared by Woodrow & Associates, Inc., dated August 20, 2001, with latest revisions dated March 19, 2002, and 6 sheets prepared by McCloskey & Faber, P.C., dated August 24, 2001, with latest revisions dated March 19, 2002, ("Plan") that were hand delivered to our office for review on March 20, 2002.

Based upon our review of the second revised preliminary plan submission, we hereby provide the following comments:

1.    The Plan that was submitted for the Project is inconsistent with the following provisions of Chapter 116 "Zoning" of the Whitemarsh Township Code:

   a.    The applicant proposes to construct a retention basin on the southeasterly portion of the Project site, which is located within the AA Residential Zoning District, which is not a permitted use within the aforementioned district. (Sections 116-35 and 116-48)

   b.    Details/design specifications concerning the proposed on-site sewage treatment plant depicted on the Plan were not submitted to the Township for review. (Section 116-152.A.4)

CKS Engineers, Inc.

Ref: #5536
Page 2

    c.   A suitably sized berm and chain link fencing were not provided around the perimeter of the proposed land development site in the specific locations required by the Whitemarsh Township Code. (Sections 116-156.B and C)

    d.   The applicant proposes to construct the on-site sewage treatment plant on the southeasterly portion of the project site, within the 200 ft. setback from the AA-Residential Zoning District, which is not permitted. (116-148.B.2)

2.   The applicant did not obtain the following regulatory agency permits/approvals required for the Project:

    a.   A Part 2 Water Quality Management Permit and an NPDES Permit from the Pennsylvania Department of Environmental Protection ("PA DEP") for the proposed on-site sewage treatment plant. (Section 105-78.C)

    b.   A Water Service Agreement, with the applicable utility company that will be furnishing public water service to the site. (Sections 116-28, 105-21.B.10.b, and 105-89.D)

    c.   Montgomery County Conservation District approval of the proposed Erosion and Sedimentation Control Plan for the Project. (Section 105-42)

    d.   Approval of the PA DEP for the modifications to the existing pumped water bypass system as illustrated on the Plan. (Section 58-4.B.4)

    e.   A Highway Occupancy Permit from the Pennsylvania Department of Transportation ("Penn DOT") for the proposed improvements along Stenton Avenue and did not obtain PennDOT approval of the scope of improvements along the roadway. (Sections 105-28.A, 105-30.A, 105-28.I and 105-89.C)

3.   The applicant did not provide the following documentation required to satisfy the provisions of Chapter 105 "Subdivision and Land Development" of the Whitemarsh Township Code:

    a.   The revised PA DEP Sewage Facilities Planning Module pertaining to the Project that was submitted to the Township on March 19, 2002 was reviewed by Township Staff and determined to be incomplete for the following reasons (Section 105-14.D.2.e):

        (1)   The Alternatives Analysis that was attached to the revised Planning Module submission is incomplete for the following reasons:

            (a)   Information concerning the private sewage pumping station/force main alternative costs were not included within the Alternatives Analysis.

CKS Engineers, Inc.

Ref: #5536
Page 3

(b)     The Alternatives Analysis indicates that the on-site sewage treatment plant is to be offered for dedication to Whitemarsh Township or will be privately owned and maintained. The applicant was previously advised that the Township's past policy with such treatment plants is not to accept dedication of such facilities. The proposed operation and maintenance obligations for the on-site sewage treatment plant are unresolved in the Alternatives Analysis, which would prohibit the Township from considering the Planning Modules in accordance with PA DEP regulations.

(2)     Item I.3 of Component 3 of the Planning Module submission was not completed.

(3)     The proposed preliminary treatment requirements provided within the Section I.3.b attachment to the Planning Module submission are incomplete as they do not include suspended solids, pH, etc. effluent limits.

(4)     A copy of a proposed Operation and Maintenance Agreement pertaining to the proposed on-site sewage treatment plant, in a format acceptable to the Township Solicitor, was not provided as required to document the perpetual ownership/maintenance responsibilities of the private on-site sewage treatment plant alternative.

(5)     Montgomery County Planning Commission and Montgomery County Health Department review comments concerning the Planning Module submission were not provided.

b.     The applicant did not submit fire flow information pertaining to the public water facilities in the vicinity of the Project site to the Township for Township Fire Marshal review of the proposed water system design. (Section 105-76)

c.     The applicant did not submit copies of easement agreements for all proposed off-site grading, landscaping and drainage facilities construction illustrated on the Plan, in a format acceptable to the Township Solicitor, to the Township. (Sections 105-45 and 58-4.B.4)

d.     The Geotechnical Investigation Report pertaining to the Project that was submitted to the Township on March 1, 2002 was reviewed by Township Staff and determined to be inadequate based upon the discrepancies noted within the CKS Engineers, Inc. review correspondence dated March 12, 2002 (copy attached). (Section 105-26.E)

CKS Engineers, Inc.

Ref: #5536
Page 4

e.   The applicant did not submit an easement agreement pertaining to the proposed on-site "blanket" easement, in a format acceptable to the Township Solicitor, to the Township.  (Section 105-45)

f.   The stormwater management/storm drainage calculations that were submitted for the Project were determined to be incomplete for the following reasons (Sections 105-41 and 58-4.B.4):

   (1)   Capacity calculations for all proposed receiving stormwater swales, drainage system, etc. were not submitted to the Township.

   (2)   Time of Concentration calculations verifying the design criteria utilized for the storm sewer pipe extending between Inlet ST-56 to Endwall ST-57 were not provided for review.

   (3)   The outlet structure configuration utilized within the Stormwater Management Report does not agree with that illustrated on the Plan.

   (4)   The Time of Concentration flow path for pre-development Drainage Area "B" was not shown on the watershed mapping provided.

   (5)   Hydraulic calculations for the by-pass pipe collection system, addressing the diversion into the on-site retention basin, were not submitted to the Township.

   (6)   The rip-rap energy dissipating device configurations noted within the calculations do not agree with the associated details provided on the Plan.

4.   The Plan that was submitted for the Project is inconsistent with the following design requirements of Chapters 58 "Grading, Erosion Control, and Stormwater Management" and 105 "Subdivision and Land Development" of the Whitemarsh Township Code:

   a.   The applicant did not include the recommendations contained within the Transportation Impact Study pertaining to this site, prepared by Horner & Canter Associates, dated February 19, 2002, with no revisions.  (Section 105-21.B.9.a)

   b.   All proposed grading is not set back a minimum of 5 ft. from the Project property lines. (Section 58-4.B.4)

   c.   Complete profiles of all proposed storm sewer lines were not provided. (Sections 105-21.B.8 and 58-4 B.4)

CKS Engineers, Inc.

Ref: #5536
Page 5

d.    Detailed construction plans pertaining to the proposed Stenton Avenue roadway improvements, which illustrate all applicable design/construction information (i.e., roadway cross sections, guiderail relocation, traffic signalization details, utility pole relocations, traffic control signage, striping, curb grades, etc.), were not submitted to the Township for review/approval. (Sections 105-21.B.1.o, 105-21.B.8, 105-69.C and 58-4.B.4)

e.    The Project landscaping plans include the following discrepancies (Sections 105-21.B.7 and 105-52.B.2):

    (1)    Site landscaping conflicts with underground piping.

    (2)    A request for Board of Supervisors' approval of the alternate buffer tree design proposed on the landscaping plans was not submitted to the Township.

f.    The final closure plan pertaining to the existing quarry on the Project site, which establishes the "pre-construction" topography depicted on the improvements construction plans, was not included as part of the overall land development plan set. Additionally, a note was not placed on the plans indicating that escrow would be posted by the applicant to ensure completion of the closure plan, if the quarry closure is not complete at the time of final plan approval consideration of the project. (105-26.D and 105-82)

g.    Sufficient existing features (i.e., buildings, driveways, utilities, drainage facilities, topography, etc.) within 500 feet of, and within, the site are not shown on the Plan. (Section 105-21.B.1.n)

h.    Sufficient bearing/distance information concerning the legal and ultimate rights-of-way along Stenton Avenue, as required for future right-of-way conveyance, has not been indicated on the Plan. (Section 105-21.B.1.m)

i.    The following information concerning the existing "pumped-water by-pass system" extending through the site, was not placed on the Plan (Section 105-21.B.1.n):

    (1)    Details, including pipe depths, etc.

    (2)    Ownership and maintenance responsibilities for this pipe, including easement.

j.    All applicable construction details pertaining to the proposed land development (i.e. Sanitary Sewer System, Emergency Access Lane, Water System, etc.) were not included on the Plan. (Sections 105-65.B and 58-4.B.4)

CKS Engineers, Inc.

Ref: #5536
Page 6

k.  The following discrepancies in the grading/stormwater management/storm drainage and erosion and sedimentation control aspects of the proposed Project were noted (Sections 105-41, 105-42, and 58-4.B.4):

  (1)  Sufficient spot grades were not provided at proposed entrance islands, between buildings, and at all corners and break points to ensure proper drainage of the site.

  (2)  The "double" inlets required by the stormwater management/storm drainage calculations were not properly identified on the Plan.

  (3)  Proposed roof drain connections were not shown.

  (4)  The proposed 228 L.F. outlet pipe noted on Sheet 21 of 36 was not shown on the erosion and sediment control plan view.

  (5)  A number of spot elevation discrepancies exist on the Plan.

  (6)  A construction sequence was not placed on the Plan.

  (7)  The location(s) of the proposed erosion and sedimentation control baffles was not shown on the Plan.

  (8)  Complete dimensions and details pertaining to the proposed basin outlet structure modifications were not shown on the Plan.

  (9)  Construction details for the proposed 8" gate valve were not shown.

  (10)  A storm sewer manhole frame and cover detail was not provided.

  (11)  Proposed Drainage Structure ST-24 is inconsistently identified as an inlet and manhole on the Plan.

  (12)  Inadequate silt fence has been provided immediately downgrade of the proposed earth disturbance in the vicinity of the railroad right-of-way.

  (13)  The proposed grading illustrated on Sheet 15 of 36 does not properly tie to existing contours along the southeasterly side of the Project site.

  (14)  Endwall ST-123 was not included within the Manhole Details or Outlet Protection Detail on Sheet 34 of 36 of the Plan.

Mar 21 02 05:12p     CKS ENGINEERS, INC.         215-340-1655          p.8

CKS Engineers, Inc.

Ref: #5536
Page 7

l.   The detention basin fence detail provided on Sheet 36 of 36 of the plans is incomplete as the location/gauge of the mesh material has not been indicated thereon. (Section 105-65.B)

m.   The location of the Floodplain Conservation District on the land development site has not been shown/identified on the Record Plan, Sheet 2 of 36. (Section 105-21.B.2.d, e & f)

n.   The public sanitary sewer design information indicated on the Plan is inconsistent with the on-site sewage treatment plant sewer service alternative proposed within the applicant's Planning Module submission. (105-21.B.6)

o.   The applicant proposes to pipe an existing drainage ditch on the site, which is not permitted. (Section 58-4.B.4)

If you should have any questions concerning the comments provided above, please do not hesitate to contact me.

Very truly yours,
CKS ENGINEERS, INC.
Township Engineers

Thomas F. Zarko, P.E.

TFZ/mak

Enclosure

cc:   Lawrence J. Gregan, Township Manager
      Ross Weiss, Esquire, Township Solicitor
      James J. Garrity, Esquire
      Neil Stein, Esquire
      Whitemarsh File
      File

**EXHIBIT B**

## RESOLUTION #2002-17

WHEREAS, on September 10, 2001, Peter DePaul ("Applicant"), owner of a 54± acre parcel of ground, Tax Map Block 44A Unit 6, located on the north side of Stenton Avenue, east of Joshua Road ("Property") submitted an application with plans for preliminary land development approval for a 500,000 square foot office development entitled "Creekside Commons" ("Project") consisting of 30 sheets prepared by Woodrow & Associates, Inc. dated August 20, 2001 and six sheets prepared by McCloskey & Faber, P.C. dated August 24, 2001 ("Plan"); and,

WHEREAS, the Original Plan ("Original Plan") was reviewed by Thomas F. Zarko, P.E., Township Engineer ("Township Engineer") for compliance with the provisions of the Whitemarsh Township Code, including Chapter 58 entitled "Grading, Erosion Control and Stormwater Management"; Chapter 105 entitled "Subdivision and Land Development"; and, Chapter 116 entitled "Zoning"; and,

WHEREAS, the Township Engineer prepared a report dated October 11, 2001 ("Original Review") entitled "Creekside Commons Major Land Development – Stenton Avenue, Township File SLD #5-00 Preliminary Plan Review" (attached as Exhibit "A"), which report was transmitted to the Applicant on October 25, 2001; and,

WHEREAS, Applicant offered a Letter of Extension (attached as Exhibit "B") extending the time period for the Township to act on the Plan which extension was accepted by the Board of Supervisors on November 8, 2001; and,

WHEREAS, Applicant submitted a Revised Plan ("Revised Plan") for the Project consisting of 30 sheets prepared by Woodrow & Associates, Inc., dated August 20, 2001 with latest revisions dated December 20, 2001 on December 24, 2001 with a cover letter from Timothy P. Woodrow, P.E. dated December 21, 2001 (attached as Exhibit "C"); and,

WHEREAS, the Township Engineer reviewed the Revised Plan for compliance with the provisions of the Whitemarsh Township Code and prepared a report on the Revised Plan dated January 24, 2002 ("Revised Plan Review") entitled "Creekside Commons Major Land Development – Stenton, Avenue Township File SLD #5-00 Revised Preliminary Plan Review" (attached as Exhibit "D"), which was transmitted to the Applicant on January 31, 2002; and,

WHEREAS, based on the Township Engineer's review of the Revised Plan, only 21 of the 93 comments contained within the Original Review were satisfactorily addressed on the Revised Plan; and,

WHEREAS, Applicant submitted a Second Revised Plan ("Second Revised Plan") for the Project consisting of 30 sheets prepared by Woodrow & Associates, Inc., dated August 20, 2001 with latest revisions dated March 19, 2002, and 6 sheets prepared by McCloskey & Faber, P.C. dated August 24, 2001 with latest revisions dated March 19, 2002, with a cover letter from Timothy P. Woodrow, P.E. dated March 19, 2002 (attached as Exhibit "E"); and,

WHEREAS, the Township Engineer reviewed the Second Revised Plan for compliance with the provisions of the Whitemarsh Township Code and prepared a report on the Second Revised Plan dated March 21, 2002 entitled "Creekside Commons Major Land Development – Stenton Avenue, Township File SLD #5-00 Second Revised Preliminary Plan Review" (attached as Exhibit "F") which was transmitted to the Applicant on March 21, 2002; and,

WHEREAS, based on the Township Engineer's review of the Second Revised Plan, only 17 of the 64 comments contained within the Revised Plan Review were satisfactorily addressed on the Second Revised Plan; and,

WHEREAS, the ninety-day period for action by the Board of Supervisors on the Revised Plan expires on March 24, 2002.

NOW, THEREFORE, BE IT RESOLVED, and it is hereby resolved by the Board of Supervisors of Whitemarsh Township that the Second Revised Plan is hereby denied for the following reasons:

1.    The Second Revised Plan that was submitted for the Project is inconsistent with the following provisions of Chapter 116 "Zoning" of the Whitemarsh Township Code:

    a.    The applicant proposes to construct a retention basin on the southeasterly portion of the Project site, which is located within the AA Residential Zoning District, which is not a permitted use within the aforementioned district. (Sections 116-35 and 116-48)

    b.    Details/design specifications concerning the proposed on-site sewage treatment plant depicted on the Plan were not submitted to the Township for review. (Section 116-152.A.4)

    c.    A suitably sized berm and chain link fencing were not provided around the perimeter of the proposed land development site in the specific locations required by the Whitemarsh Township Code. (Sections 116-156.B and C)

    d.    The applicant proposes to construct the on-site sewage treatment plant on the southeasterly portion of the project site, within the 200 ft. setback from the AA-Residential Zoning District, which is not permitted. (116-148.B.2)

2.    The applicant did not obtain the following regulatory agency permits/approvals required for the Project:

    a.    A Part 2 Water Quality Management Permit and an NPDES Permit from the Pennsylvania Department of Environmental Protection ("PA DEP") for the proposed on-site sewage treatment plant. (Section 105-78.C)

    b.    A Water Service Agreement, with the applicable utility company that will be furnishing public water service to the site. (Sections 116-28, 105-21.B.10.b, and 105-89.D)

    c.    Montgomery County Conservation District approval of the proposed Erosion and Sedimentation Control Plan for the Project. (Section 105-42)

    d.    Approval of the PA DEP for the modifications to the existing pumped water bypass system as illustrated on the Plan. (Section 58-4.B.4)

    e.    A Highway Occupancy Permit from the Pennsylvania Department of Transportation ("PennDOT") for the proposed improvements along Stenton Avenue and did not obtain PennDOT approval of the scope of improvements along the roadway. (Sections 105-28.A, 105-30.A, 105-28.i and 105-69.C)

3.    The applicant did not provide the following documentation required to satisfy the provisions of Chapter 105 "Subdivision and Land Development" of the Whitemarsh Township Code:

    a.    The revised PA DEP Sewage Facilities Planning Module pertaining to the Project that was submitted to the Township on March 19, 2002 was reviewed by Township Staff and determined to be incomplete for the following reasons (Section 105-14.D.2.e):

        (1)    The Alternatives Analysis that was attached to the revised Planning Module submission is incomplete for the following reasons:

3

(a)    Information concerning the private sewage pumping station/force main alternative costs were not included within the Alternatives Analysis.

(b)    The Alternatives Analysis indicates that the on-site sewage treatment plant is to be offered for dedication to Whitemarsh Township or will be privately owned and maintained. The applicant was previously advised that the Township's past policy with such treatment plants is not to accept dedication of such facilities. The proposed operation and maintenance obligations for the on-site sewage treatment plant are unresolved in the Alternatives Analysis, which would prohibit the Township from considering the Planning Modules in accordance with PA DEP regulations.

(2)    Item 1.3 of Component 3 of the Planning Module submission must be completed.

(3)    The proposed preliminary treatment requirements provided within the Section 1.3.b attachment to the Planning Module submission are incomplete as they do not include suspended solids, pH, etc. effluent limits.

(4)    A copy of a proposed Operation and Maintenance Agreement pertaining to the proposed on-site sewage treatment plant, in a format acceptable to the Township Solicitor, was not provided as required to document the perpetual ownership/maintenance responsibilities of the private on-site sewage treatment plant alternative.

(5)    Montgomery County Planning Commission and Montgomery County Health Department review comments concerning the Planning Module submission were not provided.

b.    The applicant did not submit fire flow information pertaining to the public water facilities in the vicinity of the Project site to the Township for Township Fire Marshal review of the proposed water system design. (Section 105-76)

c.    The applicant did not submit copies of easement agreements for all proposed off-site grading, landscaping and drainage facilities construction illustrated on the Second Revised Plan, in a format acceptable to the Township Solicitor, to the Township. (Sections 105-45 and 58-4.B.4)

4

d.   The Geotechnical Investigation Report pertaining to the Project that was submitted to the Township on March 1, 2002 was reviewed by Township Staff and determined to be inadequate based upon the discrepancies noted within the CKS Engineers, Inc. review correspondence dated March 12, 2002 (copy attached as Exhibit "G"). (Section 105-26.E)

e.   The applicant did not submit an easement agreement pertaining to the proposed on-site "blanket" easement, in a format acceptable to the Township Solicitor, to the Township. (Section 105-45)

f.   The stormwater management/storm drainage calculations that were submitted for the Project were determined to be incomplete for the following reasons (Sections 105-41 and 58-4.B.4):

     (1)   Capacity calculations for all proposed receiving stormwater swales, drainage system, etc. were not submitted to the Township.

     (2)   Time of Concentration calculations verifying the design criteria utilized for the storm sewer pipe extending between Inlet ST-56 to Endwall ST-57 were not provided for review.

     (3)   The outlet structure configuration utilized within the Stormwater Management Report does not agree with that illustrated on the Plan.

     (4)   The Time of Concentration flow path for pre-development Drainage Area "B" was not shown on the watershed mapping provided.

     (5)   Hydraulic calculations for the by-pass pipe collection system, addressing the diversion into the on-site retention basin, were not submitted to the Township.

     (6)   The rip-rap energy dissipating device configurations noted within the calculations do not agree with the associated details provided on the Second Revised Plan.

4.   The Second Revised Plan that was submitted for the Project is inconsistent with the following design requirements of Chapters 58 "Grading, Erosion Control, and Stormwater Management" and 105 "Subdivision and Land Development" of the Whitemarsh Township Code:

5

a.  The applicant did not include the recommendations contained within the Transportation Impact Study pertaining to this site, prepared by Horner & Canter Associates, dated February 19, 2002, with no revisions (attached as Exhibit "H"). (Section 105-21.B.9.a)

b.  All proposed grading is not set back a minimum of 5 ft. from the Project property lines. (Section 58-4.B.4)

c.  Complete profiles of all proposed storm sewer lines were not provided. (Sections 105-21.B.8 and 58-4.B.4)

d.  Detailed construction plans pertaining to the proposed Stenton Avenue roadway improvements, which illustrate all applicable design/construction information (i.e., roadway cross sections, guiderail relocation, traffic signalization details, utility pole relocations, traffic control signage, striping, curb grades, etc.), were not submitted to the Township for review/approval. (Sections 105-21.B.1.o, 105-21.B.8, 105-69.C and 58-4.B.4)

e.  The Project landscaping plans include the following discrepancies (Sections 105-21.B.7 and 105-52.B.2):

   (1)  Site landscaping conflicts with underground piping.

   (2)  A request for Board of Supervisors' approval of the alternate buffer tree design proposed on the landscaping plans was not submitted to the Township.

f.  The final closure plan pertaining to the existing quarry on the Project site, which establishes the "pre-construction" topography depicted on the improvements construction plans, was not included as part of the overall land development plan set. Additionally, a note was not placed on the plans indicating that escrow would be posted by the applicant to ensure completion of the closure plan, if the quarry closure is not complete at the time of final plan approval consideration of the project. (105-26.D and 105-82)

g.  Sufficient existing features (i.e., buildings, driveways, utilities, drainage facilities, topography, etc.) within 500 feet of, and within, the site were not shown on the Second Revised Plan. (Section 105-21.B.1.n)

h.   Sufficient bearing/distance information concerning the legal and ultimate rights-of-way along Stenton Avenue, as required for future right-of-way conveyance, has not been indicated on the Second Revised Plan. (Section 105-21.B.1.m)

i.   The following information concerning the existing "pumped-water by-pass system" extending through the site, was not placed on the Plan (Section 105-21.B.1.n):

    (1)   Details, including pipe depths, etc.

    (2)   Ownership and maintenance responsibilities for this pipe, including easement.

j.   All applicable construction details pertaining to the proposed land development (i.e. Sanitary Sewer System, Emergency Access Lane, Water System, etc.) were not included on the Second Revised Plan. (Sections 105-65.B and 58-4.B.4)

k.   The following discrepancies in the grading/stormwater management/storm drainage and erosion and sedimentation control aspects of the proposed Project were noted (Sections 105-41, 105-42, and 58-4.B.4):

    (1)   Sufficient spot grades were not provided at proposed entrance islands, between buildings, and at all corners and break points to ensure proper drainage of the site.

    (2)   The "double" inlets required by the stormwater management/storm drainage calculations were not properly identified on the Second Revised Plan.

    (3)   Proposed roof drain connections were not shown.

    (4)   The proposed 228 L.F. outlet pipe noted on Sheet 21 of 36 was not shown on the erosion and sediment control plan view.

    (5)   A number of spot elevation discrepancies exist on the Second Revised Plan.

    (6)   A construction sequence was not placed on the Second Revised Plan.

7

(7)   The location(s) of the proposed erosion and sedimentation control baffles was not shown on the Second Revised Plan.

(8)   Complete dimensions and details pertaining to the proposed basin outlet structure modifications were not shown on the Second Revised Plan.

(9)   Construction details for the proposed 8" gate valve were not shown.

(10)  A storm sewer manhole frame and cover detail was not provided.

(11)  Proposed Drainage Structure ST-24 is inconsistently identified as an inlet and manhole on the Second Revised Plan.

(12)  Inadequate silt fence has been provided immediately downgrade of the proposed earth disturbance in the vicinity of the railroad right-of-way.

(13)  The proposed grading illustrated on Sheet 15 of 36 does not properly tie to existing contours along the southeasterly side of the Project site.

(14)  Endwall ST-123 was not included within the Manhole Details or Outlet Protection Detail on Sheet 34 of 36 of the Second Revised Plan.

l.    The detention basin fence detail provided on Sheet 36 of 36 of the plans is incomplete as the location/gauge of the mesh material has not been indicated thereon.  (Section 105-65.B)

m.    The location of the Floodplain Conservation District on the land development site has not been shown/identified on the Record Plan, Sheet 2 of 36.  (Section 105-21.B.2.d, e & f)

n.    The public sanitary sewer design information indicated on the Second Revised Plan is inconsistent with the on-site sewage treatment plant sewer service alternative proposed within the applicant's Planning Module submission.  (105-21.B.6)

o.    The applicant proposes to pipe an existing drainage ditch on the site, which is not permitted.  (Section 58-4.B.4)

8

ADOPTED as a Resolution by the Board of Supervisors of Whitemarsh Township this _21st_ day of _MARCH_ 2002.

ATTEST:                                    WHITEMARSH TOWNSHIP
                                           BOARD OF SUPERVISORS


LAWRENCE J. GREGAN                         ANN YOUNGLOVE
Secretary                                  Chairman


c:\my documents-I\resoluti\creekside.doc

9