**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

HIGHWAY MATERIALS, INC.,          :
                                  :
          Plaintiff,              :
                                  :
     v.                           :      CIVIL ACTION NO. 02-3212
                                  :
WHITEMARSH TOWNSHIP,              :
MONTGOMERY COUNTY, PA, et al.,    :
                                  :
          Defendants.             :
                                  :

## ORDER

AND NOW, this          day of          , 2003, it is hereby ORDERED

that the Motion of Plaintiff Highway Materials, Inc. to Compel Answers to Questions

Propounded During Depositions Upon Oral Examination is GRANTED.  IT IS FURTHER

ORDERED that (i) Mr. Rimel, Mr. DeRosa and Ms. Younglove shall be produced for deposition

within ten days of this Order at which time they will answer all questions that they were

instructed not to answer as well as follow-up questions; and (ii) the defendants shall pay to the

plaintiff the reasonable expenses incurred, including attorney's fees and costs of court reporters,

in recalling the deponents to answer the questions.

                                        _____
                                                              Kelly, J.

PHL_A #1746686 v3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.,     :
    :
       Plaintiff,     :
    :
       v.     :       CIVIL ACTION NO. 02-3212
    :
WHITEMARSH TOWNSHIP,     :
MONTGOMERY COUNTY, PA, et al.,     :
    :
       Defendants.     :
    :

## MOTION OF PLAINTIFF HIGHWAY MATERIALS, INC.
## TO COMPEL ANSWERS TO QUESTIONS PROPOUNDED
## DURING DEPOSITIONS UPON ORAL EXAMINATION

Plaintiff Highway Materials, Inc., through its undersigned counsel, hereby moves

pursuant to Federal Rules of Civil Procedure 30(d) and 37(a) for an Order compelling answers to

questions propounded during oral depositions as well as awarding expenses, including attorney

fees and costs, incurred in recalling the deponents. The reasons in support of this Motion are

more fully set forth in the attached Memorandum of Law, incorporated herein by reference.

Respectfully submitted,

Michael Sklaroff
Walter M. Einhorn, Jr.
Arleigh P. Helfer III
Corey Field
BALLARD SPAHR ANDREWS & INGERSOLL,
    LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

Attorneys for Plaintiff
Highway Materials, Inc.

Dated: April 28, 2003

PHL_A #1746686 v3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.,              :
                                      :
            Plaintiff,                :
                                      :
      v.                              :        CIVIL ACTION NO. 02-3212
                                      :
WHITEMARSH TOWNSHIP,                  :
MONTGOMERY COUNTY, PA, et al.,        :
                                      :
            Defendants.               :
                                      :

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFF HIGHWAY
MATERIALS, INC. TO COMPEL ANSWERS TO QUESTIONS PROPOUNDED
DURING DEPOSITIONS UPON ORAL EXAMINATION**

**I.    INTRODUCTION**

This Motion to Compel is a result of defendants' counsel's ongoing refusal to

permit party defendants to answer perfectly legitimate questions.  Specifically, during the

depositions of the three defendants taken thus far in this case,[1] counsel for the defendants has

instructed the deponents not to answer questions relating to non-privileged facts concerning

whether the deponents sought or received the advice of Township Solicitor Ross Weiss with

respect to matters at issue in this case.

As will be explained more fully below, counsel's objections and instructions to

the deponents are patently improper because the attorney-client privilege protects only the

*substance* of attorney-client communications, not the facts of whether legal counsel was sought

or the general subject matter of that counsel.

---

[1]    The three defendants deposed by HMI thus far include William Rimel, Ronald DeRosa,
and Ann Younglove.

## II.    FACTS

Plaintiff Highway Materials, Inc.("HMI") brought this case pursuant to 42 U.S.C.
§ 1983, alleging various violations of its substantive and procedural due process and equal
protection rights at the hands of the defendants. The defendants in this action, Whitemarsh
Township (the "Township") and various of its officials and staff, including the deponents
(collectively, the "Township defendants"), systematically and improperly implemented a scheme
that singled out HMI and deprived it of its constitutionally protected rights to develop its
property in the Township. In the main, this scheme consisted of two steps: 1) an improper
rezoning of HMI's property, and 2) a perversion of the customary land development process in
the Township in order to thwart the plans HMI had submitted prior to the rezoning.

On March 21, 2003, HMI deposed defendant William Rimel, a member of the
Township's Board of Supervisors. During the course of the deposition, Mr. Rimel's counsel
instructed him not to answer questions concerning whether the defendants sought legal advice on
matters relating to this case.[2] The relevant portions of the colloquy are these:

> Q:    You mentioned that Mr. Weiss, the solicitor, plays a role.
> What role does the solicitor play?
>
> A:    Well, he would advise us on the legality of it. He would,
> obviously, construct the actual ordinance itself as our solicitor.
>
> Q:    I don't want you to tell me what Mr. Weiss told you, but
> you can tell me if he did play that role in this particular process.
>
> MR. MAHONEY:    Objection. I'm not sure that he can tell you
> that. You're asking him generally what the solicitor does with
> regard to a rezoning – any communication with regard to what he
> actually did I think is privileged. So, I would instruct you not to
> answer that question.

---

[2]    True and correct copies of the relevant pages from Mr. Rimel's March 21, 2003
deposition transcript ("Rimel Dep.") are attached hereto as Exhibit A.

Q:    Let me put it this way: Did Mr. Weiss play a role in the
rezoning of the DePaul property?

MR. MAHONEY:    Same objection.  You're just going about it
in a different way.  Instruct you not to answer that question.

Rimel Dep. at 29:19-30:10.

And again:

Q:    Do you recall in connection with the rezoning whether the
Board of Supervisors requested any input from the township
engineer?

A:    I do not recall.

Q:    How about the solicitor?

MR. MAHONEY:    Objection.  Whether the Board of
Supervisors requested input from the solicitor?

MR. EINHORN:    Right.

MR. MAHONEY:    Objection.  Instruct the witness not to
answer.

. . .

MR. EINHORN:    On the basis of the attorney-client privilege?

MR. MAHONEY:    Yes.

Rimel Dep. at 95:12-95:22, 96:3-96:5.

And finally:

Q:    Did the Board of Supervisors ask the solicitor to provide
legal advice in connection with the rezoning process?

MR. MAHONEY:    Objection.  Instruct the witness not to
answer.

Q:    Did the solicitor provide legal advice in connection with
the process of rezoning this property?

MR. MAHONEY: Objection.  Instruct the witness not to answer.

Rimel Dep. at 97:4-97:14.

On March 26, 2003, HMI deposed defendant Ronald DeRosa, a member of the Township's Board of Supervisors. During the course of the deposition, defendants' counsel once again instructed his client not to answer legitimate questions concerning whether defendants sought legal assistance in matters relating to the rezoning or HMI's plans,[3] matters highly relevant to this case. The relevant portions of the colloquy are these:

> Q:    Now, we talked about discussions relating to the denial of the plans. Did you have any discussions with regard to the rezoning of the property, other than discussions at public meetings?
>
> MR. MAHONEY:    And other than discussions with counsel?
>
> MR. EINHORN:    Again, you can – I believe that if he had discussion with counsel about this topic that I'm entitled to know that. I may not be entitled to know what was discussed, but I believe that I'm entitled to know about the existence of a discussion.
>
> MR. MAHONEY:    If he won't clarify the question, I will. The question being put to you, as far as I understand, is if there are discussions which you have had outside of the presence of counsel regarding that issue, you can answer it. If it's with counsel, I'm instructing you not to answer.
>
> . . .
>
> Q:    All right. Did you ever seek the assistance of counsel in connection with this rezoning process of the township solicitor?
>
> MR. MAHONEY:    Seek the assistance of counsel? That is, solicit his opinion?
>
> MR. EINHORN:    Did he ever go to the township solicitor to ask for his help in this matter?
>
> THE WITNESS:    Did I? No.
>
> BY MR. EINHORN:

---

[3]    True and correct copies of the relevant pages from Mr. DeRosa's March 26, 2003 deposition transcript ("DeRosa Dep.") are attached hereto as Exhibit B.

Q:    Do you know if the supervisors did?

MR. MAHONEY:    Objection. To divulge anything like that would divulge attorney-client communication. I will instruct the witness not to answer.

DeRosa Dep. at 95:1-95:19, 96:23-97:12.

On April 18, 2003, HMI deposed defendant Ann Younglove, a member of the Township's Board of Supervisors. During the course of the deposition, Ms. Younglove's counsel yet again instructed his client not to answer questions concerning whether or not legal assistance was sought by defendants in this case on specific relevant matters.[4] Mr. Mahoney instructed his client not to answer the following questions:

[1.]    Q    Did the solicitor play an advisory role in connection with the DePaul zoning?

[2.]    Q    Did you ever seek the assistance of the solicitor in connection with the DePaul rezoning?

[3.]    Q    Did you ever seek any legal advice from the solicitor in connection with the rezoning?

MR. MAHONEY: Any rezo[n]ing?

MR. EINHORN: The DePaul rezoning.

MR. MAHONEY: Objection. Instruct the witness not to answer.

[4.]    Q    Do you recall any instance in which the solicitor played a role in the rezoning process?

MR. MAHONEY: Any rezoning process?

MR. EINHORN: Yeah.

---

[4]    At this time, the transcript of that deposition is being prepared by the court reporter, Ms. Holly J. Cross. Attached hereto as Exhibit C is an e-mail communication dated April 18, 2003 from Holly J. Cross to Mr. Einhorn and Mr. Mahoney (the "Cross e-mail"). The Cross e-mail sets forth the questions Mr. Mahoney instructed Ms. Younglove not to answer, as well as some colloquy necessary to understanding the issues.

MR. MAHONEY:  Go ahead and answer that.

THE WITNESS:  Other than advisory.

BY MR. EINHORN:

[5.]    Q    In which properties did he provide an advisory role?

MR. MAHONEY:  Objection.  A specific property, I'm going to instruct her not to answer.  Generally speaking, it's fine, but specific properties, no.

[6.]    Q    I take it, then, you don't recall ever seeking any input from the solicitor on this issue on the plans in any way, shape, or form?

[7.]    Q    Did you ever seek any advice from Mr. Weiss in connection with Mr. DePaul's plans?

[8.]    Q    Did you ever have any discussions with Mr. Weiss about Mr. DePaul's plans?

Cross e-mail, Exh. C.

Pursuant to Local Rule 26.1(f), and Fed. R. Civ. P. 37(a)(2)(B), counsel for HMI made a good faith effort to resolve the issue.  In addition to arguments made during the depositions, counsel for HMI wrote to counsel for the Township defendants on April 10, 2003, prior to Ms. Younglove's deposition, setting forth HMI's position and the relevant law with regard to whether the fact of legal consultation is privileged.  Counsel for defendants continued to make instructions not to answer at Ms. Younglove's deposition and then, by letter dated April 23, 2003, counsel for the Township defendants rejected HMI's attempt to resolve the issue without involving the Court.

## III.    ARGUMENT

The fundamental aspects of the attorney-client privilege are well settled.  The privilege covers the substance of communications between client and counsel from compelled disclosure; however, it does not protect underlying facts.  *See Rhone-Poulenc Rorer Inc. v. Home*

*Indemn. Co.*, 32 F.3d 851, 862 (3d Cir. 1994). Furthermore, it is clear that the privilege applies to the contents of communications with counsel but not to the fact of whether communications have occurred. *See Stabilus v. Haynsworth, Baldwin, Johnson and Greaves, P.A.*, 144 F.R.D. 258, 268 (E.D. Pa. 1992) (ruling that the general nature of the privileged matter, the occasion and circumstances of any communications, and the factual circumstances of the attorney-client relationship remain discoverable even when the substance of the communication is protected); *accord Valenti v. Allstate Ins. Co.*, 243 F. Supp. 2d 200, 218 (M.D. Pa. 2003) (observing same); *DiPalma v. Medical Mavin, Ltd.*, No. Civ. A. 95-8094, 1998 WL 123009, *2 (E.D. Pa. Feb 10, 1998) (observing same); *see also Blumenthal v. Drudge*, 186 F.R.D. 236, 242-43 (D.D.C. 1999) (noting that that the substance of communications may be privileged, but that a party has no right to decline to identify the privileged communications); *Refuse & Environmental Sys., Inc. v. Industrial Servs. Of Am.*, 120 F.R.D. 8, 10 (D. Mass. 1988) (observing that the facts that an attorney was consulted, the date, length of time and place of consultation are not privileged).

Thus, a description of the nature of the work performed, the dates that services were rendered, the hours spent, and whether communications occurred are merely circumstances surrounding the attorney-client relationship and "do not threaten to reveal the substance of any confidential communications." *Cohen v. Uniroyal, Inc.*, 80 F.R.D. 480, 483 (E.D. Pa. 1978). The attorney-client privilege "need not foreclose inquiry into the general nature of a lawyer's activities on behalf of a client, the conditions of the lawyer's employment, or any of the other external trappings of the relationship; the privilege is concerned only with confidential communications, not with the structural framework within which they are uttered." *Id.*

Leading treatises confirm that HMI may enquire into the "structural framework" surrounding the Township defendants' communications with counsel. The privilege "does not

automatically extend to peripheral facts regarding an attorney-client communication or the attorney-client relationship generally." Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 66 (4th ed. 2001). Thus, "the date on which a privileged communication took place and the identity of the persons who participated in a meeting . . . are not generally regarded as privileged." *Id*; *see also* 24 Charles Alan Wright & Kenneth W. Graham Jr., *Federal Practice and Procedure: Evidence* § 5484 (stating that "information concerning the factual circumstances surrounding the attorney-client relationship is not privileged") (internal citations omitted).

Here, HMI's questions to the deponents clearly did not ask for the substance of any attorney-client communications. That is, none of the questions in dispute is one in which HMI asked, "What did you say to your attorney?"[5] Instead, each of the questions in dispute, as set forth above, may be categorized as inquiring into the general nature of the privileged matter, the occasion and circumstances of any communications, and the factual circumstances of the attorney-client relationship -- in short, whether legal advice was sought or obtained. None of these topics is privileged. *See Stabilus*, 144 F.R.D. at 268.

The Township defendants' counsel's repeated instructions to his clients not to answer these valid questions are improper in the face of the law concerning the scope of the attorney-client privilege. HMI's limited inquiries into the facts of whether the township solicitor was involved in the rezoning or consideration of HMI's development plans and whether the deponents had sought or received counsel from the township solicitor with respect to the same do not require the disclosure of any *substance* or *contents* of their communications with him.

---

[5]    To the contrary, during the first deposition, that of Mr. Rimel, HMI's counsel diligently instructed the witness not to disclose the substance of communications with counsel. *See, e.g.*, Rimel Dep. at 29:19, Exh. A.

Rather, the questions were narrowly tailored to discover only whether any communications had taken place on a relevant general matter.

As noted above, HMI's Complaint sets forth claims pursuant to 42 U.S.C. § 1983 alleging violations of its equal protection and due process rights. Part of the relevant legal analysis therefore entails whether the Township defendants acted in an arbitrary and capricious manner. *See Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 143 F.3d 582, 590 (3d Cir. 1998). The fact of whether the Township solicitor played any role in the rezoning or review of HMI's development plans, and the fact whether the Township defendants sought legal advice before they acted, are thus directly relevant to the matter in dispute in this case.

As a result of counsel's improper instructions to the deponents, HMI submits that it is entitled to recall these three deponents as well as to the reasonable costs it has incurred and will incur as a result of defendants' improper objections.

## IV.    CONCLUSION

For these reasons, HMI requests that the Court enter an Order that deponents Rimel, DeRosa, and Younglove, and all other past and future deponents in this case, be required to answer the questions discussed above and additional follow-up questions. HMI further requests that, pursuant to Fed. R. Civ. P. 37(a)(4), this Court order the Township defendants to pay the reasonable expenses, including attorney's fees and costs of court reporters, in recalling the witnesses to complete their depositions.

Respectfully submitted,

Michael Sklaroff
Walter M. Einhorn, Jr.
Arleigh P. Helfer III
Corey Field
BALLARD SPAHR ANDREWS & INGERSOLL,
    LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

Attorneys for Plaintiff
Highway Materials, Inc.

Dated: April 28, 2003

## CERTIFICATE OF SERVICE

I, Arleigh P. Helfer III, Esquire, hereby certify that on April 28, 2003, I served

copies of the foregoing Motion to Compel upon the following individuals as noted below:

By hand:

Harry G. Mahoney, Esquire
Deasey Mahoney & Bender Ltd.
1800 John F. Kennedy Boulevard, Suite 1300
Philadelphia, PA  19103-2978

By U.S. Mail:

Kevan F. Hirsch, Esquire
Kaplin Stewart Meloff Reiter & Stein, P.C.
350 Sentry Parkway, Building 640
Blue Bell, PA 19422

_____
Arleigh P. Helfer III

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.,       :
                                 :

       Plaintiff,              :
                                 :

           v.                :       CIVIL ACTION NO. 02-3212
                                 :

WHITEMARSH TOWNSHIP,      :
MONTGOMERY COUNTY, PA, et al.,  :
                                 :

       Defendants.          :
                                 :

## CERTIFICATION PURSUANT TO
## LOCAL RULE 26.1(f)

Pursuant to Local Rule 26.1(f), the undersigned hereby certifies that after reasonable effort, as set forth in the accompanying motion, the parties have been unable to resolve this dispute.

Dated:  April 28, 2003

                                           Arleigh P. Helfer III, Esquire
                                           BALLARD SPAHR ANDREWS & INGERSOLL, LLP
                                           1735 Market Street, 51st Floor
                                           Philadelphia, PA 19103
                                           (215) 665-8500

                                           Attorneys for Plaintiff
                                           Highway Materials, Inc.

# EXHIBIT A

2

COPY

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

---------------------------------
HIGHWAY MATERIALS, INC        : CIVIL ACTION
                              :
    -vs-                      :
                              :
WHITEMARSH TOWNSHIP, et al.     NO. 02-3212
---------------------------------

- - -
March 21, 2003
- - -

Oral deposition of WILLIAM RIMEL, held in the offices of Whitemarsh Township Building, 616 Germantown Pike, Whitemarsh, Pennsylvania 19444, commencing at 10:21 a.m. on the above date, before Robin M. Valentini, a Certified Shorthand Reporter.

- - -

A P P E A R A N C E S :

BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
BY:    WALTER M. EINHORN, JR., ESQUIRE
       1735 Market Street, 51st Floor
       Philadelphia, PA 19103
Counsel for the Plaintiff


DEASEY, MAHONEY & BENDER
BY:    HARRY G. MAHONEY, ESQUIRE
       1800 John F. Kennedy, Suite 1300
       Philadelphia, PA 19103
Counsel for the Defendants


ALSO PRESENT:
BY:    MS. KRISTINE MACIOLEK, ESQUIRE
       JAMES GARRITY, ESQUIRE
       ROBERT RAQUET

3

I N D E X

| WITNESS | PAGE NO. |
|---|---|
| WILLIAM RIMEL | |
| By Mr. Einhorn | 4 |

- - -

E X H I B I T S

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| P-1 | Letter, 7/3/2001 | 42 |
| P-2 | Minutes, 7/12/2001 | 50 |
| P-3 | Letter, 7/13/2001 | 55 |
| P-4 | Comprehensive Plan | 58 |
| P-5 | Minutes, 7/26/2001 | 73 |
| P-6 | Minutes, 9/20/2001 | 87 |
| P-7 | Minutes, 10/18/2001 | 112 |
| P-8 | Resolution #2001-7 | 125 |
| P-9 | Letter, 1/24/2002 | 129 |
| P-10 | Letter, 3/21/2002 | 130 |
| P-11 | Letter, 8/20/2001 | 144 |
| P-12 | Letter, 10/15/2001 | 151 |
| P-13 | Letter, 11/20/2001 | 153 |
| P-14 | Minutes, 1/7/2002 | 160 |
| P-15 | Memo, 1/31/2002 | 163 |

4

E X H I B I T S

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| P-16 | Letter, 2/4/2002 | 165 |
| P-17 | Letter, 3/8/2002 | 175 |
| P-18 | Letter, 3/12/2002 | 181 |
| P-19 | Memo, 3/20/2002 | 192 |
| P-20 | Letter, 3/21/2002 | 194 |
| P-21 | Resolution #2002-17 | 200 |
| P-22 | Minutes, 7/18/2002 | 218 |

30

1   in the zoning and rezoning process?
2       A.   It's an advisory role. I don't think he
3   really interprets the legal aspects of it.
4            It would be an advisory role as to
5   perhaps whether it would be relatively safe or
6   unsafe or engineeringly feasible to do what's being
7   proposed.
8       Q.   Did Mr. Zarko play that role in this
9   particular rezoning? I mean —
10      A.   I don't recall him being involved in this.
11      Q.   In the rezoning part?
12      A.   Yes.
13      Q.   You mentioned that Mr. Weiss, the
14  solicitor, plays a role.
15           What role does the solicitor play?
16      A.   Well, he would advise us on the legality
17  of it. He would, obviously, construct the actual
18  ordinance itself as our solicitor.
19      Q.   I don't want you to tell me what Mr. Weiss
20  told you, but you can tell me if he did play that
21  role in this particular process.
22           MR. MAHONEY:   Objection. I'm not sure
23      that he can tell you that. You're asking him
24      generally what the solicitor does with regard

1   to a rezoning — any communication with regard
2   to what he actually did I think is privileged.
3            So, I would instruct you not to answer
4       that question.
5   BY MR. EINHORN:
6       Q.   Let me put it this way:  Did Mr. Weiss
7   play a role in the rezoning of the DePaul property?
8            MR. MAHONEY:   Same objection. You're just
9       going about it in a different way.
10           Instruct you not to answer that question.
11           MR. EINHORN:   I'm not asking him for
12      attorney-client communication. I'm asking
13      whether Mr. Weiss played a role in this
14      process, and you're instructing him not to
15      answer?
16           MR. MAHONEY:   If he played a role in this
17      process, by the very definition of what he said
18      he did, it would necessarily involve divulging
19      that he did give instructions to this Board in
20      terms of whether something was legal or not
21      legal.
22           So by that very definition, you are
23      inquiring into what communications Mr. Weiss
24      gave to the Board.

31

1           MR. EINHORN:   I totally disagree with
2       that.
3            Are you going to refuse to answer that
4       question, sir?
5            MR. MAHONEY:   No. I'm instructing him not
6       to answer the question.
7   BY MR. EINHORN:
8       Q.   Are you going to follow —
9       A.   Based on my lawyer's instructions, I will
10  not answer.
11      Q.   Okay. What about Mr. Gregan; what role
12  does the township manager play in a rezoning
13  process?
14      A.   He, more or less, orchestrates the whole
15  process.
16      Q.   What do you mean by that?
17      A.   Well, he sets up and schedules meetings;
18  works with professional staff in the development of
19  the ordinance. And given his years of experience,
20  he will, from time to time, discuss particular
21  issues relative to the ordinance.
22      Q.   And did he do that in the DePaul rezoning?
23      A.   He may have. I don't recall.
24           We have a very interactive Board, and

32

1   everybody has inputs.
2       Q.   What do you mean by that?
3       A.   I mean we talk among ourselves about what
4   we're doing and not doing in executive session when
5   it's something that's relative to a legal issue.
6       Q.   You mean the Board of Supervisors talks
7   among themselves with the staff?
8       A.   Yes, with the staff.
9       Q.   Did you have such meetings in connection
10  with the DePaul rezoning?
11      A.   I'm sure we did.
12      Q.   Was Mr. Weiss present at those meetings?
13      A.   I'm sure he was.
14      Q.   Now, I assume there are several ways, but
15  how does a rezoning come up? I mean, who brings the
16  action to the Township?
17      A.   Well, again, it's the Planning Commission.
18  It may be an individual supervisor who has a feeling
19  about a given area of the Township. It may be a
20  citizen.
21      Q.   Anyone else you can think of who has asked
22  for a rezoning?
23      A.   No.
24      Q.   So I have citizen, supervisor, or Planning

1      Do you know what the EX-extraction
2  zoning is?
3      A.  Basically, it allows for the continued use
4  of the quarry for what its current use is. And then
5  when that usage is over, to be developed as
6  single-family homes.
7      Q.  Two-acre minimum lots; is that right?
8      A.  I don't recall specifically, but it was a
9  large zoning district, yes.
10     Q.  Okay. Why did the Board of Supervisors
11 pick that particular zoning as opposed to some other
12 zoning?
13     A.  It's very compatible with the area around
14 it.
15     Q.  How do you know that?
16     A.  I live here.
17     Q.  Is that it?
18     A.  Yes.
19     Q.  No expert help?
20     A.  Well, staff.
21     Q.  No outside expert help to help you make
22 that decision?
23     A.  Not on this particular ordinance, no.
24     Q.  Would one-acre residential lots be

1  appropriate on that property?
2      MR. MAHONEY:  Objection. Talking about an
3  alternative?
4      MR. EINHORN:  He said he thought two acres
5  were appropriate because he lives here. I want
6  to know if —
7      MR. MAHONEY:  He said it was compatible
8  with the area around it. Those were his words.
9      MR. EINHORN:  That's why it was
10 appropriate, because it was compatible.
11 BY MR. EINHORN:
12     Q.  Would one acre be appropriate because it
13 was compatible?
14     A.  I never considered it.
15     Q.  Why not?
16     A.  I don't know why not.
17     Q.  What about a half acre; would that be
18 appropriate because it was compatible?
19     MR. MAHONEY:  Objection. You're arguing
20 with the witness.
21     MR. EINHORN:  I'm asking questions.
22     MR. MAHONEY:  The ordinance is what it is.
23 It's either appropriate or it's inappropriate.
24 You can ask him a hundred questions about other

1  types of zoning districts. What does that have
2  to do with anything?
3      Answer the question, if you can.
4      THE WITNESS:  Would you rephrase it,
5  please, or repeat it?
6      MR. EINHORN:  Sure.
7  BY MR. EINHORN:
8      Q.  Do you believe that half acre lots,
9  residential zoning, would be appropriate if they
10 would be compatible with the area?
11     A.  I don't know.
12     Q.  Do you recall in connection with the
13 rezoning whether the Board of Supervisors requested
14 any input from the township engineer?
15     A.  I do not recall.
16     Q.  How about the solicitor?
17     MR. MAHONEY:  Objection. Whether the
18 Board of Supervisors requested input from the
19 solicitor?
20     MR. EINHORN:  Right.
21     MR. MAHONEY:  Objection.
22     Instruct the witness not to answer.
23     THE WITNESS:  I beg your pardon.
24     MR. MAHONEY:  I instructed the witness not

1  to answer.
2      THE WITNESS:  Thank you.
3      MR. EINHORN:  On the basis of the
4  attorney-client privilege?
5      MR. MAHONEY:  Yes.
6      MR. EINHORN:  You and I have a difference
7  of opinion about what the attorney-client
8  privilege protects.
9      MR. MAHONEY:  We very well might.
10 BY MR. EINHORN:
11     Q.  Did the township solicitor assist in the
12 process that ended up with the rezoning of this
13 property?
14     MR. MAHONEY:  Objection. The only
15 assistance the township solicitor can give is
16 his advice.
17     MR. EINHORN:  Okay.
18     MR. MAHONEY:  Therefore, it's an
19 inappropriate question.
20     MR. EINHORN:  I'm not asking for what the
21 advice was. I'm asking whether you asked for
22 or received advice.
23     MR. MAHONEY:  The way you frame the
24 question, given the definition of what a

1    solicitor does, it invites going into what the
2    solicitor said.
3    BY MR. EINHORN:
4        Q.    Did the Board of Supervisors ask the
5    solicitor to provide legal advice in connection with
6    this rezoning process?
7            MR. MAHONEY:   Objection.
8            Instruct the witness not to answer.
9    BY MR. EINHORN:
10        Q.    Did the solicitor provide legal advice in
11    connection with the process of rezoning this
12    property?
13            MR. MAHONEY:   Objection.
14            Instruct the witness not to answer.
15    BY MR. EINHORN:
16        Q.    Sir, do you have an understanding of the
17    effect of the rezoning on the plans that had already
18    been filed by Mr. DePaul?
19        A.    Yes, I do.
20        Q.    What is that understanding?
21        A.    My understanding is that the plans
22    Mr. DePaul filed were valid and usable plans.
23            Failing to complete those plans and
24    get them approved would mean that the zoning that

1    was enacted would be zoning he would have to live
2    with going forward.
3        Q.    Okay.  So you knew that the plans had to
4    be evaluated under the old zoning?
5        A.    Yes.
6        Q.    Now, you took your seat January '96;
7    correct?
8        A.    That's correct.
9        Q.    Do you recall, from January 1996 to the
10    present, whether the Board of Supervisors ever has
11    denied a land development application?
12        A.    I do not recall one.
13        Q.    You don't recall that ever happening?
14        A.    No, I don't.
15        Q.    I screwed up the record here.  Let me get
16    it right.
17            Do you recall any occasion in which
18    the Board of Supervisors has rejected a land
19    development plan since January of 1996?
20        A.    No, I do not.
21        Q.    Thank you.  Sorry about that.
22        A.    That's all right.
23        Q    Did you have any understanding about what
24    effect the rezoning would have on Mr. DePaul's

1    rights to file new plans under the old zoning?
2            MR. MAHONEY:   Right to file new plans
3        under the old ordinance?
4            MR. EINHORN:   Right.  Let me strike that.
5    BY MR. EINHORN:
6        Q.    After the rezoning had been enacted, do
7    you have any understanding about whether Mr. DePaul
8    would have any rights to submit new plans and have
9    them evaluated under the old zoning?
10        A.    My understanding is that he could not
11    submit a new plan under the old zoning.
12        Q.    And so, in other words, any plans that
13    were filed by Mr. DePaul after the date of the
14    rezoning would have to be evaluated by the new
15    zoning standards?
16        A.    That's my understanding.
17            MR. MAHONEY:   New plans as opposed to
18        revisions; correct?  Just so we have the
19        terminology correct.
20            MR. EINHORN:   Right.  New plans.
21            THE WITNESS:   Not revisions.
22    BY MR. EINHORN:
23        Q.    Is it your understanding, then, that
24    Mr. DePaul was able to file revisions to his

1    September '01 plans and still have those revisions
2    evaluated under the old zoning?
3        A.    That is correct.
4        Q.    Do you recall any discussions along the
5    line that a rezoning of Mr. DePaul's properties
6    would, quote, unquote, level the playing field in
7    connection with his land development proposals?
8        A.    No, I do not.
9        Q.    Do you recall any discussions at all to
10    the effect that the rezoning would have no effect
11    upon Mr. DePaul's plans, as filed on September '01,
12    unless those plans were eventually denied?
13        A.    I'm not sure I understand what the
14    question is.
15        Q.    Let's try it one more time.
16        A    Okay.
17        Q    I think it might have been okay.  And if
18    you don't understand, I'll try it again.
19        A    Okay.
20            MR. EINHORN:   Can you read it back?
21            (Whereupon, the pertinent portion
22        of the record was read.)
23        A.    I don't recall.  Specifically, I don't
24    recall.

1      A.    Well, my view is, if I were Mr. DePaul or
2    any owner of this property, I would view this report
3    as a free $60,000 land plan — you know, an
4    opportunity to get benefit for myself, make a
5    profit, and comply with my neighbors' and the
6    Township's desires.
7      Q.    I don't know if I asked you this when we
8    talked about your employment.
9            Have you ever done any land
10   development in your career?
11     A.    No.
12     Q.    If I showed you the final report, would
13   you be able to tell me whether it was the final
14   report or not?
15     A.    There were so many interim reports, I
16   couldn't tell for sure.
17     Q.    This is the last topic for the day.
18           Here's the —
19     A.    That looks like it's the power point.
20     Q.    This is what I have.
21     A.    All right. That's pretty much what I
22   have.
23     Q.    And I'm trying to figure out whether this
24   is the final version or not. We haven't had a

1    chance to talk to Mr. Simone.
2      A    Okay.
3            MR. MAHONEY:   It's got on second page,
4    these things.
5            MR. EINHORN:   That's what is confusing me.
6            THE WITNESS:   Yes.
7            MR. EINHORN:   That as well as —
8            MR. MAHONEY:   Off the record for a second.
9            (Whereupon, a discussion was held off
10           the record.)
11           MR. EINHORN:   I have no further questions
12   for the witness.
13           I just do want to say for the record that
14   there are documents that have not yet been
15   produced relating to certain land development
16   files. I think we may have an agreement. I'm
17   not 100 percent sure yet.
18           There have also been some instructions not
19   to answer during this deposition, and I would
20   just like to reserve the right, if necessary,
21   to call this witness back at some later date,
22   as a result of those two items.
23           (Whereupon, the deposition was
24           concluded at 4:45 p.m.)

223

1              C E R T I F I C A T I O N
2            I, ROBIN M. VALENTINI, a Certified
3      Shorthand Reporter, do hereby certify the
4      foregoing to be a true and accurate
5      transcript of my original stenographic
6      notes taken at the time and place
7      hereinbefore set forth.
8
9
10           _____
             ROBIN M. VALENTINI, CSR
11
12           (The foregoing certification of
13     this transcript does not apply to any
14     reproduction of the same by any means,
15     unless under the direct control and/or
16     supervision of the certifying reporter.)
17              - - -
18
19
20
21
22
23
24

# EXHIBIT B

**1**

```
1        IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF PENNSYLVANIA
2
                        - - -
3
   HIGHWAY MATERIALS, INC.      :  CIVIL ACTION
4
              -vs-              :
5                              :  NO. 02-3212
   WHITEMARSH TOWNSHIP, et al. :
6
7                        - - -
8                   March 26, 2003
9                        - - -
10
11        Deposition of RONALD DEROSA, held in the
12   Law Offices of BALLARD SPAHR ANDREWS & INGERSOLL, LLP,
13   located at 1735 Market Street, 51st Floor, Philadelphia,
14   Pennsylvania, commencing approximately at 10:20 a.m. on
15   the above date, before Holly J. Cross, a Registered
16   Professional Reporter and Notary Public for the State of
17   Pennsylvania.
18
19
20
21
22
23
24
```

**2**

```
1   APPEARANCES:
2
        BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3       BY:  WALTER M. EINHORN, JR., ESQUIRE
        1735 Market Street, 51st Floor
4       Philadelphia, PA  19103
        Counsel for Plaintiff
5
        DEASEY, MAHONEY & BENDER
6       BY:  HARRY G. MAHONEY, ESQUIRE
        1800 John F. Kennedy Boulevard
7       Suite 1300
        Philadelphia, PA  19103
8       Counsel for Defendants
9
10  ALSO PRESENT:
11       Kristine Maciolek, Esquire
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
1                          INDEX
2
3   THE WITNESS                              - PAGE
4   RONALD DEROSA
5       By Mr. Einhorn                          4
6
7
8
9
10
11
12
13                        EXHIBITS
14  MARKED     DESCRIPTION                     PAGE
15  P-23       HTRA Recap, 5/24/01 Minutes      78
16  P-24       7/19/00 Letter From Mr. Gregan   171
17  P-25       6/23/00 Memo From Thomas Zarko   173
18  P-26       7/13/00 Minutes                  174
19
20
21
22
23
24
```

**4**

```
1                          - - -
2           RONALD DEROSA, having been duly sworn, was
3   examined and testified as follows:
4                          - - -
5           MR. EINHORN:  I don't think there really
6   are any stipulations.  We'll just proceed pursuant to
7   the Federal Rules of Civil Procedure.
8   -                     EXAMINATION
9   BY MR. EINHORN:
10  Q       Good morning, Mr. DeRosa.  My name is Walt
11  Einhorn.  We just met a minute or two ago.  I'm here as
12  an attorney for Highway Materials, Inc. in a lawsuit
13  entitled Highway Materials, Inc. versus Whitemarsh
14  Township, et al.  You are a defendant in that lawsuit.
15  I'm here today to ask you a series of questions.
16          What I'll ask you to do is to first wait until
17  I'm finished with my question before you start your
18  answer, and I will try to do the same courtesy for you;
19  that is, let you finish your answer before I start my
20  next question.
21          Do we have an agreement on that?
22  A       Sure.
23  Q       Okay.  The next thing, which you've already
24  done, is you have to answer things out loud.  The court
```

93

1 of going through change.
2 Q   And that being the filing of the plans?
3 A   Filing of the plans was the first thing that
4 let us know that there would be a change coming.
5 Q   Did you seek any assistance in determining
6 whether the rezoning proposed by the residents was
7 appropriate?
8       MR. MAHONEY: Excuse me. What do you
9 mean by -- I'll withdraw --
10 BY MR. EINHORN:
11 Q   The township engineer, outside consultants,
12 anybody, before you rezoned the property in October of
13 2001?
14       MR. MAHONEY: Thank you.
15       THE WITNESS: Not that I'm aware of.
16 BY MR. EINHORN:
17 Q   Was there any consideration of any alternate
18 uses for the property before you rezoned it?
19 A   Not that I'm aware of.
20 Q   Why did you pick -- as part of the zoning that
21 was enacted -- the rezoning that was enacted, the use
22 after Quarry use was limited to two-acre residential
23 lots. Do you remember that?
24 A   I believe it's triple A residential, isn't it?

94

1 Q   What's your understanding of the allowed uses
2 after the extraction use is finished on the --
3 A   Triple A residential.
4 Q   And what does that mean in terms of density?
5 A   That means one-acre lots in public sewer and
6 water facilities are available; otherwise, two.
7 Q   Okay. Why did you pick that classification?
8 A   We didn't. The petitioners made that request.
9 Q   Well, you're the ones -- I thought you said the
10 buck stops with the board of supervisors.
11 A   We agreed with the petitioners and, therefore,
12 passed the ordinance for it being an appropriate use
13 there.
14 Q   Again, why did you make it that one as opposed
15 to a half acre, for instance?
16 A   I can't say. I mean, I don't know.
17 Q   Never considered that?
18 A   No.
19 Q   Never considered the recommendations of the
20 draft comprehensive plan?
21 A   No.
22 Q   Didn't wait for your land use planner to give
23 you his recommendation?
24 A   No.

1 Q   Now, we talked about discussions relating to
2 the denial of the plans. Did you have any discussions
3 with regard to the rezoning of the property, other than
4 discussions at public meetings?
5       MR. MAHONEY: And other than discussions
6 with counsel?
7       MR. EINHORN: Again, you can -- I
8 believe that if he had discussion with counsel about
9 this topic that I'm entitled to know that. I may not be
10 entitled to know what was discussed, but I believe that
11 I'm entitled to know about the existence of a
12 discussion.
13       MR. MAHONEY: If he won't clarify the
14 question, I will.
15       The question being put to you, as far as I
16 understand, is if there are discussions which you have
17 had outside of the presence of counsel regarding that
18 issue, you can answer it. If it's with counsel, I'm
19 instructing you not to answer.
20       MR. EINHORN: And I'll take what I can
21 get now, and we'll deal with that later.
22 BY MR. EINHORN:
23 Q   Can you answer it?
24 A   Well, what's the question.

1 Q   I thought Mr. Mahoney said it pretty well.
2       We'll exclude counsel for the time being. So
3 the record is clear, I don't agree with that, but I'll
4 exclude counsel for the time being.
5       Did you have any discussions about the rezoning
6 outside of public meetings?
7 A   No.
8 Q   Nothing in executive session, outside the
9 presence of counsel? Well, strike that.
10       Anything in the executive sessions?
11       MR. MAHONEY: Excuse me. If discussions
12 in executive session included the solicitor, I'm
13 instructing you not to answer it.
14 BY MR. EINHORN:
15 Q   Well, were there any discussions in executive
16 session?
17 A   Can I answer?
18       MR. MAHONEY: Go ahead and answer that.
19       THE WITNESS: I just said, I can't -- if
20 discussions include the executive and include counsel, I
21 can't answer it.
22 BY MR. EINHORN:
23 Q   All right. Did you ever seek the assistance of
24 counsel in connection with this rezoning process of the

97

1  township solicitor?
2          MR. MAHONEY:  Seek the assistance of
3  counsel?  That is, solicit his opinion?
4          MR. EINHORN:  Did he ever go to the
5  township solicitor to ask for his help in this matter?
6          THE WITNESS:  Did I?  No.
7  BY MR. EINHORN:
8  Q    Do you know if the supervisors did?
9          MR. MAHONEY:  Objection.  To divulge
10  anything like that would divulge attorney-client
11  communication.  I will instruct the witness not to
12  answer.
13          MR. EINHORN:  All right.  It's your
14  position that the existence of discussions is
15  privileged?
16          MR. MAHONEY:  No.  What I'm saying to
17  you is there's executive sessions.  The solicitor is
18  present at the executive session.  You know that.  So
19  all the discussions in the executive session relating to
20  this matter are privileged.
21          By the very nature of your question, you're
22  asking him to divulge if there were communications
23  specifically relating to either, one, rezoning or land
24  development or however you phrased the question.

98

1          So by the very nature of the question, you're
2  asking him to divulge the subject matter of those
3  communications, and that's why I'm objecting.
4          MR. EINHORN:  I couldn't disagree more.
5  Is your position that any executive session discussions
6  are privileged just because the solicitor is there?
7          MR. MAHONEY:  If the solicitor is there
8  and he is expressing any opinions whatsoever, if he is
9  having a discussion with his client, i.e., the township,
10  then those discussions are privileged, yes.
11  BY MR. EINHORN:
12  Q    Were there any discussions in executive session
13  in which counsel was not involved relating to the
14  rezoning?
15  A    Not that I can recall.
16  Q    Now, you understood when the rezoning was
17  eventually passed that because Mr. DePaul had previously
18  filed plans that those plans had to be judged according
19  to the preexisting zoning; correct?
20  A    Yes.
21  Q    And you understood at the time of the rezoning
22  that if Mr. DePaul's plans were ultimately disapproved
23  he would not be permitted to promulgate new plans
24  pursuant to the preexisting zoning?

99

1          MR. MAHONEY:  Promulgate?
2          MR. EINHORN:  Submit.
3          THE WITNESS:  Yes.
4          MR. MAHONEY:  Wait a second.  Is your
5  question that if he submitted a new plan that it had to
6  be subject to the new ordinance?  Is that what you're
7  saying?
8          MR. EINHORN:  I think we got --
9          MR. MAHONEY:  I'm trying to understand
10  your question.
11          MR. EINHORN:  Let me follow-up.
12          MR. MAHONEY:  Okay.
13  BY MR. EINHORN:
14  Q    So as of October 2001, when the rezoning was
15  passed, you understood that if Mr. DePaul's preexisting
16  plan was eventually denied, if he wanted to apply with
17  new plans, they would be subject to the new zoning;
18  right?
19  A    Yes.
20  Q    Do you remember anyone suggesting that the
21  rezoning or the denial of Mr. DePaul's plans might level
22  the playing field with Mr. DePaul?  Do you remember that
23  phrase?
24  A    No.

100

1  Q    Do you remember anything like it?  Do you
2  remember anyone discussing that it would help in the
3  negotiations with Mr. DePaul if the property was
4  rezoned?
5  A    No.
6  Q    How about it would help in the negotiations
7  with Mr. DePaul if his plans were denied?
8  A    No.
9          MR. EINHORN:  It's probably a good time
10  to take a half hour or so.
11          MR. MAHONEY:  Sure, that's fine.
12          (A lunch recess was taken.)
13  BY MR. EINHORN:
14  Q    Sir, as a supervisor, have you become familiar
15  with the land development process in Whitemarsh
16  Township?
17  A    Have I become familiar with the land
18  development process in Whitemarsh Township?  Yes.
19  Q    Okay.  What's the role of the supervisors in
20  that process?
21  A    To approve the development, the development
22  plan, actually.
23  Q    Okay.  Is it fair to say that after submission
24  of plans that the township cooperates with the

185

1    That's me.
2    Q        And the manager is part-time?
3    A        The manager is part-time.
4            MR. EINHORN:  All right.  That's all I
5    have for the time being.
6            Again, as I said at the end of the last
7    deposition, depending on future motions and review of
8    the SALDO files, I'll at least reserve the right to call
9    you back, if necessary.
10            MR. MAHONEY:  We don't necessarily agree
11    with that, but we understand your statement.
12                (The deposition concluded at
13                approximately 3:50 p.m.)
14
15
16
17
18
19
20
21
22
23
24

186

1                WITNESS CERTIFICATION
2
3        I hereby acknowledge that I have read the
4    foregoing transcript of my deposition given on
5    March 26, 2003 and that it is a true, correct and
6    complete transcript of the answers given by me to the
7    questions propounded, to the best of my knowledge,
8    recollection and belief, except for the list of
9    corrections, if any, noted on the below Errata Sheet.
10
11
                    _____
12                    RONALD DEROSA
13
14
15
16
17
18
19
20
21
22
23
24

187

1                C E R T I F I C A T I O N
2
3        I, Holly J. Cross, a Registered Professional
4    Reporter, do hereby certify that the proceedings,
5    evidence, and objections upon the deposition of
6    RONALD DEROSA are contained fully and accurately in the
7    stenographic notes taken by me upon the foregoing matter
8    on March 26, 2003 and that this is a true and correct
9    transcript of same.
10
11
12
13
14            _____
15            HOLLY J. CROSS
            Registered Professional
            Reporter
16
17
18
19
20
21
22
23
24

# EXHIBIT C

**Helfer, Arleigh (Phila)**

-----Original Message-----
**From:** Holly Cross [mailto:hcross3365@comcast.net]
**Sent:** Friday, April 18, 2003 4:29 PM
**To:** Einhorn, Jr., Walter M. (Phila); hgmahoney@dmbphila.com
**Subject:** direction to witness not to answer

Mr. Einhorn and Mr. Mahoney,

Here are the questions that the witness was instructed not to answer. I've included some colloquy where I felt it was important to understand those particular sections.

I cannot guarantee or certify that these are all of the questions, although I have reviewed my notes three times and feel that they're all here.

The final transcript will be prepared and my certification page will be attached that will show the final product.

I hope this is of some help for you. Holly J. Cross, RPR

Q    Did the solicitor play an advisory role in connection with the DePaul zoning?

Q    Did you ever seek the assistance of the solicitor in connection with the DePaul rezoning?

Q    Did you ever seek any legal advice from the solicitor in connection with the rezoning?
    MR. MAHONEY:  Any rezoning?
    MR. EINHORN:  The DePaul rezoning.
    MR. MAHONEY:  Objection. Instruct the witness not to answer.


Q    Do you recall any instance in which the solicitor played a role in the rezoning process?
    MR. MAHONEY:  Any rezoning process?
    MR. EINHORN:  Yeah.
    MR. MAHONEY:  Go ahead and answer that.
    THE WITNESS:  Other than advisory.
BY MR. EINHORN:
Q    In which properties did he provide an advisory role?
    MR. MAHONEY:  Objection. A specific property, I'm going to instruct her not to answer. Generally speaking, it's fine, but specific properties, no.


Q    I take it, then, you don't recall ever seeking any input from the solicitor on this issue on the plans in any way, shape, or form?

Q    Did you ever seek any advice from Mr. Weiss in connection with Mr. DePaul's plans?

Q    Did you ever have any discussions with Mr. Weiss about Mr. DePaul's plans?

Q    Did you meet with Mr. Mahoney to prepare for this deposition?
A    Yes.
Q    How long did you meet with him?
    MR. MAHONEY:  Excuse me a second. No, I'm not going to allow that question. Instruct the witness not to answer.