## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.,     :
             :
    Plaintiff,      :
             :
    v.         :  CIVIL ACTION NO. 02-3212
             :
WHITEMARSH TOWNSHIP *et al*,   :
             :
    Defendants.     :
             :

### ORDER

  AND NOW, this _____ day of December, 2003, upon consideration of plaintiff's Motion To Compel Deposition Witness Lawrence Gregan To Answer Questions Concerning The Gregan Memorandum, and defendants' response thereto, it is hereby ORDERED that:  (a) the Motion is GRANTED; and (b) deposition witness Lawrence Gregan shall respond to questions relating to his August 7, 2001 Memorandum marked as Exhibit P-75 at his deposition.

       BY THE COURT:


         _____
         Robert F. Kelly, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.,  :
          :
   Plaintiff,     :
          :
   v.       :   CIVIL ACTION NO. 02-3212
          :
WHITEMARSH TOWNSHIP,  :
MONTGOMERY COUNTY, PA, et al., :
          :
   Defendants.   :
          :

## MOTION OF PLAINTIFF HIGHWAY MATERIALS, INC.
## TO COMPEL DEPOSITION WITNESS LAWRENCE GREGAN
## TO ANSWER QUESTIONS
## CONCERNING THE GREGAN MEMORANDUM

Plaintiff Highway Materials, Inc., through its undersigned counsel, hereby moves

the Court pursuant to Federal Rules of Civil Procedure 37(a) for an Order compelling deposition

witness Lawrence Gregan, and any other witness who may hereafter refuse, to answer questions

relating to the August 7, 2001 Memorandum marked as Exhibit P-75 at his deposition.  The

reasons in support of this Motion are more fully set forth in the attached Memorandum of Law,

which is incorporated herein by reference.

Respectfully submitted,

Michael Sklaroff
Walter M. Einhorn, Jr.
Lawrence D. Berger
Arleigh P. Helfer III
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

Attorneys for Plaintiff
Highway Materials, Inc.

Dated: December 1, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.,       :
                                   :
           Plaintiff,       :
                                   :
           v.            :    CIVIL ACTION NO. 02-3212
                                   :
WHITEMARSH TOWNSHIP *et al*,   :
                                   :
           Defendants.   :
                                   :

**MEMORANDUM OF LAW OF PLAINTIFF HIGHWAY MATERIALS, INC.
IN SUPPORT OF ITS MOTION TO COMPEL DEPOSITION WITNESS
LAWRENCE GREGAN TO ANSWER QUESTIONS CONCERNING
THE GREGAN MEMORANDUM**

Michael Sklaroff (ID No. 03287)
Walter M. Einhorn, Jr. (ID No. 48733)
Lawrence D. Berger (ID No. 16028)
Arleigh P. Helfer, III (ID No. 84427)
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

Attorneys for Plaintiff
Highway Materials, Inc.

Date: December 1, 2003

**Table of Contents**

I.    PRELIMINARY STATEMENT .................................................................... 1

II.   SUMMARY OF THE FACTS ..................................................................... 2

    A.   The Whitemarsh Township Supervisors Receive A Proposal From
         Neighbors To Rezone HMI's Property, But Decide To Refer The Proposal
         To A Land Use Planner For Study........................................................... 2

    B.   The Whitemarsh Township Supervisors Abruptly And Precipitously
         Rezone HMI's Property, Without Waiting For The Land Use Planner's
         Study ..................................................................................................... 3

    C.   The August 7, 2001 Memorandum From Township Manager Gregan To
         The Board Of Supervisors Shows That The Township's About-Face On
         Rezoning Was In Direct Retaliation For Plaintiff's Filing Of Its
         Development Plan.................................................................................. 4

    D.   The Gregan Memorandum Was Produced For Inspection And Copying To
         Plaintiff's Counsel Shortly After The Supervisors Rezoned HMI's
         Property................................................................................................. 5

    E.   Defendants' Deposition Testimony Relating To The Zoning Ordinance Is
         Inconsistent With The Gregan Memorandum......................................... 6

    F.   Gregan Refused, On Instructions Of Counsel, To Answer Any Questions
         Concerning The Gregan Memorandum .................................................. 6

III.  ARGUMENT ............................................................................................... 7

    A.   The Gregan Memorandum Is Not Privileged......................................... 7

    B.   Because The Gregan Memorandum Was Voluntarily Produced By The
         Township And Is A Key Document In This Case, The Plaintiff Should Be
         Permitted To Use The Document ........................................................... 8

        1.   The Gregan Memorandum Undercuts Defendants' Deposition
             Testimony, And It Would Make A Mockery Of Justice To
             Suppress It Now.............................................................................. 9

            a.   The Testimony Of Supervisor Rimel............................................ 10

            b.   The Testimony Of Supervisor Younglove.................................... 11

            c.   The Testimony Of Supervisor DeRosa ........................................ 11

            d.   The Testimony Of Township Manager Gregan ............................ 13

        2.   If The Gregan Memorandum Was Ever Privileged, Defendants
             Have Long Ago Waived That Privilege.......................................... 15

            a.   The Gregan Memorandum Was Voluntarily Disclosed................ 15

            b.   Even If The Disclosure Of The Gregan Memorandum Was
                Inadvertent, Its Production Constituted A Waiver Of Any
                Privilege Claim .......................................................................... 15

|       |     |                                                                              |     |
|-------|-----|------------------------------------------------------------------------------|-----|
| (1)   |     | The Township Did Not Take Reasonable Precautions To Prevent Disclosure       | 17  |
| (2)   |     | The Number Of Disclosures Bespeaks A Lack Of Caution                         | 19  |
| (3)   |     | The Gregan Memorandum Was Completely Disclosed                               | 19  |
| (4)   |     | The Gregan Memorandum Was Disclosed More Than Two Years Ago                  | 20  |
| (5)   |     | The Interests of Justice Would Be Served By Finding Waiver On These Facts    | 20  |
| IV.   | CONCLUSION                                                                         |     | 22  |

## I.    PRELIMINARY STATEMENT

On November 18, 2003, plaintiff Highway Materials, Inc. ("HMI") began the deposition of Whitemarsh Township Manager Lawrence J. Gregan.  During Gregan's deposition, counsel for HMI attempted to ask questions concerning a memorandum dated August 7, 2001 (the "Gregan Memorandum") that Gregan had written to the Whitemarsh Township Board of Supervisors (the "Board").  (*See* Gregan Dep. at 81.)[1]  Defendants' counsel took the position that the Gregan Memorandum was a privileged document and refused to let the witness answer any questions about it.  (*See* Gregan Dep. at 84, 86-87.)  HMI's counsel asserted that the Gregan Memorandum was not a privileged document and, even if it were, the production of the document to lawyers representing HMI in October 2001 – more than two years ago – constituted a waiver of any privilege.  (*Id.* at 88.)  Counsel contacted the Court by telephone and were instructed to brief the issue.  (*Id.* at 93-94.)

In accordance with the Court's instruction, HMI is now moving to compel Gregan to answer questions concerning the Gregan Memorandum.  For the reasons set forth below, the Gregan Memorandum is not privileged, and never was.  Moreover, even assuming for the sake of argument that the Gregan Memorandum was ever privileged, any privilege was waived when the document was produced without objection or assertion of privilege – more than two years ago – to lawyers representing HMI.

Since the Gregan Memorandum is not privileged, or the privilege has been waived, there is no justification for counsel's instruction, or for the refusal of Gregan, or any other witness. to answer questions concerning the Gregan Memorandum.

---

[1]  Transcript excerpts from the November 18, 2003 deposition of Lawrence Gregan ("Gregan Dep.") are attached hereto as Exhibit A.

## II.  SUMMARY OF THE FACTS

A few background facts are needed to put the Gregan Memorandum in perspective:

### A.  The Whitemarsh Township Supervisors Receive A Proposal From Neighbors To Rezone HMI's Property, But Decide To Refer The Proposal To A Land Use Planner For Study

In July 2001, a group of neighbors organized as the "Whitemarsh Township Residents Association" or "WTRA" submitted a proposed zoning ordinance to the Whitemarsh Township Supervisors to create a new zoning classification called "EX-Extraction," and to rezone HMI's property.[2]  The neighbors requested that the Supervisors vote on and adopt the ordinance "as soon as possible."[3]  Responding at the July 26, 2001 meeting of the Supervisors, Chairman Kramer noted that the Board was initiating a "**process** to evaluate the appropriate zoning for the Corson Quarry site."[4]  The Supervisors took no action on the zoning ordinance submitted by the neighbors, but instead approved issuance of a request for proposals ("RFP") "to solicit proposal[s] from planning consultants to perform a study of the rezoning of the tract."[5]  According to the public minutes of the July 26, 2001 Supervisors meeting, Township Manager Gregan estimated that the study, which would include a review of the EX-Extraction zoning

---

[2]  The Court will recall that HMI purchased the property at issue in 1997.  At the time of purchase, the vast majority of the property was zoned HVY-X Industrial, a zoning classification that permitted virtually any use except for retail and residential.  The EX-Extraction zoning proposed by the neighbors was vastly more restrictive, essentially permitting only large-lot residential homes on the property after quarrying had been completed.

[3]  *See* Deposition Exhibit P-1, July 3, 2001 Letter from Stephen Marshall, Esq. to Whitemarsh Township Board of Supervisors.  A copy of Deposition Exhibit P-1 is attached hereto as Exhibit B.

[4]  *See* July 26, 2001 Minutes (emphasis added).  A copy of the July 26, 2001 Minutes is attached hereto as Exhibit C.

[5]  *Id.*

proposed by the neighbors, would take about six months.[6]

**B.    The Whitemarsh Township Supervisors Abruptly And Precipitously Rezone HMI's Property, Without Waiting For The Land Use Planner's Study**

On September 10, 2001, HMI submitted a preliminary development plan for a portion of its property known as "Hole No. 1."  Plaintiff's plan was based on the existing zoning of the property as HVY-X, a classification which permitted – among other things – development of an office park like the one that plaintiff proposed.

Ten days later, at their September 20, 2001 meeting, the Township Supervisors abruptly abandoned their prior decision to follow a "process to evaluate the appropriate zoning."  Instead, the Supervisors took the first step – advertising of a public hearing – toward creating the EX-Extraction classification proposed by the neighbors in July.[7]

Not even a month later, on October 18, 2001, the Supervisors enacted the new EX-Extraction zoning ordinance, which was virtually identical to the one proposed by the neighbors in July.[8]  What happened next is perhaps even more remarkable: the very next action taken by the Board at the October 18 meeting was to hire the firm of Simone Jaffe Collins to conduct the land use study (including the evaluation of the "appropriate zoning") of HMI's property that it had just rezoned.[9]

---

[6]  *Id.*

[7]  *See* September 20, 2001 Minutes.  A copy of the September 20, 2001 Minutes is attached hereto as Exhibit D.

[8]  A copy of the October 18, 2001 Minutes is attached hereto as Exhibit E.

[9]  *Id.*

**C.**    **The August 7, 2001 Memorandum From Township Manager Gregan To The Board Of Supervisors Shows That The Township's About-Face On Rezoning Was In Direct Retaliation For Plaintiff's Filing Of Its Development Plan**

The Township's about-face on rezoning was in direct retaliation for plaintiff's filing of its development plan.    The Gregan Memorandum, which was written shortly after plaintiff's attorney informed Township Manager Gregan of plaintiff's intention to file the plan, shows this clearly:

> After the last Board meeting on July 26th, we spoke with both James Garrity, Esq. and Stephen Marshall, Esq., advising them of the action that the Board of Supervisors was taking to perform a land use study of the Corson Quarry property.  A copy of the RFP was sent to both of them.  **In our discussions with Jim Garrity, he advised that DePaul had decided not to pursue a rezoning of the property but intends to prepare and submit a land development plan based on the current HVY zoning of the property**.
>
> **As a result of that conversation, Ross and I have been discussing an option for the Board to consider to authorize advertisement of an Ex-Extraction District Ordinance and Zoning Map Amendment to rezone a portion or all of the Corson Quarry Property**.    Attached is a draft Ordinance to create the Ex-Extraction District.  **It is basically the same as the draft supplied with the [WTRA] petition** with some additions to provide dimensional standards (Section 116-251).
>
> We would like to discuss this concept with the Board on the Executive Agenda prior to the Public Meeting.  **If the Board wants to pursue this option, we are prepared to present a proposed Ex-Extraction Ordinance and Map Amendment Ordinance for the Board's consideration at the Public Meeting. The Ordinances could be authorized for advertisement and would be advertised in a local newspaper, as required under the Township Code, by Monday, August 13th**.
>
> If you have any questions on this matter prior to the meeting on Thursday night, please let me know.  Thank you.

(Emphasis added.)[10]    Copies were indicated to Township Solicitor Ross Weiss, Assistant Township Manager Ford, and Township Engineer Zarko.

---

[10]  A copy of the Gregan Memorandum, marked P-75, is attached hereto as Exhibit F.

On September 10, 2001, HMI filed its development plan, just as Mr. Garrity had told

Gregan it would.  And, as discussed in the previous section, ten days later the Supervisors voted

to advertise the rezoning ordinance, the very act of retaliation that Gregan had proposed in his

Memorandum.

**D.    The Gregan Memorandum Was Produced For Inspection And Copying To Plaintiff's Counsel Shortly After The Supervisors Rezoned HMI's Property**

On October 25, 2001, one week after the Supervisors rezoned HMI's property, HMI's

counsel made a telephone call request to Township Solicitor Ross Weiss and Township Manager

Gregan, and requested an opportunity to inspect the Township's files relating to the zoning

ordinance and zoning map amendments passed on October 18.  *See* Affidavit of James Garrity,

¶5.[11]  Mr. Garrity informed Messrs. Weiss and Gregan that the purpose of his review was to

determine whether the October 18 zoning was valid from both a technical and substantive

viewpoint.  *Id.*  Mr. Weiss and Mr. Gregan agreed that the files would be made available.  *Id.*

Mr. Garrity called Township Manager Gregan again on October 29 to follow up, and Mr. Gregan

advised that the files were ready to be reviewed.  During this interval between the request and the

production, the Township had time and, presumably, took time to review the documents before

production.

On October 29, 2001, Wisler Pearlstine attorney Joseph Bagley, Esquire, inspected the

files provided by the Township.  *See* Affidavit of Joseph Bagley, ¶5.[12]  The Gregan

Memorandum was included in the files that were shown to him.  Mr. Bagley requested copies of

only about 35 documents, totaling about 100 pages.  One of those documents was the Gregan

---

[11]  The Garrity Affidavit is attached hereto as Exhibit G.

[12]  The Bagley Affidavit is attached hereto as Exhibit H.

Memorandum.  *See* Bagley Affidavit, ¶7.  The Township copied the pages requested by

Mr. Bagley, and the copies were duly provided to Mr. Bagley.  *See* Bagley Affidavit, ¶¶6 and 7.

No claim of attorney-client privilege or any other privilege was asserted.  *See* Bagley Affidavit,

¶10.  The Gregan Memorandum, which was addressed to the Supervisors and which did not

reflect any request for legal advice or the contents of any legal advice, was included among the

copies.  *See* Bagley Affidavit, ¶7.[13]

### E.    Defendants' Deposition Testimony Relating To The Zoning Ordinance Is Inconsistent With The Gregan Memorandum

Plaintiff has deposed the members of the Board of Supervisors, and asked the Supervisors

about the reason for their "about-face" decision that led to the rezoning.  As described in detail

below at pages 9-14, plaintiff asked such questions of Supervisors Rimel, Younglove, Kramer

and DeRosa.  Remarkably, three of the Supervisors – Rimel, Younglove and DeRosa – denied

that there was **any** connection between the abrupt decision to advertise rezoning on

September 20, 2001 and plaintiff's filing of the land development plan for Hole No. 1 on

September 10, 2001.

### F.    Gregan Refused, On Instructions Of Counsel, To Answer Any Questions Concerning The Gregan Memorandum

On November 18, 2003, plaintiff took the deposition of Township Manager Gregan.

Plaintiff marked the Gregan Memorandum as Exhibit P-75, and attempted to ask Gregan

questions about the Memorandum.  Defendants' counsel, Mr. Mahoney, asserted that the

document was listed on a privilege log that he submitted on March 14, 2003 – nearly 17 months

after the document was produced to Mr. Bagley in October 2001 – and directed Mr. Gregan not

---

[13]  As it turned out, the rezoning, rushed and hurried, **was** defective.  The Township rezoned HMI's property again in February 2002.

to answer any questions concerning the document.  (Gregan Dep. at 89.)[14]  Counsel then contacted the Court and were directed to brief the matter.  Accordingly, plaintiff is now moving, pursuant to the Court's direction, to compel Mr. Gregan to answer questions concerning his Memorandum.

## III.    ARGUMENT

### A.    The Gregan Memorandum Is Not Privileged

Gregan's Memorandum to the Board of Supervisors is not a privileged document. Indeed, it satisfies **none** of the requirements for the attorney-client privilege.

The first and most elemental requirement of the attorney-client privilege is that the communication must be **from** a party who was or sought to become a client of an attorney, **to** an attorney acting as such.  *See, e.g., Rhone-Poulenc Rorer Inc. v. Home Indemnity Co.,* 32 F.3d 851, 862 (3d Cir. 1994); *Kaminski v. First Union Corp.,* 2001 WL 793250 (E.D. Pa. 2001) (Kelly, J.).  Gregan's memo is not to an attorney; it is to the Board of Supervisors.  The indication of a copy being sent to Mr. Weiss, the Township Solicitor, does not alter this fact because a non-privileged document does not become privileged merely because the document is given to an attorney.  *See, e.g., Simon v. G.D. Searle & Co.,* 816 F.2d 397 (8th Cir. 1987), *cert. denied,* 484 U.S. 917 (1987):

---

[14]  Apparently attempting to employ the "best defense is a good offense" strategy, counsel for defendants has accused HMI of "ambushing" Mr. Gregan with the document.  Given the fact that defendants have attempted to withhold a very damaging document on a bogus (and obviously waived) claim of privilege, this accusation rings hollow in the extreme.

> [T]he special master stated: "**A business document is not made privileged by providing a copy to counsel**. * * * Thus, those documents from one corporate officer to another with a copy sent to an attorney do not qualify as attorney client communications." Report I of Special Master, *supra*, at 7 (citation omitted). We perceive no error in this statement of the law. . . .

816 F.2d at 403 (emphasis added). *See also United States v. Fisher,* 500 F.2d 683, 691 (3d Cir. 1974), *aff'd,* 425 U.S. 391 (1976) ("Papers otherwise not endowed with Fifth Amendment protection cannot be transmuted into a privileged status merely because of the act of delivery to a lawyer"); *Commonwealth v. Ferri,* 410 Pa.Super. 67, 74, 599 A.2d 208, 212 (1991), *appeal denied,* 534 Pa. 652 (1993), *cert. denied,* 510 U.S. 1164 (1994) ("Permitting the use of the attorney-client privilege effectively to block the admissibility of non-privileged physical evidence, merely because it is placed in an attorney's hands, is a result equally unreasonable").

A second fundamental requirement of the attorney-client privilege is that the purpose of the communication must be to obtain legal advice. *See, e.g., Rhone-Poulenc, id.*; *Kaminski v. First Union Corp., id.* There is absolutely nothing in Gregan's memo to indicate that Gregan's purpose for writing the memo to the Board of Supervisors was to obtain legal advice. Rather, the clear purpose for writing the memo was to request that the Supervisors consider an Ordinance to create an Ex-Extraction District to rezone the quarry property, in light of plaintiff's intention "to prepare and submit a land development plan based on the [then-]current HVY zoning of the property." By providing a copy of the memo to Weiss, Gregan informed him of this non-privileged fact, but did not ask him to provide legal advice about it.

Therefore, even if defendants had not already waived any possible claim of privilege, the simple fact is that this document was never privileged in the first place.

### B.    Because The Gregan Memorandum Was Voluntarily Produced By The Township And Is A Key Document In This Case, The Plaintiff Should Be Permitted To Use The Document

Even assuming, for the sake of argument, that the Gregan Memorandum was ever

privileged, plaintiff should now be permitted to use it, for at least two reasons:

**First**, as demonstrated above at page 6, and below at pages 9-14, the document contradicts defendants' deposition testimony, because it shows that the decision to rezone plaintiff's property was in direct retaliation for plaintiff's lawful efforts to develop its property under the existing zoning ordinance. Moreover, as demonstrated above, plaintiff's counsel received the Gregan Memorandum from the Township without any objection or assertion of privilege, and pursuant to a legitimate document request. Therefore, to suppress it now would suppress the truth, and would make a mockery out of justice.

**Second**, even assuming that the document was ever privileged, defendants waived the privilege by voluntarily producing the document.

### 1. The Gregan Memorandum Undercuts Defendants' Deposition Testimony, And It Would Make A Mockery Of Justice To Suppress It Now

Even assuming, for the sake of argument, that the production of the Gregan Memorandum was "inadvertent" as defendants will argue, it would simply make a mockery of justice if the Court were to allow defendants to now pull back and suppress this document:

> [T]his "now you see it, now you don't" approach creates a risk of undermining the appearance of justice. To take a simple example, suppose the item in question is a letter from the defendant to his lawyer that says, "The light was red," and defendant testifies at trial that the light was green. Putting aside ethical constraints on defendant's lawyer, the truth-suppressing consequence of the privilege would effectively deprive plaintiff of this contradictory evidence. That cost is different, however, from the costs that would result **had defendant inadvertently produced the letter and later asked that it be suppressed**. Then plaintiff would know of the existence of the contradictory evidence but still be unable to use it, a result that **not only suppresses the truth but threatens to make justice a mockery**. That cost may be justified where the privileged material is stolen, but not where the opposing party **received it innocently**.

Richard L. Marcus, *The Perils of Privilege: Waiver and the Litigator*, 84 MICH. L. REV. 1605, 1636 (1986) (emphasis added) (footnotes omitted).

This is just such a case. Even if the Township's production of the Gregan Memorandum was "inadvertent," HMI's counsel received it in good faith. Suppressing the document would not serve justice.[15]

Four Supervisors, and Gregan himself, were deposed concerning the relationship between the filing of HMI's development plan and the rezoning. Three of the Supervisors and Gregan himself denied that there was any relationship. Tellingly, one Supervisor admitted that the filing of HMI's development plan was a factor that "might have moved it [the rezoning] along."[16]

### a.    The Testimony Of Supervisor Rimel

For example, Supervisor Rimel denied that there was any connection between HMI's filing of a development plan on September 10, 2001 and the abrupt decision to advertise the zoning ordinances on September 20, 2001, and could not explain why the Township abandoned its previous plan to wait for the land use study:

> Q.    Okay.  I'm now focusing on the timing more than the actual zoning itself. Why was there the big rush to do this?
>
> MR. MAHONEY:  Object to the form of question.  That's your characterization.
>
> MR. EINHORN:  That's true.  It is.
>
> A.    Well, I don't think there was a big rush.
>
> Q.    Sir, in July of '01, we're talking about a process [*i.e.,* the land use study].  We can go back.  We'll look at the study.  The study would take about six months.

---

[15] Nor does defendants' bogus privilege claim represent their only attempt to suppress the truth in this matter. The discussion of a zoning matter during an Executive Session, as suggested in the Gregan Memorandum, is a violation of Pennsylvania's Sunshine Law. *See* 65 Pa. C.S. § 702 *et seq. See also Ackerman v. Upper Mt. Bethel Township*, 567 A.2d 1116, 1119-20 (Pa. Commw. Ct. 1989) (private conference by quorum of township board of supervisors to discuss a proposed zoning amendment violated the Sunshine Law).

[16] *See* Kramer Dep. at 51.  Transcript excerpts from the July 18, 2003 deposition of William Kramer ("Kramer Dep.") are attached hereto as Exhibit I.

A.  Yes.

* * * *

Q.  Sir, is it fair to say that, in your mind, anyway, that this action on September 20th was a retaliation for Mr. DePaul filing the plans on September 10?

A.  Absolutely not.

Q.  Absolutely not?

A.  Absolutely not.

Q.  And you can't, sitting here today, give me a reason why you didn't wait for the Simone study on these properties?

A.  No, I cannot.

(Rimel Dep. at 104-105.)[17]

### b.    The Testimony Of Supervisor Younglove

Similarly, Supervisor Younglove claimed that the filing of plaintiff's development plan did not "play[ ] any role" in the decision to advertise and then rezone the Corson Quarry property without waiting for the land use study:

Q   Well, then, what role did the filing of Mr. DePaul's plans play in this decision?

A    I don't know that it played any role in it.

(Younglove Dep. at 74.)[18]

### c.    The Testimony Of Supervisor DeRosa

Finally, Supervisor DeRosa testified that "nothing changed" between the July 26, 2001 Board meeting at which the "evaluation process" was promised and the September 20, 2001

---

[17] Transcript excerpts from the March 21, 2003 deposition of William Rimel ("Rimel Dep.") are attached hereto as Exhibit J.

[18] Transcript excerpts from the April 18, 2003 deposition of Ann Younglove ("Younglove Dep.") are attached hereto as Exhibit K.

Board meeting at which the Board voted to advertise the EX-Extraction district, and that there

was no reason for the Supervisors' decision to abruptly change course in September 2001:

> Q    Sir, why is it that in July of 2001 the board is promising a process in which the planner is the only one, pursuant to your testimony, to evaluate the properties and in September 2001 you're now advertising them for rezoning?
>
> A    The question was why?
>
> Q    Yeah, can you tell me what changed?
>
> A    Nothing changed.
>
> Q    Nothing changed?
>
> A    With the exception that we had a request from residents to rezone the property to a use that was more appropriate than the existing zoning.
>
> Q    Do you remember testifying a few minutes ago that the ordinance that had been proposed by the residents was forwarded to the land use planner for evaluation?  Do you remember that testimony?
>
> A    The RFP says that we will forward it to the land use planner.
>
> Q    Do you remember the testimony about why the land use planner was important in the process?
>
> A    To give us professional opinions and advice, yes.
>
> Q    Why didn't you wait for the land use planner?
>
> MR. MAHONEY:  Waiting for the land use planner to do what?
>
> MR. EINHORN:  To do his work.
>
> THE WITNESS:  There was no need to wait for the land use planner to do his work to rezone the property now.  We have the option of rezoning it again at a future time if the land use planner comes up with something more appropriate.
>
> * * * *
>
> BY MR. EINHORN:
>
> Q    I'm asking you about the timing of the rezoning.  Why did the rezoning have to commence on September 20th, 2001?
>
> MR. MAHONEY:  I think he already answered that question.  We didn't have to. We just did.

THE WITNESS: We just did.

BY MR. EINHORN:

Q    You just did it?

A    Yeah.

Q    There's no reason why you picked September 20th?

A    There is no reason, specific reason, in my mind why we picked September 20th, no.

(DeRosa Dep. at 85-88.)[19]

### d.    The Testimony Of Township Manager Gregan

Township Manager Gregan is like the defendant who admits that the light was red, and then – using the shield of a privilege that has been waived – insists that the light was green. Even when confronted with his own Memorandum linking the "option" to rezone HMI's property to HMI's announced intent to file its development plan, Gregan still disclaimed any connection between HMI's September 10, 2001 filing of its Preliminary Plans and the Board of Supervisors' decision to advertise the proposed EX-Extraction ordinances on September 20, 2001:

> Q.    It is true, sir, that the reason that the township decided to list the plans, the ordinances for rezoning on September 20th for advertisement on September 20th was because Mr. DePaul had filed plans ten days before that?
>
> A.    No, I don't believe that is true.
>
> Q.    Do you have any explanation then as to why on September 20th you decided to put the authorization to advertise the ordinances on the agenda?
>
> A.    I don't remember a specific reason why we did it.

* * * *

---

[19] Transcript excerpts from the March 26, 2003 deposition of Ronald DeRosa ("DeRosa Dep.") are attached hereto as Exhibit L.

Q.     Anything happen between July and September that might precipitate that?

A.     I don't remember a specific reason for putting it on that particular agenda.

\* \* \* \*

Q.     Do you recall any conversations with board members, for instance, or anybody in that July, August, September time frame when someone said to you we changed our minds we are not going to evaluate this ordinance, we are going to put it up for a vote as soon as possible, no discussions like that?

A.     No discussions like that.

Q.     Were there discussions about the ordinances in that time frame?

A.     There was a discussion, I believe, there would have been a discussion with the Board of Supervisors and the township solicitor.

Q.     In executive session?

A.     In executive session.

\* \* \* \*

Q.     Is it your testimony today, sir, that the filing of [HMI's] plans on September 10th had nothing to do with the timing of the authorizing the advertising of the rezoning ordinances on September 20th?

A.     Nothing to do, no, not because of the filing of the plans, no.

(Gregan Dep. at 106-110.)

The contents of the Gregan Memorandum contradict the sworn testimony of three Supervisors and Gregan himself that the timing of the rezoning was unrelated to HMI's submission of its Preliminary Plans. The Gregan Memorandum also suggests that, as soon as HMI informed the Township of its intention to file a development plan, the Board immediately abandoned its announced plan to obtain the professional evaluation of a land use planner before beginning the rezoning process, which targeted HMI's property and only HMI's property. Simply stated, the document will greatly assist the jury in determining the facts in this matter and the credibility of the defendants. It should be part of this case.

### 2. If The Gregan Memorandum Was Ever Privileged, Defendants Have Long Ago Waived That Privilege

Even assuming, for the sake of argument, that defendants could carry their burden and prove that the Gregan Memorandum was initially privileged, the Township's voluntary production of the document to Mr. Bagley in October of 2001 waived the privilege.

### a. The Gregan Memorandum Was Voluntarily Disclosed

It is a bedrock principle of privilege law that voluntary disclosure of otherwise confidential documents or communications waives the privilege. *See, e.g., Westinghouse Electric Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1423-24 (3d Cir. 1991) ("voluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the privilege"); *Fidelity & Deposit Co. of Md. v. McCulloch,* 168 F.R.D. 516, 521 (E.D. Pa. 1996) ("While waiver of the attorney-client privilege must generally be voluntary . . . , our Court will find in some circumstances that the privilege is lost as to particular documents that are inadvertently disclosed"). Here, even if the Gregan Memorandum were privileged, there is no contesting the fact that the Township voluntarily disclosed it to Mr. Bagley on October 29, 2001 when he came to the Township Building to review the few folders of documents pertaining to the October 18, 2001 Rezoning. In addition to disclosing the Gregan Memorandum to Mr. Bagley, the Township itself provided him with a copy of it. Bagley Affidavit, ¶7. As a result of this voluntary disclosure and copying of the Gregan Memorandum by representatives of the Township, the Township waived any claim of privilege as to this document.

### b. Even If The Disclosure Of The Gregan Memorandum Was Inadvertent, Its Production Constituted A Waiver Of Any Privilege Claim

Furthermore, assuming the defendants will argue that the production of the Gregan

Memorandum was inadvertent, the attendant circumstances demonstrate that the Township failed to take reasonable precautions to safeguard the asserted privilege, and therefore, any "inadvertence" in producing the document is not excused.

Under the traditional law of privilege, any disclosure of a privileged document destroys the privilege. *Westinghouse Electric Corp., supra,* 951 F.2d at 1424. It is well-established within the Third Circuit that even inadvertent disclosure of privileged documents may destroy their privileged nature. *See Fidelity & Deposit Co.,* 168 F.R.D. at 521-22 (even inadvertent disclosures may waive the privilege); *Ciba-Geigy Corp. v. Sandoz Ltd.,* 916 F.Supp. 404, 411 (D.N.J. 1995) (if disclosure results from gross negligence, privilege is waived); *Advanced Med., Inc. v. Arden Med. Sys., Inc.,* CIV A. No. 87-3059, 1988 WL 76128, *2 (E.D. Pa. July 18, 1988) (finding waiver because of lack of precautions, noting that only in "extraordinary situations such as expedited discovery or massive document exchanges" will a limited inadvertent disclosure not result in waiver). Unlike other contexts, in which a waiver must be intentional, knowing and voluntary, the producing party's subjective intent does not control the question of whether a privilege has been waived. *Advanced Med., Inc.,* 1988 WL 76128 at *4; *see also Fidelity & Deposit Co.,* 168 F.R.D. at 521. The party claiming the privilege and resisting an argument of waiver carries a heavy burden to establish non-waiver. *See Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, LLC,* 202 F.R.D. 418, 423 (E.D.Pa. 2001); *Ciba-Geigy Corp., supra,* 916 F.Supp. at 412.

Courts sitting in the Third Circuit routinely apply five factors on a "case by case" basis to determine whether a party's purportedly inadvertent disclosure of documents preserves the claim of privilege, considering:

> (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent

disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosure; and (5) whether the overriding interests of justice would or would not be served by relieving the party of its error.

*Ciba-Geigy Corp.*, 916 F.Supp. at 411 & n.14 (quoting *Advanced Med., Inc.*, 1988 WL 76128 at

*2).[20]   These criteria, like the privilege itself, are applied strictly and the party claiming the

privilege bears the burden of establishing them.  *See Advanced Med, Inc.,* 1988 WL 76128 at *3

(reasoning that because privilege is strictly construed, the five factors should be applied

stringently); *Ciba-Geigy Corp.,* 916 F.Supp. at 412 (party resisting waiver argument carries

burden).

The facts surrounding the production of the Gregan Memorandum to Mr. Bagley and the

contents of the document itself militate against a finding that it was inadvertently produced in

such a manner as to preserve any purported privilege.

### (1)   The Township Did Not Take Reasonable Precautions To Prevent Disclosure

Based on application of the first factor alone, the Court should reject any argument

negating waiver based on "inadvertent" production.  A party resisting a waiver argument carries

the burden of demonstrating that "it undertook reasonable precautions to avoid inadvertent

disclosures of privileged documents."  *Ciba-Geigy Corp.*, 916 F.Supp. at 412.  The defendants

simply cannot meet that standard.

---

[20]   Aside from the prevailing five factor "case by case" approach, there are two other approaches courts have taken to the issue, though neither has been widely adopted in courts sitting in the Third Circuit.  The first follows the traditional rule of privilege and finds that any disclosure, whether inadvertent or not, destroys the privilege.  *See Ciba-Geigy Corp.*, 916 F.Supp. at 410.  The other general approach provides that an attorney's negligence in producing a privileged document cannot inadvertently waive the privilege because the client is the holder of the privilege.  *See id.* at 410-11.  Because Whitemarsh Township itself and not its counsel produced the Gregan Memorandum to Mr. Bagley, it is clear that the "non-waiver" line of cases is inapplicable here.

It is not clear that the Township took any precautions whatsoever, let alone reasonable precautions, to prevent disclosure of the Gregan Memorandum that it now claims to be privileged. After the October 18, 2001 rezoning, Mr. Garrity made arrangements with Township Solicitor Weiss and Township Manager Gregan to review the Township's files for evidence of procedural defects or other irregularities. The Township clearly had an opportunity to have its lawyers review those files for privileged matter before producing them to Mr. Garrity's colleague, Mr. Bagley. There is no evidence that the Township did so. *See* pp. 5-6, *supra,* and Affidavits of James Garrity and Joseph Bagley.

What the facts establish, therefore, is that the Township made a very limited production of documents that it must have known were of great interest to HMI, given the then-recent rezoning of HMI's property. From these limited files, Mr. Bagley selected approximately 35 documents comprising 112 pages, a relatively small production under any view. The Township Solicitor was notified, by Mr. Garrity himself, of the request. The Township had time to review those documents before they were produced to Mr. Bagley. The notice and opportunity to review before production seriously undermines any claim that the production of the document should be excused as inadvertent. *See, e.g., Ciba-Geigy, Inc.*, 916 F.Supp. at 412 (noting that the small size of a document production coupled with a lack of time constraints and failure to conduct a privilege review prior to producing copies of documents compel a finding of waiver); *Fidelity & Deposit Co.*, 168 F.R.D. at 523 (finding waiver where the contents of the documents and the interests of justice tended to demonstrate that they would not have been disclosed had the party arguing against waiver taken reasonable precautions). This is particularly so given the underwhelming number of documents produced, a far cry from cases in which one or two documents out of thousands may slip through despite substantial precautionary efforts.

(2)    **The Number Of Disclosures Bespeaks A Lack Of Caution**

The small number of disclosures dovetails with the assessment of whether reasonable precautions were taken to prevent disclosure. For example, where only one of thirty documents requested is privileged but is produced, the production shows "lax, careless, and inadequate procedures." *Advanced Med., Inc.*, 1988 WL 76128 at *3 (citing *Eigenheim Bank v. Halpern*, 598 F.Supp. 988 (S.D.N.Y. 1984)).[21]  In the case at bar, unlike other cases in which the numerical factor may be telling (*i.e.*, where there are "mass exchanges of documents" and out of thousands of pages produced one or two privileged documents are disclosed), the Township produced only a handful of manila folders and their contents for Mr. Bagley to review. He selected approximately 35 documents totaling 112 pages. Therefore, though only one purportedly privileged document was produced, it was not buried in numerous boxes of documents. Disclosure of one purportedly privileged document out of thirty-five total documents establishes an incredibly high ratio of error.

(3)    **The Gregan Memorandum Was Completely Disclosed**

Like the document at issue in *Ciba-Geigy Corp.*, the Gregan Memorandum was completely disclosed to Mr. Bagley and a copy was provided to him. *Ciba-Geigy Corp.*, 916 F.Supp. at 414 (assessing the "extent" prong and finding that complete disclosure of the document at issue weighed in favor of finding waiver). This was not an instance in which a party glimpsed a privileged document in a folder in a file drawer or even a situation in which a party reviewing documents selected a document for copying that the producing party then

---

[21]  In *Eigenheim,* the allegedly privileged document was one document out of a production of only thirty documents, and the Court stated, "Given the need to limit the scope of the privilege, this Court will not countenance defendants' attempt to affirmatively use their carelessness to recover a privilege once lost." 598 F.Supp. at 992.

refused to copy. *See Advanced Med., Inc.*, 1988 WL 76128 at *3. Furthermore, once confidentiality is lost through complete disclosure, it cannot be restored. *Id. See also* p. 9, supra (to suppress the document now "not only suppresses the truth but threatens to make justice a mockery"). As a result, an order restraining use of a document that has been completely disclosed "requires a very strong showing with respect to the other factors." *Id.*

Because the Gregan Memorandum was completely disclosed, this factor weighs in favor of finding waiver.

### (4)     The Gregan Memorandum Was Disclosed More Than Two Years Ago

At this point, more than two years have passed since the Township furnished Mr. Bagley with a copy of the Gregan Memorandum. The Township never contacted Mr. Bagley to demand return of the document, even though Wisler Pearlstine lodged a legal challenge to the October 18, 2001 rezoning that resulted in the Board reenacting the rezoning during its February 28, 2002 meeting. Bagley Affidavit, ¶ 9. The Township never took any steps to correct its disclosure of the document.

### (5)     The Interests of Justice Would Be Served By Finding Waiver On These Facts

Courts agree that the interests of justice are served by finding waiver where a party's negligence results in the production of a privileged document. *See Fidelity & Deposit Co.*, 168 F.R.D. at 523 ("These documents clearly would not have been disclosed had Fidelity taken reasonable precautions, and in view of the substance of the disclosures, the interests of justice are served by finding that Fidelity has lost its privilege with respect to them."); *Advanced Med., Inc.*, 1998 WL 76128 at *4 (finding no "special circumstance" to relieve the disclosing party of its error where, in part, the party failed to use any of the opportunities available to it to protect against production of privileged materials).

As discussed above, it does not appear that Whitemarsh Township exercised any precautions whatsoever with respect to the purportedly privileged Gregan Memorandum. On the other hand, the document establishes that a number of the deponents affiliated with the Township have been misrepresenting the truth in their depositions.

Finding a waiver in this instance does not injure the general policies underlying the attorney-client privilege. It is hornbook law that the attorney-client privilege exists to encourage a full and frank communication between a client and a lawyer. Finding waiver of any purported privilege with respect to the Gregan Memorandum would not discourage full and frank attorney-client discussions because, in this instance, it is the client itself that has disclosed a purportedly privileged document. This is simply not a matter in which the Court would be punishing the holder of the privilege for its attorney's negligence.

In addition, it is not the Township's communications with the Solicitor or the incidental mention of his name that makes the document so crucial. It is the fact that the Board was considering and discussing a course of action behind closed doors in response to plaintiff's announced intent to file by-right plans that deponents now are claiming they never discussed that makes the document crucial.

On these facts, the interests of justice weigh heavily on the side of finding that the Gregan Memorandum is no longer privileged, if it ever was.

**IV.     CONCLUSION**

For the reasons stated above, and in the Garrity and Bagley Affidavits, plaintiff respectfully submits that:   (1) the Gregan Memorandum is not, and never was, a privileged document; and (2) if any privilege ever applied to the Gregan Memorandum, the privilege was waived by defendants' voluntary production of the document to plaintiff's counsel over two years ago, and it would make a mockery of justice to suppress the document now.   Therefore, (3) Gregan, and any other witness who may hereafter refuse, should be ordered to answer questions relating to the Gregan Memorandum.

Respectfully submitted,

*Walter M. Einhorn Jr. / LAB*

Michael Sklaroff (ID No. 03287)
Walter M. Einhorn, Jr. (ID No. 48733)
Lawrence D. Berger (ID No. 16028)
Arleigh P. Helfer, III (ID No. 84427)
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

*Attorneys for Plaintiff*
Highway Materials, Inc.

Date:   December 1, 2003

## Certificate Pursuant To Local Rule 26.1

I hereby certify, pursuant to Local Rule 26.1 of this Court, that the parties, after reasonable effort, are unable to resolve the discovery dispute which is the subject of this motion.

*Lawrence D. Berger*

**Lawrence D. Berger**

## Certificate of Service

I hereby certify that plaintiff's Motion To Compel Deposition Witness Lawrence Gregan To Answer Questions Concerning The Gregan Memorandum, proposed Order, Affidavits of James Garrity, Esquire, and Joseph Bagley, Esquire, and supporting Memorandum of law were served on December 1, 2003 as follows:

**By hand delivery**
Harry G. Mahoney, Esquire
Deasey, Mahoney & Bender, Ltd.
1800 John F. Kennedy Boulevard, Suite 1300
Philadelphia, PA 19103-2978

Attorneys for Defendants Whitemarsh Township, Board of Supervisors of Whitemarsh Township, Ann D. Younglove, Ronald J. DeRosa, William P. Rimel, III, Peter B. Cornog, Michael A. Zeock, and Thomas F. Zarko.

**By first class mail, postage prepaid**
Kevan Francis Hirsch
Kaplin Stewart Meloff Reiter & Stein PC
350 Sentry Parkway East Building 640
Blue Bell, PA 19422

Attorneys for Intervenor Defendants

_____
Arleigh P. Helfer, III

**Exhibits to Motion of Plaintiff Highway Materials, Inc.**
**To Compel Deposition Witness Lawrence Gregan**
**To Answer Questions Concerning The Gregan Memorandum**

**Exhibit**

| | |
|---|---|
| A | Gregan Deposition Excerpts |
| B | Deposition Exhibit P-1, July 3, 2001 Letter from Stephen Marshall, Esq. to Whitemarsh Township Board of Supervisors |
| C | July 26, 2001 Board of Supervisors Minutes |
| D | September 20, 2001 Board of Supervisors Minutes |
| E | October 18, 2001 Board of Supervisors Minutes |
| F | Deposition Exhibit P-75, August 7, 2001 Memorandum from Lawrence Gregan to Whitemarsh Township Board of Supervisors |
| G | Affidavit of James J. Garrity, Esquire |
| H | Affidavit of Joseph M. Bagley, Esquire |
| I | Kramer Deposition Excerpts |
| J | Rimel Deposition Excerpts |
| K | Younglove Deposition Excerpts |
| L | DeRosa Deposition Excerpts |