**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.          :     CIVIL ACTION

                             :

    vs.                     :     COPY

                             :

WHITEMARSH TOWNSHIP, et al.  :     NO. 02-3212

Philadelphia, Pennsylvania

November 18, 2003

Pretrial examination of

LAWRENCE J. GREGAN, taken on behalf of the

Plaintiff at the offices of Ballard, Spahr,

Andrews & Ingersoll, 1735 Market Street,

Philadelphia, Pennsylvania, on the above

date, commencing at 9:45 a.m., before Linda

A. Ricciardi, Certified Court Reporter.

1   packet, correct?
2   A.    Yes, it is a cover sheet for the
3   packet for the meeting on August 23rd.
4   Q.    Now, we know that these packets
5   typically include a table of contents, right?
6   A.    Yes.
7   Q.    They include an agenda, correct?
8   A.    Yes.
9   Q.    What else do you put in the weekly
10  packets?
11  A.    We put reference material to the items
12  on the agenda.  Also any miscellaneous
13  communications that we would receive or send
14  out, minutes and reports.
15  Q.    Would things like P-61, your
16  evaluation that we looked at, I can show it
17  to you, but would those type of memos
18  typically be included in the weekly packet?
19  A.    Depends on -- generally, yes, but it
20  would depend if there is -- frequently where
21  there are documents that we prepared and give
22  to the board the day of a meeting, that would
23  not be in the individual packets.
24  Q.    You anticipated my next question,

1   which is other than putting them in the
2   weekly packets, and other than giving them to
3   the board the day of the meeting how do your
4   memos get to the board, are there any other
5   ways?
6   A.    No, that would be the only two ways,
7   either given to them or distributed to them
8   at a meeting when they were all there or sent
9   out in the packet or sent out in a
10  supplemental packet or envelope with
11  material.
12  Q.    Now, you said the regular meeting was
13  the first Thursday, correct?
14  A.    Second Thursday of the month.
15  Q.    The second Thursday of the month, but
16  the first meeting of the month?
17  A.    Yes.
18  Q.    Would the weekly packets tend to be
19  thicker for those meetings than the other
20  weekly packets?
21  A.    That would depend on what was
22  scheduled on the agenda or whether I was in
23  the week before and had a chance to get stuff
24  together or whatever, could be a number of

1   different reasons, but generally they are
2   maybe a little bit thicker because they have
3   reports in it, but that is not all of them.
4   Q.    Who prepares the weekly packets when
5   you are on vacation?
6   A.    The manager's secretary would prepare
7   any information that would go out to the
8   board, she would assemble, prepare the table
9   of contents.
10  Q.    And she would be responsible for
11  sending the packets to the board directly?
12  A.    They are delivered by police officers
13  so she delivers them to the police department
14  and they make the delivery.
15  Q.    So when you are on vacation you are
16  just left out of the process basically?
17  A.    No, because we try to get it organized
18  before I leave, and there may be some issues
19  that we would have to follow up on while I am
20  away.
21  Q.    Do you have any particular time that
22  you take vacations every year?
23  A.    No.
24  Q.    Are the agendas available to the

1   public?
2   A.    Yes.
3   Q.    The public sees the agenda when they
4   come to a meeting?
5   A.    That is one way to see the agenda.  We
6   also have a list of residents who have under
7   our ordinance provisions requested to be
8   notified, we send fax copies of the agendas
9   to them.
10  Q.    Does that include the executive
11  session agenda?
12  A.    No.
13  Q.    What about at the meeting itself, if I
14  went to a Whitemarsh Township Board of
15  Supervisors meeting I would see the open
16  meeting agenda, correct?
17  A.    Yes.
18  Q.    Would it be on a table, I could pick
19  it up?
20  A.    Yes.
21  Q.    Copies?
22  A.    Yes.
23  Q.    But I would not see the executive
24  session agenda?

Page 82

1  A.   No.
2         (Whereupon memo dated August 7,
3    2001 was marked for identification
4    as P-75.)
5  BY MR. EINHORN:
6  Q.   **Have you seen this memo before, Mr.**
7  **Gregan?**
8  A.   Yes.
9  Q.   **When did you see it?**
10  A.   When I wrote it.
11  Q.   **Any time after that?**
12  A.   I am sure.
13  Q.   **Did you see it in connection with the**
14  **production of the documents in this case?**
15  A.   I don't recall.
16  Q.   **Do you have any explanation why this**
17  **was not produced to us in connection with the**
18  **township's production of documents?**
19         MR. MAHONEY: Objection. Are
20  you saying this was not produced?
21         MR. EINHORN: Yes.
22         MR. MAHONEY: I don't
23  necessarily agree with that, and this appears
24  to be an attorney-client privilege matter

Page 83

1  because it does reference discussions, Ross
2  and I meeting the manager, then it shouldn't
3  have been disclosed, and if we held it back
4  it was because it was attorney-client
5  privilege, it is on the log.
6         MR. EINHORN: I do not think it
7  was.
8         MR. MAHONEY: Do you know for a
9  fact?
10         MR. EINHORN: I can find that
11  out at the break.
12  BY MR. EINHORN:
13  Q.   **Do you have any explanation why this**
14  **wasn't produced, sir?**
15         MR. MAHONEY: Excuse me, can I
16  just discuss this with him for a second?
17         MR. EINHORN: Sure.   And this
18  was not produced on the log.
19         (Whereupon the witness confers
20    with his attorney.)
21         (Whereupon the court reporter
22    read back from the record.)
23         MR. MAHONEY: At this
24  particular point I think we are going to have

Page 84

1  to wait until we see the privilege log,
2  number 1, and I would like to know where you
3  got the document because it does appear to be
4  an attorney-client privileged document.
5         MR. EINHORN: I don't think it
6  is my obligation at this point to tell you
7  where we received the document. I am
8  producing it to you now.  You did not produce
9  it to me for reasons that I don't quite
10  understand. Memos that look like this were
11  produced throughout this litigation.
12         MR. MAHONEY: Let's reiterate
13  my position on this. In the second paragraph
14  of this particular document there is a
15  reference to a discussion between the
16  solicitor and Mr. Gregan. How you came upon
17  this document I don't know, if it was
18  produced in somebody else's working file I
19  don't know that as well because as you
20  remember Mr. Zarko was being represented by
21  some other counsel before I got involved with
22  Mr. Zarko, whether it was produced out of
23  his file, I don't know.
24         All I am telling you is this an

Page 85

1  attorney-client privileged communication and
2  it shouldn't have been delivered to you.
3         MR. EINHORN: I disagree that
4  this is not something that should be in the
5  public records, but that being so, sir.
6  BY MR. EINHORN:
7  Q.   **Do you have any explanation as to why**
8  **this was not produced to us?**
9         MR. MAHONEY: Other than the
10  fact that it is an attorney-client
11  communication, there is no other explanation,
12  and I am going to direct the witness not to
13  answer that.
14         MR. EINHORN: Are you going to
15  direct him not to answer why it wasn't
16  produced?
17         MR. MAHONEY: Yes, for the very
18  reasons I just explained to you, it is an
19  attorney-client communication and it should
20  not have been disclosed to you.  You
21  obviously got it during discovery in this
22  case, whether it came from us, I don't know,
23  but I don't think it did.
24         MR. EINHORN: I will tell you

22 (Pages 82 to 85)

Page 86

1  where it came from, it was in the files, in
2  the township files back in 2001, and it was
3  reviewed by Mr. Garrity's office in
4  connection with the initial appeal of the
5  zoning that was found to be deficient.
6      MR. MAHONEY:  So you are
7  telling me Mr. Garrity came upon an
8  attorney-client privileged document, and
9  despite the fact that it is clear on its face
10  what it is and he made a copy of it.
11      MR. EINHORN:  Look, Hank, I am
12  asking the questions today, you will have
13  your chance with Mr. Garrity.  I am asking
14  Mr. Gregan a very straight forward, very
15  simple question, whether he can explain why
16  this wasn't produced.  If he can't explain
17  it, he can't explain it, if he can explain it
18  and the explanation is it is attorney-client
19  privilege and you pulled it I would like to
20  hear that, but I don't think it is an
21  appropriate instruction not to answer.
22      MR. MAHONEY:  Well, I disagree
23  with you because what you are telling me now
24  is that this document was secured by Mr.

Page 87

1  Garrity in the year 2001.
2      MR. EINHORN:  Was provided to
3  him by the township in 2001, and not produced
4  in this litigation by the township.
5      MR. MAHONEY:  How did the
6  township provide it to him?
7      MR. EINHORN:  It is in the
8  records.
9      MR. MAHONEY:  So he was
10  reviewing the records and came upon it and
11  took it?
12      MR. EINHORN:  I am not going to
13  speak for Mr. Garrity because I might get it
14  wrong.  You are free to ask Mr. Garrity these
15  questions.
16      MR. MAHONEY:  I already gave
17  you an explanation why it wasn't produced.
18  So I am going to ask the witness not to
19  answer any further because once the documents
20  come from his office to my office he --
21      MR. EINHORN:  Let's wait for
22  the log, and is it your position he is not
23  going to answer any questions at all with
24  this document?

Page 88

1      MR. MAHONEY:  With regard to
2  the document itself I don't think he should
3  because I think it is an attorney-client
4  communication.  Let's wait for the log.
5      MR. MAHONEY:  Okay.
6      MR. EINHORN:  So let's take a
7  break.
8      (Whereupon a short recess was
9  taken.)
10      MR. MAHONEY:  I just called
11  back to my office and asked my secretary to
12  pull the privilege log, and the very first
13  item on the privilege log for the township
14  documents is a memorandum dated August 7,
15  2000 from Larry Gregan to the Board of
16  Supervisors.
17      What you have pulled is a document,
18  which you have marked as P-75, is a document
19  which is clearly an attorney-client
20  privileged communication, one which is listed
21  in my privilege log which I gave to you many
22  months ago when these documents were
23  produced.
24      I think I am entitled to know

Page 89

1  specifically how Highway Materials, Inc. and
2  its attorneys came upon a document which we
3  have already identified in the privilege log
4  as being privileged.  I think I have a right
5  know that right now.
6      MR. EINHORN:  Let me just state
7  for the record that I will take Mr. Mahoney's
8  representation that it is on his privilege
9  log.  I disagree with his representation that
10  this is an attorney-client privilege
11  document.  I also think it obviously has been
12  waived if, in fact, it ever was
13  attorney-client privilege because this
14  document as I already mentioned was provided
15  to counsel for Highway Material in business
16  with the township in connection with the
17  appeal of the initial rezoning in 2001.
18      MR. MAHONEY:  I disagree with
19  you, and I respect your representation, but
20  Jim Garrity isn't here to tell me that.  So I
21  am directing the witness not to answer any
22  further questions about this particular
23  document.  If you want to raise it with the
24  judge be my guest.

Page 90

1         MR. EINHORN:  All right, let's
2    do it.
3         (Whereupon a discussion was
4         held off the record.)
5    BY MR. EINHORN:
6    Q.    For the record, we had a little bit of
7    an interruption here, I am going to pass on
8    my questions about the document that has been
9    marked P-75 for the time being, we have
10   contacted Judge Kelly's chambers and we
11   remain hopeful that he will call us back to
12   try to resolve this dispute, but for the time
13   being I am going to move on to try to get
14   this thing going as expeditiously as
15   possible.
16        P-11, please, sir, if you would please
17   look at P-11.  Sir, do you recognize P-11?
18   A.    Yes.
19   Q.    Is that your writing there that says
20   accepted by BOS on 11-8-01?
21   A.    Yes.
22   Q.    Is this a form, if you will, form
23   extension that is typically used in
24   Whitemarsh Township?

Page 91

1    A.    Yes, with exception --
2         JUDGE KELLY:  Hello.
3         MR. EINHORN:  Hello Judge
4    Kelly, this is Walt Einhorn, I am calling in
5    the middle of a deposition in one of your
6    cases.
7         JUDGE KELLY:  Right.
8         MR. EINHORN:  It is the Highway
9    Materials versus Whitemarsh Township case,
10   and we have an issue.  It is the deposition
11   of Mr. Gregan, who is the township manager,
12   and Mr. Gregan authored a memorandum dated
13   August 7, 2001 that was produced to counsel
14   for the Highway Materials, the plaintiff,
15   back in 2001 time frame.
16        JUDGE KELLY:  Okay.
17        MR. EINHORN:  It has to do with
18   one of the key issues in this case, which is
19   the rezoning of property, if you recall the
20   facts of the case.
21        JUDGE KELLY:  I do.
22        MR. EINHORN:  And the document
23   as it turns out is on the privilege log of
24   the defendants in the case, but nonetheless

Page 92

1    was produced to us, previous counsel in this
2    case, as part of an appeal from the rezoning
3    action.
4         The way we stand right now, Your Honor
5    I believe I am entitled to ask questions
6    about the document, and counsel for the
7    defendant, Mr. Mahoney, is claiming that the
8    document is attorney-client privilege.
9         MR. MAHONEY:  Your Honor, if I
10   could, it is Hank Mahoney representing the
11   township defendant in this case.
12        JUDGE KELLY:  Yes.
13        MR. MAHONEY:  Mr. Einhorn
14   started the questioning of Mr. Gregan by
15   marking this particular memorandum from Mr.
16   Gregan to the Board of Supervisors, and it
17   deals with a conversation that Mr. Gregan had
18   with Ross Weiss and a purported course of
19   action which could or could not be taken by
20   the Board of Supervisors.
21        In our response to request for
22   production of documents I listed this as
23   number 1 on our privilege log because it was
24   an attorney-client communication.

Page 93

1         When Mr. Einhorn produced the document
2    today I asked him specifically where he got
3    it.  Initially he wouldn't tell me, and then
4    he said he got it from Mr. Garrity, who is
5    handling the land use appeal.  Your Honor, I
6    don't know how Mr. Garrity got a hold of this
7    document.
8         JUDGE KELLY:  Who is Mr.
9    Garrity?
10        MR. MAHONEY:  The attorney
11   representing Highway Materials in the state
12   court action.
13        JUDGE KELLY:  Okay.
14        MR. MAHONEY:  And I asked Mr.
15   Einhorn how Mr. Garrity got it, and Mr.
16   Garrity is not here to explain himself, all
17   Mr. Einhorn can say he got it somehow or
18   another with regard to the rezoning process.
19        Now, to me, Your Honor, if an attorney
20   comes across a document like this in a
21   document review thousands of thousands of
22   pages and it is clearly an attorney-client
23   communication I don't see how he can take
24   this and make a copy of it and then give it

1  to counsel in the federal action who then
2  intends to use it even though I listed the
3  same document as a privileged document.
4        MR. EINHORN: Your Honor, if I
5  may?
6        MR. MAHONEY: Mr. Einhorn is
7  saying that we waived the privilege.
8        JUDGE KELLY: Hold on a second,
9  this sounds like a rather important matter.
10       MR. EINHORN: It is because it
11 contradicts much of the testimony that has
12 already been given. This is Mr. Einhorn.
13       JUDGE KELLY: I think it should
14 be briefed.
15       MR. EINHORN: Okay, Your Honor.
16       JUDGE KELLY: I don't think it
17 is the type of thing that I would want to
18 rule on over the phone without case law on
19 this.
20       MR. EINHORN: Okay, Your Honor,
21 we will be happy to do that. We will
22 continue on with the deposition and I will
23 not ask questions about this particular
24 document.

1        JUDGE KELLY: And submit either
2  a motion for protective order by somebody.
3        MR. MAHONEY: Okay, thank you,
4  Your Honor.
5        MR. EINHORN: Thank you Your
6  Honor.
7        JUDGE KELLY: Thanks, bye.
8        (Whereupon the court reporter
9        read back from the record.)
10       THE WITNESS: With the
11 exception that the last two lines of this
12 form have been struck out and deleted.
13 BY MR. EINHORN:
14 Q.    Those last two lines read, "If within
15 one year of the date of this letter we have
16 not submitted a revised plan and the township
17 has not taken formal action on the last plan
18 submitted we withdraw the application."
19       MR. MAHONEY: That is marked as
20 deleted.
21 BY MR. EINHORN:
22 Q.    That's right, that is the part that
23 you say is deleted?
24 A.    Yes.

1  Q.    And it surely looks that way from the
2  document. Now, you are familiar with this
3  extension form I gather?
4  A.    Yes.
5  Q.    You will agree with me then that in
6  the event that there is a revised plan filed
7  the township has 90 days from receipt of the
8  revised plan on which to act upon it,
9  correct?
10 A.    Yes.
11 Q.    And, in fact, if I had my dates right
12 in this particular case Mr. DePaul had filed
13 a revised plan somewhere around December 20th
14 or so of 2001, correct?
15 A.    Yes, that is my recollection.
16 Q.    And I believe the testimony from Mr.
17 Ford had been that the reason that the plans
18 were eventually scheduled for action in March
19 of 2002 was because of the running of that 90
20 days from the filing of the revised plan.
21 Does that comport with your understanding?
22 A.    Yes.
23 Q.    Now, getting to your writing there,
24 does it mean just what it says, that, in

1  fact, on the 8th of November 2001 the board
2  accepted this extension?
3  A.    It is my recollection, yeah, that it
4  was at that meeting.
5  Q.    That would be an item that would be
6  brought up at the meeting?
7  A.    Yes.
8        (Whereupon weekly packet was
9        marked for identification as P-76.)
10 BY MR. EINHORN:
11 Q.    Is P-76 excerpts from the weekly
12 packet for the meeting on September 20, 2001?
13 A.    Yes.
14 Q.    And I notice that there is a table of
15 contents, correct?
16 A.    Yes.
17 Q.    That is the first page. And then the
18 next page is the agenda, correct?
19 A.    Yes.
20 Q.    Now, sir, do you recall when Mr.
21 DePaul filed his plans for development of
22 hole number 1?
23 A.    I don't remember a specific date.
24 Q.    Was it around September 10th?

Page 106

1   **Q.  Once the zoning was passed?**
2   A.  Yes, when the zoning was passed.
3   **Q.  It is true, sir, that the reason that**
4   **the township decided to list the plans, the**
5   **ordinances for rezoning on September 20th for**
6   **advertisement on September 20th was because**
7   **Mr. DePaul had filed plans ten days before**
8   **that?**
9   A.  No, I don't believe that is true.
10   **Q.  Do you have any explanation then as to**
11   **why on September 20th you decided to put the**
12   **authorization to advertise the ordinances on**
13   **the agenda?**
14   A.  I don't remember a specific reason why
15   we did it.
16   **Q.  Do you have any explanation as to why**
17   **it was in July of 2001 the township had**
18   **decided to send the ordinances out for**
19   **evaluation but in September of 2001 it was**
20   **advertising them, authorizing the advertising**
21   **of them for a vote?**
22       MR. MAHONEY: Object to the
23   form of the question. They weren't
24   authorizing that specific ordinance submitted

Page 107

1   by the petition.
2   BY MR. EINHORN:
3   **Q.  Do you have any explanation for that,**
4   **sir?**
5   A.  I don't have, no, I don't have a
6   specific explanation for it.
7   **Q.  Anything happen between July and**
8   **September that might precipitate that?**
9   A.  I don't remember a specific reason for
10   putting it on that particular agenda.
11   **Q.  Do you recall anything, any reason,**
12   **whether specific, general or other?**
13   A.  I mean, well, we would put ordinances
14   on agendas for consideration for
15   authorization for advertisement for the
16   board's consideration, didn't necessarily
17   require any specific direction, we do it all
18   the time.
19   **Q.  You do that all the time?**
20   A.  We do.
21   **Q.  Put on residents --**
22   A.  No.
23   **Q.  Residents petitions all the time for**
24   **rezoning?**

Page 108

1   A.  This was not the residents petition.
2   **Q.  Other than the changes we went through**
3   **that you did on P-61, did you do anything**
4   **else to the ordinances to revise them?**
5   A.  No.
6   **Q.  Do you recall any conversations with**
7   **board members, for instance, or anybody in**
8   **that July, August, September time frame when**
9   **someone said to you we changed our minds we**
10   **are not going to evaluate this ordinance, we**
11   **are going to put it up for a vote as soon as**
12   **possible, no discussions like that?**
13   A.  No discussions like that.
14   **Q.  Were there discussions about the**
15   **ordinances in that time frame?**
16   A.  There was a discussion, I believe,
17   there would have been a discussion with the
18   Board of Supervisors and the township
19   solicitor.
20   **Q.  In executive session?**
21   A.  In executive session.
22   **Q.  Do you believe it is appropriate under**
23   **the Sunshine Act to discuss rezoning at**
24   **executive sessions?**

Page 109

1   A.  We didn't discuss rezoning, where we
2   discussed options, if they wanted us to
3   pursue it was direction to staff.
4   **Q.  I thought you just testified there**
5   **were discussions about the rezoning in**
6   **executive session, now you are saying there**
7   **were not?**
8   A.  We didn't talk about the rezoning, we
9   talked about options that the board had and
10   they could give us direction to move forward
11   with.
12   **Q.  Options for rezoning?**
13   A.  For taking any action.
14   **Q.  Including the rezoning, possibility of**
15   **rezoning?**
16   A.  Yes, they always had that option.
17   **Q.  In fact, if you look back at P-74,**
18   **please, that is the agenda for the August 23,**
19   **2001, I mean, the packet rather for the**
20   **August 23, 2001 meeting, right?**
21   A.  Yes.
22   **Q.  Isn't it true that on the executive**
23   **agenda at WT-18780 one of the items is a**
24   **discussion of the extraction ordinance**

ROYAL COURT REPORTING SERVICE, INC.    215.563.1782  1.888.595.RCRS  FAX: 215.563.2955

Page 110

1  proposal?
2  A.    Yes.
3  Q.    Do you consider rezoning litigation?
4        MR. MAHONEY:  Object to the
5  form of the question.  You are asking for a
6  legal conclusion.
7  BY MR. EINHORN:
8  Q.    If you know, your understanding of
9  whether a rezoning is litigation?
10  A.    It could lead to litigation.
11  Q.    Personnel matter, is it a personnel
12  matter?
13  A.    Is it a personnel matter?
14  Q.    Is a rezoning a personnel matter?
15  A.    No.
16  Q.    Is it your testimony today, sir, that
17  the filing of Mr. DePaul's plans on September
18  10th had nothing to do with the timing of
19  authorizing the advertising of the rezoning
20  ordinances on September 20th?
21  A.    Nothing to do, no, not because of the
22  filing of the plans, no.
23  Q.    Just a coincidence?
24  A.    Do I think, no, I don't believe it was

Page 111

1  a coincidence, but I don't think one leads to
2  the other.
3  Q.    What is the relationship then?
4  A.    I think there was -- the only
5  relationship to the other is that the board
6  was interested in moving forward and looking
7  at the possibility of rezoning the property,
8  and they authorized the advertisement of the
9  ordinances for the purposes of scheduling a
10  public hearing.
11  Q.    But you are the one who placed it on
12  the agenda?
13  A.    I placed it on the agenda, and it was
14  for their consideration as an option.
15  Q.    In your consideration of whether to
16  put that item on the agenda or not did you
17  consider the fact that Mr. DePaul had filed
18  plans on September 10th?
19  A.    I did not, no.
20  Q.    You did not?
21  A.    No.
22  Q.    Did anybody to your knowledge?
23  A.    I don't recall anybody specifically
24  saying that, no.

Page 112

1  Q.    So I am still a little unclear then.
2  I don't understand why you won't agree with
3  me that it was just a coincidence then, did
4  one have anything to -- to your knowledge did
5  the fact that the rezoning ordinances were
6  put on the agenda for authorization for
7  advertisement September 20th have anything to
8  do with the fact that Mr. DePaul filed the
9  plans on September 10th?
10        MR. MAHONEY:  Objection.  He
11  has answered that question multiple times
12  already.  Is it the same answer?
13        THE WITNESS:  It is the same
14  answer, I answered the question.
15        MR. MAHONEY:  Read it back.
16        MR. EINHORN:  You don't need to
17  read back.  Read back what?
18        MR. MAHONEY:  His answer that
19  he gave to you previously to the same
20  question that you asked three or four times
21  at this particular point.
22        MR. EINHORN:  I think you might
23  agree with me, Mr. Mahoney, that this is a
24  pretty important point, at least it is to me,

Page 113

1  and I am entitled to probe the witness'
2  recollection.
3        MR. MAHONEY:  The importance of
4  the point doesn't mean you can ask the
5  question over and over and over again until
6  you get an answer you want.  You obviously
7  haven't gotten the answer you want, you are
8  going to ask the question until you get the
9  answer you want, you are not entitled to do
10  that.
11        MR. EINHORN:  Are you
12  instructing him not to answer?
13        MR. MAHONEY:  He already
14  answered the question, the court reporter is
15  prepared to read it back.
16        MR. EINHORN:  We could have
17  been done with this if you let the witness
18  answer the question.
19        MR. MAHONEY:  And you would
20  have gotten the same answer and you would
21  have asked the question over again, when is
22  that going to end?
23        MR. EINHORN:  I got three
24  inconsistent answers.

Page 170

1   are going to bring Mr. Gregan back at a
2   mutually convenient time, maybe the 25th,
3   Tuesday, and subject to maybe further
4   discussions about the issue of the memo, and
5   we will take it from there.
6           (Witness excused.)
7           (Deposition concluded at 2:15 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 172

1                C E R T I F I C A T E
2       I, the undersigned, LAWRENCE J.
3   GREGAN, do hereby certify that I have read
4   the foregoing deposition, and that to the
5   best of my knowledge, recollection and
6   belief, said deposition is true and correct
7   with the exception of the following
8   corrections listed below.
9   PAGE   LINE       REASON
10
11
12
13
14
15
16
17
18
19
20
21                      SIGNATURE
22
23                      DATE
24

Page 171

1           CERTIFICATION
2
3       I, Linda A. Ricciardi, hereby
4   certify that the foregoing is a true and
5   accurate transcript of the deposition of
6   LAWRENCE J. GREGAN, who was first sworn by me
7   at the time, place and on the date herein
8   before set forth.
9       I further certify that I am
10  neither attorney nor counsel for, not related
11  to or employed by any of the parties to the
12  action in which this deposition was taken;
13  further, that I am not a relative or employee
14  of any attorney or counsel employed in this
15  case, nor am I financially interested in this
16  action.
17
18
19
20
21
        Linda A. Ricciardi
22      Court Reporter and Notary
        Public
23
24

**EXHIBIT B**



05/11/02  FRI 13:30 FAX 6108284887        WPTCG&P                          ☑002

✓ CC BOS



# KSM R&S

## KAPLIN · STEWART · MELOFF · REITER & STEIN
LAW OFFICES / A PENNSYLVANIA PROFESSIONAL CORPORATION

Stephen Marshall
Direct Dial: (610) 941-2526
Direct Fax: (610) 260-1240
Email: smarshall@kaplaw.com

350 SENTRY PARKWAY
BUILDING 640
P. O. BOX 3037
BLUE BELL, PA
19422

(610) 260-6000
FAX (610) 260-1240

25 CHESTNUT STREET
SUITE 106
HADDONFIELD, NJ
08033

(856) 428-7784
FAX (856) 428-7540

TWO PENN CENTER PLAZA
SUITE 200
PHILADELPHIA, PA
19102

(215) 567-3120

www.kaplaw.com

July 3, 2001

**VIA HAND DELIVERY**

Board of Supervisors
Whitemarsh Township
616 Germantown Pike
Lafayette Hill, PA 19444-1498

WHITEMARSH TOWNSHIP
RECEIVED

JUL - 3 2001

OFFICE OF THE TWP. MANAGER

Re:  <u>Corson Lime Quarry- Stenton Avenue, Flourtown Avenue and
Joshua Road, Whitemarsh Township, Montgomery County,
Pennsylvania</u>

Dear Members of the Board:

This firm represents Donald and Trina Cohan. Mr. and Mrs. Cohan are long-time Whitemarsh Township residents with an address at 350 Stenton Avenue. The Cohan's home is near the approximately 300 acre property commonly known as the "Corson Lime Quarry", currently owned by Highway Materials, Inc.

Enclosed please find a Petition for Amendment to the Zoning Ordinance and Zoning Map of the Township of Whitemarsh. The Petition requests that the Board of Supervisors hold a hearing on Amendments to the Whitemarsh Township Zoning Ordinance in connection with rezoning the Corson Lime Quarry property. The Amendments are attached to the Petition in the form of a proposed Ordinance.

This firm prepared the Petition and proposed Ordinance on behalf of Mr. Cohan. The Whitemarsh Township Residents Association has assisted in obtaining 319 signatures of Township residents in support of the Petition. We expect to forward a significant number of additional signatures under separate cover some time next week.

As the governing body of Whitemarsh Township, you are empowered to enact amendments to the Zoning Ordinance pursuant to Section 609 of the Pennsylvania Municipalities Planning Code (53 P.S.§10609). This power is also enumerated in Article XXXI, §116-236, et seq. of the Zoning Ordinance.

It is our position that a hearing on this matter should be scheduled as soon as possible, given the importance of the future development of this property to all of the residents of Whitemarsh Township. Accordingly, please advise at your earliest

IMAN58 /SZM/5486/3/276792_1                                    07032001/14:37



Board of Supervisors
July 3, 2001
Page 2

convenience whether the Petition is granted and, if so, where and when a hearing will be held on this matter.

In the interim, do not hesitate to contact Marc Kaplin or myself should you have any questions.

Respectfully Submitted,

Stephen Marshall

SZM:dla
Enclosure
cc:    Ross Weiss, Esquire (w/encl. via facsimile)
       Lawrence J. Gregan, Manager (w/out encl. via hand delivery)
       Robert A. Ford, Assistant Manager (w/out encl. via hand delivery)

05/17/02  FRI 13:31 FAX 6108284887          WPTCG&P                                    ☒004

## PETITION FOR AMENDMENT TO THE ZONING ORDINANCE AND ZONING MAP
## OF THE TOWNSHIP OF WHITEMARSH

TO THE BOARD OF SUPERVISORS OF THE TOWNSHIP OF WHITEMARSH, MONTGOMERY COUNTY, PENNSYLVANIA:

Application is hereby made by the undersigned residents of Whitemarsh Township (collectively the "Petitioner"), pursuant to Article XXXI, § 116-236 of Chapter 116 of the Whitemarsh Township Code ("Zoning Ordinance") for the enactment of amendments to the Zoning Ordinance and the Whitemarsh Township Zoning Map ("Map"), and the Petitioner represents that:

1.    They are residents of Whitemarsh Township, Montgomery County, Pennsylvania.

2.    The property that is the subject of this Petition consists of two(2)parcels totaling approximately 313 acres and historically known as the "Corson Lime Quarry" ("Quarry"). The Quarry is currently owned by Highway Materials, Inc. and is identified as Montgomery County Tax Parcel Numbers 65-00-03886-009 and 65-00-03886-108.

3. .  The Quarry is located in a section of the Township which is presently zoned as HVY-X-Heavy Industry District and is surrounded by AAA and AA Residential Districts.

4.    The Petitioner requests that the Zoning Ordinance be amended to provide for a new zoning district to provide for the continued use of existing extraction sites to and promote the attractive and economically successful redevelopment of land where existing extraction sites are located, after reclamation of such sites. The new zoning district shall be known as the "EX: Extraction District" (the "EX District").

5.    The Petitioner requests the Map be amended to include the Quarry in the EX District.

6.    A proposed ordinance amending the Zoning Ordinance to create the EX District and a proposed ordinance amending the Map to include the Quarry in the EX District are attached hereto and made a part hereof. (the "Proposed Ordinances").

1

05/17/02  FRI 13:32 FAX 6108284887          WPTCG&P                                    ☑006

District, the following regulations shall apply.


### § 116-249. USE REGULATIONS.

In an EX: Extraction District, a building may be erected, altered or used and a lot may be used or occupied for any of the following purposes and no other:

A.   Extraction  of  mineral  deposits,  stockpiling,  the processing of the removed materials and on-site operations appurtenant to mineral extraction as set forth in Article XXI, § 116-156.

B.   Any use permitted in Article V, § 116-35, following Rehabilitation, as defined in  §§ 116-156.K.-M.


### § 116-250. EXTRACTIVE USE STANDARDS

Extractive use standards shall be those provisions set forth in Article XXI, § 116-156.

### § 116-251. RESIDENTIAL USE STANDARDS

Residential use standards shall be those applicable provisions in Article VII (AAA Residential District), § 116-43 et seq.

Section 4.     Except as specifically hereby amended, the Zoning Ordinance is hereby ratified and confirmed in its entirety.

Section 5.  If any provision or part of this Ordinance is held invalid, the remaining provisions or parts of this Ordinance shall not be affected thereby.  If the application of this Ordinance or any of its provisions or parts to any persons, property or circumstances is held invalid, the application of this Ordinance to other persons, property or circumstances shall not be affected thereby.

ENACTED AND ORDAINED by the Board of Supervisors of the Township of Whitemarsh, Montgomery County, Pennsylvania, this _____ day of _____, 2001.

                                        BOARD OF SUPERVISORS OF
                                        WHITEMARSH TOWNSHIP


2

ORDINANCE _____ OF 2001

AN ORDINANCE CHANGING THE ZONING MAP CLASSIFICATION OF CERTAIN
PROPERTIES WITHIN THE HVY-X HEAVY INDUSTRIAL DISTRICT TO THE
EX: EXTRACTION DISTRICT, INCLUDING BUT NOT LIMITED TO THE
CERTAIN TRACT/PARCEL/LOT DESCRIBED HEREIN.

The Board of Supervisors of Whitemarsh Township, Montgomery
County, Pennsylvania does hereby enact and ordain the following:

    Section 1.   Article III.  Enumeration and Boundaries of
Districts; Maps; Applicability, §116-13. Zoning Map of Chapter 116
of the Whitemarsh Township Code, as amended, and all the notations,
references and other data shown thereon are hereby amended to
change the Zoning Map classification of the following properties
from the HVY-X District to the EX: Extraction District:

    Whitemarsh Township Tax Map Block 044A, Unit No. 001, Parcel
    No. 65-00-03886-009 (see legal description attached hereto as
    Exhibit A.)

    Whitemarsh Township Tax Map Block 044A, Unit No. 006, Parcel
    No. 65-00-03886-009 (see legal description attached hereto as
    Exhibit B.)

    Section 2.  Except as specifically hereby amended, Chapter 116
of the Whitemarsh Township Code and the Zoning Map are hereby
ratified and confirmed in their entirety.

    Section 3.  If any provision or part of this ordinance and Map
is held invalid, the remaining provisions or parts of this
Ordinance and Map shall not be affected thereby.   If the
application of this Ordinance or Map or any of its provisions or
parts to any persons, property or circumstances is held invalid,
the application of this Ordinance or Map to other persons, property
or circumstances shall not be affected thereby.

    ENACTED AND ORDAINED by the Board of Supervisors of the
Township of Whitemarsh, Montgomery County, Pennsylvania, this
_____ day of _____, 2001.

                                    BOARD OF SUPERVISORS OF
                                    WHITEMARSH TOWNSHIP

1

05/17/02  FRI 13:33 F   8108284887          WPTCG&P                                    @008

## EXHIBIT B

### LEGAL DESCRIPTION

**EXHIBIT C**

**JULY 26, 2001**

The Special Meeting of the Whitemarsh Township Board of Supervisors was held on Thursday, July 26, 2001 at 8:00 P.M. in the Whitemarsh Township Building, 616 Germantown Pike, Lafayette Hill, PA.

Supervisors Present:   William E. Kramer, Chairman, Ann Younglove, Vice Chairman, William P. Rimel III, Elizabeth W. Graf and Ronald J. DeRosa.

Also Present:   Lawrence J. Gregan, Township Manager, Robert A. Ford, Assistant Township Manager, Ross Weiss, Esquire, Township Solicitor and Thomas F. Zarko, P.E., Township Engineer.

The Board took the following action:

1.      Chairman Kramer acknowledged receipt of a petition of residents that was received on July 12, 2001, requesting the Board to schedule a public hearing on the amendments to the Township Zoning Ordinance and Zoning Map to rezone the Corson Quarry property owned by Highway Materials, Inc.  The petition received also included a proposed ordinance to establish a new zoning district, EX-Extraction, which would provide for the continued extraction use on the Quarry property and provide for redevelopment of the site after reclamation as single family dwellings.  The petition also included a proposed ordinance to rezone all of the Corson quarry property to the proposed Ex-Extraction District.  Chairman Kramer stated that the draft Comprehensive Plan that has been worked on the by the Township Planning Commission over the last year and which has recently been released for public comment and submitted to the surrounding municipalities, as required, recommends consideration of reasoning this property.  The Board of Supervisors has also been considering a process to evaluate the appropriate zoning for the site and its future development impact and to identify any zoning options that are compatible with the surrounding community and its uses.  A request for proposal has been prepared for consideration at the current meeting to solicit proposal from planning consultants to perform a study of the rezoning of the tract.

Joanne Walker (Scarlet Oak Drive) asked about the status of development of the site while the study is underway and how long the study would take.  She was advised by Mr. Gregan that the study would take approximately six months.

Jim McGann (308 Whitemarsh Valley Road) wanted to know about the process for the selection of the consultant.  Supervisor Kramer said that the RFP would be sent to several qualified firms whose proposals will be considered.  The RFP would be due by August 30, 2001.  Mr. Weiss explained that once received the proposals will be public record.  The Township will then decide whether to interview one or all of the

July 26, 2001

consultants who submit proposals, which interviews would be open to the public, if desired. The proposals will be discussed at public meetings. The Township will consider the engagement of a consultant at a public meeting.

Bernard Madden (860 Valley View Road) suggested that time is of the essence to have the study performed quickly.

Supervisor Kramer opined that the time period within which the study could be performed will be included in the RFP.

David Contosta (19 Laurence Place) asked what a developer could be able to do before the study and completed. Mr. Zarko explained the process for subdivision and land development review in the Township.

Jim McGann asked how the opinions of the over 700 people who signed the petition would be factored into the final decision. He also asked whether a condemnation and/or consideration for a state park or open space has been considered for the site. Supervisor Kramer stated that the petition will be sent to the planner selected, and consideration of the property as open space would be included in the study. Mr. McGann said that the 700 residents expressing their wishes is a significant indicator that should be considered.

On a Motion by Supervisor Rimel, seconded by Supervisor DeRosa (Vote 5-0), the Board authorized Staff to finalize and submit the RFP for planning services to planning consultants. Proposals will be due by August 30, 2001.

There was no additional public comment on this action.

2.     Edward Hughes, Esq. appeared on behalf of the minor subdivision plan for Frank J. and Charlene Sciarra, 2312 Holly Lane. The lot in question is an oversized lot that was previously known as Lot 13 in the Whitemarsh Hunt Subdivision being proposed to be subdivided into two lots, the Lot #1 retaining the existing dwelling and Lot 2 to be developed with a new single family house.

Township Engineer Thomas F. Zarko, P.E. reviewed the Staff comments on the proposed minor subdivision noting a number of issues on the plans which can be conditions of final approval. He also reviewed the waiver requested by the applicant along with the Township Planning Commission and Staff recommendations.

Maria Mack (2313 Holly Lane) asked about the setback on the tract and also about the specific conditions imposed on the settlement of the zoning cases.

WT-009408

2

July 26, 2001

Natalie Smalley had a question about the maintenance responsibility for the stormwater basin located behind the property.

On a Motion by Supervisor Rimel, seconded by Supervisor DeRosa (Vote 5-0), the Board adopted Resolution 2001-22 granting Conditional Final Minor Subdivision approval for SLD 2-01, Smalley Tract, subject to conditions as outlined in the Resolution.

3.    Joseph Kuhls, Esq. and Robert E. Blue, P.E. appeared on behalf of Stenton Avenue Properties, applicant/owner, with regard to the preliminary/final subdivision plan, SLD 21-96 Whitemarsh Chase (Butler Pike & Stenton Avenue), which proposes a twenty lot subdivision on the 17± acre parcel. Mr. Kuhls noted that a conditional use application was heard and approved by the Board of Supervisors in mid-1999 to permit cluster development of the parcel. Mr. Blue provided a description of the proposed plan which includes two short cul-de-sacs, with the main entrance to the property from Butler Pike. He noted that there are two detention basins on the site, and approval has been received from George Washington Memorial Park to accept stormwater discharge from the basins. Additional landscape buffering is included as part of the plan, and the plan includes approximately ten acres of open space.

Mr. Kuhls advised that the applicant is in agreement with all of the conditions included in the draft Resolution.

Thomas F. Zarko, P.E., Township Engineer, reviewed the Staff comments on the proposed preliminary/final subdivision plan noting a number of issues on the plans which can be conditions of final approval. He also reviewed the waivers and interpretation requests by the applicant along with the Township Planning Commission and Staff recommendations.

Bernard Madden (860 Valley View Road) asked if the property current has a "George Washington Memorial Park" sign. Mr. Zarko advised that the sign is currently on the site and will be removed.

Robert Wertz (4115 Presidential Drive) asked about the sidewalks and the impact on the lot sizes.

On a Motion by Supervisor DeRosa, seconded by Supervisor Rimel (Vote 5-0), the Board adopted Resolution 2001-21 granting Conditional Preliminary/Final Subdivision approval for SLD 21-96 Whitemarsh Chase, subject to conditions as outlined in the Resolution.

3

WT-009409

July 26, 2001

Supervisors Graf was asked by a resident about whether or not she had an interest in this property and should recuse herself from voting on the Resolution. Supervisor Graf advised that she no longer has any involvement in this property.

There was no public comment on this action.

4.    On a Motion by Supervisor Rimel, seconded by Supervisor Graf (Vote 5-0), the Board approved the request for extension of non-conforming setbacks at 2004 Spring Mill Road to July 28, 2002.

There was no public comment on this action.

5.    On a Motion by Supervisor Rimel, seconded by Supervisor Younglove (Vote 5-0), the Board acknowledged receipt of the final punchlist inspection of site improvements for SLD 3-95 Estates at Whitemarsh Hills. The Board directed that the inspection be submitted to the Developer for completion prior to release of the escrow and closure of the Improvement Agreement.

There was no public comment on this action.

6.    On a Motion by Supervisor DeRosa, seconded by Supervisor Rimel (Vote 5-0), the Board accepted a Letter of Extension for SLD 3-99 American Communications Land Development, extending the time period within which to take formal action on the land development application for a period of ninety (90) days after receipt of revised plans. If within one (1) year the applicant fails to submit revised plans, the applicant will withdraw the application.

There was no public comment on this action.

7.    On a Motion by Supervisor Rimel, seconded by Supervisor Graf (Vote 5-0), the Board approved the outstanding Vendor List of July 19, 2001 in the amount of $341,185.53.

On a Motion by Supervisor DeRosa, seconded by Supervisor Graf (Vote 5-0), the Board approved the External Checklist dated July 26, 2001 in the amount of $9,334.85.

On a Motion by Supervisor Graf, seconded by Supervisor DeRosa (Vote 5-0), the Board approved Payroll #15 in the amount of $141,646.74.

There was no public comment on these voucher approvals.

WT-009410

4

July 26, 2001

8.    Chairman Kramer announced that the Board had held a brief Executive Meeting prior to the Public Meeting and will continue in Executive Session for the purpose of discussing personnel and/or potential litigation matters.
o the bridge.

7.    On a Motion by Supervisor Rimel, seconded by Supervisor Younglove (Vote 5-0), the meeting was adjourned at 8:53 PM.

Respectfully submitted,

LAWRENCE J. GREGAN
Township Manager

c:\my documents-lf\minutes\01-july 26bos.doc

5

WT-009411