**EXHIBIT I**

```
                                    1
    IN THE UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF PENNSYLVANIA

                - - -

HIGHWAY MATERIALS, INC.    :  CIVIL ACTION
                           :
         -vs-              :  NO. 02-3212
                           :
WHITEMARSH TOWNSHIP, et al.:

                - - -

              July 18, 2003
                - - -


        Deposition of WILLIAM KRAMER, held in the
Law Offices of BALLARD SPAHR ANDREWS & INGERSOLL, LLP,
located at 1735 Market Street, 51st Floor, Philadelphia,
Pennsylvania, commencing approximately at 9:35 a.m. on
the above date, before Holly J. Cross, a Registered
Professional Reporter and Notary Public for the State of
Pennsylvania.
```

```
                                    2
APPEARANCES:

    BALLARD SPAHR ANDREWS & INGERSOLL, LLP
    BY:  WALTER M. EINHORN, JR., ESQUIRE
    1735 Market Street, 51st Floor
    Philadelphia, PA  19103
    Counsel for Plaintiff

    DEASEY, MAHONEY & BENDER
    BY:  HARRY G. MAHONEY, ESQUIRE
    1800 John F. Kennedy Boulevard
    Suite 1300
    Philadelphia, PA  19103
    Counsel for Defendants


ALSO PRESENT:

    Kristine Maciolek, Esquire
```

```
                                    3
                    INDEX


THE WITNESS                              PAGE

WILLIAM KRAMER

    By Mr. Einhorn                         4


                   COPY




                  EXHIBITS

MARKED      DESCRIPTION                  PAGE

P-58        Transcript of 7/26/01 Meeting   7

P-59        6/1/01 Memo From Mr. Gregan    81

P-60        5/24/01 Minutes of Special Meeting  82

P-61        7/18/01 Memo From Mr. Gregan   97

P-62        11/9/01 Letter From Mr. Garrity 105
```

```
                                    4
                - - -
        WILLIAM KRAMER, having been duly sworn, was
examined and testified as follows:
                - - -
        MR. MAHONEY:  For the record, I'd like
the witness to read and sign the transcript.
                EXAMINATION
BY MR. EINHORN:
Q    Good morning, Mr. Kramer.
A    Good morning.
Q    Mr. Kramer, it's true, isn't it, that in July
of 2001 some of the neighbors of the DePaul quarry sites
presented the board of supervisors with a petition to
rezone the properties?
A    I believe so.
Q    You don't remember that?
A    Oh, I remember it.  I mean, I don't know the
dates; but yes, they did.
        MR. EINHORN:  Hank, do you have P-1
there?
        MR. MAHONEY:  Sure.
BY MR. EINHORN:
Q    Mr. Kramer, we've had many depositions in this
matter already; and in the course of those depositions,
```

**Page 49**

BY MR. EINHORN:
Q  Can you answer the question, sir?
A  No. It's been answered.
Q  You're not going to answer my question?
A  I answered your question.
Q  Is this a sensitive point for you, sir, this flip flop --
A  No, you are a sensitive point.
    MR. MAHONEY:  Excuse me, excuse me.
    THE WITNESS:  No, you are a sensitive point, sir.
    MR. MAHONEY:  Excuse me.
    THE WITNESS:  You're twisting every freaking thing around.
    MR. EINHORN:  Did you get that?
    MR. MAHONEY:  Let's have a break.
    (Recess taken.)
BY MR. EINHORN:
Q  Did you have any discussions with anyone about the placement of this agenda item on September 20th?
A  I don't recall.
Q  Do you recall knowing before the meeting that this agenda item was going to be on the list for that night?

**Page 50**

A  Only when I got the packet. That's all I can recall.
Q  What was your reaction when you got the packet?
A  Well, I couldn't make the meeting, so I probably just put it aside.
Q  But you remember getting the packet with the agenda item on there?
A  I would assume so that I got the packet delivered, yes. I just don't know where I was.
Q  You don't recall any reaction to that?
A  It's just on the agenda.
Q  But you don't recall yourself having any reaction to that agenda item?
    MR. MAHONEY:  I think he already answered the question.
    THE WITNESS:  Yeah. I mean, what else --
BY MR. EINHORN:
Q  If the answer is you don't remember, just say, "I don't remember."
A  I don't remember.
Q  Okay. I gather, then, you didn't ask anybody, "Why are we putting this on the agenda if we haven't hired the land use planner yet?" Did you ever ask that

**Page 51**

question of anybody?
A  I don't recall.
Q  Was it a surprise to you that this was on the agenda, given the fact that the land use planner hadn't been hired yet?
A  No.
Q  Sir, isn't it true that the vote on September 20th to advertise the ordinance was in response to Mr. DePaul filing the plans, the preliminary plans, on the property?
A  It might have moved it along, yes; but the plans were already filed, so whether we advertised or didn't didn't make much sense -- didn't make much consequence, it seems, because the plans -- he's filed. He's in.
Q  Okay. So the only consequence that the rezoning would have would be if the plans were denied; correct?
A  If the plans were denied or if he sold the property to somebody else or he abandoned the project.
Q  But you understood at the time that the rezoning would have no practical effect on the property if his plans were eventually approved; correct?
A  Right. I believe even filing his plans -- it's

**Page 52**

hard to disapprove the plan as long as it meets all the other criteria.
Q  Now, you said that it might have moved it along. What do you mean that?
A  Well, basically, each time I saw a submission from here it got more aggressive, so the other properties -- the other parts of the site hadn't been developed, and this is a pretty intense development. So at the very best we, at least, would be left with, you know, maybe a good balance between the office use and triple A residential and the rest of the site.
Q  So, then, it's fair to say --
A  Sites, other sites. I'm sorry.
Q  It's fair to say that the township action in rezoning the property, then, was in response, at least in part, to the filing of Mr. DePaul's plans?
    MR. MAHONEY:  Objection.
    THE WITNESS:  Part of the rezoning process had been going on for some time.
BY MR. EINHORN:
Q  But it wasn't until September 20th that you actually took the step to advertise the rezoning; correct?
A  Right.

**Page 53**

1  Q    And my question is: That, in part, was a
2  response to the filing of Mr. DePaul's plans?
3  A    The zoning process had been going on since
4  prior to Mr. DePaul's plans. It had been recommended to
5  rezone. It was a bad zoning. It's just part of the
6  process.
7  Q    I'm just asking why September 20th.
8  A    I have no idea.
9  Q    So it's your testimony under oath today, sir,
10 that the filing of the plans did not result -- strike
11 that.
12      It's your testimony, if I'm hearing you
13 correctly, that the vote on September 20th to advertise
14 the residents' ordinance was, at least in part, a
15 response to the filing of Mr. DePaul's preliminary plan?
16      MR. MAHONEY:  Objection. He already
17 testified that it moved it along.
18      THE WITNESS:  It moved it along.
19 BY MR. EINHORN:
20 Q    So the answer to that is a yes?
21 A    Yes. It moved it along. It is not the
22 residents' ordinance. It was the township's ordinance,
23 also.
24 Q    Just so the record is clear, you're agreeing

**Page 54**

1  with me that the scheduling of the vote on September
2  20th was, at least in part, a response to the filing of
3  Mr. DePaul's plans?
4       MR. MAHONEY:  Object to the form of the
5  question. It's been asked and answered repeatedly.
6  BY MR. EINHORN:
7  Q    Can you answer that yes or no, sir?
8  A    I already answered the question.
9  Q    I didn't hear it. Was it a yes or a no?
10 A    I already answered the question in previous
11 questions. It's part of a long process of rezoning that
12 ground. I've already answered the question.
13 Q    Sir, I'm asking you, since I missed it, was it
14 a yes or a no? Was your answer a yes or a no to the
15 question?
16 A    Have her read it back.
17 Q    Well, we'll be looking a long time for that yes
18 or no, sir.
19      MR. MAHONEY:  Excuse me. The witness
20 has the right to ask for testimony or a question to be
21 read back.
22      MR. EINHORN:  Mr. Mahoney, you're
23 absolutely right. Do you think you can find the answer
24 to that question?

**Page 55**

1       (The record was read by the
2       reporter.)
3  BY MR. EINHORN:
4  Q    So the answer is a yes; is that correct?
5       MR. MAHONEY:  Which question?
6       THE WITNESS:  The question has already
7  been answered. She just read it back.
8  BY MR. EINHORN:
9  Q    I'm going to try one more time, sir, and then
10 we can move along, because I don't want to belabor the
11 point. I'm just asking for a simple yes or no. If you
12 can't answer it yes or no, just tell me that, too.
13      Was the vote to advertise on September 20th, at
14 least in part, a response to the filing of Mr. DePaul's
15 preliminary plans?
16      MR. MAHONEY:  It's been asked and
17 answered, but go ahead and answer it.
18      THE WITNESS:  Possibly.
19 BY MR. EINHORN:
20 Q    What do you mean by "possibly"?
21 A    Jesus Christ --
22 Q    Well, sir, I'm entitled to follow-up on that
23 answer.
24 A    Look, I already told you earlier, and she read

**Page 56**

1  it back. I said -- you know, she read the darn thing
2  back; and, instead -- you know, in response, yeah,
3  partial pressure, yeah, possibly, yes. There's a
4  pressure of that development on that.
5  Q    Okay.
6  A    Of future developments. Excuse me. His
7  development had already been submitted. All right? The
8  zoning is changed for future developments, not the
9  development he already submitted.
10 Q    Understood. Under the law is what you're
11 telling me. He has the right to develop under the old
12 zoning.
13 A    Right.
14 Q    Okay. Now, you've testified about the draft
15 comprehensive plan on a few occasions in your answers.
16 A    Yes.
17 Q    Are you referring to the June 2001 draft plan?
18 A    I don't have it in front of me; but I assume,
19 if that's the last draft, that would be correct.
20 Q    Let me show it to you. P-4.
21      MR. MAHONEY:  P-4? Just this page?
22      MR. EINHORN:  I was just going to point
23 out his name on it, and then ask him a few preliminary
24 questions.

145

1  that work?
2  A   I just read them.
3  Q   Did it come in your weekly packet?
4  A   Yes.
5  Q   And the previous --
6  A   Yes.
7  Q   -- ones came in your weekly packet?
8  A   Yes.
9  Q   And you reviewed them for accuracy?
10 A   Tried to, yeah, speed read them.
11 Q   Okay. Did you -- but you had the opportunity
12 to correct the minutes if you chose to?
13 A   Yes.
14 Q   One more topic, P-40, please, Hank.
15     Sir, this has been marked P-40 to a previous
16 deposition. I forget who it was. I think it was
17 Mr. Zarko, but I'm not sure. Do you recognize that
18 document?
19 A   No. I don't think we see this document.
20 Q   You don't recall ever seeing that document?
21 A   No, no.
22 Q   Have you ever seen any checklist that is
23 applicable to preliminary plans in Whitemarsh Township?
24 A   I don't recall, no.

146

1           MR. EINHORN: All right. Those are all
2  the questions I have.
3           MR. MAHONEY: That's it.
4           (The deposition concluded at
5           approximately 12:45 p.m.)

147

WITNESS CERTIFICATION

I hereby acknowledge that I have read the foregoing transcript of my deposition given on July 18, 2003 and that it is a true, correct and complete transcript of the answers given by me to the questions propounded, to the best of my knowledge, recollection and belief, except for the list of corrections, if any, noted on the below Errata Sheet.

_____
WILLIAM KRAMER

148

C E R T I F I C A T I O N

I, Holly J. Cross, a Registered Professional Reporter, do hereby certify that the proceedings, evidence, and objections upon the deposition of WILLIAM KRAMER are contained fully and accurately in the stenographic notes taken by me upon the foregoing matter on July 18, 2003 and that this is a true and correct transcript of same.

_____
HOLLY J. CROSS
Registered Professional Reporter

**EXHIBIT J**

2

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

---

HIGHWAY MATERIALS, INC        : CIVIL ACTION
                              :
    -vs-                      :
                              :
WHITEMARSH TOWNSHIP, et al.   NO. 02-3212

---

- - -
March 21, 2003
- - -

   Oral deposition of WILLIAM RIMEL, held in the offices of Whitemarsh Township Building, 616 Germantown Pike, Whitemarsh, Pennsylvania 19444, commencing at 10:21 a.m. on the above date, before Robin M. Valentini, a Certified Shorthand Reporter.

APPEARANCES:

BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
BY:  WALTER M. EINHORN, JR., ESQUIRE
     1735 Market Street, 51st Floor
     Philadelphia, PA 19103
Counsel for the Plaintiff


DEASEY, MAHONEY & BENDER
BY:  HARRY G. MAHONEY, ESQUIRE
     1800 John F. Kennedy, Suite 1300
     Philadelphia, PA 19103
Counsel for the Defendants


ALSO PRESENT:
BY:  MS. KRISTINE MACIOLEK, ESQUIRE
     JAMES GARRITY, ESQUIRE
     ROBERT RAQUET

- - -

COPY

3

INDEX

| WITNESS | PAGE NO. |
|---|---|
| WILLIAM RIMEL | |
| By Mr. Einhorn | 4 |

- - -

EXHIBITS

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| P-1 | Letter, 7/3/2001 | 42 |
| P-2 | Minutes, 7/12/2001 | 50 |
| P-3 | Letter, 7/13/2001 | 55 |
| P-4 | Comprehensive Plan | 58 |
| P-5 | Minutes, 7/26/2001 | 73 |
| P-6 | Minutes, 9/20/2001 | 87 |
| P-7 | Minutes, 10/18/2001 | 112 |
| P-8 | Resolution #2001-7 | 125 |
| P-9 | Letter, 1/24/2002 | 129 |
| P-10 | Letter, 3/21/2002 | 130 |
| P-11 | Letter, 8/20/2001 | 144 |
| P-12 | Letter, 10/15/2001 | 151 |
| P-13 | Letter, 11/20/2001 | 153 |
| P-14 | Minutes, 1/7/2002 | 160 |
| P-15 | Memo, 1/31/2002 | 163 |

4

EXHIBITS

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| P-16 | Letter, 2/4/2002 | 165 |
| P-17 | Letter, 3/8/2002 | 175 |
| P-18 | Letter, 3/12/2002 | 181 |
| P-19 | Memo, 3/20/2002 | 192 |
| P-20 | Letter, 3/21/2002 | 194 |
| P-21 | Resolution #2002-17 | 200 |
| P-22 | Minutes, 7/18/2002 | 218 |

101

1  Q. When you say specifically, it leads me to
2  believe you may have some general recollections of
3  discussions along those lines.
4  A. Well, I can't imagine that in an executive
5  session we didn't say, if we enact this, this is
6  what's going to happen. If we enact this zoning
7  ordinance, then these are the ground rules under
8  which the DePaul organization will have to work. I
9  can't imagine that that was not mentioned.
10  Q. Okay. You knew, though, that if the plans
11  were eventually approved, the September '01 plans
12  were eventually approved, that your change in the
13  ordinance, at least for Hole No. 1, would have been
14  meaningless?
15  A. That's correct.
16  Q. So given that you don't recall ever having
17  any land development plans denied in the Township
18  since you've been on the Board, wasn't there some
19  sense in your mind that this rezoning was just a
20  waste of time with respect to Hole No. 1?
21  A. I can't say that I thought it was a waste
22  of time.
23  Q. Okay. Did you have any thoughts in that
24  regard?

102

1  A. Not that I recall.
2  Q. But you did know that for the zoning to
3  have any effect on the plans, with respect to Hole
4  No. 1 —
5       MR. MAHONEY: Rezoning.
6       MR. EINHORN: The rezoning. Thank you.
7  BY MR. EINHORN:
8  Q. — the rezoning with respect to Hole No.
9  1, you would have to eventually deny DePaul's plans,
10  meaning the Board?
11      MR. MAHONEY: You're saying that's what
12  his thought process was?
13      MR. EINHORN: Yes.
14  A. I knew that if we denied the plan, that
15  any future plans would have to be considered under
16  the new zoning.
17  Q. But you knew for this rezoning to have any
18  practical effect in the real world, Mr. DePaul's
19  plans for Hole No. 1 would have to be denied?
20      MR. MAHONEY: He knew or he knows?
21      MR. EINHORN: He knew at the time.
22  A. I knew at the time that that was the case.
23  Q. You still know that to be the case; true?
24  A. Yes. That's the law.

103

1  Q. I want to talk just for a second about the
2  KYW property. I actually believe that's zoned heavy
3  industrial. We talked generally about it.
4       MR. MAHONEY: Heavy X.
5       MR. EINHORN: Heavy X; is it?
6       MR. MAHONEY: Yes.
7       MR. EINHORN: Okay.
8  BY MR. EINHORN:
9  Q  That is part of the Simone study; correct?
10  A. That is correct.
11  Q. In fact, I believe in Mr. Simone's
12  presentations, he's addressed that KYW property in
13  addition to the DePaul properties; true?
14  A. As I recall, yes.
15  Q. Okay. But if I'm also reading your
16  minutes correctly, the KYW property was not rezoned
17  in October 2001; correct?
18  A. That's the way it looks to me. I don't
19  really recall that we discussed that particular
20  portion of the property.
21  Q. Why was there an action to rezone the
22  DePaul properties before receiving the Simone plans,
23  and no similar action to rezone the KYW property,
24  which was also to be subject in the Simone study?

104

1  A. I don't recall.
2  Q. Why did the DePaul properties have to be
3  rezoned in October '01 instead of just waiting for
4  the Simone recommendations?
5  A. Well, it seemed to us — it seemed to us
6  that it was appropriate to do for that piece of
7  property.
8  Q. Okay. I'm now focusing on the timing more
9  than the actual zoning itself.
10      Why was there the big rush to do
11  this?
12      MR. MAHONEY: Object to the form of
13  question. That's your characterization.
14      MR. EINHORN: That's true. It is.
15  A. Well, I don't think there was a big rush.
16  Q. Sir, in July of '01, we're talking about a
17  process. We can go back. We'll look at the study.
18  The study would take about six months.
19  A. Yes.
20  Q. Two months later, we're advertising the
21  rezoning of the properties.
22      How would you characterize that time
23  frame?
24  A. It's a two month time frame. It's out

**Page 105**

1  there for everybody to evaluate and look at.
2     Q. Sir, is it fair to say that, in your mind,
3  anyway, that this action on September 20th was a
4  retaliation for Mr. DePaul filing the plans on
5  September 10?
6     A. Absolutely not.
7     Q. Absolutely not?
8     A. Absolutely not.
9     Q. And you can't, sitting here today, give me
10 a reason why you didn't wait for the Simone study on
11 these properties?
12    A. No, I cannot.
13      MR. EINHORN: Off the record.
14      (Whereupon, a discussion was held
15      off the record.)
16      (Whereupon, a luncheon recess was
17      taken.)
18 BY MR. EINHORN:
19    Q. Mr. Rimel, are there agendas or minutes
20 that are kept for executive sessions?
21    A. There is an agenda that comes out in the
22 packet with the items that will be discussed. No
23 minutes, to my knowledge.
24    Q. When you're in attendance at a Board of

**Page 106**

1  Supervisors meeting, do you take notes?
2     A. No.
3     Q. You don't have a laptop or anything that
4  you put information into?
5     A. No.
6     Q. Obviously, when you're at the Board of
7  Supervisors meetings, you're able to witness what
8  the other Board members are doing; correct?
9     A. Yes.
10    Q. Do you notice any of them that take notes?
11    A. I never have.
12    Q. Anybody come with a laptop?
13    A. No.
14    Q. How about Mr. Gregan, does he come in with
15 a laptop?
16    A. No.
17    Q He takes hand notes and uses the tapes?
18    A Yes.
19    Q. Anybody affiliated with the Township that
20 you've noticed in meetings, other than Mr. Gregan,
21 taking notes?
22    A. No.
23    Q. Anybody come in with a laptop that you've
24 noticed?

**Page 107**

1     A. No.
2     Q. Is it your understanding that a citizen or
3  a citizens group can legally request the rezoning of
4  someone else's property?
5       MR. MAHONEY: Objection. Asks for a
6       conclusion.
7       You can answer, if you can.
8     A. Anybody can ask -- legally can come in and
9  ask. That's sort of the way the system works.
10    Q. It's not limited to owners, as far as you
11 know?
12    A. No.
13    Q. We talked about factors that are
14 considered in various decisions.
15      Is the community preference one of
16 the factors that the Board of Supervisors considers
17 in connection with their request for rezoning?
18    A. Yes. In a request for rezoning, yes.
19    Q. What way is that considered?
20    A. Well, if the community has an input, we
21 take it into consideration when making a zoning
22 ordinance decision.
23    Q. So if the community is for a particular
24 rezoning, you would take that into consideration in

**Page 108**

1  a positive way for the rezoning?
2     A. Sure.
3     Q. And vice versa?
4     A. Yes.
5     Q. Did that happen in the DePaul rezoning?
6     A. I did not consider it.
7     Q. Okay. So, you, meaning William Rimel,
8  III --
9     A Yes.
10    Q -- did not consider the community
11 preferences when you voted to advertise the
12 rezoning?
13    A. That is correct.
14    Q. Did you have an understanding about what
15 that community preference was?
16    A. Yes, I did.
17    Q. What was your understanding?
18    A. My understanding was that the community's
19 preference would be to rezone it.
20    Q. Were there any discussions in connection
21 with the rezoning that you were present for relating
22 to community preference?
23    A. Not that I recall.
24    Q. There could have been, but you just don't

221

1   A. Well, my view is, if I were Mr. DePaul or
2   any owner of this property, I would view this report
3   as a free $60,000 land plan -- you know, an
4   opportunity to get benefit for myself, make a
5   profit, and comply with my neighbors' and the
6   Township's desires.
7   Q. I don't know if I asked you this when we
8   talked about your employment.
9       Have you ever done any land
10  development in your career?
11  A. No.
12  Q. If I showed you the final report, would
13  you be able to tell me whether it was the final
14  report or not?
15  A. There were so many interim reports, I
16  couldn't tell for sure.
17  Q. This is the last topic for the day.
18      Here's the --
19  A. That looks like it's the power point.
20  Q. This is what I have.
21  A. All right. That's pretty much what I
22  have.
23  Q. And I'm trying to figure out whether this
24  is the final version or not. We haven't had a

222

1   chance to talk to Mr. Simone.
2   A Okay.
3       MR. MAHONEY: It's got on second page,
4   these things.
5       MR. EINHORN: That's what is confusing me.
6       THE WITNESS: Yes.
7       MR. EINHORN: That as well as --
8       MR. MAHONEY: Off the record for a second.
9       (Whereupon, a discussion was held off
10      the record.)
11      MR. EINHORN: I have no further questions
12  for the witness.
13      I just do want to say for the record that
14  there are documents that have not yet been
15  produced relating to certain land development
16  files. I think we may have an agreement. I'm
17  not 100 percent sure yet.
18      There have also been some instructions not
19  to answer during this deposition, and I would
20  just like to reserve the right, if necessary,
21  to call this witness back at some later date,
22  as a result of those two items.
23      (Whereupon, the deposition was
24      concluded at 4:45 p.m.)

223

1       C E R T I F I C A T I O N
2       I, ROBIN M. VALENTINI, a Certified
3   Shorthand Reporter, do hereby certify the
4   foregoing to be a true and accurate
5   transcript of my original stenographic
6   notes taken at the time and place
7   hereinbefore set forth.
8
9
10          ROBIN M. VALENTINI, CSR
11
12      (The foregoing certification of
13  this transcript does not apply to any
14  reproduction of the same by any means,
15  unless under the direct control and/or
16  supervision of the certifying reporter.)
17              - - -

**EXHIBIT K**

**Page 1**

```
         IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF PENNSYLVANIA

                         - - -

HIGHWAY MATERIALS, INC.      :   CIVIL ACTION
       -vs-                  :   NO. 02-3212
WHITEMARSH TOWNSHIP, et al.  :

                         - - -

                   April 18, 2003

                         - - -

       Deposition of ANN YOUNGLOVE, held at the
WHITEMARSH TOWNSHIP BUILDING, located at
616 East Germantown Pike, Lafayette Hill, Pennsylvania,
commencing approximately at 10:05 a.m. on the above
date, before Holly J. Cross, a Registered Professional
Reporter and Notary Public for the State of
Pennsylvania.
```

**Page 2**

```
APPEARANCES:

    BALLARD SPAHR ANDREWS & INGERSOLL, LLP
    BY:  WALTER M. EINHORN, JR., ESQUIRE
    1735 Market Street, 51st Floor
    Philadelphia, PA  19103
    Counsel for Plaintiff

    DEASEY, MAHONEY & BENDER
    BY:  HARRY G. MAHONEY, ESQUIRE
    1800 John F. Kennedy Boulevard
    Suite 1300
    Philadelphia, PA  19103
    Counsel for Defendants


ALSO PRESENT:

    Kristine Maciolek, Esquire
```

**Page 3**

```
                         INDEX

THE WITNESS                                    PAGE
ANN YOUNGLOVE
    By Mr. Einhorn                             4, 139
    By Mr. Mahoney                             137


                       EXHIBITS

MARKED    DESCRIPTION                          PAGE

P-33      Excerpts of 3/21/02 Meeting          4


          INSTRUCTION TO WITNESS NOT TO ANSWER

              Page              Line
               46                 8
               46                17
               46                22
               47                24
              114                13
              114                19
              114                24
              115                15

              REQUEST FOR MARKED PAGE

                       Page
                        48
```

**Page 4**

```
                         - - -
            ANN YOUNGLOVE, having been duly sworn, was
examined and testified as follows:
                         - - -
            MR. MAHONEY:  For the record, I'd like
the witness to read and sign the transcript.
                       EXAMINATION
BY MR. EINHORN:
Q       Ms. Younglove, do you know Jim Garrity?
A       Yes.
Q       How do you know Jim Garrity?
A       He appears periodically before the board of
supervisors here in Whitemarsh representing developers.
Q       Land development applications?
A       Yes.
Q       Do you find Mr. Garrity to be generally
knowledgeable about the land development process in
Whitemarsh Township?
A       Yes.
            MR. EINHORN:  Okay.  Can you mark this,
please?
            (Whereupon, Exhibit P-33 was marked
for identification.)
BY MR. EINHORN:
```

**Page 73**

1  those plans, I would have expected, would have either
2  been consistent with the rezoning that I thought was
3  proper for it or not. I guess in my mind they weren't
4  tied together. I was happy with the rezoning as it was
5  proposed.
6  Q  Did you have any discussions prior to this
7  meeting about the timing of the rezoning?
8  A  Not that I recall.
9  Q  Do you recall anyone calling you or discussing
10 with you the fact that Mr. DePaul had filed plans in
11 September of 2001?
12 A  I don't recall.
13 Q  Is it your testimony that it's just coincidence
14 that days after Mr. DePaul filed the plans you folks
15 voted to advertise his properties for rezoning?
16         MR. MAHONEY: Object to the form of the
17 question.
18         Go ahead.
19         THE WITNESS: Can you restate the
20 question or read it back to me?
21         MR. EINHORN: Sure.
22           (The record was read by the
23            reporter.)
24         THE WITNESS: Coincidence may not be the

**Page 74**

1  proper term. I mean, clearly something was happening
2  with this property. I think we needed to focus on what
3  was happening with the property. Mr. DePaul came with a
4  sketch plan, I believe, as early as Memorial Day.
5  Q  2001?
6  A  2001, so it wasn't, you know, just
7  happenstance. It also was not -- I think coincidence is
8  too strong of a word.
9  Q  Well, then, what role did the filing of
10 Mr. DePaul's plans play in this decision?
11 A  I don't know that it played any role in it.
12 Q  So what's the right word other than
13 coincidence?
14 A  I don't know that there is a word. Coincidence
15 was your word. I don't know that there was -- that I
16 would characterize it one way or another.
17 Q  What was the disadvantage to the board of
18 waiting to get the land use planner's thoughts on the
19 uses and alternatives for the property and his thoughts
20 on the ordinance proposed by the neighbors?
21         MR. MAHONEY: Object to the form of the
22 question.
23         Go ahead.
24         THE WITNESS: I'm not sure that there

**Page 75**

1  was a need to wait.
2  BY MR. EINHORN:
3  Q  Was the land use planner doing this study -- he
4  wasn't doing it for free, was it?
5  A  No.
6  Q  The board was going to pay for the study?
7  A  Correct.
8  Q  Do you know how much money the board has paid
9  the land use planner for this study?
10 A  Do I know how much we've paid? I don't know
11 specifically how much we've paid.
12 Q  Okay. Well, why would the board -- let's focus
13 on you personally. Why would you vote for a rezoning at
14 a point in time when you have not received the input
15 from a planner whose specific duty it was to determine
16 appropriate uses and give you alternatives for the
17 property that you were rezoning?
18         MR. MAHONEY: Object to the form of the
19 question. She testified already about other reasons for
20 hiring the planner.
21 BY MR. EINHORN:
22 Q  You can answer it.
23 A  As I said, I was in favor of rezoning it to
24 residential, ultimate residential. Again, my

**Page 76**

1  expectation was not that the planner's job was to be
2  focusing on rezoning; and my expectation was it was to
3  focus on alternative designs for the property.
4  Q  Alternative uses.
5  A  Uses, sorry, for the property.
6  Q  Okay. So -- are you finished? I'm sorry. I
7  didn't mean to interrupt.
8  A  I mean, I'm not saying anything different that
9  I didn't say two questions ago.
10 Q  So the land use planner is hired to give input
11 as to alternative uses for the properties; correct?
12 A  Correct.
13 Q  And the land use planner was hired in part to
14 provide input on the ordinance proposed by the
15 neighbors; correct?
16 A  Correct, part of it.
17 Q  I guess I just can't figure it out, then.
18 What's the point of rezoning -- what's the point of
19 hiring a land use planner if you're rezoning the
20 property before getting his input?
21         MR. MAHONEY: Objection; asked and
22 answered.
23         Go ahead and answer it again, if you can.
24         THE WITNESS: I don't see them as

**Page 77**

1  inconsistent.
2  BY MR. EINHORN:
3  Q    Okay. Was there any advantage to the board in
4  acting on September 20th to advertise the rezoning as
5  opposed to waiting for the land use planner's report?
6  A    I don't know there was an advantage or a
7  disadvantage. I think it was the appropriate thing to
8  do at the time.
9  Q    Now, do you know what type of density was
10 proposed by the neighbors for the property?
11 A    No, I don't.
12 Q    You don't recall that it was one-acre
13 residential --
14 A    Oh, sorry. I believe it was two acres.
15 Q    Residential?
16 A    Residential.
17        MR. MAHONEY: Is that contained in the
18 original petition, which is part of P-1? I just think
19 we should be precise.
20        MR. EINHORN: That's fine with me.
21 Actually, I think it just refers to another zoning
22 classification.
23        MR. MAHONEY: There, triple A.
24        THE WITNESS: Okay.

**Page 78**

1        MR. MAHONEY: Do you know what density
2  that provides for?
3        THE WITNESS: I want to say two acres,
4  but --
5  BY MR. EINHORN:
6  Q    All right. We're asking for your recollection
7  today. It might have been two; it might have been one.
8  A    It's residential.
9  Q    It's residential. Now, why did the board
10 decide to pick that density as opposed to some other
11 zoning classification?
12 A    Well, again, the area that DePaul -- that
13 Highway Materials' property is located in, that zoning
14 classification, whether it be one or two acres, is
15 consistent with the surrounding area.
16 Q    It's your testimony again that there were no
17 discussions outside of a public meeting about this whole
18 process?
19 A    Not that I recall.
20 Q    I gather that you are not able to run for a
21 third term consecutively?
22 A    I am not able to run for a third term, no.
23 Q    Now, do you know if you're ever able to run for
24 a third term? In other words, after waiting some period

**Page 79**

1  of time?
2  A    My understanding is I could wait for some
3  period of time and run for another term.
4  Q    Do you know what that period of time is?
5  A    No, I don't.
6  Q    But, in any event, you're not going to be able
7  to run in this November's election?
8  A    I am not able to run, no.
9  Q    Now, do you understand that the legal effect of
10 a rezoning where there is a preexisting plan is that the
11 preexisting plan must be determined by the previous
12 zoning?
13 A    My understanding is that a plan that is
14 submitted when a piece of property is zoned a particular
15 way is subject to that zoning.
16 Q    And that's even if there is a rezoning of the
17 property before the plans are decided?
18 A    I believe that's the case.
19        MR. MAHONEY: That is: plan filed,
20 rezoning, decision; the decision has to be on the zoning
21 in effect at the time the plan is filed.
22        THE WITNESS: That's my understanding.
23 BY MR. EINHORN:
24 Q    Okay. So it's your understanding that because

**Page 80**

1  Mr. DePaul had filed plans prior to the rezoning, his
2  plans would be subject to the old zoning?
3  A    My understanding is that his plans would be
4  subject to the old zoning.
5  Q    And you also understood that if those plans
6  were denied that any future plans submitted after the
7  rezoning would be subject to the new zoning; correct?
8  A    Any plans that would be proposed after the new
9  zoning would be subject to the new zoning.
10 Q    Other than Mr. DePaul's project, do you recall
11 any other land development plans being denied in your
12 terms as a board supervisor?
13 A    I can't say whether any were denied or not. My
14 recall is they were not, but I would not tell you that
15 over any span -- seven-and-a-half-year span.
16 Q    But you don't recall any in the seven and a
17 half years?
18 A    I can't recall any at this time.
19 Q    Now, would it be fair to say that there was a
20 high level of community interest in the development of
21 the DePaul properties?
22 A    I don't know if "high" is the right
23 characterization, but there was interest in the DePaul
24 property.

141

1  Q   You don't think these plans were treated any
2  differently than the Hill's plans?
3  A   I would not expect so.
4  Q   I'm asking you were they.
5  A   I don't know. I can't comment. I don't have a
6  fresh recollection of the Hill.
7  Q   The Hill is still an on ongoing project, is it
8  not?
9  A   I think so.
10         MR. EINHORN: Okay. No further
11 questions.
12         MR. MAHONEY: Okay.
13         (The deposition concluded at
14          approximately 2:35 p.m.)

142

WITNESS CERTIFICATION

I hereby acknowledge that I have read the foregoing transcript of my deposition given on April 18, 2003 and that it is a true, correct and complete transcript of the answers given by me to the questions propounded, to the best of my knowledge, recollection and belief, except for the list of corrections, if any, noted on the below Errata Sheet.

_____
ANN YOUNGLOVE

143

CERTIFICATION

I, Holly J. Cross, a Registered Professional Reporter, do hereby certify that the proceedings, evidence, and objections upon the deposition of ANN YOUNGLOVE are contained fully and accurately in the stenographic notes taken by me upon the foregoing matter on April 18, 2003 and that this is a true and correct transcript of same.

_____
HOLLY J. CROSS
Registered Professional Reporter

# EXHIBIT L

## Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

- - -

HIGHWAY MATERIALS, INC.      :   CIVIL ACTION
                             :
    -vs-                     :   NO. 02-3212
                             :
WHITEMARSH TOWNSHIP, et al.  :

- - -

March 26, 2003

- - -

Deposition of RONALD DEROSA, held in the Law Offices of BALLARD SPAHR ANDREWS & INGERSOLL, LLP, located at 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania, commencing approximately at 10:20 a.m. on the above date, before Holly J. Cross, a Registered Professional Reporter and Notary Public for the State of Pennsylvania.

## Page 2

APPEARANCES:

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
BY: WALTER M. EINHORN, JR., ESQUIRE
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Counsel for Plaintiff

DEASEY, MAHONEY & BENDER
BY: HARRY G. MAHONEY, ESQUIRE
1800 John F. Kennedy Boulevard
Suite 1300
Philadelphia, PA 19103
Counsel for Defendants

ALSO PRESENT:

Kristine Maciolek, Esquire

## Page 3

INDEX

THE WITNESS                                    PAGE

RONALD DEROSA

    By Mr. Einhorn                              4

EXHIBITS

MARKED    DESCRIPTION                          PAGE

P-23      WTRA Recap, 5/24/01 Minutes           78
P-24      7/19/00 Letter From Mr. Gregan       171
P-25      6/23/00 Memo From Thomas Zarko       173
P-26      7/13/00 Minutes                      174

## Page 4

- - -

RONALD DEROSA, having been duly sworn, was examined and testified as follows:

- - -

MR. EINHORN: I don't think there really are any stipulations. We'll just proceed pursuant to the Federal Rules of Civil Procedure.

EXAMINATION

BY MR. EINHORN:

Q   Good morning, Mr. DeRosa. My name is Walt Einhorn. We just met a minute or two ago. I'm here as an attorney for Highway Materials, Inc. in a lawsuit entitled Highway Materials, Inc. versus Whitemarsh Township, et al. You are a defendant in that lawsuit. I'm here today to ask you a series of questions.

What I'll ask you to do is to first wait until I'm finished with my question before you start your answer, and I will try to do the same courtesy for you; that is, let you finish your answer before I start my next question.

Do we have an agreement on that?

A   Sure.

Q   Okay. The next thing, which you've already done, is you have to answer things out loud. The court

**Page 81**

1  officially filed preliminary plans.
2  　　　　Did you have any discussions with anyone about
3  those plans?
4  A　　Not that I recall.
5  Q　　So it's your testimony that if I wanted to see
6  any comment you made about those plans, I could get
7  those by just looking at public meeting records?
8  A　　Yes.
9  Q　　You never discussed these plans in executive
10  session?
11  A　　Not that I recall.
12  Q　　It's true, sir, that eventually these plans
13  were denied; right? The plans we're talking about were
14  eventually denied?
15  　　　　MR. MAHONEY: Which ones? The September
16  10th?
17  　　　　MR. EINHORN: Yeah.
18  　　　　MR. MAHONEY: Or revisions thereof?
19  　　　　MR. EINHORN: Right.
20  　　　　THE WITNESS: Yes.
21  BY MR. EINHORN:
22  Q　　Okay. Now, maybe you -- Mr. Mahoney makes a
23  good point. When I'm referring to the September 10th
24  plans and discussions you may have had about them, I'm

**Page 82**

1  including in that question, at least I am now, any
2  revisions thereto.
3  A　　Okay.
4  Q　　Okay. Did you have any discussions -- now with
5  that revised question -- about the plans or any
6  revisions thereto?
7  A　　No, not that I can recall.
8  Q　　It's true, sir, that in the time in which
9  you've served on the board there was only one set of
10  land development plans ever denied; correct?
11  A　　In the time I've served on the board, yes.
12  Q　　And they were the DePaul plans; correct?
13  A　　Yes.
14  Q　　And you're telling us today that although they
15  were the only ones ever denied in the township you don't
16  recall any discussions with anyone about them?
17  　　　　MR. MAHONEY: Outside of a public
18  meeting?
19  　　　　MR. EINHORN: Outside of a public
20  meeting.
21  　　　　THE WITNESS: No.
22  BY MR. EINHORN:
23  Q　　You had discussions outside a public meeting or
24  you did not?

**Page 83**

1  A　　I don't recall having discussions outside of a
2  public meeting.
3  Q　　Okay. Did you have any discussions outside of
4  a public meeting about the plans or revisions thereto
5  with Mr. Zarko?
6  A　　Not that I recall.
7  Q　　How about with Mr. Gregan?
8  A　　Not that I recall.
9  Q　　Don Cohan?
10  A　　No, I've never spoken to Don Cohan.
11  Q　　Ross Weiss?
12  　　　　MR. MAHONEY: Objection.
13  BY MR. EINHORN:
14  Q　　Do you recall any discussions about the plans
15  with Mr. Weiss?
16  　　　　MR. MAHONEY: Objection. Direct the
17  witness not to answer.
18  　　　　MR. EINHORN: Okay. Again, we
19  apparently have a disagreement as to the breadth of the
20  attorney-client privilege, but I'll move on.
21  BY MR. EINHORN:
22  Q　　Anyone at the Kaplin firm, did you have any
23  discussions with them about the plans or revisions
24  thereto outside of a public meeting?

**Page 84**

1  A　　No.
2  Q　　All right. Let's go to P-6. These are the
3  minutes of the September 20th board meeting; correct?
4  A　　Yes.
5  Q　　September 20th, 2001. Is it fair to say,
6  looking at the first page there, that at this meeting
7  the supervisors authorized the advertising of the
8  rezoning ordinance?
9  A　　Yes.
10  Q　　And that's the same ordinance, at least in
11  substantially the same form, as that proposed by the
12  neighbors' group; right?
13  A　　Yes.
14  Q　　Now, you'll agree with me that the action that
15  was taken on September 20th, 2001 seems to be a change
16  in approach from the process that was being discussed
17  just two months before then; correct?
18  　　　　MR. MAHONEY: Object to the form of the
19  question.
20  　　　　Go ahead and answer it, if you can.
21  　　　　THE WITNESS: A change in the process?
22  BY MR. EINHORN:
23  Q　　No, a change in the approach, I said, from the
24  process that had been --

**85**

1  A    No.
2  Q    No? Okay. Well, at this point had the land
3  use planner completed his study?
4  A    No, I don't believe so.
5  Q    In fact, you hadn't even hired the land use
6  planner when you authorized this, had you?
7  A    I don't recall when we actually voted for the
8  land use planner. I'm sure it's in one of the meetings.
9  Q    Sir, why is it that in July of 2001 the board
10 is promising a process in which the planner is the only
11 one, pursuant to your testimony, to evaluate the
12 properties and in September 2001 you're now advertising
13 them for rezoning?
14 A    The question was why?
15 Q    Yeah, can you tell me what changed?
16 A    Nothing changed.
17 Q    Nothing changed?
18 A    With the exception that we had a request from
19 residents to rezone the property to a use that was more
20 appropriate than the existing zoning.
21 Q    Do you remember testifying a few minutes ago
22 that the ordinance that had been proposed by the
23 residents was forwarded to the land use planner for
24 evaluation? Do you remember that testimony?

**86**

1  A    The RFP says that we will forward it to the
2  land use planner.
3  Q    Do you remember the testimony about why the
4  land use planner was important in the process?
5  A    To give us professional opinions and advice,
6  yes.
7  Q    Why didn't you wait for the land use planner?
8       MR. MAHONEY: Waiting for the land use
9  planner to do what?
10      MR. EINHORN: To do his work.
11      THE WITNESS: There was no need to wait
12 for the land use planner to do his work to rezone the
13 property now. We have the option of rezoning it again
14 at a future time if the land use planner comes up with
15 something more appropriate.
16 BY MR. EINHORN:
17 Q    So you viewed the zoning that was eventually
18 passed to be a temporary measure?
19 A    I wouldn't say temporary, the zoning is
20 necessarily temporary. I viewed it as a better
21 alternative than the current zoning and necessary to get
22 into place.
23 Q    Sir, why did you have to do this on
24 September 20th?

**87**

1       MR. MAHONEY: The advertising?
2       MR. EINHORN: Yeah.
3  BY MR. EINHORN:
4  Q    Why did the board take this action on
5  September 20th?
6  A    The ordinance had been requested. It had been
7  reviewed by staff. It was deemed advertisable, and it
8  was necessary to get the zoning issue taken care of.
9  Q    Why was that necessary?
10 A    Because the existing zoning was not appropriate
11 for the property in the area where it's located.
12 Q    And why was it necessary to do that starting on
13 September 20, 2001?
14 A    I don't know that anyone said it was necessary.
15 It was decided to do it.
16 Q    And why was it decided to do it on September
17 2001?
18 A    Because it was appropriate to do.
19 Q    Well, we're going around in circles here. Why
20 do you believe it was appropriate?
21 A    I mean, I don't understand your question.
22 Q    Well, sir, you are, maybe unintentionally,
23 conflating two concepts: the rezoning and the timing of
24 the rezoning.

**88**

1       MR. MAHONEY: Excuse me. Is there a
2  question, or are you just commenting on his answer?
3  BY MR. EINHORN:
4  Q    I'm asking you about the timing of the
5  rezoning. Why did the rezoning have to commence on
6  September 20th, 2001?
7       MR. MAHONEY: I think he already
8  answered that question. We didn't have to. We just
9  did.
10      THE WITNESS: We just did.
11 BY MR. EINHORN:
12 Q    You just did it?
13 A    Yeah.
14 Q    There's no reason why you picked
15 September 20th?
16 A    There is no reason, specific reason, in my mind
17 why we picked September 20th, no.
18 Q    Who was up for election in November of 2001, do
19 you remember? Is it Mr. Kramer and Ms. Graf possibly?
20 A    In November 2000 -- September 2001?
21 Q    In November of 2001.
22 A    Mr. Kramer.
23 Q    And Ms. Graf?
24 A    No, she had already been unelected.

185

1　That's me.
2　Q　And the manager is part-time?
3　A　The manager is part-time.
4　　　　MR. EINHORN: All right. That's all I
5　have for the time being.
6　　　　Again, as I said at the end of the last
7　deposition, depending on future motions and review of
8　the SALDO files, I'll at least reserve the right to call
9　you back, if necessary.
10　　　　MR. MAHONEY: We don't necessarily agree
11　with that, but we understand your statement.
12　　　　　(The deposition concluded at
13　　　　　approximately 3:50 p.m.)

186

WITNESS CERTIFICATION

3　　　I hereby acknowledge that I have read the
4　foregoing transcript of my deposition given on
5　March 26, 2003 and that it is a true, correct and
6　complete transcript of the answers given by me to the
7　questions propounded, to the best of my knowledge,
8　recollection and belief, except for the list of
9　corrections, if any, noted on the below Errata Sheet.

12　　　　　　　　　RONALD DEROSA

187

CERTIFICATION

　　　I, Holly J. Cross, a Registered Professional
Reporter, do hereby certify that the proceedings,
evidence, and objections upon the deposition of
RONALD DEROSA are contained fully and accurately in the
stenographic notes taken by me upon the foregoing matter
on March 26, 2003 and that this is a true and correct
transcript of same.

　　　　　　　　　HOLLY J. CROSS
　　　　　　　　　Registered Professional
　　　　　　　　　Reporter