# EXHIBIT A

## EXHIBIT A

**Documents Sought By Defendants' Motion That Have Been Produced Prior To The Response To This Motion**

Invoices listed at 11-35 of plaintiff's privilege log.

Handwritten notes at items 49-51, 54, 56-61, 63-64, and 66-69 of plaintiff's privilege log.

Items 94, 101, 107, 123 and 132 (with redaction on 132) on plaintiff's privilege log and items P-2, P-3, P-4, P-5 (with redaction on P-5), and P-13 on the Woodrow & Associates privilege log.

**Documents Sought By Defendants' Motion For Which Plaintiff Maintains Its Claims of Privilege And/Or Work Product Protection**

Handwritten notes at items 47, 48, 52-53, 55, 62, and 65 of plaintiff's privilege log.

Items 36-38, 73, 93, 97, 98, 100, 102, 103, 106, 115-116, 124, 158, 169-170 on plaintiff's privilege log, and items P-1, P-6, P-8, P-10, P-12, and P-14 through P-30 of the Woodrow & Associates Privilege log.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| HIGHWAY MATERIALS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 02-3212 |
| | : | |
| WHITEMARSH TOWNSHIP *et al*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

### DECLARATION OF ARLEIGH P. HELFER III, ESQUIRE

I, Arleigh P. Helfer III, Esquire, declare as follows:

1.     I am an associate in the law firm of Ballard Spahr Andrews & Ingersoll, LLP.  I make this declaration on my personal knowledge.

2.     On May 5, 2003, in response to defendants' document requests dated March 14, 2003, plaintiff produced documents for defendants' inspection at our offices, including documents responsive to a subpoena served on Woodrow & Associates, plaintiff's engineering consultant.

3.     Before defendants' counsel, Mr. Mahoney, left that day for another appointment, I told him that a privilege log was being prepared to reflect documents withheld from the production.

4.     Two such logs were in fact prepared in May 2003 and, until recently, I believed that they had been sent to defendants at that time.

5.     On November 20, 2003, it came to my attention that there was a possibility that the privilege logs may not have been transmitted to defendants.

6.    I believed that the logs had been previously transmitted, in part because Mr. Mahoney never inquired about them. As soon as I realized that there was a question as to whether the logs had been transmitted to defendants, I sent a copy of plaintiff's privilege logs to Mr. Mahoney. This copy was sent on November 20, 2003.

7.    Any delay in producing the privilege logs was the result of an inadvertent oversight and was not intentional.

8.    Based on discussions with Leonard Poncia and Robert Raquet, I understand that the handwritten notes listed at items 48, 52-53, 55, 62, and 65 of plaintiff's log were generated by Leonard Poncia and that Robert Raquet generated item 47.

In accordance with 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct. Executed on _December 19, 2003_.

_Arleigh P. Helf_

Dated: December 19, 2003

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HIGHWAY MATERIALS, INC., | : | CIVIL ACTION NO. 02-3212 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| WHITEMARSH TOWNSHIP, et al. | : | |
| | : | |
| Defendants. | : | |

---

### RESPONSES AND OBJECTIONS OF PLAINTIFF HIGHWAY MATERIALS, INC. TO DEFENDANTS WHITEMARSH TOWNSHIP, THE BOARD OF SUPERVISORS OF WHITEMARSH TOWNSHIP, ANN D. YOUNGLOVE, RONALD J DEROSA, WILLIAM P. RIMEL, PETER P. CORNOG AND MICHAEL A. ZEOCK'S DOCUMENT REQUESTS (FIRST SET)

Plaintiff Highway Materials, Inc. ("HMI"), hereby objects and responds to the

Document Requests of Defendants Whitemarsh Township, The Board Of Supervisors Of

Whitemarsh Township, Ann D. Younglove, Ronald J Derosa, William P. Rimel, Peter P. Cornog

And Michael A. Zeock (collectively, the "Township Defendants") as follows:

### *General Objections*

1.      HMI objects to the Document Requests and instructions contained therein

to the extent they exceed the scope of, or impose any greater obligation than that permitted by,

the Federal Rules of Civil Procedure.

2.      HMI objects to the Document Requests to the extent that they call for the

disclosure of information and documents protected by the attorney-client privilege, the work-

product doctrine, or any other privilege or protection under the Federal Rules of Civil Procedure

or applicable law.

3. HMI objects to the Document Requests to the extent they require the disclosure of confidential documents.

4. HMI objects to the Document Requests as overly broad and unduly burdensome to the extent they require the production of documents already exchanged by the parties and their counsel during this litigation.

5. HMI objects to the Document Requests to the extent they call for the production of documents in the possession of third-parties or otherwise not in HMI's possession, custody or control.

6. HMI's general objections shall be deemed applicable to each Document Request without the need to specifically reference or incorporate them in a specific response. The following responses do not waive or in any way limit HMI's general objections.

7. HMI reserves the right to amend and/or supplement its response to any Document Request, especially since discovery is ongoing. In addition, should any privileged document be produced inadvertently, HMI reserves the right to demand the return of the document and the destruction of any and all copies of the same. Such inadvertent production shall not be deemed a waiver of the relevant privilege.

### Responses

Subject to and without waiver of the foregoing general objections, HMI responds as follows:

1. All documents identified by Plaintiff Highway Materials, Inc. in its Voluntary Disclosures Pursuant to F.R. Civ. P. 26.

RESPONSE: HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

2

2.     All documents described or identified in your Answers to the Township Defendants' Interrogatories (First Set) Directed to Plaintiff Highway Materials, Inc.

RESPONSE:  HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.  Because discovery is ongoing in this matter, to the extent HMI identifies any additional non-privileged documents in supplementing its interrogatory responses, such documents will be produced at that time.

3.     All documents which identify, categorize, quantify, tend to prove or disprove or otherwise relate to your alleged damages.

RESPONSE:  HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.  Because discovery is ongoing in this matter, and because HMI has not yet retained a damages expert, HMI reserves the right to supplement its production of documents responsive to this Document Request.

4.     All contracts, agreements or other documents relating to your purchase or ownership of the "Highway Materials, Inc. property [sic]", including any letters of intent, agreements of [s]ale, addenda, modifications and/or endorsements, title report, settlement and/or closing sheets, deeds, leases and all other documents relating to title to and any ownership interests to or from Highway Materials, Inc.

RESPONSE:  HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

5.     All corporate documents and filings related to Highway Materials, Inc., including but not limited to articles of incorporation, corporate change of name, corporate change of address, certificate of incorporation, documents identifying Plaintiff's officers and any and all corporate minutes, including minutes of shareholders' meetings, board of directors'

meetings or other meetings relating to the purchase of the Highway Materials, Inc. Property and

the development of the Highway Materials, Inc. Property and any of the three parcels, Quarry

Hole #1, #2 and/or #3.

      RESPONSE:  HMI will produce responsive, non-privileged documents at a time

and place mutually convenient to counsel.  By way of further answer, HMI is not a publicly

traded company.

      6.     All contracts or agreements, including drafts, marked-up copies,

proposals, offers, riders and amendments relating to the development of the Property and any of

the three parcels, Quarry Hole #1, #2 and #3, or any notes, communications, memoranda or

similar documents relating to same.

      RESPONSE:  HMI will produce responsive, non-privileged documents at a time

and place mutually convenient to counsel.

      7.     All documents, including but not limited to all correspondence, electronic

communications, applications, plans, agendas, notes, budgets, drawings, reports, memoranda,

outlines, sketches, pro forma projections and other projections relating to your efforts to obtain

approval of subdivision and land development applications as well as other government

approvals and permits for the Property and nay of the three parcels, Quarry Hole #1, #2 and #3

from Whitemarsh Township and/or any related board, commissions, entities and persons.

      RESPONSE:  HMI will produce responsive, non-privileged documents at a time

and place mutually convenient to counsel.

      8.     All documents relating to any application for a variance, special exception

or other zoning relief to the Whitemarsh Township Zoning Hearing Board actually filed,

considered for filing, any drafts thereto and any communications, written or electronic, or

memoranda relating to the consideration of or decision to file or not file for such zoning relief for

the Property and any of the three parcels, Quarry Holes #1, #2 and/or #3.

       RESPONSE:  HMI will produce responsive, non-privileged documents at a time

and place mutually convenient to counsel.

       9.     Any and all documents, including but not limited to any form of

communication, applications or permits to Springfield Township, the City of Philadelphia or the

Pennsylvania Department of Environmental Protection and/or any other governmental entity for

any proposed development of the Property and any of the three parcels, Quarry Holes #1, #2 and

#3 concerning connection to public sanitary sewers.

       RESPONSE:  HMI objects to this request as unduly burdensome to the extent

such documents are available to the Township Defendants as a matter of public record.  Subject

to and without waiver of HMI's general and specific objections, HMI will produce responsive,

non-privileged documents at a time and place mutually convenient to counsel.

       10.    All documents, including but not limited to all correspondence, electronic

communications, plans, agendas, notes, budgets, drawings, reports, memoranda, outlines,

sketches and projections relating to your efforts to secure from Montgomery County, the

Commonwealth of Pennsylvania, the Pennsylvania Department of Environmental Protection, the

Pennsylvania Bureau of Mines and/or agency or department thereof, permits and/or approvals for

your quarry closing plan for the Property or any of the three parcels, Quarry Holes #1, #2 and/or

#3.

       RESPONSE:  HMI will produce responsive, non-privileged documents at a time

and place mutually convenient to counsel.

11.     All documents including but not limited to letters, electronic communications, notes and/or memoranda between you and any of the Defendants, Intervenors or other individuals or entities referred to in the Complaint concerning your development of the Highway Materials, Inc. Property and any of the three parcels, Quarry Holes #1, #2 and #3.

RESPONSE:   HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

12.     All documents including but not limited to letters, electronic communications, notes and/or memoranda between you and any property owners in Whitemarsh Township and/or any civic association in Whitemarsh Township including but not limited to KYW, Fitz Eugene Dixon/Erhenheim Farms, Eugenia Hospital, Philadelphia Cricket Club, Sunnybrook Golf Club, Whitemarsh Valley Farms Civic Association (WVFCA), Whitemarsh Valley Farms Civic Association, Inc. (WVFCA, Inc.) and/or Whitemarsh Township Residents Association (WTRA) concerning your development of the Highway Materials, Inc. Property and any of the three parcels, Quarry Holes #1, #2 and/or #3.

RESPONSE:   HMI objects to this Document Request as overly broad and unduly burdensome to the extent it seeks production of documents not in HMI's possession, custody or control.  Subject to and without waiver of HMI's general and specific objections, HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

13.     All contracts or agreements, including drafts, all correspondence, electronic communications, plans, agendas, notes, budgets, drawings, reports, memoranda, outlines, sketches and projections prepared by you or prepared by any consultant acting on your

behalf in the development of Highway Materials, Inc. Property and any of the three parcels,

Quarry Holes #1, #2 and/or #3 including but not limited to the following:

        (a)    Woodrow and Associates, Inc.

        (b)    Len Poncia

        (c)    Earth Engineering, Inc.

        (d)    Carroll Engineering Corporation

        (e)    Robert E. Blue Consulting Engineers, P.C.

        (f)    Pennoni & Associates, Inc.

        (g)    Any attorneys, accountants, engineers or other professional

consultants.

    RESPONSE:  HMI objects to this Document Request as overly broad and unduly

burdensome to the extent it seeks production of documents not in HMI's possession, custody or

control.  Subject to and without waiver of HMI's general and specific objections, HMI will

produce responsive, non-privileged documents at a time and place mutually convenient to

counsel.

    14.    Any and all contracts, agreements, leases, communications, memoranda,

or other documents between you and Norfolk & Southern Railroad relating to your "Property".

    RESPONSE:  HMI has no documents responsive to this Document Request in its

possession, custody or control.

    15.    All documents, including outlines, proposals, statements, presentations,

statements prepared in advance of any public meeting before any Board or Commission in

Whitemarsh Township, any meeting between you and any consultant and any meeting between

you and any property owner or civic association in Whitemarsh Township and any notes or

summaries prepared contemporaneously with such meeting(s) or after such meeting(s), relating to development of your "Property" and any of the three parcels, Quarry Holes #1, #2 and/or #3.

RESPONSE:   HMI objects to this Document Request as overly broad and unduly burdensome to the extent it seeks production of documents not in HMI's possession, custody or control.   Subject to and without waiver of HMI's general and specific objections, HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

16.   All calendars including electronic calendars of any personnel of Highway Materials, Inc. and/or the DePaul Group who were working on the development of the "Property" or any of the three parcels, Quarry Holes #1, #2 and/or #3 from January 1, 1999 to the present.

RESPONSE:   HMI objects to this Document Request as overly broad and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks production of confidential or irrelevant personal information not related to this lawsuit.   Subject to and without waiver of HMI's general and specific objections, HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.   HMI is only producing entries that relate to the subject matter of this action.

17.   All correspondence, memoranda, projection sheets, pro forma sheets, cost estimates relating to consideration of any development and/or proposed development of the "Property'" and any of the three parcels, Quarry Holes #1, #2 and/or #3, by and between Highway Materials, Inc., its officers, employees, agents and/or representatives and the DePaul Group, its officers, employees, partners, agents, representatives or its inter-related or associated companies.

RESPONSE: HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

18.    All correspondence, memoranda, projection sheets, pro forma sheets, cost estimates relating to consideration of any development and/or proposed development of the "Property" and Quarry Holes #1, #2 and #3 by and between Highway Materials, Inc.'s officers, employees, agents and/or representatives.

RESPONSE: HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

19.    All written or recorded statements of any officers, employees, agents, representatives and consultants of Highway Materials, Inc. relating to development of the "Property" and any of the three parcels, Quarry Holes #1, k#2 and/or #3.

RESPONSE: HMI objects to this Document Request as overly broad and unduly burdensome to the extent it seeks production of documents not in HMI's possession, custody or control. Subject to and without waiver of HMI's general and specific objections, HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

20.    All curriculum vitae of any experts you plan to call as witnesses at trial.

RESPONSE: HMI objects to this Document Request as premature. Subject to and without waiver of HMI's general and specific objections, HMI states that it has not yet determined who its experts will be at trial. HMI reserves the right to supplement its response to this Document Request at such time as is appropriate under the Federal Rules of Civil Procedure and the parties' Rule 26(f) Report.

21.    All written reports of any experts you plan to call as witnesses at trial.

RESPONSE:  HMI incorporates by reference its response to Document Request

20.

22.    All documents referred to in any written report of any experts you plan to

call as witnesses at trial.

RESPONSE:  HMI objects to this Document Request as premature and to the

extent it seeks documents beyond the scope of discovery permitted by the Federal Rules of Civil

Procedure.  Subject to and without waiver of HMI's general and specific objections, HMI states

that it has not yet determined who its experts will be at trial.  HMI reserves the right to

supplement its response to this Document Request at such time as is appropriate under the

Federal Rules of Civil Procedure and the parties' Rule 26(f) Report.

23.    Any and all plans, sketches, proposals and/or other documents prepared by

your officers, employees, agents, representatives or consultants concerning development of the

"Property" and any of the three parcels, Quarry Holes #1, #2 and #3 which were not delivered to

Whitemarsh Township during the sketch plan phase or the preliminary plan phase of your plan

development application.

RESPONSE:  HMI objects to this Document Request as overly broad and unduly

burdensome to the extent it seeks production of documents not in HMI's possession, custody or

control.  Subject to and without waiver of HMI's general and specific objections, HMI will

produce responsive, non-privileged documents at a time and place mutually convenient to

counsel.

24.    All appraisals or estimates of the fair market value of Highway Materials,

Inc.'s property [sic], and any of the three parcels, Quarry Hole #1, Quarry Hole #2 and/or Quarry

Hole #3.

RESPONSE:  HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel. .

25.    All documents relating to any appeals of tax assessments which were filed regarding the "Property" and any of the three parcels, Quarry Holes #1, #2 and/or #3.

RESPONSE:  HMI objects to this Document Request as overly broad, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, insofar as it requests documents that have nothing to do with this action.

26.    All documents relating to your claim for damages for "lost opportunities" as set forth in Plaintiff's Complaint.

RESPONSE:  HMI objects to this Document Request as overly broad and unduly burdensome to the extent it calls for the production of documents not in HMI's possession, custody or control. HMI further objects to this Document Request because it does not specify the documents sought with reasonable particularity.

27.    Any documents in your possession or in the possession of any consultant, representative or agent which supports your contention that Whitemarsh Township treated your application for land development differently from any other application for land development in the Township.

RESPONSE:  HMI objects to this Document Request as overly broad and unduly burdensome to the extent it calls for the production of documents not in HMI's possession, custody or control. HMI additionally notes that there are remaining issues with respect to Township Defendant Zarko's document production which may entail documents responsive to this Document Request. Subject to and without waiver of HMI's general and specific objections, HMI will produce responsive, non-privileged documents at a time and place mutually convenient

to counsel. See also the documents produced to date by the Township Defendants, including without limitation the SALDO files that demonstrate, inter alia, that HMI's application is the only application that has been denied in the Township since January 1, 1996.

28. Any and all documents relating to your attempts to secure agreement or approval of other landowners or governmental entities for any method of sewage treatment for your proposed development of Quarry Hole #1, including but not limited to the Philadelphia Cricket Club, Springfield Township, Montgomery County, the City of Philadelphia and/or any other landowner or governmental entity.

RESPONSE: HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

29. Any and all documents relating to your attempts to secure agreement or approval of other landowners or governmental entities for any method of stormwater management for your proposed development of Quarry Hole #1 including but not limited to the Philadelphia Cricket Club, Springfield Township, Montgomery County, the City of Philadelphia and/or any other landowner or governmental entity.

RESPONSE: HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

30. Any and all documents relating to your attempts to secure agreement or approval of other landowners or governmental entities for any methods of grading for your proposed development of Quarry Hole #1.

RESPONSE: HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

31.    Any and all documents relating to your attempts to secure easements from other landowners relating to your proposed development of Quarry Hole #1.

RESPONSE:    HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

32.    Any and all documents, memoranda, electronic correspondence or other documentation relating to any proposals or alternative proposals for traffic improvements relating to the development of Quarry Hole #1, including on-site and off-site improvements.

RESPONSE:    HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

33.    Any and all notes, memoranda, summaries, correspondence, electronic correspondence or other documents relating to any public meeting by Whitemarsh Township or any other governmental entity concerning the development or proposed development of Quarry Hole #1, including but not limited to any meetings of Whitemarsh Township's Board of Supervisors, Planning Commission, other Township Boards and/or Commissions or other governmental entities.

RESPONSE:    HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

34.    All proposals, bids, contracts, agreements, reports and invoices from any consultant relating to the development and/or proposed development of the "Property" and any of the three parcels, Quarry Holes #1, #2 and/or #3, including but not limited to engineers, landscape architects, accountants, land planners, traffic engineers, wastewater and water consultants, stormwater management engineers and/or other consultants and attorneys.

**RESPONSE:** HMI will produce responsive, non-privileged documents at a time and place mutually convenient to counsel.

_Arleigh P. Helfer III_

Michael Sklaroff
Walter M. Einhorn, Jr.
Arleigh P. Helfer III
Corey Field
BALLARD SPAHR ANDREWS & INGERSOLL,
    LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

Attorneys for Plaintiff
Highway Materials, Inc.

Dated: April 30, 2003

## CERTIFICATE OF SERVICE

I, Arleigh P. Helfer III, Esquire, hereby certify that on April 30, 2003, I served

copies of the foregoing Responses And Objections Of Plaintiff Highway Materials, Inc. To

Defendants Whitemarsh Township, The Board Of Supervisors Of Whitemarsh Township, Ann

D. Younglove, Ronald J Derosa, William P. Rimel, Peter P. Cornog and Michael A. Zeock's

Document Requests (First Set) upon the following individuals by U.S. Mail, first class delivery:

Harry G. Mahoney, Esquire
Deasey Mahoney & Bender Ltd.
1800 John F. Kennedy Boulevard, Suite 1300
Philadelphia, PA  19103-2978

Kevan F. Hirsch, Esquire
Kaplin Stewart Meloff Reiter & Stein, P.C.
350 Sentry Parkway, Building 640
Blue Bell, PA 19422


Arleigh P. Helfer III

PHL_A #1744589 v1

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.    : CIVIL ACTION

vs.                        :

WHITEMARSH TOWNSHIP, et al : NO. 02-3212

- - -

Oral deposition of THOMAS F. ZARKO,
taken pursuant to notice, in the law offices of
Ballard Spahr Andrews & Ingersoll, LLP, 1735
Market Street, 51st Floor, Philadelphia,
Pennsylvania, commencing on Wednesday, June 18,
2003, at or about 10:10 a.m., before Eileen P.
Barth, C.S.R., N.P.

- - -

APPEARANCES:

    BALLARD SPAHR ANDREWS & INGERSOLL,
      LLP
    By:  WALTER M. EINHORN, JR., ESQUIRE
        COREY FIELD, ESQUIRE
    1735 Market Street, 51st Floor
    Philadelphia, PA 19103
    Attorneys for the Plaintiff

    DEASEY MAHONEY & BENDER
    By:  HARRY G. MAHONEY, ESQUIRE
    1800 John F. Kennedy Boulevard
    Suite 1300
    Philadelphia, PA 19103
    Attorneys for the Defendants

ALSO PRESENT: Kristine Maciolek Small, Esquire

INDEX

| WITNESS | | PAGE |
|---------|---|------|
| THOMAS F. ZARKO | | |
|   By Mr. Einhorn | | 5 |

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| P-34 | SARDO | 73 |
| P-35 | 3/19/02 Memorandum | 107 |
| P-36 | 2/16/02 Letter | 119 |
| P-37 | 3/11/02 Letter | 124 |
| P-38 | 3/21/02 Transcript | 126 |
| P-39 | 3/26/02 Letter | 140 |
| P-40 | Checklist | 148 |
| P-41 | Resolution 2202-016 | 161 |
| P-42 | 3/18/02 Fax/Draft | 173 |
| P-43 | 3/18/02 Fax/Draft | 176 |
| P-44 | Draft | 182 |
| P-45 | 3/23/00 Notes | 191 |
| P-46 | 4/18/00 Letter | 204 |
| P-47 | 5/30/00 Letter | 207 |
| P-48 | 6/13 Notes | 210 |
| P-49 | 2/15/02 Letter | 235 |
| P-50 | Zoning Chapter 116 | 243 |
| P-51 | Land Development Plans | 269 |
| P-52 | Ordinance No. S96 | 282 |
| P-53 | Ordinance No. 9823 | 282 |

ZARKO

**9**

1   engineer?

2   A.      Primarily when I was there I was

3   assigned to various portions of a design

4   project related to the upgrade of the York

5   Wastewater Treatment Plant.

6   Q.      Were you working with the Township or

7   were you working with a developer or who were

8   you working with?

9   A.      I was working for the consulting

10  engineering firm and they were doing this

11  particular project for a municipal authority.

12  Q.      What municipal authority was that?

13  A.      I believe that would be the York County

14  Municipal Authority.

15  Q.      How long did you work at Buchart-Horn?

16  A.      I started there in June of '84 and I

17  left there, I believe it was February or March

18  of '85.

19  Q.      Did you have any other duties other than

20  the ones we just talked about?

21  A.      No.

22  Q.      What did you do in March of '85,

23  February or March of '85?

24  A.      I took a position with CKS Engineers.

---

ZARKO

**10**

1   Q.      And you continue to work there today;

2   correct?

3   A.      No.  Actually, I worked at CKS from '85

4   until 1987.  1987 I took a position with Knight

5   Engineering.  I was there for about 18 months

6   after which I went back to CKS Engineers.

7   Q.      And when that happened, you stayed at

8   CKS until today?

9   A.      That's correct.

10  Q.      Let me go back to your first, I'll call

11  it tour of duty at CKS.

12           What was your title then?

13  A.      I would say it would be similar.

14  Project engineer, staff engineer.

15  Q.      Do you know does the CKS in CKS

16  Engineers stands for anything?

17  A.      Yes.  The initial of the last name of

18  the original first owners of the firm.

19  Q.      Do you know what those names are?

20  A.      Connell, Knight and Shiewall (ph).

21  Q.      Now, does CKS Engineers do work

22  exclusively for municipalities?

23  A.      Municipalities and municipal

24  authorities.

---

ZARKO

**11**

1   Q.      It does not do any work for developers?

2   A.      That's correct.

3   Q.      And that has been true as long as you've

4   been affiliated with the firm?

5   A.      Yes.

6   Q.      Knight Engineering, I have in my notes

7   that you started there around '87?

8   A.      Yes.

9   Q.      Is that the Knight, the K from CKS?

10  A.      Yes.

11  Q.      And again, how long were you at Knight

12  Engineering?

13  A.      About 18 months.

14  Q.      Maybe '89?  Is that roughly right?

15  A.      Yes.

16  Q.      And what was your title and duties

17  there?

18  A.      Again, project engineer, staff engineer.

19  Q.      In 1989 then you go back to CKS

20  Engineers, you're still a project engineer,

21  staff engineer at that point?

22  A.      At that point I was considered a project

23  manager.

24  Q.      How does project manager differ from

---

ZARKO

**12**

1   project engineer?

2   A.      I guess as it's applied at CKS, a

3   project manager is the person that's wholly

4   responsible for projects or for handling a

5   municipal client.  Project engineer would work

6   under the project manager to do certain

7   functions which would be reviewed and checked

8   by the project manager.

9   Q.      Let's just move forward from '89 to the

10  present.

11          Did there come a point in time

12  when your duties or titles changed?

13  A.      No.

14  Q.      So today in 2003 you're still a project

15  manager?

16  A.      Project manager and also vice-president

17  of the firm.  I was made a partner in the firm

18  in 1992.

19  Q.      Partner?  I was going to ask you that.

20          So how many partners are there in

21  CKS?

22  A.      Right now there are six.

23  Q.      How many employees?  Do you know?

24  A.      Approximately 35.

ZARKO                                          25

1   Q.   How long did that executive session
2   last?
3   A.   The best as I can recall, twenty minutes
4   to a half hour.
5   Q.   Were you asked to give a presentation
6   during that executive session?
7   A.   No.
8   Q.   What was your role in that executive
9   session?
10  A.   I was invited in before the meeting.
11  Q.   Who invited you?
12  A.   Township manager.
13  Q.   Mr. Gregan?
14  A.   Yes.
15  Q.   Did you say anything at the meeting?
16  A.   Not that I can recall.
17  Q.   Do you recall any discussions about the
18  denial resolution at that executive session?
19          MR. MAHONEY:  Objection.  To the
20      extent that it would call for the
21      disclosure of attorney/client
22      communications, I'll direct the witness
23      not to answer the question.
24  BY MR. EINHORN:

ZARKO                                          26

1   Q.   Can you answer the question?
2   A.   I've been directed not to answer the
3   question.
4   Q.   I think Mr. Mahoney's direction was if
5   it would involve --
6          MR. MAHONEY:  If it would involve
7      disclosure of attorney/client
8      communication, i.e., communication
9      between you, any member of staff, Board
10     of Supervisors and Mr. Weiss going back
11     and forth, I would instruct you not to
12     answer the question.
13         THE WITNESS:  Then I can't answer
14     that question.
15  BY MR. EINHORN:
16  Q.   Mr. Weiss was at the executive session?
17  A.   Yes.
18  Q.   Who else was there?
19  A.   The five members of the Board of
20  Supervisors, the Township manager Larry Gregan
21  and I believe the assistant manager Rob Ford.
22  Q.   Anybody else?
23  A.   Not that I can recall.
24         MR. MAHONEY:  Did you mention Mr.

ZARKO                                          27

1   Weiss?
2          MR. EINHORN:  I think I said in
3      addition to Mr. Weiss.
4   BY MR. EINHORN:
5   Q.   Is it fair to say then having heard your
6   duties then that you are very familiar with the
7   Township zoning and SALDO ordinances?
8   A.   Yes.
9   Q.   And how about the Stormwater Management
10  Ordinance?
11  A.   Yes.
12  Q.   Is it also fair to say that a main
13  portion of your job as engineer is to review
14  land development plans?
15  A.   With respect to subdivision/land
16  development applications, yes.
17  Q.   Is that in fact the biggest portion of
18  your job?
19  A.   No.
20  Q.   What would you say takes up the most
21  time of your job as Whitemarsh Township
22  engineer?
23  A.   Just the general engineering activities
24  that I mentioned earlier, work on the public

ZARKO                                          28

1   improvement projects and managing all the other
2   people below me that provide services to the
3   Township.
4   Q.   So reviewing subdivision and land
5   development ordinances is a big part of your
6   job but not the biggest.  Is that your
7   testimony?
8   A.   I think that's fair to say.
9   Q.   Who else at CKS works for Whitemarsh
10  Township?
11  A.   It could be a number of different
12  people.  We have staff engineers that assist in
13  the performance of the subdivision/land
14  development reviews.  I have construction
15  managers and inspectors that are in the field
16  on a daily basis monitoring public improvement
17  projects or development-related activities.
18         I would say, you know, out of the
19  35 people on staff, probably ten contribute
20  towards Whitemarsh Township in some fashion.
21  Q.   Is there some Whitemarsh Township team
22  so-to-speak?
23  A.   The way CKS is organized, there is
24  typically one inspector that is assigned to the

ZARKO

**169**

1  know what time it was.

2  Q.    Thursday being the 21st?

3  A.    Yes.

4  Q.    At that point, at some point on the

5  21st, I assume it was after 7:00 in the

6  morning -- or could it have been earlier than

7  that?

8  A.    No, it would have been after 7:00 in the

9  morning.

10        MR. EINHORN:  Off the record.

11        (Whereupon, a discussion was held

12        off the record.)

13  BY MR. EINHORN:

14  Q.    Your work on the comments which I

15  understand to be adding more comments and

16  putting into letter form -- is that right?

17  That was your contribution?

18  A.    Well, in the instance of the second

19  revised preliminary plan, in order to get the

20  review done, I made a decision to split up

21  various components of the review and assign

22  then to different people.  And so I didn't just

23  take their comments on their aspects.  I also

24  did a part of the overall review of these plans

---

ZARKO

**170**

1  as well myself.

2  Q.    So there was a portion of the plan that

3  your two employees didn't look at, that you

4  took it upon yourself to do the first cut?

5  A.    That's correct.

6  Q.    Well, when did you begin the process of

7  putting together all those comments and putting

8  then into letter form?  That was sometime in

9  the morning on the 21st?

10  A.    Well, I received their comments in the

11  morning of the 21st and I worked through the

12  day completing my review and then incorporating

13  their comments into the letter.

14  Q.    When was your letter ready in draft form

15  approximately?

16  A.    It would have been in the afternoon of

17  the 21st, probably the mid to late afternoon.

18  Q.    Can you be more specific?  3:00, 4:00

19  o'clock?  Something like that?

20  A.    I don't know specifically the time.

21  Q.    Did you send the draft once it was

22  completed over to Mr. Gregan for comment?

23  A.    Yes.

24  Q.    What time do you think that happened?

---

ZARKO

**171**

1  A.    It was immediately after the draft was

2  done, so it was mid to late afternoon.

3  Q.    Did you also send over to him a draft

4  denial resolution that you prepared?

5  A.    No.

6  Q.    Did Mr. Gregan get back to you with

7  comments on the draft letter?

8  A.    We discussed the draft.  There might

9  have been a couple typographical-type issues,

10  but there were no substantial comments that I

11  can recall.

12  Q.    This is just a conversation with Mr.

13  Gregan?

14  A.    I don't know if I can answer that.  Can

15  I answer that?

16        MR. MAHONEY:  If you had a

17        conversation with Mr. Gregan, tell him

18        about that conversation.  If it was with

19        Mr. Weiss and it was more than an

20        administrative matter, then no, you

21        can't disclose it.

22        THE WITNESS:  I had a conversation

23        with Mr. Gregan and Mr. Weiss.

24  BY MR. EINHORN:

---

ZARKO

**172**

1  Q.    Again we're in the mid to late afternoon

2  timeframe?

3  A.    Yes.

4  Q.    And you incorporated the

5  typographical-type errors that were suggested

6  into your letter?

7  A.    Yes.

8  Q.    About what time was that when it was

9  finalized and signed?

10  A.    It was probably late afternoon by that

11  time.

12  Q.    5:00?  6:00?  4:00?

13  A.    Late afternoon.  4:00, 5:00.  And I was

14  directed to transmit a copy of the final letter

15  as soon as it was signed over to Mr. Garrity

16  and Mr. Woodrow.

17  Q.    Now, during that same timeframe, March

18  20th, March 19th, there was also work being

19  done on the denial resolution; correct?

20  A.    No, not during that timeframe.

21        MR. MAHONEY:  You mean by this

22        gentleman?

23        MR. EINHORN:  Yes.

24  BY MR. EINHORN:

---

ZARKO                                   321

1                    CERTIFICATE OF DEPONENT

2

3              I hereby certify that I have read and

4       examined the foregoing transcript, and the same

5       is a true and accurate record of the testimony

6       given by me.

7

8

9                    _____

10                   THOMAS F. ZARKO

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CERTIFICATION

             I, EILEEN P. BARTH, hereby certify

that the testimony and proceedings in the

aforegoing matter taken on June 18, 2003 are

contained fully and accurately in the

stenographic notes taken by me, and that Pages

1 to 320, inclusive of this testimony are a

true and correct transcript of the same.

                    _____
                    EILEEN P. BARTH
                    Certified Shorthand
                    Reporter

             The foregoing certification of this

transcript does not apply to any reproduction

of the same by any means unless under the

direct control and/or direction of the

certifying shorthand reporter.

# EXHIBIT E

### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HIGHWAY MATERIALS, INC. | : | CIVIL ACTION NO. 02-cv-3212 |
| | : | |
| v. | : | |
| | : | |
| WHITEMARSH TOWNSHIP, MONTGOMERY | : | |
| COUNTY, PA; | : | |
| AND THE BOARD OF SUPERVISORS OF | : | |
| WHITEMARSH TOWNSHIP, MONTGOMERY | : | |
| COUNTY, PA; | : | |
| AND ANN D. YOUNGLOVE, Individually | : | |
| and in her capacity as Chairman of | : | |
| the Board of Supervisior; | : | |
| AND RONALD G. DEROSA, Individually | : | |
| and in his capacity as Vice | : | |
| Chairman; | : | |
| AND WILLIAM P. RIMEL, III, | : | |
| Individually and in his capacity | : | |
| as Supervisor; | : | |
| AND PETER B. CORNOG, Individually | : | |
| and in his capacity as Supervisor; | : | |
| AND MICHAEL A ZEOCK, Individually | : | |
| and in his capacity as Supervisor; | : | |
| AND THOMAS F. ZARKO, Individually | : | |
| and in his capacity as Township | : | |
| Engineer | : | |

### DEFENDANT THOMAS F. ZARKO'S PRIVILEGE LOG

The following documents have not been produced by Defendant Thomas F. Zarko in his Response to Plaintiff's Request for Production on the basis that they are privileged, attorney-client communications:

1.    6/16/00 fax from Thomas F. Zarko, Township Engineer, to Ross Weiss, Esquire, Township Solicitor requesting legal advice;

2.    6/23/00 fax from Zarko to Weiss requesting legal advice;

3.    1/09/02 fax to Weiss from Lawrence Gregan, Township Manager requesting legal advice (redacted; redacted document produced in response to Request);

4.    3/11/02 fax to Weiss from Zarko requesting legal advice;

5.    3/22/02-e-mail from Zarko to Weiss requesting advice; and return e-mail from Weiss to Zarko providing advice.

DEASEY, MAHONEY & BENDER, LTD.

BY:

HARRY G. MAHONEY, ESQUIRE
MICHAEL L. BARBIERO, ESQUIRE
Attorneys for Defendants, Whitemarsh
Township, the Board of Supervisors of
Whitemarsh Township, Ann D. Younglove,
Ronald J. Derosa, William P. Rimel, Peter P.
Cornog, Michael A. Zeock and Thomas F.
Zarko

Attorney I.D. Nos. 19609/82933
Suite 1300
1800 John F. Kennedy Boulevard
Philadelphia, PA 19103-2978
(215) 587-9400
(215) 587-9456 - fax
245.20872

# EXHIBIT F

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF PENNSYLVANIA
 2
                      - - -
 3
    HIGHWAY MATERIALS, INC.   :   CIVIL ACTION
 4
            -vs-             :   NO. 02-3212
 5                          :
    WHITEMARSH TOWNSHIP, et al. :
 6
 7                    - - -
 8             November 24, 2003
 9                    - - -
10
11        Deposition of TIMOTHY P. WOODROW, held in the
12   Law Offices of DEASEY MAHONEY & BENDER, located at
13   1800 John F. Kennedy Boulevard, Suite 1300,
14   Philadelphia, Pennsylvania, commencing approximately at
15   10:10 a.m. on the above date, before Holly J. Cross, a
16   Registered Professional Reporter and Notary Public for
17   the State of Pennsylvania.
18
19
20
21
22
23
24
```

**2**

```
 1   APPEARANCES:
 2        BALLARD SPAHR ANDREWS & INGERSOLL, LLP
          BY:  WALTER M. EINHORN, ESQUIRE
 3        1735 Market Street, 51st Floor
          Philadelphia, PA  19103
 4        Counsel for Plaintiff
 5        DEASEY, MAHONEY & BENDER, LTD.
          BY:  HARRY G. MAHONEY, ESQUIRE
 6        1800 John F. Kennedy Boulevard
          Suite 1300
 7        Philadelphia, PA  19103
          Counsel for Defendants
 8
 9   ALSO PRESENT:
10
          Kristine Maciolek Small, Esquire
11        Thomas F. Zarko
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
 1                    INDEX
 2   THE WITNESS                          PAGE
 3   TIMOTHY P. WOODROW
 4      By Mr. Mahoney                      4
 5
 6
 7      QUESTIONS WITNESS HAS INSTRUCTED NOT TO ANSWER
 8           Page      Line
 9            20        22
10            70         6
11
12
13                 EXHIBITS
14   MARKED   DESCRIPTION                      PAGE
15   D-66     7/26/99 Letter from Mr. Woodrow    13
16   D-67     8/9/01 Memo from Mr. Woodrow       73
17   D-68     12/16/97 Letter from Mr. Zarko    103
18   D-69     1/19/01 Letter from Mr. Zarko     106
19   D-70     8/14/97 Letter from Mr. Zarko     107
20   D-71     10/29/03 Letter from Mr. Zarko    110
21   D-72     2/18/02 Letter from Mr. Woodrow   112
22   D-73     3/8/02 Letter from Mr. Zarko      115
23
24
```

**4**

```
 1                    - - -
 2        TIMOTHY P. WOODROW, having been duly sworn, was
 3   examined and testified as follows:
 4                    - - -
 5        MR. EINHORN:  We've been proceeding
 6   under the federal rules of civil procedure, and we'd
 7   like to reserve the right to have the witness read the
 8   sign the deposition transcript.
 9                 EXAMINATION
10   BY MR. MAHONEY:
11   Q        All right.  Would you state your full name for
12   the record, sir, and spell your last name?
13   A        Timothy P. Woodrow, W-O-O-D-R-O-W.
14   Q        Mr. Woodrow, as you know, my name is Hank
15   Mahoney.  I represent the defendants, which include
16   Whitemarsh Township, its boards of supervisors, and Tom
17   Zarko, sitting to my left, with regard to this federal
18   litigation which Mr. Einhorn's office has brought on
19   behalf of Highway Materials.
20        I'm going to ask you some questions concerning
21   your background in the field of engineering, your
22   engagement by Peter DePaul to assist him in the
23   preparation of plans and submission of them to the
24   township for approval, as well as your knowledge
```

17

1    Q    Did the plans comply with SALDO?
2    A    I believe they were in substantial compliance
3    with that subdivision and land development ordinance,
4    yes.
5    Q    When you say "substantial compliance," what do
6    you mean?
7    A    I believe that our intent was to submit a
8    compliant set of plans.
9    Q    You're also aware that on December 21st, 2001,
10   you submitted revised plans to the township; correct?
11   A    Thereabouts, yes. I'm not confident of the
12   exact date but in that time frame.
13   Q    Did the revised plans comply with the zoning
14   ordinance?
15   A    Yes, in my opinion, they did, based upon some
16   clarifications we were seeking from the township.
17   Q    Well, you said in my opinion based upon
18   clarifications. What specific issues were there
19   outstanding at that time, if you know?
20   A    I recall two.
21   Q    And they were?
22   A    A question regarding a berm and a fence and a
23   location of a detention facility.
24   Q    On December 21st, 2001, when you submitted the

18

1    revised plans, did they comply with the SALDO?
2              MR. EINHORN: The entire SALDO?
3              MR. MAHONEY: That's what I'm asking
4    him, yes.
5              THE WITNESS: In my opinion, the revised
6    plan submission we prepared addressed the preliminary
7    plan requirements in the Whitemarsh Township Code.
8    BY MR. MAHONEY:
9    Q    Well, that wasn't my question. My question
10   was: Did the plans comply with the SALDO?
11   A    Yes.
12             MR. EINHORN: Object to the question as
13   being ambiguous.
14             I object to it, but you can answer.
15   BY MR. MAHONEY:
16   Q    I'm sorry. Your answer?
17   A    The answer is yes.
18   Q    It did comply. And then on March 19th, 2002,
19   you submitted a second revised set of plans to
20   Whitemarsh Township. Do you recall that?
21   A    Again, date specific, I'm not certain, but that
22   time frame, yes.
23   Q    And at the time that you submitted the second
24   revised set of plans, did they comply with the zoning

19

1    ordinance of Whitemarsh Township?
2    A    I believe they did with, again, the
3    qualification there was still two issues that we sought
4    the direction on from the township.
5    Q    And at the time you submitted second revised
6    plans, did they comply with the SALDO?
7              MR. EINHORN: Same objection to form.
8    General, not specifying what section of the SALDO.
9              You can answer, if you can.
10   BY MR. MAHONEY:
11   Q    Can you answer the question?
12   A    Yeah, I guess, in my opinion, the way I viewed
13   the requirements for preliminary plan in the Whitemarsh
14   Township Code, we had provided sufficient information
15   whereby the supervisors could render preliminary
16   approval with conditions.
17        Certainly it was apparent that Mr. Zarko had a
18   different view of what preliminary plan requirements
19   were, but we were working toward bringing those two
20   opposing views to closure.
21             MR. MAHONEY: Would you read the answer
22   back, please?
23             (The record was read by the
24             reporter.)

20

1    BY MR. MAHONEY:
2    Q    Sir, you indicated that your plans, your first
3    revised set of plans, complied with the zoning
4    ordinance; correct?
5    A    Correct.
6    Q    And your opinion, it complied with SALDO?
7    A    Correct.
8    Q    Would you agree with the statement, sir, that
9    the revised set of plans were clearly not ready for
10   action by the board of supervisors?
11   A    I wonder if you could rephrase that,
12   Mr. Mahoney.
13   Q    With regard to the revised set of plans
14   submitted on December 21st, 2002, with regard to their
15   compliance with the zoning ordinance and SALDO, do you
16   or do you not believe that the plans were clearly not
17   ready for action by the board of supervisors?
18   A    I believe the board of supervisors could have
19   granted a conditional approval on the set of plans. We
20   were seeking further input on issues from the township
21   that would have helped complete the picture.
22   Q    Did you ever have a conversation with
23   Mr. Garrity after you submitted the revised set of plans
24   concerning whether or not they complied substantially

21

1  with SALDO?
2        MR. EINHORN:  Object to the form of the
3  question.  Also, it's attorney-client privilege.  He's
4  not answering discussions he had with Mr. Garrity.
5        MR. MAHONEY:  Well, with all due
6  respect, Mr. Woodrow is not the client of Mr. Garrity.
7  He is an outside consultant.
8  BY MR. MAHONEY:
9  Q     So the question is proper, and I'd ask you to
10 answer it, sir.
11       MR. EINHORN:  He's not answering the
12 question.  Just as Mr. Zarko is not answering any
13 questions about his discussions with Mr. Weiss and
14 others, Mr. Woodrow is not going to be answering
15 questions about his discussions with Mr. Garrity.
16       MR. MAHONEY:  The difference, Walt, as
17 you know, is that Mr. Zarko, as an appointed official of
18 the township, was part of township staff; and any
19 discussions he had with Mr. Weiss were clearly
20 attorney-client privilege.
21       Mr. Woodrow on the other hand is an outside
22 consultant retained by Mr. DePaul, and any discussions
23 he had with Mr. Garrity are fair game.
24       Are you directing him not to answer the

22

1  question?
2        MR. EINHORN:  Yes.
3        MR. MAHONEY:  Would you mark that,
4  please?
5        THE COURT REPORTER:  Yes.
6  BY MR. MAHONEY:
7  Q     Sir, if the plans, as you've indicated,
8  substantially complied with the SALDO and complied with
9  the zoning ordinance in your opinion on March 19th,
10 2002, when you submitted the second revised set of
11 plans, can you tell me why Highway, Materials, Inc., was
12 requesting an extension of time or offering an extension
13 of time to the board of supervisors to review the plans
14 rather than proceed for an approval at that point?
15       MR. EINHORN:  Object to the form of the
16 question.  It mischaracterizes his testimony about those
17 plans.
18       You can answer, if you know.
19       THE WITNESS:  No, I was not part of the
20 discussions regarding the -- I'm looking for an
21 adjective --
22       MR. EINHORN:  Extension.
23       THE WITNESS:  The extension agreement,
24 yeah.

23

1  BY MR. MAHONEY:
2  Q     But in your mind, when you submitted the second
3  revised set of plans, they could have been approved; is
4  that what your testimony is?
5  A     If the board of supervisors was so inclined,
6  they could have granted approval with conditions, yes.
7  Q     So is it your belief that the plan
8  substantially complied with the preliminary plan
9  requirements in the Whitemarsh Township SALDO?
10 A     Yes.
11 Q     And being of that view, there would have been
12 no reason for the developer to seek an extension; isn't
13 that correct?
14       MR. EINHORN:  Object to the form of the
15 question.  He just told you that wasn't part of his
16 bailiwick to determine those issue, and I object to
17 asking a hypothetical question like that.
18 BY MR. MAHONEY:
19 Q     Answer the question, please.
20       MR. EINHORN:  You can answer it, if you
21 know, I mean --
22       THE WITNESS:  I think our goal was to
23 provide the township with as much information and as
24 much latitude as possible; and, again, I can only

24

1  surmise that the DePaul Group was saying to Whitemarsh,
2  "Boy, if you give us additional information, additional
3  direction, we can bring these plans further along, if
4  that will make you feel more comfortable under the
5  approval process."
6  BY MR. MAHONEY:
7  Q     Did somebody from the DePaul Group tell you
8  that that's why they asked for an extension?
9  A     No.
10 Q     You're just surmising that?
11       MR. EINHORN:  Objection.  You asked him
12 to surmise that.
13       MR. MAHONEY:  I didn't ask him to
14 surmise anything.  I asked him the question, and I'll
15 ask it again.
16 BY MR. MAHONEY:
17 Q     As of March 19th, 2002, when you submitted the
18 revised set of plans, is it your opinion that the plans
19 complied in all respects with the preliminary plan
20 requirements of SALDO?  Yes or no.
21       MR. EINHORN:  Objection.  That was not
22 the question that you asked --
23       MR. MAHONEY:  That's my question now.
24 BY MR. MAHONEY:

**69**

1  Q    Sir, the letter attached to the memo bears your
2  signature on page 10; am I correct?
3  A    Yes, that's correct.
4  Q    After you submitted the letter, do you recall
5  having a conversation with Tom Zarko, before this
6  federal lawsuit was filed, in which you said that you
7  were upset at the tone of this letter?
8  A    I remember talking to Tom after this letter was
9  filed. I mean, I think we had some conversation about
10 the plan denial, and I may have said that, you know,
11 "Boy, I may have had a tough tone with the letter,"
12 something to that effect, yes.
13 Q    You were apologetic about the tone of the
14 letter?
15 A    Yes.
16 Q    And why were you apologetic about the tone of
17 the letter?
18 A    Well, because I've always had a good working
19 relationship with Mr. Zarko. We've always, you know,
20 gone through things and came to, I think, a legitimate
21 and intelligent conclusion; and in this particular case,
22 we didn't come to an intelligent conclusion, and it was
23 unfortunate.
24 Q    Did you tell Mr. Zarko that Mr. Garrity had, in

**70**

1  fact, prepared the March 19th, 2002, letter?
2  A    Well, I don't know if Mr. Garrity prepared the
3  letter, no.
4  Q    Well, what did Mr. Garrity have to do with it?
5  A    Certainly Mr. Garrity had input.
6  Q    What input did he have?
7        MR. EINHORN: Object to the form of the
8  question. It also calls for attorney-client
9  communication. He's not answering it.
10 BY MR. MAHONEY:
11 Q    With regard to the letter itself, sir, can you
12 identify those portions of the letter which were
13 prepared by Mr. Garrity?
14 A    I don't believe Mr. Garrity prepared any
15 portion of the letter. I think he may have, you know,
16 edited my text.
17 Q    Tell me what portions of the letter Mr. Garrity
18 edited?
19 A    I cannot.
20 Q    Did you keep a draft of the letter with
21 Mr. Garrity's editing remarks?
22 A    I don't believe that I did. I think it was
23 verbal as opposed to written.
24 Q    In the other four or five projects that you've

**71**

1  had in Whitemarsh Township, have you ever had an
2  attorney edit your comments in response to the municipal
3  engineer's review letters?
4  A    I don't recall.
5  Q    You may have; you might not have. You just
6  don't recall?
7  A    That's correct.
8        MR. EINHORN: I just want to amend my
9  previous objection. I think I just said attorney-client
10 privilege. I also wanted to put work product privilege
11 as part of the objection.
12 BY MR. MAHONEY:
13 Q    With regard to your original plan submission,
14 when you prepared and filed the plans in September of
15 2001, were you aware that there was a district
16 regulation in the heavy X zoning district in the zoning
17 ordinance which required berming and fencing to be
18 placed around the perimeter of the property?
19 A    Yes.
20 Q    Would I be correct, sir, that you were aware of
21 that regulation, that district regulation, in the
22 heavy X portion of the zoning ordinance as early as 1999
23 when you met with the township?
24 A    Yes.

**72**

1  Q    And, specifically, how did you become aware of
2  that?
3  A    I think just through my normal course of
4  reviewing the ordinances prior to making a
5  recommendation to my client.
6  Q    So is it something which you recognized
7  yourself?
8  A    Yes.
9  Q    And, in fact, Van Reiker, the land planner, he
10 also recognized it and put it in a memo to you,
11 Mr. Garrity, the architect, Mr. Poncia, did he not?
12 A    I don't recall a specific memo, Mr. Mahoney,
13 but it would not surprise me.
14 Q    There's no question at all in your mind that
15 the heavy X ordinance states what I just said, that is,
16 it requires a berm and fencing around the perimeter of a
17 heavy X site?
18 A    Yes.
19 Q    Did you ever recommend to your development team
20 that you address the issue up front with the township
21 before you submitted plans?
22 A    I had conversations with Mr. Garrity about
23 that.
24 Q    And was that prior to submission of the plans

169

1      You can answer.
2  BY MR. MAHONEY:
3    Q    Go ahead.
4    A    Yes, I was prepared to discuss it.
5    Q    And were you introduced by Mr. Garrity at the
6  meeting that you were there and were prepared to present
7  the plans?
8    A    I don't recall that I was introduced by
9  Mr. Garrity.  I just don't remember that detail.
10   Q    By the way, sir, are you being paid or
11  reimbursed in any way, shape, or form for your
12  appearance here today?
13   A    I haven't really thought about that.  I'm not
14  sure.
15   Q    So you didn't have an agreement walking in here
16  that you're going to be paid for your time?
17   A    No.  I never had any conversations with DePaul
18  about that.
19   Q    Did you have any conversations with anyone,
20  other than Mr. Einhorn, about your testimony today?  I
21  know you spoke briefly with Mr. Jordan about his
22  testimony; but aside from Mr. Einhorn, have you
23  spoken --
24   A    Yeah, I spoke to Mr. Garrity just briefly.  You

170

1  know, I had gone down to the deposition on Monday.
2    Q    When you had the conversation with Mr. Zarko
3  after March 21st, 2002, when the board of supervisors
4  denied the preliminary plan application, did you ever
5  tell Mr. Zarko, in addition to the other things we
6  talked about earlier, that you wished you had never
7  gotten involved in this project?
8    A    I'm not sure I used those specific words; but,
9  certainly, it turned into a much more controversial
10  project than I was anticipating.  And, you know, I think
11  I've always been an engineer who has prided myself in
12  working problems out, finding solutions.  You know,
13  that's what I'm trained to do.  I'm not a great fighter,
14  and I don't enjoy that environment.
15   Q    As of March 19th, 2002, when the second revised
16  plans were submitted to the township, had either you or
17  the DePaul Group engaged Dutchland as the sub-consultant
18  of the on-site treatment plant?
19   A    I can't speak to DePaul, but I had not.
20        MR. MAHONEY:  Okay.  That's it.
21        MR. EINHORN:  Thanks.
22             (The deposition concluded at
23             approximately 3:50 p.m.)
24

171

1                WITNESS CERTIFICATION
2
3        I hereby acknowledge that I have read the
4  foregoing transcript of my deposition given on
5  November 24, 2003, and that it is a true, correct and
6  complete transcript of the answers given by me to the
7  questions propounded, to the best of my knowledge,
8  recollection and belief, except for the list of
9  corrections, if any, noted on the below Errata Sheet.
10
11
12                    _____
                       TIMOTHY P. WOODROW
13
14
15
16
-17
18
19
20
21
22
23
24

172

1              C E R T I F I C A T I O N
2
3        I, Holly J. Cross, a Registered Professional
4  Reporter, do hereby certify that the proceedings,
5  evidence, and objections upon the deposition of
6  TIMOTHY P. WOODROW are contained fully and accurately in
7  the stenographic notes taken by me upon the foregoing
8  matter on November 24, 2003, and that this is a true and
9  correct transcript of same.
10
11
12
13
14
                       _____
                       HOLLY J. CROSS
15                     Registered Professional
                       Reporter
16
17
18
19
20
21
22
23

## CERTIFICATE OF SERVICE

I, Arleigh P. Helfer III, Esquire, hereby certify that on December 19, 2003, I served copies of the foregoing Memorandum Of Plaintiff Highway Materials, Inc. In Opposition To Defendants' Motion To Compel Production Of Documents Listed In Woodrow & Associates' Privilege Log And Plaintiff's Privilege Log upon the following individuals in the manner stated below:

By Federal Express:

Harry G. Mahoney, Esquire
Deasey Mahoney & Bender Ltd.
1800 John F. Kennedy Boulevard, Suite 1300
Philadelphia, PA  19103-2978

By U.S. Mail, first class delivery:

Kevan F. Hirsch, Esquire
Kaplin Stewart Meloff Reiter & Stein, P.C.
350 Sentry Parkway, Building 640
Blue Bell, PA 19422