UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.          :
                                 :          CIVIL ACTION NO. 02-cv-3212
        v.                       :
                                 :
WHITEMARSH TOWNSHIP, MONTGOMERY  :
COUNTY, PA, et al.               :

ORDER

AND NOW, this          day of                          , 2004, upon consideration

of Defendants Whitemarsh Township, the Board of Supervisors of Whitemarsh Township, Ann D.

Younglove, Ronald J. Derosa, William P. Rimel, Peter P. Cornog, Michael A. Zeock and Thomas

F. Zarko's Motion for Summary Judgment Pursuant to Rule 56(b) of the Federal Rules of Civil

Procedure and any response thereto, it is hereby

ORDERED

that the Motion is granted.  Judgment is hereby entered in favor of Defendants Whitemarsh

Township, the Board of Supervisors of Whitemarsh Township, Ann D. Younglove, Ronald J.

Derosa, William P. Rimel, Peter P. Cornog, Michael A. Zeock and Thomas F. Zarko and against

Plaintiff.

BY THE COURT:

_____
ROBERT J. KELLY, SR., J.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.                    :
                                           :        CIVIL ACTION NO. 02-cv-3212
        v.                                 :
                                           :
WHITEMARSH TOWNSHIP, MONTGOMERY  :
COUNTY, PA, et al.                         :

DEFENDANTS WHITEMARSH TOWNSHIP, THE BOARD OF SUPERVISORS
OF WHITEMARSH TOWNSHIP, ANN D. YOUNGLOVE,
RONALD J. DEROSA, WILLIAM P. RIMEL, PETER P. CORNOG,
MICHAEL A. ZEOCK AND THOMAS F. ZARKO'S
MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56(b)
OF THE FEDERAL RULES OF CIVIL PROCEDURE

Defendants Whitemarsh Township, the Board of Supervisors of Whitemarsh Township, Ann

D. Younglove, Ronald J. Derosa, William P. Rimel, Peter P. Cornog, Michael A. Zeock and Thomas

F. Zarko herewith move this Honorable Court to grant summary judgment in favor of all Defendants

pursuant to Rule 56(b) of the Federal Rules of Civil Procedure for the reasons set forth in the

attached Memorandum of Law, which is incorporated herein by reference.

DEASEY, MAHONEY & BENDER, LTD.


BY:_____
        HARRY G. MAHONEY, ESQUIRE
        CARLA P. MARESCA, ESQUIRE
        Attorneys for Defendants, Whitemarsh
        Township, the Board of Supervisors of
        Whitemarsh Township, Ann D. Younglove,
        Ronald J. Derosa, William P. Rimel, Peter P.
        Cornog, Michael A. Zeock and Thomas F. Zarko

        Validation Codes: HM1224/CM853
        Suite 1300
        1800 John F. Kennedy Boulevard
        Philadelphia, PA 19103-2978
        (215) 587-9400
        (215) 587-9456 - fax

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HIGHWAY MATERIALS, INC. | : | |
| | : | CIVIL ACTION NO. 02-cv-3212 |
| v. | : | |
| | : | |
| WHITEMARSH TOWNSHIP, MONTGOMERY | : | |
| COUNTY, PA, et al. | : | |

DEFENDANTS WHITEMARSH TOWNSHIP, THE BOARD OF SUPERVISORS
OF WHITEMARSH TOWNSHIP, ANN D. YOUNGLOVE,
RONALD J. DEROSA, WILLIAM P. RIMEL, PETER P. CORNOG,
MICHAEL A. ZEOCK AND THOMAS F. ZARKO'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56(b)
OF THE FEDERAL RULES OF CIVIL PROCEDURE

DEASEY, MAHONEY & BENDER, LTD.
HARRY G. MAHONEY, ESQUIRE
CARLA P. MARESCA, ESQUIRE
Attorneys for Defendants, Whitemarsh
Township, the Board of Supervisors of
Whitemarsh Township, Ann D. Younglove,
Ronald J. Derosa, William P. Rimel, Peter P.
Cornog, Michael A. Zeock and Thomas F.
Zarko

Validation Codes: HM1224/CM853
Suite 1300
1800 John F. Kennedy Boulevard
Philadelphia, PA 19103-2978
(215) 587-9400
(215) 587-9456 - fax

TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i-iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv-xii

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.  The Property and Surrounding Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.  Zoning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    D.  Land Development Process Under the Subdivision
        and Land Development Ordinance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    E.  Plaintiff's Desired Use of the Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    F.  Rezoning of the Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    G.  Plaintiff's Application for Preliminary Plan Approval . . . . . . . . . . . . . . . . 17

        1.  Review by the Township Engineer -
            October 11, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        2.  Revised Plans Filed on December 24, 2001 . . . . . . . . . . . . . . . . . . . 20

        3.  Review of the Revised Plans by the
            Township Engineer - January 24, 2002 . . . . . . . . . . . . . . . . . . . . . . . 20

            a.  Sanitary Sewer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            b.  Berm and Fence Requirements in
                HVY-X District . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            c.  Retention Basin in the "AA"
                Residential District . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        4.  Scheduling Plaintiff's Preliminary Plans for
            Action by the Board of Supervisors . . . . . . . . . . . . . . . . . . . . . . . . 27

    5. Second Revised Plans and Review by the
     Township Engineer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

  H. March 21, 2002 Board of Supervisors Meeting . . . . . . . . . . . . . . . . . . . . . . . . 32

    1. Presence of a Court Reporter and Swearing
     In Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    2. Passage of Resolution 2002-17 Denying
     Plaintiff's Application for Preliminary
     Plan Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

III. LEGAL STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . 43

IV. LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

  A. Defendants are Entitled to Summary Judgment as a
   Matter of Law on Plaintiff's Claim of Violation of
   Procedural Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

  B. Defendants are Entitled to Summary Judgment as a
   Matter of Law on Plaintiff's Claim of Violation of
   Substantive Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    1. Only Conduct that "Shocks the Conscience"
     Rises to the Level of a Substantive Due
     Process Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    2. The Courts in the Third Circuit Have Consistently
     Applied the "Shocks the Conscience" Standard
     To Invalidate Substantive Due Process Claims in
     Land Use and Zoning Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    3. Defendants' Conduct Does Not "Shock the Conscience" . . . . . . . . . . . . 58

      a. Rezoning Plaintiff's Property Does Not Shock
       the Conscience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

      b. Listening to Public Concerns About a Proposed
       Use Which is Inconsistent With Surrounding
       Uses Does Not Shock the Conscience . . . . . . . . . . . . . . . . . . . . 61

      c. Non-Acceptance of HMI's Offer for an
       Extension of Time Does Not Shock The Conscience . . . . . . . . 62

d.    The Township Cooperated with HMI and HMI's Claim of Lack of Cooperation Does Not Shock The Conscience ................................. 63

e.    The Board of Supervisors' Passage of Resolution 2002-17 Does Not Shock The Conscience ........................................ 65

C.    Defendants Are Entitled to Summary Judgment as a Matter of Law on Plaintiff's Equal Protection Claim Because Plaintiff's Property is Not Similarly Situated to Other Properties in Whitemarsh Township, was Not Treated Differently or, Alternatively, There was a Rational Basis for the Difference in Treatment ...................................................... 66

1.    Rezoning is Municipal Legislation ............................ 69

2.    Plaintiff's Property Is Not Similarly Situated to Other Properties in Whitemarsh Township ........................... 70

a.    Plaintiff's Property Is Not Similarly Situated to the KYW Property ................................. 72

b.    Plaintiff's Property Is Not Similarly Situated to Other Properties Whose Owners/Developers Received Land Development Approval Prior to March 21, 2002 ................................... 73

3.    Plaintiff's Preliminary Plan Application Was Treated the Same As Other Previously Filed Applications .................... 77

D.    The Individual Defendants Are Entitled to Qualified Immunity ............. 78

1.    The Law of Qualified Immunity ............................... 78

2.    Thomas Zarko, Township Engineer ............................ 81

3.    Supervisors Cornog and Zeock .............................. 84

4.    Supervisors Younglove, Rimel and DeRosa .................... 84

V.    CONCLUSION ...................................................... 86

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

Abeyta by Martinez v. Chama Valley Indep. Sch.,
  77 F.3d 1253 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Acierno v. Mitchell,
  6 F.3d 970 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Anderson v. Creighton,
  483 U.S. 635 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242, 106 S. Ct. 2505 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 43

Bell v. Tere Duperrault,
  2004 U.S. Dist. LEXIS 9296 (7th Cir. May 12, 2004) . . . . . . . . . . . . . . . . . 71

Bello v. Walker,
  840 F.2d 1124 (3d Cir. 1988), cert. denied, 488 U.S. 868 (1988) . . . . . . . . . . . . . . 44, 45, 48, 50

Blain v. Township of Radnor, et al.,
  C.A. No. 02-cv-6684 (E.D. Pa., May 19, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 57

Boyanowski v. Capital Area Intermediate Unit,
  215 F.3d 396 (3d cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Brown v. Hot, Sexy and Safer Productions, Inc.,
  68 F.3d 525 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Celotex Corp. v. Catrett,
  477 U.S. 317, 106 S. Ct. 2548 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Chesterfield Development Corp. v. City of Chesterfield,
  963 F.2d 1102 (8th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

City of Cuyahoga Falls v. Buckeye County Hope Found.,
  . – U.S. –, 123 S.Ct. 1389 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Cleburne v. Cleburne Living Center, Inc.,
   473 U.S. 432 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 71

Collier v. Town of Harvard,
   cv-No. 95-11652-DPW, 1997 U.S. Dist. LEXIS 23582
   (D. Mass. Mar. 28, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Collins v. City of Harker Heights,
   112 S.Ct. 1061 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Conn v. Gabbert,
   119 S.Ct. 1292 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Corneal v. Jackson Township,
   No. 1:cv-00-1192, (M.D., Pa. July 28, 2003),
   affirmed, 2004 U.S. App. LEXIS 7198 (3d Cir., April 13, 2004) . . . . . . . . . . . . . . . 48, 55, 58

Costello v. Mitchell Public School Dist.,
   79, 266 F.3d 916 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

County of Sacramento v. Lewis,
   523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed2d 1043 (1998) . . . . . . . . . . . . . . . . . . 3, 47, 49, 54, 58

Creative Environments, Inc. v. Estabrook,
   680 F.2d 822 (1st Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Cruz-Erazo v. Rivera-Montanez,
   212 F.3d 617 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Daniels v. Williams,
   474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Dartmouth Review v. Dartmouth College,
   889 F.2d 13 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 71, 75

Davis v. Township of Hillside,
   190 F.3d 167 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

DeBlasio v. Zoning Board of Adjustment,
   53 F.3d 592 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 44, 48

Dill v. Runyon,
   1997 U.S. Dist. LEXIS 4355, 1997 WL 164275, *4 (E.D. Pa. Apr. 3, 1997) . . . . . . . . . . . . 70

Doe v. Gooden,
  214 F.3d 952 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Doyle v. Oklahoma Bar Association,
  998 F.2d 1559 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Ercegovich v. Goodyear Tire & Rubber Co.
  154 F.3d 344 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70,75

FERC v. Mississippi,
  456 U.S. 742, 768, n. 30 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Fred's Modern Contracting, Inc. et al. v. Horsham Township,
  C.A. No. 02-cv-0918 (E.D. Pa., Mar. 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Fuentes v. Wagner,
  206 F.3d 335 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Good v. Dauphin Cty. Soc Serv for Children & Youth,
  891 F.2d 1087 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Gordon v. Hansen,
  168 F.3d 1109 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Grant v. City of Pittsburgh, et al.,
  98 F.3d 116 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Grimm v. Sweeney,
  249 F.Supp.2d 571 (E.D. Pa. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 53

Gruenke v. Seip,
  225 F.3d 290 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Harlow v. Fitzgerald,
  457 U.S. 800, 102 S.Ct. 2727, 73 L.#d2d 396 (1982) . . . . . . . . . . . . . . . . . . . . . . . 79

Hawkins v. Freeman,
  195 F.3d 732 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Heller v. Doe,
  509 U.S. 312, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) . . . . . . . . . . . . . . . . . . . . . . 67

Holifield v. Reno,
115 F.3d 1555 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 75

Hunter v. Bryant,
112 S.Ct. 534 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Hunterson v. Disabato,
308 F.3d 236 (3d Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Immediato v. Rye Neck School Dist.,
73 F.3d 454 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

In re: Montgomery County,
215 F.3d 367 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Katz v. Aetna Casualty and Surety Co.,
972 F.2d 53 n. 5 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Keating v. Bucks County Water and Sewer Authority,
2000 WL 1888770 (E.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Keystone Outdoor Advertising Co., Inc. v. West Whiteland Township,
2003 WL 1914157, *2, 64 Fed.Appx. 333 (3rd Cir.(Pa.) Mar. 11, 2003) . . . . . . . . . . . . . . . . . 55

Klein v. McGowan,
198 F.3d 705 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Kline v. Kansas City, Mo., Fire Dept.,
1999 U.S. App. LEXIS 8500, 175 F.3d 660, 1999 WL 270013, (8th Cir. 1999) . . . . . . . . . . 70

Lapid-Laurel, L.L.C. v. Zoning Bd. of the Adjustment of Scotch Plains,
2002 WL 408082 (3d Cir., March 15, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Leamer v. Fauver,
288 F.3d 532 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Levin v. Upper Makefield Tp.,
2004 U.S, App. LEXIS 4457 (March 8, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Lindquist v. Buckingham Township, et al., (Lindquist I)
C.A. No. 00 cv-1301 (E.D. Pa. April 15, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Lindquist v. Buckingham Tp., (Lindquist II)
  2003 WL 21357247, *1, 68 Fed.Appx. 288, 289 (3rd Cir.(Pa.) May 16, 2003) . . . . . . . . . . . 54

Magnuson v. City of Hickory Hills,
  933 F.2d 562 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Malley v. Briggs,
  475 U.S. 335 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Midnight Sessions, Ltd. v. City of Philadelphia,
  945 F.2d 667 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Miller v. City of Philadelphia,
  174 F.3d 368 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Moreland v. Las Vegas Metropolitan Police Dept.,
  159 F.3d 365 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Nestor Colon Medina & Sucesores, Inc. v. Custodio,
  964 F.2d 32 (1st Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

New Orleans v. Dukes,
  427 U.S. 297 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Nicini v. Morra,
  212 F.3d 798 (3d Cir. 2000) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Omnipoint Communications, Inc. v. Penn Forest Township,
  42 F.Supp.2d 493 (M.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Pace Resources, Inc. v. Shrewsbury Township,
  808 F.2d 1023 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 62

Parratt v. Taylor,
  451 U.S. 527 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

PFZ Properties, Inc. v. Rodriguez,
  928 F.2d 28 (1st Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Riley v. St. Louis County of Missouri,
  153 F.3d 627 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Rochin v. People of California,
  72 S.Ct. 205 U.S. 1655 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Rogin v. Bensalem Township,
  616 F.2d 680 (3d Cir. 1980), cert. denied, 450 U.S. 1029 (1981) . . . . . . . . . . 44, 45, 60, 62, 69

Sameric v. City of Philadelphia,
  142 F.3d 582 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 79

Sameric Corp. of Delaware, Inc. v. City of Philadelphia,
  1996 U.S. Dist. LEXIS 1167 (E.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Santiago de Castro v. Morales Medina,
  943 F.2d 129 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Sauers v. Bensalem Township,
  C.A. No. 01-cv-5759, 2003 U.S. dist. LEXIS 476 (E.D. Pa. Mar. 5, 2003) . . . . . . . . . . . . . . 57

Shay v. County of Berks,
  2003 WL 21973318, *7 (E.D. Pa. June 12, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Sheppard v. Berman,
  94 F.3d 823 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Shumway v. United Parcel Service,
  118 F.3d 60 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Singh v. Wal-Mart Stores, Inc.,
  1999 U.S. Dist. LEXIS 8531 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 75

Skinner v. City of Miami, Fla.,
  62 F.3d 344 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,
  2002 WL 654431 (U.S. 4/23/02) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Temkin v. Frederick County, Md.,
  945 F.2d 716 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Thornbury Noble, Ltd. v. Thornbury Township, et al.,
  C.A. No. 99-cv-6460 (E.D. Pa., October 21, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United Artists Theatre Circuit, Inc. v. Township of Warrington, et al.,
  316 F.3d 392 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 47, 48, 49, 50, 53, 54, 58, 80

United of Omaha Life Ins. Co. v. Solomon,
  960 F.2d 31 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Vance v. Bradley,
  440 U.S. 93 S.Ct. 939, 942, 59 L.Ed.2d 171  (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Village of Belle Terre v. Boraas,
  416 U.S. 1, 13, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 68

Vito v. Bray,
  1991 U.S. Dist. LEXIS 13564 (E.D. Pa., Sept. 27, 1991) at *19. . . . . . . . . . . . . . . . . . . . . . . 70

Wagner v. Township of Harmer,
  651 F.Supp. 1286 (W.D. Pa. 1987),
  aff'd. 826 F.2d 1054 (3rd Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Washington v. Glucksberg,
  521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Weimer v. Amen,
  870 F.2d 1400 (8th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Welch v. Paicos,
  66 F.Supp.2d 138,  (D. Mass. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Willow Grove v. Olech,
  528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Wilson v. Layne,
  526 U.S. 603 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Wilson v. Northcutt,
  987 F.2d 719 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Woodwind Estates, Ltd. v. Gretkowski,
  205 F.3d 118 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## STATE CASES

Abarbanel v. Solebury Township,
  572 A.2d 862, 132 Pa.Cmwlth 326 (Cmwlth. 1990);
  appeal denied, 593 A.2d 422, 527 Pa. 651 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 66


Akin v. South Middleton Township Zoning Hearing Board,
  120 Pa.Cmwlth. 112, 547 A.2d 883 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

County Builders, Inc. v. Lower Providence Township,
  5 Pa.Cmwlth. 1, 287 A.2d 849 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Herr v. Lancaster County Planning Commission,
  155 Pa.Cmwlth. 379, 625 A.2d 164 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Morris v. Northampton County Hanover Twp. Board of Supervisors,
  395 A.2d 697, 39 Pa.Cmwlth. 466 (Cmwlth. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Raum v. Board of Supervisors of Tredyffrin Township,
  29 Pa.Cmwlth. 9, 370 A.2d 777 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

## FEDERAL RULES AND STATUTES

U.S. CONST. Amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

U.S. CONST. Amend. XIV, §1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 67

F.R.C.P. 56(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

F.R.C.P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 47, 55

## STATE RULES AND STATUTES

53 P.S. §10101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 44

53 P.S. §10508. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 62

53 P.S. §10508(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 62

53 P.S. §10508(4)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10, 60

53 P.S. §10509(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

53 P.S. §10601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

53 P.S. §10609.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

53 P.S. §10909.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

53 P.S. §10916.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

53 P.S. §11001A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

I.    <u>INTRODUCTION</u>

Plaintiff, Highway Materials, Inc. (sometimes referred to as "HMI") filed a three count Complaint on May 24, 2002 (Exhibit "A" attached hereto)[1] against Defendants Whitemarsh Township, the Board of Supervisors of Whitemarsh Township, Ann D. Younglove, Ronald J. DeRosa, William P. Rimel, Peter P. Cornog, Michael A. Zeock and Thomas F. Zarko (hereinafter collectively "Township Defendants") pursuant to 42 U.S.C. §1983, the Civil Rights Act, for alleged violation of Plaintiff's (1) procedural due process rights, (2) substantive due process rights and (3) equal protection rights.   The case was borne from a March 21, 2002 decision by the Board of Supervisors to deny Plaintiff's application for preliminary plan approval of a proposed land development of a 54 acre tract of land.   The proposal called for a major office development on a partially filled-in quarry site, almost entirely covering the 54 acre site with buildings, other structures and asphalt parking lots.   The application and its second revisions were denied after extensive reviews by the Township Planning Commission, the Township Engineer, the Montgomery County Planning Commission and the Board of Supervisors.   The reviews showed not only that the plans were conceptually inappropriate for the area, but more importantly that the plans failed to comply with the requirements of the Township's Zoning Ordinance, Subdivision and Land Development Ordinance and Grading Ordinance.

Defendants filed an Answer (Exhibit "B") denying the allegations contained in the Complaint.   The parties have conducted exhaustive discovery in this case, which, as set forth in this Memorandum, clearly demonstrates that there are no genuine issues of material fact.   Therefore, Defendants are entitled to judgment as a matter of law.

---

[1]All exhibit references are to the Appendix submitted herewith.

The crux of Plaintiff's Complaint is that the Township's Board of Supervisors rezoned Plaintiff's property from "Heavy Industrial-Extraction" to a new zoning classification, "EX-Extraction" after Plaintiff had filed an application for preliminary plan approval for a proposed office development.   Then the Board, on March 21, 2002, passed a resolution denying Plaintiff's preliminary plan application.  Those actions, Plaintiff contends, violated its rights to procedural due process, substantive due process and equal protection under the Constitution.

The law in Pennsylvania is clear that a pending application for land development must be reviewed under the zoning ordinance in effect at the time of the application, even if the zoning of the subject property is changed while the application is pending.  53 P.S. §10508(4).  Any new applications filed after the new zoning is passed are reviewed under the new zoning ordinance.

Rezoning property is a valid exercise of a Township governing body's legislative power, even if an application is pending, because pending applications are "grandfathered" in as discussed above.  Also, denying an application for land development that fails to comply with applicable municipal ordinances is a valid exercise of a municipality's executive power.  When distilled to its essence, Plaintiff's Complaint amounts to nothing more than its disagreement with the Board of Supervisors which exercised its valid legislative and executive duties to rezone Plaintiff's property to a more appropriate zoning and to deny a plan that did not comply with the Township's ordinances.

This Memorandum will demonstrate that the Board of Supervisors, in rezoning Plaintiff's property and denying Plaintiff's application for preliminary plan approval, acted properly, legally and in full compliance with their statutory duties and responsibilities as the legislative and governing body of Whitemarsh Township.  Also, Defendant Thomas F. Zarko, in reviewing the plans, acted properly, legally and in full compliance with his duties as the appointed Township Engineer.

-2-

Plaintiff was not denied procedural due process. The test for procedural due process in land use and zoning matters is whether the state affords a full judicial mechanism with which to challenge an official decision. DeBlasio v. Zoning Board of Adjustment, 53 F.3d 592 (3d Cir. 1995). Pennsylvania provides that full judicial mechanism through the procedures set forth in the Municipalities Planing Code. 53 P.S. 10101, et seq. Plaintiff has exercised these rights by filing a land use appeal from the Board of Supervisors' decision to deny its preliminary plans.

Plaintiff was not denied substantive due process. After Plaintiff filed its Complaint, the United States Court of Appeals for the Third Circuit, in the case of United Artists Theatre Circuit, Inc. v. Township of Warrington, et al., 316 F.3d 392 (3d Cir. 2003), significantly changed the standard necessary to establish a substantive due process claim. In that case, the Court abandoned the previous standard of "improper motive" to the more stringent "shocks the conscience" standard. Only the "most egregious" official conduct can be said to be arbitrary in the constitutional sense. County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed2d 1043 (1998); United Artists, supra. This Memorandum will clearly demonstrate that the Defendants' actions did not, in any respect, "shock the conscience".

Plaintiff was not denied equal protection. Plaintiff's property was not similarly situated to other properties in Whitemarsh Township which were treated differently. Even if the Court concludes, however, that Plaintiff's property is similarly situated to other properties treated differently, there was a rational basis for the difference in treatment. The equal protection claim is no more than a shoestring attempt to assert another federal constitutional claim where no claim exists. While the land use appeal in state court may or may not result in a reversal of the Board's March 21, 2002 decision to deny the preliminary plan application, that is the only remedy appropriate

for the Plaintiff.  To permit the present lawsuit to continue would federalize a routine land use dispute.

II.     FACTS

    A.     Parties

Plaintiff, Highway Materials, Inc. (hereinafter sometimes "HMI"), is a Pennsylvania corporation whose offices are located in Blue Bell, Pennsylvania.  Peter DePaul is the president of HMI.  HMI is one of many corporations, partnerships and sole proprietorships known as the "DePaul Companies" which own and operate construction companies, quarries, cement and asphalt plants, apartment complexes, real estate and development companies, nursing homes, country clubs, restaurants and other businesses.  (See Exhibit "C", deposition of Peter DePaul, pp. 6-35).  As he stated at his deposition, Mr. DePaul has an ownership interest in all of these companies which are owned, controlled and run by him and members of his family.  The holdings of his business empire are so vast and complex that he could not even recount at his deposition the extent of his ownership interests in all of the companies or the position(s) he holds in each company.  The one thing he was adamantly sure of, however, was the fact that all major decisions for all the companies rested with him.  (Exhibit "C", DePaul deposition, pp. 10, 11).

The Defendants include Whitemarsh Township, a home-rule charter municipality located in Montgomery County, Pennsylvania and its legislative and governing body, the Board of Supervisors.  The Supervisors are citizens of the Township who are elected to staggered terms of four years.  They are compensated for their service in the amount of $2,500 per year.  The Board is the only entity in the Township which has the legal authority to enact and amend the Zoning Ordinance.  It is also the only entity which has the legal authority to approve or deny land development applications.  The five

-4-

Supervisors who sat on the Board and voted to rezone the Plaintiff's property on February 28, 2002 and who also voted on March 21, 2002 to deny Plaintiff's application for preliminary plan approval, were sued in their official capacity and in their individual capacity.  The five Supervisors are William P. Rimel, Ronald J. DeRosa, Ann D. Younglove, Peter P. Cornog and Michael A. Zeock.  Of those five individuals, only Messrs. Cornog and Zeock are still members of the Board.  Both of them were sworn into office in January, 2002.  Because of term limits set forth in the Township's Home Rule Charter, Mr. Rimel and Ms. Younglove were not permitted to run for reelection and concluded their terms in office at the end of 2003.  Mr. DeRosa lost his bid for reelection in November, 2003. Lawrence Gregan is the Township Manager.  He was not named as a defendant.  Also named as a defendant is Thomas F. Zarko, the Township's former consulting engineer.  The claims against Mr. Zarko in his official capacity have been dismissed.  He remains a Defendant in his individual capacity only.  He is a principal in CKS Engineers, Inc. of Doylestown, Pennsylvania.

Intervenors in the action are Donald and Trina Cohen and Paul and Barbara Henkels, neighbors of Quarry Hole #1 who are opposed to its development as an "all office" complex.  They have also intervened in the related state court action which is pending in the Court of Common Pleas of Montgomery County, docketed at C.A. No. 2002-07500.

B.    The Property And Surrounding Properties

The real property which is the subject of this lawsuit is located in Whitemarsh Township on the east side of Stenton Avenue near its intersection with Joshua Road.  Quarry Hole #1 is directly adjacent to the Philadelphia Cricket Club golf course. The parcel consists of 54 acres.  It is one of three quarry sites previously known as the Corson Limestone Quarry.  For convenience, the parties refer to Plaintiff's three quarry sites as Quarry Holes #1, 2 and 3.  Quarry Hole #1 was formerly an

active limestone quarry but has been partially filled in over the years with clean fill. A true and correct copy of the Zoning Map in effect at the time of Plaintiff's application is attached hereto as Exhibit "D". The subject 54 acre parcel is outlined in red (Quarry Hole #1). The other two quarries are outlined in green (Quarry Hole #2) and yellow (Quarry Hole #3). Quarry Hole #2 is in the process of being "filled in". Quarry Hole #3 is still an active quarry. The Plaintiff intends to eventually redevelop both Holes #2 and 3. In fact, Plaintiff filed applications for preliminary plan approval for proposed developments on Holes #2 and 3 on October 18, 2001. The parties (HMI and Township) have agreed to withhold processing those plans.

The Philadelphia Cricket Club golf course is located to the north, east and south of Quarry Hole #1. The Cricket Club is zoned AA Residential and has a recreational overlay. To the west, across Stenton Avenue, is Quarry Hole #2 and a portion of Erdenheim Farm, a large, working farm owned by the Dixon family. The Farm is zoned AAA Residential. To the north and west beyond Joshua Road is another golf course owned and operated by the Sunnybrook Country Club. The zoning of that golf course and the residential areas on either side of Stenton Avenue are zoned AA Residential. Most other adjacent parcels are zoned residential. The only property in the vicinity of the site which is not agricultural, residential or a golf course is property owned by KYW, a 15 acre lot west of Quarry Hole #2. It is zoned HVY-Industrial. A very high radio transmitting tower and a small building are located on the property. The majority of the KYW site is a meadow.

Plaintiff purchased the quarry properties on June 21, 1997. (See Deed, Exhibit "E"). The purchase price of $8,000,000 was divided between the real property and the equipment purchased. The entire real property of 312 acres (quarry holes #1, 2 and 3) was assigned a value of $1,000,000. This is consistent with the realty transfer tax which was paid to Montgomery County and

Whitemarsh Township. (Exhibit "E", p. 3). The equipment was assigned the remaining value of $7,000,000. (See Exhibit "SSS", deposition of Patrick Callahan, CFO of the DePaul Companies, pp. 64, 65 ).

C.    Zoning

Quarry Hole #1 had split zoning. The majority of the site was zoned "HVY-X" (Heavy Industrial-Extraction). Two smaller portions of the site were zoned AA Residential. These portions included a "panhandle" in the northeast corner of the parcel and a "triangular" piece in the southeast corner of the parcel. (See Exhibit "F", diagram of Quarry Hole No. 1; "AA" residential portions colored yellow). The uses permitted in each zoning district are set forth in sections 116-155 (HVY and HVY-X) and 116-48 ("AA " Residential) of the Zoning Ordinance. (Exhibit "G"). The HVY-X zoning, making up most of Quarry Hole #1, permits mineral extraction and any other uses not specifically prohibited by the ordinance. This means that office development is permitted but residential development is not because residential development other than a caretaker or watchman's dwelling is prohibited.

Section 116-156 of the Zoning Ordinance contains district-wide regulations specific to properties in a HVY-X district. Section 116-156.B requires a berm around the property of a minimum height of fifteen (15) feet and maximum height of fifty (50) feet with the slope of the sides of the berm not to exceed a ratio of one to one (1:1). Section 116-156.C requires the installation of a chain link fence of at least six (6) feet in height, surmounted by three (3) strands of barbed wire around the property. That regulation specifies that an "impenetrable living fence", such as multiflora rose, may be substituted for the chain link fence.

-7-

"AA" Residential zoning permits single family dwellings on lots whose minimum size are 30,000 square feet, agriculture or horticulture uses, certain public utility facilities which are designed to appear residential in character and passenger stations for public transportation (Exhibit "G", Zoning Ordinance, §§116-48, 116-35). The Zoning Ordinance does not provide for a retention basin in an "AA" Residential District as an accessory use to a principal industrial or commercial use in an adjacent zoning district. An "accessory use" is defined in the ordinance as "a use subordinate to the principal use of land or a building or other structure on a lot and customarily a part of or incidental thereto". (Exhibit "G", Zoning Ordinance, §116-11).

As described in more detail below, these provisions of the Zoning Ordinance became significant in the review of Plaintiff's land development plan and revisions thereto. The HVY-X regulations imposed certain burdens on any development in a HVY-X district. Plaintiff, throughout the land development process, refused to seek zoning relief from the Zoning Hearing Board, even though the Zoning Hearing Board was the only entity legally entitled to grant zoning relief. 53 P.S. §10909.1.

D.    Land Development Process Under The Subdivision And Land Development Ordinance

Subdivision and land development procedures, requirements and standards are set forth in the Township's Subdivision and Land Development Ordinance (SALDO). (Exhibit "H", SALDO). The Township's SALDO sets forth three stages in the procedure for approval of land development plans: (1) optional sketch plan, (2) required preliminary plan and (3) required final plan. (SALDO, §105-12). The sketch plan stage allows a developer to interface with the Planning Commission, the

-8-

Township Planner and others at the Township to receive early and informal consultation and guidance before preparation of and submission of the application for preliminary plan approval.

The next step, which is mandatory, is application for preliminary plan approval. The purpose of this stage, according to Section 105-14, "is to obtain formal conditional approval **in order to minimize changes and revisions before final plans are submitted".** Section 105-14 sets forth the procedures for preliminary plan procedure. Section 105-14.B(2) provides as follows:

> B.    General.
>
> (2) **The preliminary plan and all information and procedures relating thereto shall in all respects be in compliance with the provisions of this Chapter,** except where variation therefrom may be requested pursuant to §105-10. (Emphasis added).

Section §105-21 sets forth requirements for a preliminary plan.

Article V of the SALDO contains design standards applicable to subdivision and land development plans. In §105-25, entitled "Scope; minimum standards; adjustment of standards" the following pertinent provisions appear:

> ARTICLE V
> Design Standards
> §105-25.  Scope; minimum standards; adjustment of standards.
> A.    The following subdivision and land development principles, standards and requirements **will be applied in evaluating plans** for proposed subdivisions and land developments.
>
> B.    The **standards and requirements outlined herein shall be considered minimum standards and requirements for the promotion of the public health, safety and general welfare.**

(Emphasis added).

-9-

Section 105-26, "General Standards", provides that the "developer **shall** conform to all applicable performance standards, including, but not limited to, those contained in the **Zoning Ordinance and the Grading Ordinance."** (Emphasis added). The approval of a preliminary plan is a required prerequisite to obtaining final plan approval. In summary, a preliminary plan most comply with all design standards in the SALDO, all applicable provisions of the Zoning Ordinance and the Grading Ordinance.

The SALDO specifies that the Board of Supervisors must act on a preliminary plan application within 75 days of the first Planning Commission meeting which occurs after submission of the plan (§105-14.D(15)) and notify the developer of its decision in writing, within 15 days thereafter (§105-14.D(16)). The combination of the days is referred to as the 90 day time limit, the time specified for municipal action on submitted land development plans under the Municipalities Planning Code. 53 P.S. §10508.

It is universally recognized by land use practitioners that the preliminary plan phase of land development is the most important phase. Once a municipality approves a preliminary plan, with conditions, then the applicant who has secured the approval is absolutely entitled to final plan approval and the right to develop his property in accordance with those plans as long as he submits final plans that satisfy all of the conditions of preliminary plan approval. 53 P.S. §10508(4)(i). Indeed, Whitemarsh Township's SALDO in Section 105-15(B)(1) states:

> "The final plan shall conform to the preliminary plan, as approved."

A municipality cannot risk overlooking anything in the preliminary plan phase. To do otherwise may force it to accept a final plan that is detrimental to the public health, safety and welfare. Therefore, compliance with the Zoning Ordinance, SALDO and other applicable ordinances is required.

Thorough and timely reviews by the township engineer of a plan and revisions to those plans disclose violations, non-compliances and deficiencies with these ordinances and provide a road map for the developer for revisions to its plans or requests for zoning relief.

    E.    <u>Plaintiff's Desired Use of the Property</u>

Plaintiff's principal, Peter DePaul, has always sought to use Quarry Hole #1 for a mixed use of apartment dwellings and offices. Despite that desire, he never submitted a request for rezoning. As stated before, although the HVY-X zoning permitted offices, it did not permit residential uses. Therefore, in order to permit a combination of the two (offices and apartments), the zoning on Quarry Hole #1 had to be changed.

In 1998, Plaintiff retained E. Van Rieker, a land planner, to assist in investigating possible uses for Quarry Hole #1. He performed a feasibility study and issued a report which provided various land development scenarios under various types of rezoning. The feasibility study report was issued by Rieker on October 29, 1998. (Exhibit "I"). After consideration of many different proposals, Peter DePaul decided to pursue a mixed use of offices and apartments. (Exhibit "J", Rieker deposition, pp. 71-74). This type of use would require a rezoning, because the HVY-X zoning did not permit residences other than a caretaker's cottage. According to DePaul, the mixed-use was his "preferred" plan. (Exhibit "C", p. 109). His "preference" for a mixed use development resulted in the submission of a sketch plan to the Township which proposed a mixed use of 450,000 square feet of offices and 600 high-rise apartments. The sketch plan was filed with the Township on November 30, 2000. (See Exhibit "K", Sketch Plan).

Following submission of the sketch plan, the Montgomery County Planning Commission reviewed the plan and issued a report on January 29, 2001. (Exhibit "L", Montgomery County

Planning Commission review letter of January 29, 2001). Nels Sandberg, who authored the review letter, was complimentary of the "concept" of a mixed use, but highly critical of the density depicted in the sketch plan:

> We believe this plan presents a proposal that is too intense in both its impervious coverage and density for this site and the surrounding area. The HVY-X zoning was developed for heavy industrial uses and its dimensional standards were devised for such uses. When applied to suburban style office buildings and mid-rise apartment buildings (the proposed buildings are 80 feet in height), the coverage of this site becomes excessive, resulting in buildings surrounded by acres of paving. (Exhibit "L", p.1, item No. 1).

(See also, Exhibit "M", Sandberg deposition, pp. 133-138). He recommended that DePaul and the Township work together to draft a new zoning district to accommodate a mixed use development of offices and apartments in a campus setting. (Exhibit "L", p. 3, "Recommendations").

The Whitemarsh Township Planning Commission also reviewed the sketch plan at a public meeting on February 27, 2001. As the minutes of that meeting reflect, attendees were critical of the sketch plan. (See Exhibit "N", Minutes of Planning Commission meeting of February 27, 2001). Several noted that the plans and their presentation by James Garrity, HMI's attorney, was an attempt to threaten and intimidate the Township.

A neighbor of Quarry Hole #1, Donald Cohan, one of the intervenors in this case, retained an attorney, Marc Kaplin, Esquire, to represent him in opposing DePaul's proposed development of the property as depicted in the sketch plan. Cohan resides on Stenton Avenue north of Joshua Road. Cohan had two meetings with Peter DePaul in the Spring of 2001 and was accompanied by Marc Kaplin to the second of these meetings. Cohan expressed his dismay at the mixed use plan depicted in HMI's sketch plan. (See Exhibit "O", deposition of Donald Cohan, pp. 13-15, 87-88, 95). Kaplin

testified at his deposition that he told DePaul that he could support a less intense use of the property with fewer apartments. However, he was never shown such a plan by DePaul despite Kaplin's request. (See Exhibit "P", deposition of Marc Kaplin, pp. 31-33).

On May 24, 2001, the Board of Supervisors held a public meeting at which time it reviewed the HMI sketch plan. According to the minutes, HMI's attorney, James Garrity, Esquire, made an aggressive presentation of the plan by stating that under the existing zoning (HVY-X), Mr. DePaul could develop the property with over one million square feet of office space. (Emphasis added). If the Township was not "amenable" to HMI's mixed use concept, DePaul would proceed under the HVY-X zoning. (See Exhibit "Q", Minutes of Public Meeting of Board of Supervisors, May 24, 2001). In response, Marc Kaplin addressed the Supervisors and stated, among other things, that the HMI proposal was offensive and the method of presenting it was a threat to the Township. He urged a rezoning of the property to a use compatible with the surrounding residential areas. Kaplin elaborated at his deposition that the "threat" of developing a million square feet of office space in the middle of a residential and agricultural area if the Township was not "amenable" to the developer's rezoning plan is a typical "scare tactic" used by developers. In this case, he observed, it was "a particularly crude" use of it by Garrity on behalf of Peter DePaul and HMI. In fact, he referred to it as an attempt "to scare the devil out of everybody in the Township". (Exhibit "P", pp. 117-118). Numerous residents of the Township spoke in opposition to the sketch plan, citing concerns about traffic, incompatibility with the surrounding area and environmental considerations. Each Supervisor expressed their concerns about the proposal. A majority suggested they would be willing to consider a rezoning to accommodate a mixed use, but would only do so if the proposal was less dense than shown in the sketch plan. (Exhibit "Q").

-13-

Despite the Supervisors' opposition to the "density" of his proposal, DePaul knew that the "concept" of a mixed use was something the Board of Supervisors would consider. Therefore, on July 3, 2001, he hired another land planner, Robert Heuser, who was instructed to provide HMI with several sketch plans for Quarry Hole #1, one for all offices which were permitted under the HVY-X zoning and one for a modified mixed use of apartments and offices. (See Exhibit "R", deposition of Robert Heuser, pp. 78-80). The "all-office" sketch by Heuser served as the basis for the Preliminary Plans for an "all office" development prepared by Timothy P. Woodrow and submitted to the Township on September 10, 2001. The "mixed-use" sketch was prepared to depict a mixed use proposal of offices and apartments that was less dense and had less impervious coverage than the earlier sketch plan reviewed by the Board on May 24, 2001. Heuser's sketch plan was amended several times before presentation to the Township, each time reducing the square footage of the office space and the number of apartments. (See Exhibit "R", pp. 100-108). These further amended sketches were prepared by Heuser in November and December 2001. Another plan, prepared in February 2002, depicts a mixed-use development of 598 apartment units and one (1) 30,000 square foot office building. This plan was <u>not</u> shown to Township officials during the land development proceedings. The fact that Peter DePaul and his consultants kept working on amending the mixed-use sketch plans demonstrates, clearly and unequivocally, that DePaul was still pursuing the mixed-use concept, his "preferred" plan, even though he had filed preliminary plans to "publicly" propose the one-half million square feet of office development. Only one of the "mixed-use" plans prepared by Heuser was shown to the Township, as set forth below.

Even after Woodrow had submitted the first revised preliminary plan for the "all-office" development on December 24, 2001, DePaul, through Garrity, still pursued the mixed-use plan.

-14-

Garrity asked the Township if he could submit a further revision of the "mixed use" plan for the Board's consideration. The Township agreed and Garrity submitted the revised, mixed-use sketch plan. This plan proposed 308,000 square feet of offices in four three story buildings and 380 apartment units. Although not obligated to provide a public meeting to review this revised mixed-use plan, the Board of Supervisors did so on March 7, 2002. The negative comments and criticism by the public and the Supervisors about the plans were little different than the criticisms of the earlier sketch plan reviewed on May 24, 2001. (See Exhibit "S", Minutes of Board of Supervisors meeting of March 7, 2002, pp. 1, 2). The continued pursuit of a mixed-use plan (offices and apartments) by DePaul while his preliminary plans (offices only) were proceeding through the land development review process demonstrates his "preference" for the mixed-use plan and serves to explain why he did not vigorously pursue revisions to the all-office plans to comply with the Township's ordinances. If he had done that, he would have secured approval of plans for a development that he did not want to build.

F.    Rezoning Of The Property

As stated before, rezoning of the property to something other than the HVY-X district was considered by the parties as early as 1998. Rezoning of Quarry Hole #1 to a "residential use" was suggested by Marc Kaplin and residents of the Township at the meeting of May 24, 2001. (Exhibit "Q"). On July 3, 2001, Stephen Marshall, Esquire, a lawyer in Marc Kaplin's office, submitted a petition on behalf of Donald and Trina Cohan to amend the zoning ordinance to create a new EX-Extraction zoning district and rezone the quarry properties to EX-Extraction. (Exhibit "T", Petition). The petition was submitted in accordance with a provision of the Zoning Ordinance which permits

-15-

individuals who are neighbors of the property proposed to be rezoned to petition the Board of

Supervisors to enact such a rezoning. §116-239 of the Zoning Ordinance states as follows:

> §116-239. Petition.
>
> Whenever the owners of fifty per centum (50%) or more of the property owners within any district or the property owners of property fronting on the same street or streets or abutting on the property sought to be changed, and situate within one thousand (1,000) feet of the property sought to be changed, shall present to the Board of Supervisors a petition duly signed and acknowledged, requesting an amendment, supplement, change, modification or repeal of the regulations prescribed, or of the Zoning Map, including such district, it shall be the duty of the Board of Supervisors to hold a public hearing thereon and cause notice thereof to be given in the manner prescribed in §116-237 herein.

See Exhibit "G", Zoning Ordinance, §116-239.

The Cohan proposal for EX-Extraction would permit extractive uses and, in the event of

reclamation, residential uses via single family homes on one-acre lots in accordance with "AAA"

Residential zoning.

Acting on the suggested ordinance, the Board of Supervisors enacted several ordinances on

October 18, 2001 which amended the Zoning Ordinance to create the new EX-Extraction zoning

district and rezoned the Plaintiff's properties to EX-Extraction. (Exhibit "U", Minutes of Board of

Supervisors Meeting, October 18, 2001). Plaintiff filed a challenge on procedural grounds with the

Township's Zoning Hearing Board to the new zoning district and the rezoning of its properties. The

Board of Supervisors corrected the purported procedural defects by enacting Ordinance No. 747

which added the new district designated EX-Extraction on February 28, 2002. (See Exhibit "V",

minutes of the Board of Supervisors meeting on February 28, 2002 and Exhibit "W", Ordinance No.

747). <u>Plaintiff did not file any challenge with the Zoning Hearing Board to Ordinance No. 747.</u>

-16-

By Ordinance Nos. 748, 749 and 750, major portions of the three parcels owned by the Plaintiff on which the former quarries and quarry (Holes #1, 2 and 3) are located were rezoned to EX-Extraction District. Small portions of the 54 acre site (Hole #1) remained zoned AA Residential. A portion of Hole #3 remained zoned A Residential. (See Exhibits "X", "Y" and "Z", Ordinances Nos. 748, 749 and 750).

The overall effect of the changes in the Zoning Ordinance and the Zoning Map was to rezone major portions of Plaintiff's three parcels, including the 54 acre parcel (with the exception of the portion zoned AA- Residential) to EX-Extraction which, as stated before, permitted the extractive quarry use to continue, but once abandoned and the property reclaimed, the land could be used for residential purposes. Previously, under the HVY-X Industrial District use regulations, any use except those restricted (including residential), were permitted in the HVY-X District. Permitted uses in a HVY-X District would include administrative and executive offices.

G.    Plaintiff's Application For Preliminary Plan Approval

Plaintiff's consulting engineer, Timothy P. Woodrow, P.E., prepared a set of engineered plans in accordance with the instructions of Peter DePaul and based upon the sketch plan prepared by Robert Heuser, DePaul's second land planner. The preliminary plans were filed with the Township on September 10, 2001 as part of a package of materials which also included, among other things, a formal subdivision and land development application signed by Peter DePaul, a grant of a waiver of extension of time to the Township to take formal action on the Plan, also signed by DePaul and a document entitled Pennsylvania Department of Environmental Protection Planning Module. (See Exhibit "AA", Application for Preliminary Plan Approval). This package also included several letters from Woodrow. In one letter dated August 20, 2001, Woodrow stated:

-17-

"[it] is our intention to comply with all Township requirements and
to seek only those waivers which are routinely granted in Whitemarsh
Township or identified by the Township as permitting a more
effectively designed project". (Exhibit "AA", Tab No. 7).

Woodrow was referring to waivers from SALDO, which can be granted by municipalities, including

Whitemarsh Township, if it is determined, in the discretion of the governing body, that the waivers

"will not adversely affect the promotion of the public health, safety and general welfare and if literal

compliance with the standards is impractical". (Exhibit "H", SALDO, §105-25.B and C).

In another letter dated August 22, 2001, Woodrow estimated that the approval process would

take approximately one year from the date of application. This projection included approvals of both

preliminary plans and final plans. (Exhibit "AA", Tab 8).

In accordance with the provisions of the SALDO, the Township administrative staff

distributed copies of the application and/or plans to various individuals and organizations, including

the Montgomery County Planning Commission and Thomas F. Zarko, P.E., the Township's

consulting engineer.

The Montgomery County Planning Commission review letter which was critical of the plans,

was issued by Nels Sandberg on November 20, 2001. (Exhibit "BB"). Reiterating the comments

he made in his January 29, 2001 review of HMI's sketch plan, Sandberg wrote: "As we stated in our

January 29, 2001 letter, we believe that this project is too intense for this site." At his deposition,

when comparing his first review letter (Exhibit "L", January 29, 2001) with his next review letter

(Exhibit "BB", November 11, 2001), the following exchange took place:

Q.     Did it appear to you, sir, that the DePaul Group, who was the
applicant here, had taken up any of your criticisms, if you will, in the
development proposed in the preliminary or in the sketch plan and
then incorporated it into the preliminary plan?

-18-

A.      It would have appeared they didn't really listen to anything at all except perhaps removing the apartment building.

Q.      It was still too intense a development, is that correct?

A.      Correct.

(Exhibit "M", Sandberg deposition, pp. 139, 140).

1.      Review By The Township Engineer - October 11, 2001

As in most Pennsylvania municipalities, the review by the Township's engineer is the most critical from the Township's perspective.  In Whitemarsh, the engineer is charged with the responsibility of conducting a thorough review of the submitted plans to determine if they comply with the applicable Township ordinances.  The principal ordinances involved are the Zoning Ordinance, the SALDO and the Grading Ordinance (See Exhibits "CC", the Township's Grading, Erosion Control and Stormwater Management Ordinance and "DD", Grading, Erosion Control and Stormwater Management Regulations).

Thomas Zarko performed a review of the September, 2001 preliminary plans and issued his review letter on October 11, 2001.  (Exhibit "EE").  The review noted 90 items of non-compliances with the Zoning Ordinance, SALDO and the Grading Ordinance.  The letter pointed out each discrepancy and cited the specific sections of the applicable ordinances with which the applicant needed to comply.

Zoning comments included items related to the proposed sanitary sewer and water facilities, parking, the HVY-X district requirement for a berm and fence, a proposed pond in the "AA" Residential portion of the site and the absence of zoning criteria listed on the plan.  Most of the remaining comments related to non-compliances and deficiencies with the SALDO, the Grading

-19-

Ordinance and its regulations. In his position as engineer, it was the duty of Mr. Zarko to list all violations, non-compliances and deficiencies of the preliminary plans with the ordinances. By doing this, he alerted the applicant to all of the deficiencies so that the applicant could make necessary changes to the plans. Specifically with regard to zoning violations, the review letter put the applicant on notice to either (1) change the plans to comply with the zoning ordinance or (2) apply to the Zoning Hearing Board for relief in the nature of a variance and/or an interpretation of the ordinance. As stated before, under the Municipalities Planning Code, only the Zoning Hearing Board can grant relief from a zoning ordinance. The Board of Supervisors is not legally permitted to grant such relief.

        2.     <u>Revised Plans Filed on December 24, 2001</u>

On December 24, 2001, over two months after receiving Zarko's October 11, 2001 review letter, Woodrow submitted revised preliminary plans which he represented in his cover letter dealt with all of Zarko's earlier comments. (Exhibit "FF", Woodrow letter of December 21, 2001; received December 24, 2001).

        3.     <u>Review Of Revised Plans By The Township Engineer<br>- January 24, 2002</u>

Zarko issued his review letter of the revised plans on January 24, 2002. (Exhibit "GG"). In this review, Zarko identified 73 items of the plan's violations, non-compliances and deficiencies regarding Township ordinances. Surprisingly, none of the three major zoning issues had been dealt with by Woodrow in the revised plans. These items included selection of a sanitary sewage option, the lack of a berm and fence as required by the HVY-X regulations and the continued location of the retention basin in the "AA" Residential district. Many SALDO deficiencies were noted as well as

grading and stormwater violations. Typically, during the land development process, revised plans result in new or first time comments by the municipal engineer because the revised plans provide more information and details which the engineer reviews for the first time. In this instance, there were very few new comments, indicative of the lack of detail and clarification provided by the revised plans. The three major zoning issues are addressed in the following subparagraphs.

      a.    <u>Sanitary Sewer</u>

Although HMI had originally advised in its September 2001 application that the proposed project would be serviced by a connection to the public sanitary system, in the December 2001 revised preliminary plan, Woodrow advised that HMI was going to <u>either</u> connect to the public sanitary system <u>or</u> install a private on-site sewage treatment plant. In point of fact, HMI had been negotiating with the Philadelphia Cricket Club to secure an easement over the adjacent golf course to connect to the public sanitary sewer system. These negotiations abruptly ended on December 12, 2001 when the Cricket Club advised HMI's attorney, James Garrity, Esquire, that the Club would not grant the easement. (Exhibit "HH").

At that point, Woodrow, under instructions from Garrity and DePaul to submit revised plans, was compelled to submit a hastily-revised set of plans on December 24, 2001 which now included two alternative sanitary sewer options (public connection and on-site system). Neither of the alternatives complied with the requirements of the Township's Zoning Ordinance. Plaintiff and its attorney have falsely criticized the Township, claiming the delay in designing an adequate sewage system (public connection vs. on-site plant) was the fault of the Township in not <u>directing</u> Plaintiff on the type of system it should install. The fact of the matter is that no municipality has the right to tell a land owner what kind of system he is required to use. If the owner can secure approval of a

-21-

system by the Pennsylvania Department of Environmental Protection, he is entitled to install it. In fact, on January 16, 2002 at a meeting at the Township Building attended by Messrs. DePaul, Garrity and Woodrow and by Messrs. Gregan, Zarko, and Ross Weiss (Township solicitor), Mr. Weiss advised the HMI representative that the Township had no preference as to the type of sewer system to be installed. (Exhibit "II", deposition of Ross Weiss, pp. 51, 52, 161). This was confirmed by Thomas Zarko (Exhibit "JJ", pp. 30-32) in his second deposition. In his deposition, (Exhibit "KK", p.187), James Garrity denied that Weiss made this statement. His testimony, however, is belied by the actions of Timothy Woodrow. On February 18, 2002, Woodrow sent a letter to Mr. Gregan in which he stated HMI's intention to use a private, on site sewage treatment plant:

> As you know, it is our intention to serve the project with a private/on site sewage treatment plant. Mr. Garrity is in the process of addressing Mr. Zarko's concerns about a suitable operation and maintenance agreement to be entered between the township and Highway materials, Inc. in order to memorialize maintenance and ownership obligations.
>
> Included with this letter is a detailed PA DEP Planning Module for Land Development. The planning module describes the use of an on-site treatment package treatment plant for the project and explores alternatives that were not chosen for this property. We will need to secure this planning approval from the PA DEP through Whitemarsh Township prior to submission of a Part II construction permit and in fact before we can complete the design of the package plant owing to DEP's need to provide us with water quality discharge parameters.

(Exhibit "LL"). When confronted with his own letter at his deposition, Woodrow sheepishly testified that "I suspect that my letter is a little misleading in that I was never aware that a decision had been made." (Exhibit "MM", p. 113). HMI and Garrity's criticism of lack of cooperation by the Township is totally unfounded. It was asserted by Garrity as an excuse for HMI and Woodrow's

failure to properly and timely revise the preliminary plans to eliminate the sanitary sewer as a zoning violation.

b.    <u>Berm And Fence Requirement In HVY-X District</u>

Both the original preliminary plans and the revised plans did not show a berm and fence as required by the district regulations of the HVY-X zoning. (Exhibit "G", Zoning Ordinance, §116-156.B and C; Exhibit "EE", Zarko review letter of 10/11/01, item 4, p.2; Exhibit "GG", Zarko review letter of 1/24/02, item 2, p. 3).

Peter DePaul and his development team were well aware of the issue because his first land use consultant, E. Van Rieker, pointed it out in his feasibility study of October 29, 1998. (Exhibit "I", item g, p. 10). Rieker later confirmed that the HVY-X requirement for a berm and fence could be an issue with the Township in an August 22, 2000 memo he sent to James Garrity, Leonard Poncia, Jack Thrower (HMI's architect) and Timothy Woodrow on August 22, 2000. (Exhibit "NN"). There he said:

> Section 116-156 provides additional regulations for extraction operations. One would assume that none of these standards would apply under the plans now contemplated, but I would point out that Subsections B and C talk about berming and fencing which could be interpreted as a requirement even though an extraction or HVY-X operation is not contemplated on site. We should ask for clarification of these issues as the plans proceed."

Rather than take Mr. Rieker's advice to seek a clarification from the Township, James Garrity, HMI's counsel, chose a strategy for HMI to withhold this information, reasoning as follows in his reply memo of August 24, 2000:

> I think we should assume that the berming and fencing requirements of 116-156 apply only to quarries unless we are told otherwise. **I would not want to suggest the idea to the Township.**

(Exhibit "OO", item 2, p. 1). Despite being "told otherwise" in two review letters by Zarko, Garrity, Woodrow and HMI refused to change the plans or seek relief from the Zoning Hearing Board.

When finally confronted with the issue in 2002, Garrity took the tack of claiming that the HVY-X district regulation was not applicable to HMI's project for office buildings. Garrity refused to recognize and concede that the berm and fence requirement in §116-156. B and C was a district-wide zoning regulation, applicable to any type of development permitted in an HVY-X District. The only properties in the Township which were zoned HVY-X were HMI's quarries. Therefore, it is patently illogical to conclude that regulations for a HVY-X district did not apply to a use in a HVY-X district. Also, Garrity knew that the engineer, the solicitor and the Board of Supervisors did not have the legal authority to waive a requirement of the Zoning Ordinance. That authority rested solely with the Township's Zoning Hearing Board through the grant of a variance. Garrity and HMI never applied for a variance. Instead, Garrity demanded an "interpretation" from Ross Weiss, the solicitor, that the regulation did not apply. Weiss refused Garrity's demand, advising Garrity that he should apply for relief from the Zoning Hearing Board. (Exhibit "II", Weiss deposition, pp. 45-49).

        c.    Retention Basin In The "AA" Residential District

Given the amount of impervious coverage for the proposed development, HMI, in order to comply with the Pennsylvania statute and the Township ordinance governing the runoff of stormwater as a result of development, proposed to install a retention basin in the southeastern, triangular piece of the site which was zoned "AA" Residential. In both the first review letter and the second review letter, Zarko pointed out that the "pond" was not a permitted use within the "AA" Residential District. (Exhibit "EE", p. 2, item 5; Exhibit "GG", p. 6, item 12).

The fact that the 54 acre parcel could be subject to different zoning was first pointed out to HMI by Van Rieker in his feasibility study of October 29, 1998 and his November 6, 1998 letter to Leonard Poncia. (Exhibit "PP"). Rieker focused on the uncertainty of the ownership and zoning of the triangular corner of the property. (Exhibit "I", item C, second bullet point, p. 1; Exhibit "PP", item 1, p. 1).

Either recognizing that the split zoning on the site could pose a problem to HMI or simply ignoring it altogether, HMI and Woodrow did not disclose, until the first revised plan on December 24, 2001, that the property was zoned both HVY-X and AA Residential.

HMI preposterously claims that the Township and Zarko tricked it into submitting a preliminary plan in September 2001 with a retention basin in the AA Residential portion of the site, when Zarko, in reviewing a stormwater waiver request, stated that one possible way for HIM to deal with stormwater from the site was a basin suggested by Woodrow. Unbeknownst to Zarko, the location suggested by Woodrow for the retention basis was a portion of the site zoned AA Residential, a fact not disclosed by Woodrow in his request.

In June 2000, Woodrow, on behalf of HMI, had requested a waiver from the "meadow" condition requirement of the Township's Grading and Stormwater Management Ordinance. This ordinance requires that stormwater management facilities should be designed as if the pre-development condition of the property was a "meadow". Woodrow argued, in his request, that this was unfair to HMI because the site was barren earth, having been filled in as part of the reclamation project of Hole #1. (Exhibit "QQ").

Aside from the fact that HMI was requesting a waiver before any development plans had been submitted by HMI (a highly unusual requirement because waivers are normally requested at

-25-

or after preliminary plan filing), Woodrow had suggested alternative methods of handling stormwater, including a basin in the southeastern, triangular piece of the site. <u>As stated before, Woodrow did not disclose that the proposed basin would be located in an "AA" Residential District</u>. Zarko reviewed the meadow waiver request. In this review, Zarko focused only on the stormwater waiver request and not zoning. He recommended against granting the waiver, suggesting that the applicant had other ways to handle stormwater, as outlined by Woodrow in the southeastern triangle of the site. Plaintiff's allegation that the Township and Zarko "tricked" it into submitting a plan that did not comply with the Zoning Ordinance is not borne out by the facts.

Woodrow and HMI continued to conceal the split zoning on the site when the plans were filed with the Township on September 10, 2001. Even though the SALDO requires that each plan submitted by a developer show complete zoning information, (Exhibit "H", SALDO, §§105-20.A(4), 105-21.B(1)(d), 105-22.B(1)(d)), HMI did not comply. The sketch plan submitted on November 30, 2000 represented that the entire site was zoned HVY-X. This violated Section 105-20.A(4) of SALDO. (Exhibit "H"). When the preliminary plan was filed in September, 2001, Woodrow and HMI again represented that the site was only zoned HVY-X. This concealment of the split zoning was demonstrated not only by the plans themselves (Exhibit "RR", Record Plan submitted as part of Preliminary Plan Application on September 10, 2001 with Engineer Zarko's subsequent handwritten comments, including lack of complete zoning information), but by the application, which listed the zoning of the site as HVY-X. (Exhibit "AA". Tab "1"). This failure to properly advise of the split zoning was a violation of §105-20.(B)(1)(d) of SALDO.

Fortunately, in his initial review of October 11, 2001, Zarko identified the split zoning and listed it as a violation of the SALDO and the Zoning Ordinance. (Exhibit "EE", item 18, p. 5 and

item 5, p.2; see also "RR", Zarko's comments on Record Plan).  Woodrow, in his revised plans of December, 2001, finally listed the site as being zoned HVY-X and AA Residential.  However, he did not substantively respond to Zarko's comment that the proposed retention basin/pond was not a permitted use in an "AA" Residential district.  As with the berm and fence issue, HMI and Garrity chose to argue with Township officials about Zarko's comments rather than eliminate or relocate the basin on the plans or seek a variance from the Zoning Hearing Board.

        4.        Scheduling Plaintiff's Preliminary Plans For Action
                   By The Board Of Supervisors

      When Plaintiff filed its application for preliminary plan approval in September, 2001, Woodrow submitted a signed offer for an extension of time for the Board of Supervisors to act on Plaintiff's plans.  (Exhibit "AA", tab 2).  The Board of Supervisors accepted the offer at a public meeting in November 2001.  As worded, the extension had the effect of resetting the 90 day time limit as of the date of filing of revised plans by the Plaintiff.  Those plans were filed by Woodrow on December 24, 2001.  Therefore, the Board of Supervisors was legally obligated to act on the revised plans by March 24, 2002 not only in accordance with the Municipalities Planning Code, but pursuant to HMI's offered extension which was accepted by the Board of Supervisors.  If the Board did not act on the plans within that time frame, it ran the risk that the revised plans, as deficient as they were, would be "deemed approved" in accordance with section 508 of the Municipalities Planning Code.  53 P.S. §10508(3).  That section of the Code provides for an automatic approval of plans if not acted upon within the 90 day period.  Because the last Supervisors' meeting before the deadline was March 21, 2002, the plans had to be acted upon by that date, absent a further extension accepted by the Township.

On March 8, 2002, Township Manager Gregan sent a letter to Garrity advising him that HMI's preliminary plans were going to be considered and acted upon by the Board of Supervisors at the meeting on March 21, 2002.  (Exhibit "SS", March 8, 2002 letter from Manager Gregan to Garrity).

Apparently recognizing that HMI's plans had no chance of approval and that he and his client had done little to demonstrate progress on the plans, Garrity began a letter writing campaign to the Township and its officials in which he alternately pleaded with the Township to accept another extension of time and threatened the Township with dire consequences if it acted on the plans.  (See Exhibit "TT", 3/12/02 letter from James Garrity to Lawrence Gregan; Exhibit "UU", 3/21/02 letter from James Garrity to Ross Weiss).  In the first letter, Garrity made it abundantly clear that HMI was interested in pursuing a mixed use development, referring to the March 7, 2002 review of a revised sketch plan and his "constant" request for dialogue about this use:

> Recently, as you know, I requested permission to appear before the Board of Supervisors with an alternate sketch plan idea involving a mixed use concept of office and luxury apartments.  The Supervisors were kind enough to grant us a public hearing on that sketch plan for the evening of March 7, 2002.
>
> * * *
>
> At the end of the public hearing, I reiterated my almost constant requests for the opening of some kind of productive dialogue between my client and the Township, but the Supervisors took no action on my request.

Garrity went on to state:

> . . . **"the last-submitted plans [first revised plans of December 24, 2001] are clearly not ready for any action by the Board of Supervisors."**

-28-

This means that as of March 12, 2002, Garrity was admitting that if the Board acted on the plans, the Board would be compelled to deny them because of their deficiencies and non-compliances with Township ordinances.

Ross Weiss, in an effort to avoid a confrontation, suggested the idea of a "freeze" to Garrity in which HMI and the Township would take no further action on the revised plans for a set period of time. Garrity "adopted" the idea of a freeze as his in his March 21, 2002 letter. The proposed "freeze" in the proceedings would be used to negotiate a resolution of what had become an extremely complex and volatile situation. After suggesting to Weiss that he needed to discuss the idea of a freeze with his client, Peter DePaul, Garrity had Woodrow prepare and submit further revised plans, thus violating not only the freeze proposed by Weiss, but also the trust Weiss had placed in Garrity in seeking agreement to the freeze. (See Exhibit "VV", Affidavit of Ross Weiss).

     5.    Second Revised Plans And Review By The Township Engineer

Woodrow, at the direction of Garrity, filed second revised plans on March 19, 2002, only two (2) days before the March 21, 2002 meeting set to take action on the preliminary plans, and in violation of the "freeze" proposed by Ross Weiss. Zarko expeditiously reviewed the second revised plans to meet the deadline for action. Zarko's review letter of March 21, 2002 (Exhibit "WW"), identified numerous non-compliances, violations and deficiencies with regard to the ordinances. The second revised plans did little to address the comments in Zarko's earlier review letters. The zoning violations still remained, including the lack of a berm and fence and the placement of the basin in the "AA" District. Virtually no details of the sanitary sewer system were found on the plans, either for the connection to the public sanitary system or installation of an on-site treatment plant. Indeed,

the extent of the details of the on-site treatment plant consisted of a rectangle meant to depict the location of the treatment plant on pages 2 and 15 of Woodrow's plans.

The second revised plans did not come any closer to compliance with the Zoning Ordinance, SALDO and the Grading Ordinance. Indeed, as noted before, Garrity had written in his letter of March 12, 2002 "that the plans [first revised plans] were not yet ready for action by the Board". (Exhibit "TT"). HMI and Garrity had still not applied to the Zoning Hearing Board for zoning relief and gave no indication that they were going to do so.

Zarko performed his usual thorough review and issued his comments before the Supervisors' meeting on March 21, 2002. (Exhibit "WW"). As stated before, his review identified numerous instances of non-compliances, violations and deficiencies with the Zoning, SALDO and Grading Ordinances. Given that situation, the only two possible actions the Board could take at its March 21, 2002 meeting was either to (1) accept HMI's offered extension of time or (2) deny the preliminary plans. With that in mind and realizing that his review letter might be the basis for a proposed denial resolution, Zarko detailed every non-compliance, deficiency or violation of the ordinances. Plaintiff has repeatedly claimed that final plan requirements were inappropriately included in Zarko's review letter. As Zarko testified at his deposition, all of the non-compliances, violations and deficiencies were of preliminary plan requirements which is consistent with his normal practice. (Exhibit "JJ". Zarko deposition, pp. 80-87).

Plaintiff and its representatives have been highly critical of Zarko's position that HMI's plans failed to include sufficient construction details as required by the SALDO. Such details, Plaintiff has argued, are not required until the final plan approval stage or at construction. Plaintiff's

criticisms in this regard are totally unfounded and have been asserted in an effort to mask the major deficiencies of the second revised plan.

Zarko's review letter of March 21, 2002 (Exhibit "WW") identifies the second revised plan's lack of detail and/or construction detail regarding the sanitary sewage system (Exhibit "WW", p. 1, item 1.b and p. 5, item 4.j), storm sewer lines (p. 4, item 4.c), roadway improvements on Stenton Avenue (p. 5, item 4.d), water system (p. 5, item 4.j), grading, stormwater management and erosion and sedimentation control system (p. 6, item k). Aside from the facts that all these items are either addressed in the design standards of SALDO (Article V), the Grading Ordinance (referenced in SALDO, §105-26.C), Zarko has consistently applied these SALDO criteria in other preliminary plan reviews. (See Exhibits "GGG" through "RRR", inclusive). Most importantly, however, the applicability of these SALDO standards to preliminary plans is emphatically reinforced by the provisions of Section 509 of the Municipalities Planning Code, which states, in pertinent part, as follow:

§10509.    Completion of improvements or guarantee thereof prerequisite to final plat approval

(a) No plat shall be finally approved unless the streets shown on such plat have been improved to a mud-free or otherwise permanently passable condition, or improved as may be required by the subdivision and land development ordinance and any walkways, curbs, gutters, street lights, fire hydrants, shade trees, water mains, sanitary sewers, storm sewers and other improvements as may be required by the subdivision and land development ordinance have been installed in accordance with such ordinance. In lieu of the completion of any improvements required as a condition for the final approval of a plat, including improvements or fees required pursuant to section 509(i), the subdivision and land development ordinance shall provide for the deposit with the municipality of financial security in an amount sufficient to cover the costs of such improvements or common amenities including, but not limited to,

> roads, storm water detention and/or retention basins and other related drainage facilities, recreational facilities, open space improvements or buffer or screen plantings which may be required.

53 P.S. §10509(a).

A developer is entitled, pursuant to that section of the Municipalities Planning Code, to complete the identified improvements before final plan approval (plat approval). If the details of those improvements are not shown on a preliminary plan, a municipality is at risk in approving such a plan because the developer may then proceed to construct those improvements in a manner which may be inconsistent or non-compliant with the Township's design and improvement standards. Zarko's position that HMI's plan was deficient with regard to these details is consistent with the SALDO, his engineering practice and the Municipalities Planning Code.

H.    March 21, 2002 Board Of Supervisors' Meeting

The March 21, 2002 meeting of the Board of Supervisors was held at the Colonial Elementary School rather than at the Township Building to accommodate the large number of citizens who had expressed an interest in the HMI plans. Although given the opportunity to present his clients' second revised plans, Garrity declined. Rather, he reiterated his client's offer to extend the 90 day time period for action by the Board on the preliminary plans and subtly threatened the Board if it took action on the Plans. (Exhibit "XX", pp. 2-11).

It is most telling that HMI's engineer, Timothy Woodrow, was present at the meeting yet was not called by Garrity to explain the second revised plans to the Board. HMI's total failure to press for approval of its plans fatally contradicts the testimony by Woodrow and Garrity at their depositions that the second revised plans were "approvable".

-32-

By Resolution No. 2002-17, the Board of Supervisors denied Plaintiff's application for preliminary plan approval, as revised through March 19, 2002. (Exhibit "YY"). The only legitimate basis for denying an application is violation or non-compliance with the Township's ordinances. The resolution itself demonstrates substantial and extensive violations and non-compliances with the Zoning Ordinance, SALDO and the Grading Ordinance. The resolution, standing alone, provides an ample factual and legal basis for denying the plans.

Plaintiff's witnesses refused, at their depositions, to admit that the second revised plans did not fully comply with the Township's ordinances. Robert Jordan, an employee of Timothy Woodrow, for example, said they "were worthy of approval". (Exhibit "FFF", pp. 136, 137). Timothy Woodrow, Plaintiff's consulting engineer, said the plans were approvable, with conditions. (Exhibit "MM", Woodrow deposition, p.23). "Approvable with conditions" is another way of saying the plans did not comply with the Township's ordinances.

1.      Presence Of A Court Reporter And Swearing In Witnesses

Out of an abundance of caution and expecting Garrity to hire his own court reporter to record the Board of Supervisors meeting, Weiss arranged for a court reporter to provide a verbatim transcription of the proceedings. He realized that if the plan was denied, an appeal would be taken. Therefore, he thought having a court reporter present was appropriate. (Exhibit "II", Weiss deposition, p. 188).

At the meeting, Weiss also chose to have the Township witnesses sworn in so that if there was a denial of the plan and appeal, the Court would have the benefit of a sworn record. (Exhibit

"II", p. 188). Plaintiff has been critical of swearing in witnesses, even though nothing in the Municipalities Planning Code or the Township ordinances prevents that.

>2. Passage of Resolution 2002-17 Denying Plaintiff's
>Application for Preliminary Plan Approval

Each of the Supervisors testified at their depositions about the reasons they had for not accepting Plaintiff's offered extension of time and voting to pass resolution 2002-17 denying Plaintiff's application. Peter Cornog, who had been a Supervisor for less than three (3) months as of March 21, 2002 but was well aware of the history of the project, testified that he considered a number of reasons in deciding not to accept HMI's offer of an extension of time:

> BY MR. EINHORN:
> Q.    Were you aware that an extension of time had been offered?
> A.    I was aware that an extension had been offered.
> Q.    And were you aware of that as of the time that the board directed these plans be scheduled for action?
> A.    Yes, I was.
> Q.    Do you recall any discussions about that offer of an extension?
> A.    I do recall discussions.
> Q    Can you tell me who was there?  What was said?
> A    I don't recall specifics.
> Q.    Do you recall anything?
> A.    Yes.  I recall what I decided in my mind.
> Q.    And what was that?
> A.    I decided two things.  I decided that the – that we had to take action on this development, because this development was essentially never going to be built as proposed.
> Q.    Okay.  Was there any – I thought you said you thought two things.
> A.    And the second thing that I thought was that the developer had an obligation to move a plan along in a reasonable time frame, and I did not see that happening here.  I saw this project dragging on forever.
> Q.    Why did you think the first thing, that it was not going to be built as described?

-34-

A.    I felt that for several reasons. I felt that there was a glut of office space in much more desirable locations, and I could not envision people driving to Joshua and Stenton to an office complex.

Q.    Well, let me just –

A.    So I did not believe that the marketplace would, first of all, support this project; and know what I know about Mr. DePaul, being the shrewd businessman that he is, he would have never built this project as proposed.

Q.    So why is that a reason to –

MR. MAHONEY: Excuse me. I don't think he finished his answer, because he said a number of reasons, and he just articulated one.

MR. EINHORN: Okay. I thought you were done; but if you're not, please continue.

MR. MAHONEY: I think you should give him the reasons that you were –

THE WITNESS: Well, this is what I was thinking. This had been a concern of mine all along, that this project would never be built.

BY MR. EINHORN:

Q.    Okay.

A.    And then what Mr. DePaul wanted from day one was the mixed use, which was laid out in the sketch plan, which went through various transformations; and to this day, Mr. DePaul still would like the mixed use.

Q.    Okay. So one of the reasons you voted against the extension, decided not to grant the extension, is because you believed that Mr. DePaul was not serious about building the Creekside Commons office park?

A.    As laid out in the land development plan that needed to be voted on.

Q.    Okay.

A.    The other thing was that I had followed this project since 2000, and I did not see it moving along expeditiously in any way whatsoever.

Q.    I was going to get to that. That was your second –

A.    That was the second part of it, but that was also part of my thinking.

Q.    Okay. And your feeling was, I think you said, it was dragging on forever; is that --

A.    Yes, it was.

Q.    Okay. Now, you're aware that the plans were filed only six months prior to their denial?

-35-

A.    I'm aware of discussions, conversations, letters between the township and the developer going back to 2000 on issues like sewage, traffic, storm water management.

So, yes, you can say that the plan was submitted six months prior to this date; but these issues had been unresolved for an extended period of time.

(Exhibit "AAA", deposition of Peter Cornog, pp. 85-88).

He then explained how that reasoning factored into his decision to deny HMI's preliminary plans,

even though there had been an intervening change of zoning for the site:

Q.    In your mind, was there any weight given in your decision? Did you give any weight to the fact that denying Mr. DePaul's plans would extinguish his rights under the previous zoning?

A.    Of course I did.

Q.    In what way did you do that?

A.    In what way did I do that?

Q.    What weight did you give it?

A.    It's too global a question for me.  Did I assign a point value to it?  I gave it weight.

Q.    And did you – for lack of a better word – take a more lenient approach with the plans because of that?

MR. MAHONEY: What do you mean by "more lenient approach"?

BY MR. EINHORN:

Q.    Well, the fact that his rights would be extinguished if these plans were denied, did that lead you to be more accommodating and be more open-minded in your decision-making process?

A.    I don't work that way.  I make the decisions I have to make based upon what the regulations or guidelines are.  I don't give discounts for this or that.

Q.    Well, maybe I'm trying to put words in your mouth.  Can you tell me how – maybe you can tell me how the decision or how the fact that the decision –

A.    I took the factor into account.  I weighted the significance of the impact to Mr. DePaul; and his rights; and to the degree that you can believe what I'm saying, I placed value on that.  I did not make this decision frivolously.  I gave him the same consideration that I would give any property owner vis-a-vis their property rights.

Q.    See, I just can't understand what was so pressing that you guys couldn't accept the extension and give him additional time.

-36-

A.    I know you don't understand that.

Q.    Do you have any explanation for that?

A.    I gave you my explanation earlier.

Q.    Wasn't serious about building the office site was one; and tow, it was dragging on forever?

MR. MAHONEY: Objection.  You already answered that.

THE WITNESS: I already answered.

BY MR. EINHORN:

Q.    Are those the two reasons?

A.    What is your question?

Q.    You said you already testified about why you didn't give the extension, and I'm asking you the testimony you're referring to is, one, because he was never serious about building the office park; and, two, that the process was dragging on forever.  Is that what you were referring to?

MR. MAHONEY: Objection.  He has answered the question previously.  The transcript will reflect that.

BY MR. EINHORN:

Q.    Is that what you're referring to?

A.    I gave reasons.  I felt that the – first of all, the plan wasn't approvable; secondly, that the project would in all likelihood never be built as proposed; and then my third reason was that the process had dragged on forever.

Q.    Okay.

A.    And I could not see it coming to any kind of reasonable conclusion.

(Exhibit "AAA", deposition of Peter Cornog, pp. 108-110).

Ann Younglove, Chairperson of the Board, on March 21, 2002, testified that when she voted to deny the plans, she was focusing only on the plans and whether they were approvable.  Relying on the expertise of Thomas Zarko, the Township's Engineer of many years, she voted to deny the plans because of valid reasons cited by Zarko.  She also expressed her reasoning for not accepting the offered extension, that there did not seem to be significant movement on the project.

Q.    So I gather, then, you knew that by denying these plans, Mr. DePaul would now be subject to the new zoning; correct?

A.      Well, I think the practical effect of these plans is that any subsequent plans that are filed with respect to that property will be subject to the new zoning.  That's my understanding.

Q.      Right.  So you knew this resolution took away any rights that Mr. DePaul had to the old zoning?

        MR. MAHONEY: Objection to the form of the question.
        Go ahead and answer the question.
        THE WITNESS: I really can't speak to Mr. DePaul's rights.

BY MR. EINHORN:

Q.      So you didn't have that understanding back on March 21st?

        MR. MAHONEY: What understanding?

BY MR. EINHORN:

Q.      You didn't know that Mr. DePaul would no longer have the right to submit plans under the old zoning?  You didn't know that on March 21st?

        MR. MAHONEY: Object to the form of the question.

        THE WITNESS: That was not a consideration with respect to these plans.  The plans are what they are.  So on March 21st, I was not thinking about the zoning.  I was focusing on these plans and whether these plans were approvable.

BY MR. EINHORN:

Q.      So it didn't occur to you when you voted yes for this resolution that Mr. DePaul would no longer have any rights to the old zoning?

        MR. MAHONEY: Object to the form of the question.

        THE WITNESS: That was not my consideration.  My consideration when I'm reviewing this – these plans – strike that.

        In considering – deciding on whether the plans should be denied, I was focusing on the nature of the plans.  I was not focusing on the zoning issue.  The zoning was an issue we had dealt with prior to March 21st.  So on March 21st, I'm worrying about this plan.

BY MR. EINHORN:

Q.      Without giving any thought to the thought that this is the only plan that Mr. DePaul could submit that would be subject to the old zoning?

        MR. MAHONEY: Object to the form of the question.

        THE WITNESS: I was focusing on these plans.  I don't know what else to tell you.

BY MR. EINHORN:

Q.      When you say "focusing on the plans," what do you mean by that?

A.      The subject that was before the board that night were these plans.

-38-

Q.      Okay.  Was it important to you in denying the plans that the reasons for the denial were valid or not?

A.      It would not occur to me that they were not valid.  Mr. Zarko has always been quite expert at reviewing plans.  There would be no reason for me to question the validity of his reasoning.

Q.      Ma'am, you don't recall ever before voting to deny preliminary plans, do you?

A.      I don't recall one way or another.

Q.      Was it important to you that when you denied a land owner's preliminary plans that the reasons that the board was using for that denial were valid?

MR. MAHONEY: Objection.  Ar you asking generally now or specific with regard to this project?

MR. EINHORN: I'm asking generally.

THE WITNESS: Yes, it's important to me that the reasons for denial are valid.

BY MR. EINHORN:

Q.      But your testimony is the only thing you did to satisfy yourself that they were, in fact, valid was to rely upon Mr. Zarko?

A.      My testimony is that Mr. Zarko is the township's engineer.  He's a professional at reviewing plans and making the comments that are included in this resolution, and I have no reason and have never had any reason to doubt his degree of expertise.

* * *

Q.      Does Mr. Zarko have the right to deny plans at the township.

A.      No, he does not.

Q.      That's solely the board of supervisors?

A.      It lies completely with the board of supervisors, yes.

Q.      But it's your testimony that in this particular case the board of supervisors did nothing other than to rely upon Mr. Zarko?

MR. MAHONEY: Object to the form of the question.

THE WITNESS: Personally, Mr. Zarko is an expert.  He's never given me one reason to believe that he's not an expert of the highest order, and I rely on him completely.

BY MR. EINHORN:

Q.      And given your general answers in the past – I think I know the answer to this question, but do you recall any discussions about this resolution outside of a public meeting?

A.      No, I do not.

-39-

Q.    Do you have any recollection today of the reason that the vote – the decision had to take place on March 21st as opposed to giving the developer an extension of time?

A.    I'm sorry.  Say that again.

Q.    Yeah.  Sitting here today, do you recall why you decided – let's talk about you – decided to vote on the resolution this particular day, March 21st, 2002, rather than giving the developer the extension of time he was offering?

A.    It did not seem that the extension of time was appropriate.

Q.    Well, I gather that.  I'm asking you why.

A.    Because there didn't seem to be significant movement on this project, in light of Mr. Zarko's recommendations – or the comments.

Q.    How did you find out about that?  How did you come to that conclusion?

A.    I think there's any number of items on this – on this second revised plan –

Q.    I'm asking you how you came to the conclusion that Mr. DePaul wasn't responding appropriately to Mr. Zarko's –

MR. MAHONEY: That's not what she said.  She said the plan wasn't progressing.

BY MR. EINHORN:

Q.    How did you come to that conclusion?

A.    Because I think there was other plans that had been submitted that didn't seem to be significant movement and moving the plans along to completion.

Q.    How did you determine that?  You're saying – I think you just answered it again.  How did you determine that there was not, in fact, that movement?

A.    I think there were – I can't recall, but it seems to me that the issues raised at the – other revisions were not significantly addressed, one to the other.

It's a feeling.  I mean, I can't tell you specifically this was this and this was this; but that was my impression, that there was no real good faith effort to move this plan along.

Q.    I'm just asking – I mean, you've given one reason, and I'm asking you how you came to that conclusion.

A.    I don't know if I can go back and specifically tell you specifically how I got to that conclusion.

Q.    Isn't it true that you voted on those plans that day, not because there was insignificant progress but it was because of the political pressure that was being placed upon the board?

A.    No.

Q.    That had nothing to do with it?

-40-

A.     No.

Q.     Do you take into consideration the community's opinions on a project when you vote on it?

A.     I don't disregard the community's feeling on a particular issue when I vote, but I do what I feel is the right thing to do.  I'm not swayed by public opinion.

(Exhibit "BBB", deposition of Ann Younglove, pp. 125-128).

BY MR. MAHONEY:

Q.     Ms. Younglove, would you please take a look at Exhibit P-21 again, please?

A.     Yes.

Q.     and I want to direct your attention to the bottom of the first page, the last "whereas" –

A.     Yes.

Q.     – which references the township engineer's review of revised plans and the number of comments which were satisfactorily addressed.  Do you see that?

A.     Yes.

Q.     And specifically it says, "Based on the township engineer's review of the revised plans, only 21 of the 93 comments contained within the original review were satisfactorily addressed on the revised plan."

       Did I read that correctly?

A.     Yes, you did.

Q.     And then on page two, there is a reference in the third "whereas" clause to the township engineer's review of the second revised plans.  Specifically it states, "Whereas, based on the township engineer's review of the second revised plan, only 17 of the 64 comments contained within the revised plan review were satisfactorily addressed in the second revised plan."

       Did I read that correctly?

A.     Yes, you did.

Q.     Does my reading those particular sections refresh your recollection as to what was the basis for your belief that the plan was not progressing?

A.     Yes.

Q.     What was that basis?

A.     That only a minimum number of items had been satisfied satisfactorily.

Q.     And, again, this is in accordance with Mr. Zarko's review?

A.     Yes.

> Q.     And you trusted Mr. Zarko because of his expertise; correct?
> MR. EINHORN; Object to the form of the question.
> THE WITNESS: I think I've already stated that I trust Mr.
> Zarko.

(Exhibit "BBB", deposition of Ann Younglove, pp. 137, 138).

The other Supervisors, William Rimel, Ronald DeRosa and Michael Zeock, all expressed similar reasoning for not accepting the offered extension of time; i.e, that the plans had not progressed.  They all testified that they relied upon Thomas Zarko, the Township's engineer, in deciding that there were valid reasons for denying the plans.  (Exhibits "CCC", "DDD", and "EEE", depositions of William Rimel, Ronald DeRosa and Michael Zeock, respectively).

The Board of Supervisors, to a person, agreed that the"buck stops with them."  By that they meant that the final decision to accept or not accept the offered extension of time rested with them and that the decision to approve or deny the preliminary plans was their decision alone.  The Board had valid and legitimate concerns that HMI had no serious intention of proceeding with its all office plans.  Indeed, HMI's continuous pursuit of a "mixed-use" plan, as recently presented at the March 7, 2002 meeting of the Board, gave the Supervisors no confidence that the "all-office" plan was ever going to progress to the point that the plans would be approvable.  Therefore, the Board's decision not to accept the offered extension was proper.  Likewise, despite Woodrow's and Garrity's contentions to the contrary, the Board voted to deny HMI's application for preliminary plan approval based upon the testimony of Zarko at the March 21, 2002 meeting that the plan did not comply with the Township's Zoning Ordinance, SALDO and Grading Ordinance.  Therefore, there were valid, legal reasons for denying the plans.

III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper under Federal Rule of Civil Procedure 56(c), if "there is no genuine issue as to any material fact and...the moving party is entitled to judgment as a matter of law." A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Katz v. Aetna Casualty and Surety Co., 972 F.2d 53, 55 n. 5 (3d Cir. 1992). The moving party bears the initial burden of identifying the absence of a genuine issue of material fact but need not refute the non-moving party's claim. The non-moving party then has the burden of going beyond the pleadings and producing specific facts indicating that there is a genuine issue for trial. If it fails to do so, summary judgment will be granted in favor of the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, at 323-324, 106 S. Ct. 2548, 2552 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252, 106 S. Ct. 2505, 2512 (1986).

In the instant matter, it is clear that Defendants are entitled to summary judgment as a matter of law.

IV.    LEGAL ARGUMENT

    A.    Defendants Are Entitled To Summary Judgment As A Matter Of Law On
           Plaintiff's Claim Of Violation of Procedural Due Process

Plaintiff's claim for denial of its procedural due process rights should be dismissed because Pennsylvania unquestionably affords Plaintiff a full judicial remedy to challenge the denial of its

-43-

application for preliminary plan approval. While the essence of Plaintiff's allegations of procedural

due process violation are that the procedures followed by the Board of Supervisors both in enacting

the rezoning of Plaintiff's property and denying the application for preliminary plan approval were

improper, the test for procedural due process in the land use and zoning areas is whether the state

affords a full judicial mechanism with which to challenge an official decision. In DeBlasio v.

Zoning Board of Adjustment, 53 F.3d 592 (3d Cir. 1995), the U.S. Court of Appeals for the Third

Circuit stated:

> In order to establish a violation of (plaintiff's) right to procedural due
> process (plaintiff), in addition to proving that a person acting under
> color of state law deprived him of a protected property interest, must
> establish that the state procedure for challenging the deprivation does
> not satisfy the requirements of procedural due process. Midnight
> Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 680 (3d Cir.
> 1991).

A state provides constitutionally adequate procedural due process when it provides

reasonable remedies to rectify legal error by a local administrative body. Bello v. Walker, 840 F.2d

1124, 1128 (3d Cir. 1988), cert. denied, 488 U.S. 868 (1988); DeBlasio, 53 F.3d at 597; Parratt v.

Taylor, 451 U.S. 527 (1981); Rogin v. Bensalem Township, 616 F.2d 680 (3d Cir. 1980), cert.

denied, 450 U.S. 1029 (1981); Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 1996 U.S.

Dist. LEXIS 1167 (E.D. Pa. 1996); Omnipoint Communications, Inc. v. Penn Forest Township, 42

F.Supp.2d 493 (M.D. Pa. 1999).

The Municipalities Planing Code, 53 P.S. §10101, et seq., provides full, complete and

adequate remedies for a person aggrieved by a decision of a municipality regarding land use. Article

X-A of the Code provides for appeals to the Court of Common Pleas of the county in which the land

is located. 53 P.S. §11001A, et seq. Plaintiff has availed itself of these remedies provided by the

Municipalities Planning Code by filing a land use appeal to the Court of Common Pleas of Montgomery County. Therefore, since Pennsylvania clearly provides a judicial mechanism with which to challenge the administrative decision of Whitemarsh Township, Plaintiff has no viable procedural due process claim as a result of the denial of its application for preliminary plan approval. See Bello, 845 F.2d at 1128.

In addition, Plaintiff had available to it a procedure under the Township's SALDO to file a further revised plan after the Supervisors' denial resolution on March 21, 2002, but chose not to exercise that procedure. Section 105-14D.(18) of the SALDO provides as follows:

> (18) If the preliminary plan is disapproved, the applicant may file a revised preliminary plan with the Manager in order to secure approval. No fee will be charged for the first revision, but all successive submissions shall pay the fee for preliminary plans.

(Exhibit "H"). Plaintiff waived the option to file a revised plan following the passage of Resolution No. 2002-17 and chose, instead, to file a Land Use Appeal to the Court of Common Pleas of Montgomery County.

With regard to the rezoning of the Plaintiff's property to EX-Extraction, this was an act performed by the Board in its legislative capacity. Procedural due process does not extend to legislative actions. Rogin v. Bensalem Township, 616 F.2d 680 (3d Cir. 1980). Nevertheless, the Code provides for procedural and substantive challenges to zoning and rezoning. 53 P.S. §§10909.1, 10609.1, 10916.1.

In the instant case, the Board enacted an ordinance on October 18, 2001 to add the EX-Extraction District to the Zoning Ordinance and to rezone Plaintiff's three properties. Plaintiff was fully aware of the proposed changes to the Zoning Ordinance. In fact, Plaintiff filed a challenge to

-45-

the rezoning with the Township's Zoning Hearing Board on the basis that there were technical errors in the enactment procedure by the Board of Supervisors. Rather than defend their action, the Board "re-enacted" the Ordinances on February 28, 2002, after first assuring that it had followed all of the procedural requirements for enactment. Plaintiff had notice and a full opportunity to be heard on the rezoning. After enactment of Ordinance Nos. 747, 748, 749 and 750 (Exhibits "V", "X", "Y" and "Z"), Plaintiff did not file a challenge to the rezoning, even though the Municipalities Planning Code and the Township's own ordinances gave it every right and opportunity to do so.

Defendants anticipate that Plaintiff may raise, as an issue, the fact that no representative of HMI was present on July 13, 2000 when the Board of Supervisors denied Plaintiff's request for a waiver from the Township's stormwater ordinance requiring stormwater facilities be designed as if the development's pre-construction condition was that of a "meadow". Throughout the discovery of this case, Plaintiff's witnesses have complained that they were not notified that the Board of Supervisors was going to take action on HMI's waiver request. Assuming HMI does advance such an argument, it has no legal basis. Nothing in the Municipalities Planning Code or the Township's ordinances require notification to an applicant for a waiver from stormwater regulations that the Board of Supervisors will take action on the request. In addition, HMI never requested reconsideration of its waiver request after notification the Board had denied the request. Finally, even after HMI had filed its application in September, 2001, it never again requested a waiver from the meadow provisions of the Grading and Stormwater Management Ordinance.

In light of the foregoing, it is clear that Plaintiff cannot prove a violation of its procedural due process rights in either the rezoning of its property or the denial of its preliminary plan. Therefore, summary judgment should be entered in favor of the Defendants.

-46-

B.    Defendants Are Entitled To Summary Judgment As A Matter Of Law On
Plaintiff's Claim Of Violation Of Substantive Due Process

The Fourteenth Amendment mandates that "no State shall ... deprive any person of life,
liberty, or property, without due process of law."  U.S. CONST. amend.  XIV, §1. The Due Process
Clause's procedural protections are complemented by a substantive component--thereby affording
more than fair process alone.  Washington v. Glucksberg, 521 U.S. 702, 719, 117 S.Ct. 2258, 2267,
138 L.Ed.2d 772 (1997).  The substantive sphere bars "certain government actions regardless of the
fairness of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 331, 106
S.Ct. 662, 665, 88 L.Ed.2d 662 (1986);  Hunterson v. Disabato, 308 F.3d 236, 248 (3d Cir.2002).
Most significantly, substantive due process protects fundamental liberty and property interests.  To
establish a claim under §1983, two essential elements must be present: (1) the conduct complained
of was committed by a person acting under color of state law; and (2) this conduct deprived a person
of rights, privileges or immunities secured by the Constitution or laws of the United States.  Wagner
v. Township of Harmer, 651 F.Supp. 1286, 1288 (W.D. Pa. 1987), aff'd. 826 F.2d 1054 (3rd Cir.
1987).

A successful substantive due process challenge requires the Plaintiff to prove: (i) an interest
protected by the Fourteenth Amendment's Due Process Clause; and (ii) the government's deprivation
of that protected interest by action which  "shocks-the-conscience." County of Sacramento v. Lewis,
523 U.S. 833, 846-47, 118 S.Ct. 1708, 1717, 140 L.Ed.2d 1043 (1998);  United Artists Theatre
Circuit, Inc. v. The Township of Warrington, PA., 316 F.3d 392, 400 (3d Cir.2003).

"To succeed in a substantive due process claim under Section 1983 (42 U.S.C. §1983), 'a
plaintiff must establish as a threshold matter that he has a protected property interest to which the

-47-

Fourteenth Amendment's due process protection applies.'" Grimm v. Sweeney, 249 F.Supp.2d 571, 608 (E.D. Pa. 2003) (quoting Woodwind Estates, Ltd. v. Gretkowski, 205 F.3d 118, 123 (3d Cir. 2000); cf., also, Corneal v. Jackson Township, No. 1:cv-00-1192, (M.D., Pa. July 28, 2003), affirmed, 2004 U.S. App. LEXIS 7198 (3d Cir., April 13, 2004). Ownership of property subject to a local land use regulation is a property interest entitled to substantive due process protection. DeBlasio v. Zoning Board of Adjustment for the Township of West Amwell, 53 F.3d 592 (3d Cir. 1995).

In the context of land use decisions, only conduct which is so irrational as to "shock the conscience" gives rise to a substantive due process violation. United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392 (3d Cir. 2003).

1.     Only Conduct That "Shocks the Conscience" Rises To
The Level Of A Substantive Due Process Violation

The decision by the U.S. Court of Appeals for the Third Circuit in the case of United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392 (3d Cir. 2003), raised the standard of conduct in this Circuit necessary to establish a substantive due process violation from the "improper motive" standard to a new, more rigorous "shocks the conscience" standard. The previous improper motive standard, established by Bello v. Walker, 840 F.2d 1124 (3d Cir. 1988) and its progeny, is no longer applicable law in this Circuit.

The shocks the conscience standard considerably heightened HMI's burden. "[O]nly the most egregious official conduct" is encompassed within the shocks the conscience standard and only conduct of that nature will suffice to establish a substantive due process claim. United Artists, 316

-48-

F.2d at 399.  The conduct of the Defendants in this case falls far short of the shocks the conscience standard now required by United Artists.

The Third Circuit's decision in United Artists was based upon the United States Supreme Court case of County of Sacramento v. Lewis, 523 U.S. 833 (1998).  There the Supreme Court observed that the "core of the concept" of due process is protection against arbitrary action and that only the most egregious official conduct can be said to be arbitrary in the constitutional sense.  Id. The substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that shocks the conscience. Fagan v. City of Vineland, 22 F.3d 1296, 1303 (3d Cir. 1994) (en banc); United Artists Theatre Circuit v. Township  of Warrington, et al, *supra* at 399.

The Court in United Artists  noted, "our holding today brings our Court into line with several other Courts of Appeals that have ruled on substantive due process claims in land-use disputes". United Artists, supra, at 402.  See, e.g., Chesterfield Development Corp. v. City of Chesterfield, 963 F.2d 1102, 1104-05 (8th Cir.1992) (holding that allegations that the city arbitrarily applied a zoning ordinance were insufficient to state a substantive due process claim, and stating that the "decision would be the same even if the City had knowingly enforced the invalid zoning ordinance in bad faith.... A bad-faith violation of state law remains only a violation of state law."); PFZ Properties, Inc. v. Rodriguez, 928 F.2d 28, 32 (1st Cir.1991) ("Even assuming that ARPE engaged in delaying tactics and refused to issue permits for the Vacia Talega project based on considerations outside the scope of its jurisdiction under Puerto Rico law, such practices, without more, do not rise to the level of violations of the federal constitution under a substantive due process label.").

As the Court in United Artists also noted, "[a]pplication of the "shocks the conscience" standard in this context also prevents us from being cast in the role of a 'zoning board of appeals.'" Id. citing Creative Environments, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir.1982) (quoting Village of Belle Terre v. Boraas, 416 U.S. 1, 13, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (Marshall, J., dissenting)); see also Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45-46 (1st Cir.1992) (disagreeing with Bello and stating that "we have consistently held that the due process clause may not ordinarily be used to involve federal courts in the rights and wrongs of local planning disputes").  Finally, the United Artists Court stated,  "[l]and-use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with "improper" motives."  Id.

The meaning of the "shocks the conscience" standard varies depending on the factual context. Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002), Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 400 (3d cir. 2000); Nicini v. Morra, 212 F.3d 798, 809 (3d Cir. 2000) (en banc); Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999); no violation found: Conn v. Gabbert, 119 S.Ct. 1292 (1999) (police did not violate substantive due process rights of a lawyer to practice his profession when they searched him while he was advising client outside grand jury room); Collins v. City of Harker Heights, 112 S.Ct. 1061 (1992) (no substantive due process claim stated when city accused of providing unsafe working conditions for employees; constitution does not require city to provide employees with minimal levels of safety and security); Costello v. Mitchell Public School Dist., 79, 266 F.3d 916 (8th Cir. 2001) (offensive words by band leader to possibly retarded student did not violate substantive due process rights); Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396 (3d Cir. 2000) (calling contractor a "crook" and calling him responsible for cost overruns

so he lost bids did not shock the conscience and were not substantive due process violation); <u>Doe v. Gooden</u>, 214 F.3d 952 (8th Cir. 2000) (teachers verbal abuse of student does not amount to substantive due process violation; minor physical abuse does not amount to pattern sufficient to put principal on notice; no substantive violation and principal entitled to qualified immunity defense); <u>Cruz-Erazo v. Rivera-Montanez</u>, 212 F.3d 617 (1st Cir. 2000) (charge that police verbally harassed homeowners, occupied their property without permission and lied in official documents did not "shock the conscience" and did not constitute substantive due process violation); <u>Fuentes v. Wagner</u>, 206 F.3d 335 (3d Cir. 2000) (no substantive due process violation when inmate placed in restraint chair for eight hours after disruptive behavior); <u>Klein v. McGowan</u>, 198 F.3d 705 (8th Cir. 2000) (no substantive due process violation by anti-gay remarks to sheriff's deputy over period of 16 years); <u>Hawkins v. Freeman</u>, 195 F.3d 732 (4th Cir. 1999)(en banc) (act of parole board in summarily revoking erroneously issued parole order and ordering parolee back into custody did not "shock the conscience" and was not substantive due process violation); <u>Davis v. Township of Hillside</u>, 190 F.3d 167 (3d Cir. 1999) (high-speed police chase that injured bystander did not violate substantive due process rights); <u>Gordon v. Hansen</u>, 168 F.3d 1109 (8th Cir. 1999) (firing of attorney as general counsel for bank did not violate substantive due process rights; not "truly irrational" government action); <u>Moreland v. Las Vegas Metropolitan Police Dept.</u>, 159 F.3d 365 (9th Cir. 1998) (no substantive due process violation when police kill bystander in shoot-out; acts did not shock the conscience); <u>Riley v. St. Louis County of Missouri</u>, 153 F.3d 627 (8th Cir. 1998) (taking photograph of dead son's body and displaying body to public did not "shock the conscience" and is not substantive due process violation); <u>Abeyta by Martinez v. Chama Valley Indep. Sch.</u>, 77 F.3d 1253 (10th Cir. 1996) (no substantive due process violation when teacher called 12 year old student a

prostitute before class over several weeks); Immediato v. Rye Neck School Dist., 73 F.3d 454 (2d Cir. 1996) (no substantive due process violation when school requires high school students to become part of mandatory community service program); Brown v. Hot, Sexy and Safer Productions, Inc., 68 F.3d 525 (1st Cir. 1995) (no substantive due process violation when school held AIDS awareness assembly that exposed children to explicit sexual information, contrary to parents' wishes); Skinner v. City of Miami, Fla., 62 F.3d 344 (11th Cir. 1995) (city firefighter was victim of hazing incident by other firefighters and suffered serious damages; while acts may constitute state tort, no substantive constitutional violation; jury verdict of $1.3 million reversed); Doyle v. Oklahoma Bar Association, 998 F.2d 1559 (10th Cir. 1993) (no substantive due process violation when bar association did not adequately process complaint against lawyer); Wilson v. Northcutt, 987 F.2d 719 (11th Cir. 1993) (no substantive due process violation when deputies tried to serve arrest warrant and woman committed suicide as a result); Santiago de Castro v. Morales Medina, 943 F.2d 129 (1st Cir. 1991) (no substantive due process violation because of harassment of teacher by supervisor); Magnuson v. City of Hickory Hills, 933 F.2d 562 (7th Cir. 1991) (no substantive violation if city threatens to terminate water service when inhabitants refuse to allow inspection); Temkin v. Frederick County, Md., 945 F.2d 716 (4th Cir. 1991) (no substantive violation when bystander injured by police high-speed chase); Weimer v. Amen, 870 F.2d 1400 (8th Cir. 1984) (allegation that state bank official fraudulently induced depositors to keep money in insolvent bank, not serious enough to constitute substantive violation); see also United of Omaha Life Ins. Co. v. Solomon, 960 F.2d 31 (6th Cir. 1992)(allowing other bidder on state insurance program to submit bid late did not "shock the conscience" and therefore no substantive due process violation); See also, as to finding of conduct which shocks the conscience: Rochin v. People of California, 72 S.Ct. 205,

-52-

342 U.S. 1655 (1952) (conduct whereby deputy sheriffs entered accused's home, forced open door to his bedroom, forcibly attempted to extract capsules which accused had swallowed, and at hospital, directed physician to force emetic solution through a tube into accused's stomach against his will, which produced vomit containing morphine capsules, is conduct that shocks the conscience).

Since the <u>United Artists</u> decision by the Third Circuit, District Courts in this Circuit and the Third Circuit itself have quickly adapted to and applied the "shocks the conscience" standard.  <u>See</u> <u>Shay v. County of Berks</u>, 2003 WL 21973318, *7 (E.D. Pa. June 12, 2003)(to establish that a government's action "shocks the conscience," plaintiff must claim more than "the lowest common denominator of customary tort liability."  "The Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."  "[i]t is ... behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience- shocking level");  <u>Grimm v. Sweeney</u>, 249 F.Supp.2d 571, 608  (E.D. Pa. March 7, 2003) (citations issued by local fire officials to plaintiff, owner of rental properties; "We have neither the power nor the inclination to overrule the Third Circuit on this point. We therefore apply the clear precedent laid out in <u>Lewis</u> and <u>United Artists</u> and apply the shocks to the conscience standard in evaluating the defendants' actions").

2.    The Courts in the Third Circuit Have Consistently
Applied the "Shocks The Conscience" Standard to
Invalidate Substantive Due Process Claims in Land
Use and Zoning Disputes

District Courts in this Circuit and the Third Circuit itself have applied the United Artists case

to a plethora of land use and zoning cases similar to the present one and found that the conduct of

the municipal officials does not rise to the level of conscience shocking conduct.

Lindquist v. Buckingham Township, et al., (Lindquist I) C.A. No. 00 cv-1301 (E.D. Pa. April

15, 2003), non-jury trial before United Artists, decided April 15, 2003, applying United Artists;

Court found in favor of Township defendants on Plaintiffs' claim of substantive due process

violation in a subdivision and land development application even though Township Supervisors,

inter alia, 1) refused to accept Township staff and solicitor's recommendation regarding developer's

requested waivers, 2) denied developer's preliminary plans after amending the zoning ordinance and

SALDO, which amendments would have blocked the development as proposed, 3) settled

developer's subsequent lawsuit and then violated the settlement agreement by attempting to deny

revised preliminary plans and again subject developer to the amended ordinances, 4) denied the

wrong plans resulting in a "deemed approval" under §508 of the Municipalities Planning Code, 5)

refused to follow their solicitor's legal opinion that the Board could not judge the revised plans

against the amended zoning ordinance and SALDO, and 6) filed numerous appeals which caused

further delays in subdivision approval; Lindquist v. Buckingham Tp.,(Lindquist II) 2003 WL

21357247, *1, 68 Fed.Appx. 288, 289 (3rd Cir.(Pa.) May 16, 2003)("Additionally, in our recent

decision in United Artists Theatre Circuit v. Warrington, 316 F.3d 392 (3d Cir.2003), we held that

in light of County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998),

-54-

a plaintiff asserting that a municipal land-use decision violated substantive due process must show

that the defendants' conduct "shocked the conscience," and not just evinced "improper motive." The

plaintiffs do not even come close to establishing conduct on the part of defendants that shocks the

conscience"); see also, Keystone Outdoor Advertising Co., Inc. v. West Whiteland Township, 2003

WL 1914157, *2, 64 Fed.Appx. 333, 335 (3rd Cir.(Pa.) Mar. 11, 2003) (Company that leased tract

of land for free-standing billboard filed §1983 action, alleging that township and its supervisors

violated its constitutional rights by condemning tract of land. The District Court granted summary

judgment and the Court of Appeals held that company failed to meet even less stringent standard of

showing "improper motives" on part of township, as was required to maintain §1983 action); Corneal

v. Jackson Township, No. 1: cv-00-1192 (M.D. Pa., July 28, 2003) affirmed, 2004 U.S. App. LEXIS

7198 (3d Cir. April 13, 2004), Plaintiff landowner prepared a subdivision plan after which the

Township imposed a moratorium on building pending passage of a subdivision and land

development ordinance; moratorium imposed without the passage of a resolution or other formal

actions; Township refused to review the Plaintiff's subdivision plans after the moratorium went into

effect; County Planning Commission recommended denial of the subdivision plan in light of the

pending subdivision ordinance and moratorium against subdividing property; Township additionally

refused to issue sewer modules or a privy permit to allow Plaintiffs to construct their own house;

Township Building Officer told by the Supervisors not to issue building permits to the Plaintiffs;

Township officials referred to the plaintiffs in derogatory terms such as "trouble making yuppies"

and interposed numerous other roadblocks to prevent subdivision of the property; plaintiffs lost a

buyer for a subdivided parcel because of the delays caused by the municipality; conduct was not

"conscience shocking"; Levin v. Upper Makefield Tp., 2004 U.S, App. LEXIS 4457 (March 8,

2004), Third Circuit affirmed the District Court's grant of summary judgment in favor of Township

defendants based upon the "shocks the conscience" standard; property owner purchased unimproved

land in a flood plain that was zoned as Conservation Management Zoning District; Board of

Supervisors authorized its solicitor to oppose the owner's application for a variance to build a house

in the flood plain; Zoning Hearing Board denied the application; Board of Supervisors and the

Township solicitor took the following actions to block plaintiff's development of his property:

1. opposed plaintiff's appeal to the Court of Common Pleas of Bucks County which reversed the Zoning Hearing Board's decision;

2. appealed the decision of the Court of Common Pleas to the Commonwealth Court, which affirmed;

3. petitioned for allocatur to the Supreme Court, which was denied;

4. cashed plaintiff's check for $2,300.00 for building permits, then advised plaintiff that no permits would be issued before the Supreme Court decided the petition for allocatur;

5. considered changing setback requirements which would have effectively prevented development of the property;

6. delayed issuing permits after the Supreme Court denied the Township's petition for allocatur; and

7. advised plaintiff of requirements for the issuance of permits that were not listed in the permit application;

none of the actions were sufficiently egregious to rise to the level of "conscience shocking";

Thornbury Noble, Ltd. v. Thornbury Township, et al., C.A. No. 99-cv-6460 (E.D. Pa., October 21,

2003); Court granted summary judgment in favor of Township defendants in substantive due process case in which Township refused to rezone Plaintiff's property to allow a commercial development after a competitor had made a significant contribution to the Township's open space fund and the Township gave the competitor a similar zoning change; Fred's Modern Contracting, Inc. et al. v. Horsham Township, C.A. No. 02-cv-0918 (E.D. Pa., Mar. 29, 2004); Court granted summary judgment to Township in substantive due process claim in which landowner who proposed development in a flood plain and had been granted conditional use approval by the Township claimed that his development was delayed when Township did not disclose its communications with FEMA concerning necessary permits, intentionally concealed its decision to cease review of plaintiff's second application for land development and personal animus towards plaintiff; conduct did not rise to the level that shocks the conscience; Blain v. Township of Radnor, et al., C.A. No. 02-cv-6684 (E.D. Pa., May 19, 2004); Court granted summary judgment in favor of Township, its Board of Commissioners and Commissioners themselves in their official and individual capacities in a subdivision and land development dispute in which the Board chose to follow the advice of the Township's engineer over the advice of its solicitor concerning the applicability of a SALDO provision, failed to take action on the developer's plans within the 90-day time limit and thus the plans were approved, appealed an adverse decision of a Common Pleas Court to the Commonwealth Court, then abruptly withdrew its appeal the day before its appellate brief was due to be filed; listened to and acted upon neighbor's requests to negotiate for preservation of open space and walking trails on the developer's land and some Commissioners announced their intention to consider condemning the property, which may have decreased the value of Plaintiff's property; Cf., also, Sauers v. Bensalem Township, C.A. No. 01-cv-5759, 2003 U.S. dist. LEXIS 476 (E.D. Pa.,

Mar. 5, 2003); Cf. also, <u>City of Cuyahoga Falls v. Buckeye County Hope Found.</u>, . – U.S. –, 123 S.Ct. 1389 (2003). These cases demonstrate that federal courts will only consider the most egregious conduct as "conscience shocking" so as to state a case for substantive due process violation.

In <u>Corneal v. Jackson Township</u>, supra, the District Court stated that it had found only one reported land use case in the country on the "shocks the conscience" standard which had survived a motion for summary judgment. <u>Collier v. Town of Harvard</u>, cv-No. 95-11652-DPW, 1997 U.S. Dist. LEXIS 23582 (D. Mass. Mar. 28, 1997). In the <u>Collier</u> case, the plaintiffs' application for permits and zoning variances was turned down by the local Zoning Board of Adjustment (ZBA) because plaintiffs refused to grant an easement to plaintiffs' neighbor, a member of the local Planning Board which advised the ZBA. The ZBA chairperson visited the plaintiffs and advised them that their application "would go more smoothly" if they granted the Planning Board member his requested easement. Ultimately, plaintiffs did not grant the easement and their application for relief from the ZBA was denied. The Middle District in <u>Corneal</u> characterized <u>Collier</u> as involving an allegation of "governmental extortion and thus a jury could find that the ZBA was motivated by purely personal motivations devoid of any rational land use planning. Thus, <u>Collier</u> fell within the very narrow class of challenges to local land use decisions which are 'truly horrendous'". <u>Corneal</u>, at 16, citing <u>Welch v. Paicos</u>, 66 F.Supp.2d 138, 169 (D. Mass. 1999) (discussing <u>Collier</u>).

       3.    <u>Defendants' Conduct Does Not "Shock The Conscience"</u>

The shocks the conscience standard, according to the <u>Sacramento v. Lewis</u> and <u>United Artists</u> cases, is not a calibrated yardstick. However, utilizing the foregoing cases as a guide, it is clear that Whitemarsh Township, its Board of Supervisors and its Engineer were not engaged in conscience shocking behavior. Rather, they were taking what they felt were reasonable and legitimate steps to

protect the community from an overly dense development which was inconsistent with the zoning

districts and uses in the immediately surrounding areas.  In addition, the denial of the application was

based upon documented non-compliances with and violations of the Zoning Ordinance, the SALDO

and the Grading Ordinance.

In discovery, Plaintiff failed to present evidence to establish that there was any personal

animus against Peter DePaul or his company or that there was any fraud or personal gain sought by

the Township, its Supervisors or Engineer Zarko in rezoning the property or in the review and

processing of Plaintiff's applications and revisions thereto.  Indeed, to the contrary, the discovery

conducted showed that the Supervisors and the Engineer acted in accordance with their duties and

responsibilities as Township officials, consistent with previously filed land development applications

and for rational and legitimate land use planning and orderly development.

a.    Rezoning Plaintiff's Property Does Not Shock the
Conscience

Zoning and the right to rezone has been specifically reserved to a municipality's governing

body by the Municipalities Planning Code. 53 P.S. §10601.  While Plaintiff understandably may not

have liked the change in zoning, the law in Pennsylvania does not restrict a municipality's right to

rezone property after the owner has filed an application for land development.  Indeed, the

Municipalities Planning Code envisions the possibility that the zoning of property might be amended

while a land development application is pending.  Section 508 of the Code protects an applicant in

that situation by directing that the change in the zoning ordinance shall not adversely effect the

applicant who is entitled to a decision based upon the ordinance in place at the time the application

is filed.  Section 508, however, also envisions the possibility that the pending application could be

denied, thus subjecting the applicant to the amended zoning:

> However, if an application is properly and finally denied, any
> subsequent application shall be subject to the intervening change in
> governing regulations.

53 P.S. 10508(4)(i).

In <u>Pace Resources, Inc. v. Shrewsbury Township</u>, 808 F.2d 1023 (3d Cir. 1987), the Court

of Appeals affirmed a Middle District decision granting a Township's motion to dismiss because the

Complaint failed to state a substantive due process claim.  In that case, the Court found that a

Township's rezoning of Plaintiff's property from industrial to agricultural had a rational basis and

thus, Plaintiff's claim of substantive due process violation was without merit.  The Court so found

even though a state court, on Plaintiff's appeal, found that the rezoning was "illegal spot zoning".

The Court of Appeals reasoned that zoning regulations are a matter of local concern:

> The federal courts largely defer to legislative judgment on
> such matters as zoning regulation "because of the recognition that the
> process of democratic political decision making often entails the
> accommodation of competing interest, and thus necessarily produces
> laws that burden some groups and not others." [quoting <u>Rogin v.
> Bensalem Township</u>, 616 F.2d 680, 687 (3d Cir. 1980)].  This court
> will not substitute its judgment about land use policy and thereby
> undermine the legitimacy of democratic decision making <u>unless the
> local legislative judgment is without a plausible rational basis</u>.

Id., at 1035.  The Court noted that the case did <u>not</u> involve "actions aimed at this developer for

reasons unrelated to land use planning.  Rather, the case involves a difference of opinion on how

much industrial development is in the best interest of the Township and how that quantum of

industrial development should be achieved.".  Id, at 1035.  Similarly, in the case at bar, even if one

assumed that Plaintiff was intent on developing its property as an all office complex, as opposed to

-60-

the "preferred" mixed use which it continually pursued, the case is merely a difference of opinion between HMI and the Township over whether an office development of this magnitude is appropriate in the middle of an area predominantly zoned residential and predominantly used for residential, agricultural and recreational purposes.

        b.      Listening To Public Concerns About A Proposed Use Which Is Inconsistent With Surrounding Uses Does Not Shock The Conscience

Plaintiff, in its Complaint and throughout the discovery in this case, has claimed that it was improper for the Board of Supervisors to listen to the citizens who were opposed to HMI's development and who were in favor of rezoning the Plaintiff's property for uses more consistent with the surrounding area. Plaintiff's argument ignores the simple fact that in the United States, citizens are guaranteed the right under the First Amendment to the constitution to address and petition their public officials. U.S. Const., Amend. I. Indeed, the Whitemarsh Township Code encourages public participation in the governing process. It even provides a method whereby citizens are entitled to a public hearing on a petition for rezoning of property. (Exhibit "G", Zoning Ordinance, §116-239).

The fact that the EX-Extraction ordinance may have started with a petition from citizens is of no moment in analyzing the supervisors' behavior in a substantive due process context. Nor does it matter that the EX-Extraction amendment eventually enacted by the Board was similar to the petition filed on behalf of Donald and Trina Cohan (Exhibit "T"). To turn a deaf ear to the concerns of the citizens of the Whitemarsh Township would have rendered their First Amendment rights a nullity. Rather, the Board, while enacting rezoning which was consistent with public health, safety and welfare, discharged its responsibilities in upholding the constitutional rights of those competing

parties. This was nothing more than the "accommodation of competing interests". <u>Pace Resources</u>, supra; <u>Rogin</u>, supra.

c.    Non-Acceptance Of HMI's Offer For An Extension Of Time Does Not Shock The Conscience

Plaintiff claims that because the Board of Supervisors had not refused an offer from any applicant for an extension of time to act upon a subdivision and land development application from January 1, 1996 to March 21, 2002 was conscience shocking behavior. The fallacy of that argument ignores the purpose of the 90 day time limit. Section 508 of the Municipalities Planning Code was enacted to remedy indecision and protracted deliberations on the part of local governing bodies and to eliminate deliberate or negligent inactions on the part of governing officials. <u>Morris v. Northampton County Hanover Twp. Board of Supervisors</u>, 395 A.2d 697, 39 Pa.Cmwlth. 466 (Cmwlth. 1978); 53 P.S. §10508. Indeed, the failure to render a decision within the prescribed time automatically results in a "deemed approval" of the pending plans. 53 P.S. §10508(3). Nowhere in the Municipalities Planning Code does it state that an applicant must offer an extension of time when requested by the governing body or that the governing body must accept such an offer if made by the applicant.

Plaintiff's argument also ignores the fact that despite two reviews by Engineer Zarko on October 11, 2001 (Exhibit "EE"), and January 24, 2002 (Exhibit "GG") documenting the plans' non-compliances, violations and deficiencies, HMI submitted a second revised plan on March 19, 2001 which had clearly not been corrected to meet the requirements of the ordinances. Finally, Plaintiff's continued pursuit of a "mixed-use" plan and its steadfast refusal to apply for variances to

-62-

the Zoning Hearing Board reinforced the Supervisors' belief that DePaul never intended to go forward with its all office proposal.

Under these circumstances, the Supervisors were perfectly justified in concluding that no progress had been or was going to be made on these plans and thus choosing not to accept the further offer of an extension.

        d.     The Township Cooperated with HMI and HMI's Claim of Lack of Cooperation Does Not Rise to the Level of Conscience Shocking Behavior

HMI, in its Complaint and throughout discovery, has claimed that the Township failed to cooperate with HMI during the land development process. Although Plaintiff will no doubt cite to some minor examples of miscommunication, the following is only a partial list of the extensive cooperation by the Township throughout the process:

        1.     The Township agreed to a traffic impact study performed by Valley Forge Laboratories in 2000, even though no sketch plan or preliminary plan had been filed with the Township;

        2.     The Township entertained a request for a stormwater waiver of the "meadow" condition even though no plans had been filed with the Township;

        3.     The Township processed HMI's November, 2000 sketch plan, had it reviewed by the Township Engineer, the Montgomery County Planning Commission, the Township Planning Commission; the Board of Supervisors conducted a public meeting to consider the sketch plan on May 24, 2001, even though not required to do so;

-63-

4.    The Board of Supervisors conducted a review of a revised mixed-use sketch plan in a public meeting on March 7, 2002 even though it was not required to do so;

5.    Engineer Zarko performed timely reviews of the September 2001 preliminary plans, the December 2001 revised preliminary plans and the March 2002 second revised plans (Exhibits "EE", "GG" and "WW", respectively);

6.    Solicitor Weiss advised HMI's representatives on January 16, 2002 that the Township had no preference on the type of sanitary sewer (public v. on-site) to service the project;

7.    One week after requested by HMI for Zarko to accompany Plaintiff's representatives to meetings at PennDOT and the Pennsylvania Department of Environmental Protection, the Township gave that permission, even though not required to do so;

8.    Solicitor Weiss advised HMI's attorney that he could not give an interpretation of the Zoning Ordinance that HMI's attorney wanted on the zoning issues but advised him to go to the Zoning Hearing Board;

9.    Solicitor Weiss offered a "freeze" on the proceedings, to attorney Garrity even though not required or authorized by the Board of Supervisors to make such an offer.  (See Exhibit "VV").

A review of Plaintiff's litany of alleged "non-cooperation" in the Complaint is nothing more than a list of disagreements with the Township's decisions or complaints about the level of cooperation.

-64-

Stated another way, if the Township, the Engineer or the Solicitor disagreed with HMI or its representatives, HMI considered these disagreements to be "non-cooperation".

Robert Jordan, who interacted with Zarko, said that Zarko never refused his requests for a meeting or a conversation about the plans. (Exhibit "FFF", pp. 93-96).

In addition, the duties in the land development process run both ways. The municipality has the duty to act in good faith and provide timely reviews of plans submitted. The developer has the duty to submit revised plans in a reasonable and timely manner. Abarbanel v. Solebury Township, 572 A.2d 862, 132 Pa.Cmwlth 326 (Cmwlth. 1990); appeal denied, 593 A.2d 422, 527 Pa. 651. Plaintiff utterly failed in this duty to the Township.

e.    The Board of Supervisors' Passage of Resolution No. 2002-17 Does Not Shock the Conscience

Where a subdivision plan complies with all objective provisions of the applicable subdivision ordinances, as well as other applicable regulations, the subdivision plan must be approved; however, rejection of a plan is lawful if adequately supported by even one of several objections. Herr v. Lancaster County Planning Commission, 155 Pa.Cmwlth. 379, 625 A.2d 164 (1993); Akin v. South Middleton Township Zoning Hearing Board, 120 Pa.Cmwlth. 112, 547 A.2d 883 (1988); County Builders, Inc. v. Lower Providence Township, 5 Pa.Cmwlth. 1, 287 A.2d 849 (1972). Plaintiff's preliminary plans never fully complied with the Township's Zoning Ordinance, SALDO and the Grading Ordinance. This non-compliance was confirmed by the Township's engineer, Thomas Zarko, in three review letters.

The Board of Supervisors, as the governing body of the Township, had the legal obligation to ensure that the plans fully complied with the Township's ordinances. Accordingly, to the extent

that the Board insisted upon compliance with the ordinances, the Supervisors were simply discharging their obligations under the Township's Home Rule Charter, the Municipalities Planning Code and case law.  Raum v. Board of Supervisors of Tredyffrin Township 29 Pa.Cmwlth. 9, 370 A.2d 777 (1977) (Municipality has the affirmative duty in the application of its subdivision ordinance to actively oppose schemes of development unreasonably proposed and conceived).  In addition, Pennsylvania law imposes a good faith duty on the part of the developer to submit revised plans that comply in a reasonable and timely manner.  Abarbanal v. Solebury Township, 132 Pa.Cmwlth. 326, 572 A.2d 862 (1990).  As the record reveals, the usual and customary practice in subdivision and land development in Whitemarsh Township is for a developer to submit his plans. Following review by the Township consultants and the Planning Commission, deficiencies and non-compliances with the ordinances  are identified.  The plans are then revised, sometimes several times, in order to meet those deficiencies and non-compliances.  When the plans, however, do not comply, despite the Township's advices, the Board has the right to deny those plans.  (Exhibit "H", SALDO §105-14.D(15)(d)).

The facts are clear in this case that the Supervisors' denial of the preliminary plans was based solely upon Plaintiff's failure to comply with the Zoning Ordinance, SALDO and Grading Ordinance.

> C.     Defendants Are Entitled to Summary Judgment as a Matter Of Law on Plaintiff's Equal Protection Claim Because Plaintiff's Property Is Not Similarly Situated to Other Properties in Whitemarsh Township, Was Not Treated Differently or, alternatively, There Was a Rational Basis For the Difference In The Treatment

Plaintiff contends that the actions taken by the Board of Supervisors and Thomas Zarko violated Plaintiff's Equal Protection Rights.  The Equal Protection Clause of the Fourteenth

Amendment provides, in relevant part, that "No state . . . shall deny any person within its jurisdiction equal protection of the laws."  U.S. Const. Amend. XIV.

Where the state law does not classify by suspect class (i.e., race, alienage, national origin, disability or gender), "the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985).  Plaintiff does not argue that it is a member of a suspect class, but rather, that it is a member of a "class of one."  The Supreme Court has stated that an equal protection claim can be brought by a "class of one" where the Plaintiff alleges that "she has been intentionally treated differently from others similarly situated and where there is no rational basis for the disparate treatment."  Willow Grove v. Olech, 528 U.S. 562, 564 (2000) (emphasis added).  Essentially, in a class of one analysis, the number of individuals in the class is immaterial; however, the Plaintiff must still meet the requirements of an equal protection claim.  (1) that it was treated differently than similarly situated property owners, and (2) there was no rational basis for the difference in treatment.  Where there is no suspect classification, as in this case, the difference in treatment need only be rationally related to a legitimate state interest. Cleburne, supra at 440. A statute that does not impinge on a fundamental right or burden a suspect class of persons, such as in this case, "is accorded a strong presumption of validity," Heller v. Doe, 509 U.S. 312, 319-20, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993) (citations omitted), and a plaintiff will not prevail so long as "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." Id. at 320, 113 S.Ct. at 2642.  "[C]ourts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws.  The Constitution presumes that absent some reason to infer antipathy, even improvident decisions

-67-

will eventually be rectified by the democratic process and that judicial intervention is generally

unwarranted". Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979).

The Third Circuit recently noted the tradition in American law is that land use decisions are

quintessentially local in nature. Lapid-Laurel, L.L.C. v. Zoning Bd. of the Adjustment of Scotch

Plains, 2002 WL 408082 (3d Cir., March 15, 2002) citing, FERC v. Mississippi, 456 U.S. 742, 768,

n. 30 (1982)("[R]egulation of land use is quintessentially state activity"); Village of Belle Terre v.

Boraas, 416 U.S. 1, 13 (1974)(Marshall, J. dissenting)(noting that zoning "may indeed be the most

essential function performed by local government"). The Third Circuit further emphasized the view

of this Court when it stated, "[w]e too have recognized in similar contexts the value of local

authorities resolving such matters on their own without interference from the federal courts." Lapid-

Laurel, supra at 6, citing Acierno v. Mitchell, 6 F.3d 970 (3d Cir. 1993)(stating that "courts should

not insert themselves in 'delicate area(s)' subject to local regulation until local authorities have 'had

the opportunity to apply authoritatively' their specific regulations"); Sameric Corp. of Delaware, Inc.

v. City of Philadelphia, 142 F.3d 582, 596 (3d Cir. 1998) (citing "reluctance to substitute [Third

Circuit's] judgment for that of local decision-makers, particularly in matters of such local concern

as land-use planning"). See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning

Agency, 2002 WL 654431 (U.S. 4/23/02) ("Land-use regulations are ubiquitous and most of them

impact property values in some tangential way – often in completely unanticipated ways. Treating

them all as per se takings would transform governmental regulation into a luxury few governments

could afford."). Id. at 16.

1.    <u>Rezoning Is Municipal Legislation</u>

"The Supreme Court has accorded great deference to . . . legislation . . . that affects business or other economic activity." <u>Rogin v. Bensalem Township</u>, 616 F.2d 680, 68777 (1980).  In <u>Rogin</u>, the Third Circuit affirmed a district court's grant of a motion for summary judgment on, inter alia, developer's equal protection claim against a municipality which had amended its zoning ordinance to reduce the allowable density permitted in an R-4 residential zone.  Even though a state court had ruled that the ordinance amendment was invalid as a retroactive application of the zoning amendment to the property owner, the Third Circuit ruled that the amendment to the zoning ordinance was a legislative act and is thus accorded great weight.  "To prevail on its equal protection claim, [plaintiff-developer] must persuade us that the passage and application to it of the zoning amendments "so lack rationality that they constitute a constitutionally impermissible denial of equal protection."  <u>Rogin</u>, supra at 688, quoting <u>New Orleans v. Dukes</u>, 427 U.S. 297, 305 (1976).  Pointing to the desirability of reducing density in an R-4 Residential District, the Court noted that the amendment to the zoning ordinance was a rational and reasonable means to accomplish this goal.  <u>Rogin</u>, supra, at 688.

Similarly, in the case at bar, the legislative action by the Board of Supervisors in amending the Zoning Ordinance to create the EX-Extraction District and the Zoning Map to rezone the quarry properties was designed to create consistency in use and zoning of reclaimed quarries with the surrounding uses and zoning.  Such actions, as legislative, are accorded broad deference by the courts.  Such deference should be accorded Whitemarsh Township and its Board of Supervisors with regard to this legislative decision.

-69-

2.    Plaintiff's Property Is Not Similarly Situated To Other
        Property In Whitemarsh Township

"Similarly situated" means similar "in all relevant respects." Singh v. Wal-Mart Stores, Inc.,

1999 U.S. Dist. LEXIS 8531 (E.D. Pa. 1999)[2] citing Kline v. Kansas City, Mo., Fire Dept., 1999 U.S.

App. LEXIS 8500, 175 F.3d 660, 1999 WL 270013, (8th Cir. 1999). See also Ercegovich v.

Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (plaintiff must show he was "similar

in all of the relevant aspects" to persons allegedly receiving preferential treatment); Holifield v.

Reno, 115 F.3d 1555, 1563 (11th Cir. 1997)("in all aspects"); Shumway v. United Parcel Service,

118 F.3d 60, 64 (2d Cir. 1997) ("similarly situated in all material respects"); Dartmouth Review v.

Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989) ("in all relevant aspects"); Dill v. Runyon, 1997

U.S. Dist. LEXIS 4355, 1997 WL 164275, *4 (E.D. Pa. Apr. 3, 1997) (plaintiff must demonstrate

preferential treatment of persons "similarly situated in all material respects" to plaintiff).  It is simply

not enough for a plaintiff to draw conclusory allegations at face value in this area of law with regard

to similarly situated entities.  Vito v. Bray, 1991 U.S. Dist. LEXIS 13564 (E.D. Pa., Sept. 27, 1991)

at *19.

---

[2]In Singh v. Wal-Mart Stores, Inc., 1999 U.S. Dist. LEXIS 8531 (E.D. Pa. 1999),
Plaintiff, making an equal protection claim based upon race because he was not able to return a
purchased item, sought to compare himself simply to other customers at the Fairless Hills store
who were attempting to return or exchange merchandise on December 20, 1997. However, there
was no evidence any other customer had attempted to return an out-of-warranty appliance,
purchased another identical appliance and then again attempted to make a return the next day at
the same store in the presence of an employee who witnessed the events of the prior day and had
been alerted to a conversation in which the customer or his companion discussed replicating the
purchase and using the new receipt to do a swap. Plaintiff has not identified another customer of
any race or ethnicity who was similarly situated in "all relevant respects."  Id. at 308-10.

In The Dartmouth Review v. Dartmouth College, 889 F.2d 13 (1st Cir. 1989), the United States Court of Appeals for the First Circuit set forth the test as follows:

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as the lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely or necessary, but the cases must be fair congeners. **In other words, apples should be compared to apples.** (emphasis added). Dartmouth Review, 889 F.2d at 19.

For example, in Bell v. Tere Duperrault, 2004 U.S. Dist. LEXIS 9296 (7th Cir. May 12, 2004), the Court determined that Plaintiff, a land developer, was not similarly situated to other developers whose permit requests were granted because the actual permit proposals were different; the timing of the respective applications was different; and the plaintiff sought to build a new structure whereas the alleged similarly situated developers were only adding on to existing structures. Id. at * 9.

Moreover, in City of Cleburne, *supra*, which involved a zoning exclusion of mentally retarded housing in a residential district, there was no question that the decision by the City of Cleburne to bring together a particular land use – various group homes – under a single zoning category was constitutional. Rather, Cleburne focused on the question whether within that category of use, it was rational to exclude homes with **identical effects** solely based on the identity of the occupants, who were mentally retarded. Id. at 447-50. In the instant case, Plaintiff cannot make such a "similarly situated" analogy as the plaintiffs were able to do in Cleburne. It is undisputed that there are no other active quarry properties in Whitemarsh Township. It is also undisputed that Plaintiff's property is the only property that was zoned HVY-X in Whitemarsh Township. Faced

-71-

with this basic set of facts, Plaintiff has attempted, in its Complaint and in discovery, to advance an argument that it is similarly situated to the KYW property adjacent to Quarry Hole No. 2.  To rezone HMI's property and not KYW's property, Plaintiff argues,  is a violation of HMI's equal protection rights.   Plaintiff also argues that it is similarly  situated to all  property owners/developers in the Township who, since January 1, 1996, have filed applications for land development for the Township and were approved.  Plaintiff's application for land development is the only one that has been denied by a Board resolution since January 1, 1996.  However, for the reasons set forth below, it is clear that Plaintiff's property  is not similarly situated to any of these other properties.

a.      Plaintiff's Property Is Not Similarly Situated
        To The KYW Property

The KYW property, zoned HVY-Industrial, is not a quarry.  It is a 15 acre lot consisting principally of a meadow.  One small building and a high radio transmitting tower are located on the property.  The property has been used in this fashion since World War II.  It generates little traffic, no appreciable noise and virtually no sewage or stormwater runoff.  There is little impervious coverage.  The intensity of the use of this property is minimal.

On the other hand, Plaintiff's property, zoned HVY-X, consists of three separate parcels which are 54 acres, 65 acres, and 197 acres, respectively.  Quarry Hole #1, consisting of 54 acres, is an old limestone quarry that is partially filled in.  Quarry Hole #2 consists of 65 acres and is in the process of being filled.  The third parcel, consisting of 193  acres, is a fully operating quarry with

-72-

an anticipated use as a quarry for the next 20 years.  All three parcels are in various stages of reclamation for adaptive reuse.[3]

Clearly, the KYW property and the quarry properties are completely different and no reasonable person could find that they are "similarly situated".  The difference in size alone demonstrates that development of the quarry properties for uses permitted under the HVY-X zoning but inconsistent with the surrounding zoning and uses would have an impact on the surrounding area far beyond a similar development of the KYW property.  They are also different in present use, intended use, zoning, impervious coverage and physical structure, just to name a few examples.  Any comparison of the properties is the proverbial "apples to oranges" comparison.  The Township's decision not to rezone such a dissimilar property is clearly not evidence of an equal protection violation.

> b.    Plaintiff's Property  Is Not Similarly Situated To Other Properties Whose Owners/Developers  Received  Land Development Approval From January 1, 1996 To March 21, 2002

Plaintiff maintains that no other land development plans in Whitemarsh Township were denied from January 1, 1996 to March 21, 2002.  Plaintiff has conveniently overlooked a proposed development at 4070 Butler Pike, which was denied preliminary plan approval on December 7, 1995.  Interestingly, as Zarko noted in his November 21, 1994 review letter, a portion of 4070 Butler Pike is a filled quarry (Exhibit "GGG", portion of Subdivision and Land Development file (SLD) #4-93

---

[3]Quarry Hole #3 is still an active quarry.  However, land development plans filed on October 18, 2001 reflect HMI's intention to eventually reclaim the property and develop it.

for 4070 Butler Pike, including resolution No. 95-51 denying applicant's preliminary plan, Zarko review letter of November 21, 1994 and Zoning Hearing Board decision of December 9, 1992). In that application, the developer needed and did in fact secure a variance for parking and a special exception for a detention basin in the front yard from the Zoning Hearing Board.. Despite that, the Board of Supervisors denied the applicant's preliminary plan, based upon Zarko's review letter.

Defendants do not contend that 4070 Butler Pike is at all similarly situated to HMI's property. The fact that Quarry Hole No. 1 is a partially filled quarry and 4070 Butler Pike is a filled quarry is nothing more than coincidence. However, if the Court agrees with Plaintiff's analysis that "similarly situated" in this case equates to any landowner in Whitemarsh Township who has applied for subdivision and land development approval, then 4070 Butler Pike is an example of such a landowner being denied approval by the Township's Board of Supervisors.

Plaintiff cannot demonstrate how its property is similar in all material respects to other properties that have proceeded through the subdivision and land development process in Whitemarsh Township. In response to Defendants' Request for Admissions seeking specific examples of those properties to which Plaintiff believes it was similarly situated, Plaintiff identified a number of properties represented by Subdivision and Land Development file numbers produced in discovery by the Township. (Exhibit "ZZ", Request for Admissions directed to Plaintiff and Plaintiff's Second Amended Response). **It is clear from the Second Amended Response that Plaintiff, other than merely identifying properties, is unable to demonstrate how these other properties are similar in all relevant aspects or material respects.** A review of just a few of those properties demonstrates that they all have distinct characteristics and thus are not "similar in all relevant

-74-

respects."  See Singh, *supra*; Ercegovich, *supra*; Holifield, *supra*; Dartmouth Review, *supra*; Dill,

*supra*.:

1.    SLD #10-96; Garrison Greene
   a)    Zoning:  Apartment-Highrise
   b)    Size:   19.45 acres
   c)    Proposed development:  Townhouses

(See also, Exhibit "HHH", Zarko review letter of September 8, 1998)

2.    SLD # 13-96; Andorra Glen Apartment
   a)    Zoning: Apartment-Highrise
   b)    Size:   18.1 acres
   c)    Proposed development:  5 buildings, 139 apartment units, 3,000 square feet
          of office space, 46 space garage

(See also Exhibit "III", Zarko review letter of January 31, 1997)

3.    SLD #21-96; Whitemarsh Chase (Exhibit "JJJ")
   a)    Zoning: AAA Residential
   b)    Size:   30.1 acres
   c)    Proposed development: proposed cluster development of subdivided 22
          single family residential lots on 17.9 acres with 22 acres devoted to open
          space, requiring conditional use permit and zoning variance

(See also Exhibit "JJJ", Zarko review letter of July 24, 2000)

4.    SLD #15-97; Butler Commons/Vanguard
   a)    Zoning: Limited Industrial
   b)    Size:
   c)    Proposed development: one additional office building of 29,000 square feet,
          requiring variances from the zoning ordinance with regard to proposed
          setbacks, parking space separations and sign locations and dimensions; the
          same property that the Board of Supervisors denied land development
          approval in December, 1995;

(See also Exhibit "KKK", Zarko review letter of October 28, 1997 and Zarko Memorandum
of December 15, 1998 concerning conditional use application)

5.      SLD #7-98; River Park/Simpson Paper

     a)      Zoning: Heavy Industrial

     b)      Size:   24.5 acres

     c)      Proposed development: conversion of warehouse to 239,000 square feet of office space with 674 parking spaces;

(See also, Exhibit "LLL", Zarko review letter of July 23, 1998)

6.      SLD # 5-99; Miquon Preserve

     a)      Zoning: AAAA Residential

     b)      Size:   65 acres

     c)      Proposed development: Proposed development; residential subdivision of 5 lots, the minimum size of which was7.5 acres

(See also, Exhibit "MMM", Zarko review letter of July 12, 1999)

7.      SLD #01-02; Ace Clubhouse at ACE Center Golf Course

     a)      Zoning: AA and AAA Residential with Recreational overlay

     b)      Size:   306.67 acres

     c)      Proposed development: accessory use to construct on golf course property a 40,000 square foot, 2 story clubhouse, storage building and nearby maintenance equipment shop.

(See also, Exhibit "OOO", Zarko review letter of February 20, 2002).

In several cases, the developers of the seven properties outlined above were required to and did in fact apply for and secure variances from the Zoning Hearing Board.  HMI steadfastly refused to seek variances, despite being told that it needed such relief.

A comparison of Plaintiff's property and just its zoning, its size and proposed development clearly show that the seven properties above and the quarry properties of HMI are not similar in all respects.  Rather, they are different in all respects.  That comparison and a comparison of Zarko's review letters also demonstrate the idiosyncratic nature of development, particularly when one considers that HMI's quarries are the only ones in Whitemarsh Township and that their zoning as

HVY-X was unique. Therefore, HMI's property is not similarly situated to other properties which have gone through the land development process in Whitemarsh Township.

>    3.    Plaintiff's Preliminary Plan Application Was Treated The Same As Other Previously Filed Applications

Even if this Court were somehow to find that Plaintiff's property was similarly situated to all other properties which had previously proceeded through the subdivision and land development process, a review of those files in comparison to HMI's application demonstrates that the HMI plans were treated the same, albeit with different results. 4070 Butler Pike was denied preliminary plan approval on December 7, 1995. The seven properties reviewed in the previous section all received approval. Many other properties received approvals as well. However, there was no disparity of treatment because each plan was reviewed in exactly the same manner by Zarko and against the same ordinances: Zoning, SALDO and Grading.

Zarko performed consistent reviews of all the plans. He always pointed out violations of the Zoning Ordinance where applicable. In each instance, either plan revisions were made by the developer which eliminated the zoning violations or relief from the Zoning Hearing Board was secured before preliminary plan approval was given by the Board of Supervisors. In addition, Zarko consistently applied design standards in Article V of the SALDO as part of his preliminary plan review. Included in those reviews were provisions of the Grading Ordinance.

As highlighted earlier in this Memorandum, none of the three preliminary plans filed by HMI (preliminary plan, first revision, second revision) ever complied with the Township's Zoning, SALDO and Grading Ordinance). Under those circumstances, the Board was justified in refusing

the offered extension of time.  If the Court were to find that other properties were similarly situated and that the failure to accept the offered extension of time was a difference in treatment, there was a rational basis for the difference: HMI's failure to demonstrate progress on its plans, failure to apply for zoning relief, failure to file compliant plans, persistence in pursuing a mixed-use plan which was not permitted under the zoning and was conceptually inappropriate for the area, all of which justifiably led the Supervisors to believe that HMI had no intention of ever proceeding with its all-office plans.  Therefore, the Board's actions were not only rationally based, but also appropriate.

      D.       The Individual Defendants Are Entitled To Qualified Immunity

              1.      The Law Of Qualified Immunity

In Anderson v. Creighton, 483 U.S. 635 (1987), the Supreme Court confirmed that the test for qualified immunity is "whether a reasonable officer could have believed [the challenged action] to be lawful in light of clearly established law and information the officers possessed".  Id. at 641. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  The issue of qualified immunity is for the Court to decide.  Hunter v. Bryant, 112 S.Ct. 534, 537 (1991).

"Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Wilson v. Layne, 526 U.S. 603, 609 (1999) (citations omitted).  "Even where the officials should have been aware of the governing legal principals, they are nevertheless entitled to immunity, if based on the information available to them, they could have believed their conduct would be consistent with those

principles.  Good v. Dauphin Cty. Soc. Serv. for Children & Youth, 891 F.2d 1087, 1092 (3d Cir.

1989).   Thus, the qualified immunity inquiry necessarily requires the court to examine the

defendants' conduct and determine the "objective legal reasonableness of the defendants' actions."

Gruenke v. Seip, 225 F.3d 290, 299 (3d Cir. 2000).   As the Third Circuit observed in In re:

Montgomery County, 215 F.3d 367, 374, 375 (3d Cir. 2000),

> [A]n immune official(s) right to avoid trial is based not on an
> individual's desire to avoid the personal cost and aggravations of
> presenting a defense.  Rather, the right not to stand trial is based on
> far broader concerns for avoiding the social costs of the underlying
> litigation, and for insuring and preserving the effectiveness of
> government.  See Harlow v. Fitzgerald, 457 U.S. 800, 806, 102 S.Ct.
> 2727, 73 L.#d2d 396 (1982).  The concern is that, absent immunity
> from suit as well as liability, the attention of public officials will be
> diverted from important public issues.   Additionally, qualified
> individuals might avoid public service altogether, while the threat of
> litigation may undermine the willingness of those who do serve to act
> when action is necessary.  See, i.d. at 814, 102 S.Ct. 2727.

An error of law, even one which motivates a decision, is not sufficient to establish a substantive due

process claim.  Sameric v. City of Philadelphia, 142 F.3d 582, 593-94 (3d Cir. 1998).

Crucial to the resolution of any assertion of qualified immunity is a careful examination of

the record to establish for purposes of summary judgment a detailed factual description of the actions

of each individual defendant.  Grant v. City of Pittsburgh, et al., 98 F.3d 116, 122 (3d Cir. 1996).

The Court must analyze the specific conduct of each individual defendant with respect to the

constitutional right at issue.  Id.

Moreover, the burden of proof remains on the plaintiff: a defendant need only identify those

claims that are deficient within a complaint, without engaging in a lengthy defense of his conduct

to support a motion for summary judgment.  Grant v. City of Pittsburgh, 98 F.3d 116, 126 (3d Cir.

1996).  Furthermore, <u>Grant</u> requires that there be an examination of the record regarding each

individual's conduct in relation to the constitutional right allegedly violated.  Where plaintiffs are

unable, pre-trial, to show the existence of facts necessary to sustain claims against civic officials and

to pierce their presumed immunity, federal courts should not hesitate to terminate such claims at the

earliest opportunity and to remove the sword of Damocles which would otherwise overhang such

officials in the continued performance of their duties.

Plaintiff's Complaint alleges that the Supervisors acted with improper motive in rezoning

this property and denying Plaintiff's application for preliminary plan approval.  Obviously, following

the filing of the Complaint in this case, the Third Circuit decided the case of <u>United Artists Theatre</u>

<u>Circuit, Inc. v. Township of Warrington</u>, supra, which heightened the burden for a substantive due

process violation to "shocks the conscience".  The context of the <u>United Artists</u> case was an appeal

from a denial by the District Court of the Supervisors' Motion for Summary Judgement on their

claim for qualified immunity.  Accordingly, the "shocks the conscience" standard is also the standard

for determining qualified immunity in a substantive due process case.

This Court observed in <u>Keating v. Bucks County Water and Sewer Authority</u>, 2000 WL

1888770 (E.D. Pa. 2000), that the issue is whether the individual defendants could reasonably have

believed that their motivations in taking the actions they did were proper, even if they were not.  <u>Id</u>.

This Court also pointed out that where a plaintiff alleges an unconstitutional subjective intent, they

must proffer "particularized evidence of direct or circumstantial facts supporting the claim of an

improper motive in order to avoid summary judgement on qualified immunity grounds." <u>Id</u>. (quoting

<u>Sheppard v. Berman</u>, 94 F.3d 823, 828 (2d Cir. 1996)).  Applying the foregoing analysis in light of

the more recent pronouncement of the "shocks the conscience" standard in <u>United Artists</u>, the

-80-

Plaintiff must advance particularized evidence of each individual Defendant's conduct which "shocks the conscience". Discovery has demonstrated that none of the individual Defendants engaged in such conduct.

Therefore, the question is whether Plaintiff has produced sufficient evidence to create a genuine issue of material fact as to each individual Supervisor's liability for the alleged violation of Plaintiff's substantive due process rights and equal protection rights. Stated differently, the issue is whether there is sufficient evidence to find that each individual Supervisor's specific conduct shocked the conscience such that each individual Supervisor should be stripped of qualified immunity and forced to undergo trial with the possibility that each will be forced to pay a judgment from his or her personal assets. There is simply insufficient evidence on which to find that the Supervisors acted in such a manner as to shock the conscience.

### 2.     Thomas Zarko, Township Engineer

Thomas F. Zarko, at all times relevant, was acting in his capacity as the appointed Township Engineer. He performed timely reviews in accordance with instructions given to him by Township officials. His first review letter was issued on October 11, 2001 or exactly 31 days after the preliminary plans had been submitted to the Township. Similarly, he reviewed the first revised plans that had been submitted on December 24, 2001 by issuing his second review letter 31 days later on January 24, 2002. Finally, when directed by the Township staff and the Solicitor to promptly review the second revised plans that had been submitted on March 19, 2002, Zarko complied by issuing his review letter on March 21, 2002.

As can be seen by a review of each letter, (Exhibits "EE", "GG" and "WW"), Zarko complied with the requirements of the Municipalities Planning Code by pointing out each and every non-compliance, violation and deficiency with the Township's Zoning Ordinance, SALDO and Grading and Stormwater Ordinance. Zarko has consistently taken the position that each and every item of each of the three letters are preliminary plan requirements. Plaintiff has contended to the contrary, claiming that Mr. Zarko utilized final plan requirements in his last review letter which it claims is improper. The evidence presented in discovery demonstrates, at worst, that Zarko and Woodrow have a difference of professional opinions as to what is required in a preliminary plan pursuant to the Whitemarsh Township SALDO, Zoning Ordinance, Grading Ordinance and by the Municipalities Planning Code.

First, Zarko was the Engineer for many years in Whitemarsh Township. Woodrow was not. Second, Zarko provided reviews which were consistent throughout HMI's land development process. Finally, Zarko's consistency in applying the preliminary plan requirements of the SALDO, including its design standards, the Zoning Ordinance and the Grading Ordinance are demonstrated in four, non-related developments in which Woodrow was the developer's engineer. These include developments called Whitemarsh Commons, SLD #16-97; PQ Corporation, SLD #4-00; Germantown Pike Tract (720 Germantown Pike) SLD #11-97; and Cold Point Manor, SLD #1-03. A brief review of Zarko's review letters of the preliminary plans of each of those developments will show that many of his comments there are identical or similar to the comments he made in the three review letters issued in the HMI plans. This shows that Zarko has consistently applied the same ordinance provisions and sections to preliminary plans filed by other developers. (See Exhibits "OOO". Zarko review letter of December 16. 1997 of preliminary plans of Whitemarsh Commons, SLD #16-97; "PPP", Zarko

-82-

review letter of January 19, 2001 of preliminary plans of PQ Corporation, SLD #4-00; "QQQ", Zarko review letter of August 14, 1997 of preliminary plans of Germantown Pike Tract, SLD #11-97; "RRR", Zarko review letter of October 29, 2003 of preliminary plans of Cold Point Manor, SLD #10-03).   The same is true for the review letters issued by Zarko regarding the eight other developments identified in section IV.C of this Memorandum.  (Exhibits "GGG" through "NNN", inclusive).  Requirements for sewage facilities, planning modules, water service agreements, fire flow information, zoning ordinance requirements, PennDOT Highway occupancy permits, details of erosion and sedimentation control plans and approvals of those plans by the Montgomery County Conversation District and SALDO design criteria are seen throughout these review letters and in Zarko's review letters of HMI's preliminary plans.  To suggest that Zarko was inconsistent is to ignore all of these review letters, which are, to the contrary, uniformly consistent in the application of the Township ordinances by Zarko, yet with specific comments tailored to the unique nature of each development.

It should also be noted that Zarko's involvement with the rezoning process was limited to his review of the proposed EX-Extraction ordinance to determine if it was inconsistent with other provisions of the Zoning Ordinance and the preparation of metes and bounds descriptions for the three ordinances which rezoned Plaintiff's property.

Overall, the facts of this case as disclosed in discovery demonstrate that Thomas F. Zarko was doing nothing more than his job as the appointed Township Engineer.  From a purely objective standpoint, based on the information available to him, his conduct was reasonable.

3.     Supervisors Cornog And Zeock

Supervisors Cornog and Zeock were sworn into office in January 2002.  They were in office less than 90 days when the March 21, 2002 meeting occurred at which HMI's preliminary plan was denied by Resolution 2002-17.

Cornog and Zeock testified similarly with regard to the enactment of the Rezoning Ordinances on February 28, 2002.  Both were in favor of them because the changes were more in keeping with the surrounding area.  This was an objectively reasonable approach.

With regard to the denial of HMI's preliminary plans, both Cornog and Zeock objectively believed, based upon Zarko's review letter of March 21, 2002, that there were numerous violations of the Township's Zoning Ordinance, SALDO and Grading Ordinances.  They both deferred, as any local elected official would, to the professional engineer appointed by the Township to review subdivision and land development plans.  Their reliance and indeed deference to Thomas Zarko's expertise is objectively reasonable under the circumstances.

In light of the foregoing, both Cornog and Zeock acted in an objectively reasonable manner and are entitled to qualified immunity.

4.     Supervisors Younglove, Rimel and DeRosa

Although Supervisors Younglove, Rimel and DeRosa had been on the Board longer than Supervisors Cornog and Zeock, they took action to rezone the property for similar reasons cited by Cornog and Zeock; that is, they believed the HVY-X zoning was inappropriate for the site and that a residential use following extraction would be more appropriate given the surrounding zoning and uses of the properties.

-84-

These three Supervisors also deferred to Thomas Zarko's March 21, 2002 report and his sworn testimony at the March 21, 2002 meeting which served as the basis for Resolution 2002-17. Having had experience with Zarko in his capacity as the Township Engineer in numerous subdivision and land development applications, they relied upon his expertise and deferred to his comments that there were numerous non-compliances of the Township's ordinances. From a purely objective standpoint, the actions of the Supervisors could not be more reasonable. Although Plaintiff's counsel at each of the Supervisor's depositions, asked if they had done any independent investigation to determine if Zarko's comments were valid, such a procedure is not reasonable or customary in any municipality in Pennsylvania. That is the reason why municipalities have the authority to and in fact hire consulting engineers. An independent investigation by any of the Supervisors, none of whom are professional engineers, would have been useless and ineffective. Their reliance upon Zarko's expertise was normal, customary and objectively reasonable.

Under the circumstances, Younglove, Rimel and DeRosa acted in an objectively reasonable manner and are entitled to qualified immunity.

In light of all the foregoing, each of the Supervisors and Thomas Zarko are entitled to qualified immunity. The claims against each of these officials, in their individual capacities, should be dismissed.

V.     <u>CONCLUSION</u>

There are no genuine issues of material fact to prevent summary judgment in favor of Defendants on all three of Plaintiff's claims.  Plaintiff was not denied its constitutional rights to procedural due process, substantive due process or equal protection.  Therefore, Defendants respectfully request that this Honorable Court enter summary judgment in favor of all Defendants and against Plaintiff.

DEASEY, MAHONEY & BENDER, LTD.

BY:_____
　　　HARRY G. MAHONEY, ESQUIRE
　　　CARLA P. MARESCA, ESQUIRE
　　　Attorneys for Defendants, Whitemarsh Township, the Board of Supervisors of Whitemarsh Township, Ann D. Younglove, Ronald J. Derosa, William P. Rimel, Peter P. Cornog, Michael A. Zeock and Thomas F. Zarko

　　　Validation Codes: HM1224/CM853
　　　Suite 1300
　　　1800 John F. Kennedy Boulevard
　　　Philadelphia, PA 19103-2978
　　　(215) 587-9400
　　　(215) 587-9456 - fax

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.   :

          :  CIVIL ACTION NO. 02-cv-3212

  v.        :

          :

WHITEMARSH TOWNSHIP, MONTGOMERY :

COUNTY, PA, et al.     :

<u>CERTIFICATE OF SERVICE</u>

   I, Harry G. Mahoney, Esquire, hereby certify that a true and correct copy of Defendants

Whitemarsh Township, the Board of Supervisors of Whitemarsh Township, Ann D. Younglove,

Ronald J. Derosa, William P. Rimel, Peter P. Cornog, Michael A. Zeock and Thomas F. Zarko's

Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(b) was served this

date on all counsel of record in the manner indicated:

       By Hand Delivery:

       Walter M. Einhorn, Jr.,  Esquire

       Ballard, Spahr, Andrews & Ingersoll, LLP

       1735 Market Street, 51st Floor

       Philadelphia, PA 19103

       By First Class Mail:

       Kevan F. Hirsch, Esquire

       Kaplin, Stewart, Meloff, Reiter & Stein, P.C.

       350 Sentry Parkway

       Building 640

       Blue Bell, PA 19422

Date: _____    _____

HARRY G. MAHONEY, ESQUIRE