**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

HIGHWAY MATERIALS, INC.,           :
                                   :
          Plaintiff,               :
                                   :
     v.                            :      CIVIL ACTION NO. 02-3212
                                   :
WHITEMARSH TOWNSHIP *et al*,       :
                                   :
          Defendants.              :
                                   :

## ORDER

AND NOW, this _____ day of _____, 2004, upon consideration of defendants' Motion for Summary Judgment and plaintiff's opposition thereto, it is hereby ORDERED that the Motion is DENIED.

BY THE COURT:

_____
Robert F. Kelly, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIGHWAY MATERIALS, INC.,　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　Plaintiff,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　v.　　　　　　　　　　　　　　　:　　CIVIL ACTION NO. 02-3212
　　　　　　　　　　　　　　　　　　　　:
WHITEMARSH TOWNSHIP *et al*,　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　Defendants.　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:

## BRIEF OF PLAINTIFF HIGHWAY MATERIALS, INC.
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Michael Sklaroff (ID No. 03287)
Walter M. Einhorn, Jr. (ID No. 48733)
Lawrence D. Berger (ID No. 16028)
Arleigh P. Helfer, III (ID No. 84427)
Corey Field (ID No. 88650)
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

Attorneys for Plaintiff
Highway Materials, Inc.

Date:  August 11, 2004

## Table of Contents

I.     INTRODUCTION ..................................................................................1

II.    STATEMENT OF FACTS ....................................................................5

    A.    The Property .............................................................................5

    B.    The Development Process Begins. ............................................6

        1.    Without Notice, The Township Denies HMI's Stormwater
            Management Waiver Request. ...................................7

        2.    HMI's First Proposal Generates Strident Opposition. ................9

    C.    Spot Zoning of the Property .....................................................11

        1.    The Township Initially Promises A Comprehensive "Process" To
            Evaluate The Zoning On The Property. ...................................11

        2.    To Retaliate For HMI's Filing of Preliminary Plans, Defendants
            Abandon The "Process" And Rezone the Property. ...................14

    D.    The Township "Reviews" HMI's Preliminary Plans. ...................20

        1.    The Initial Review ...................................................20

        2.    The Revised Preliminary Plans ...................................................23

    E.    Defendants Schedule HMI's Revised Preliminary Plans "For Action"
      Without Warning or Explanation. ............................................29

    F.    Defendants Prepare To Deny the Revised Preliminary Plans. ...................33

    G.    The Township Denies HMI's Plans. ............................................37

        1.    The Show Trial. ...................................................38

        2.    The Prepackaged Denial ...................................................39

    H.    The Supervisors State "Reasons" For The Plan Denial. ...................41

    I.     The Defendants' Claims Of Plan Deficiencies Are False And Demonstrate
      Bad Faith. ............................................................................43

        1.    Berming/Chain Link Fencing/Barbed Wire/Warning Signs. ...................43

        2.    Detention Basin. ...................................................45

        3.    Sewer For The Project. ...................................................46

    J.     HMI's Second Revised Preliminary Plans Were Approvable. ...................47

    K.    Defendants' Actions Have Caused HMI Great Harm. ...................49

III.   ARGUMENT............................................................................................49

    A.    Summary Judgment Standards ...................................................49

    B.    Summary Judgment Should Be Denied With Respect To HMI's
      Substantive Due Process Claim. ............................................51

1.    For Purposes Of Evaluating A Substantive Due Process Violation, Defendants Who Have Time To Deliberate Are Judged Differently From Defendants In A "Hyperpressurized Environment."........................52

2.    The Opinions Of HMI's Experts Demonstrate That There Are Genuine Issues Of Material Fact Preventing Summary Judgment. ...........55

    (a)    An Expert Opinion By Itself Can Demonstrate The Existence Of Genuine Issues Of Material Fact..............................55

    (b)    The Jonas And Viscuso Opinions Demonstrate That There Are Genuine Issues Of Material Fact Preventing Summary Judgment ...................................................................................56

        (i)    Opinion Of Marc D. Jonas, Esquire...................................56

        (ii)    Opinion Of Joseph J. Viscuso, P.E. ..................................57

3.    None Of The Substantive Due Process Land Use Cases Cited By Defendants Is Even Remotely Similar To This Case. ...............................59

4.    The Individual Defendants Are Not Entitled To Qualified Immunity. ...........................................................................................62

    (a)    Engineer Zarko Is Not Entitled To Qualified Immunity ..............63

    (b)    The Supervisors Are Not Entitled To Qualified Immunity. ..........64

C.    Summary Judgment Should Be Denied With Respect To HMI's Equal Protection Claim. ........................................................................66

1.    Equal Protection Standards ........................................................66

2.    HMI Is Similarly Situated To Other Developers In Whitemarsh Township. ...............................................................................68

3.    Defendants Subjected HMI To Unprecedented Treatment:  The "Firsts.".................................................................................72

4.    A Review Of Other Land Redevelopment Files Demonstrates Defendants' Disparate Treatment of HMI. ...............................73

D.    Summary Judgment Should Be Denied With Respect To HMI's Procedural Due Process Claim. ...........................................................77

IV.    CONCLUSION....................................................................................81

# TABLE OF AUTHORITIES

## CASES

*Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191 (3d Cir. 1995) ......................55

*Associates in Obstetrics & Gynecology v. Upper Merion Township*, 270 F. Supp. 2d 633 (E.D.Pa. 2003) ...............................................54

*Barrington Cove, LP v. R.I. House & Mortg. Finance Corp.*, 246 F.3d 1 (1st Cir. 2001) ...........................................................69

*Bell v. Duperrault*, 367 F.3d 703 (7th Cir. 2004) .............................................71

*Blain v. Township of Radnor*, C.A. No. 02-CV-6684 (E.D.Pa. 2004)..............................60

*C&M Group, Inc. v. New Britain Township*, No. Civ. A. 90-4375, 1991 WL 25684 (E.D.Pa. 1991) .........................................77, 78

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................5, 49

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)........................................66

*City of Cuyahoga Falls v. Buckeye Community Hope Foundation*, 538 U.S. 188 (2003).................................................52

*Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985) ................................70

*Congregation Kol Ami v. Abington Township*, 309 F.3d 120 (3d Cir. 2002) ...................66

*Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135 (3d Cir. 2004) ...............5

*Corneal v. Jackson Township*, 313 F. Supp. 2d 457 (M.D.Pa. 2003), *aff'd*, 2004 WL 790315, 2004 U.S.App. LEXIS 7198 (3d Cir. 2004) ..........................................60

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)........................................52

*Dartmouth Review v. Dartmouth College*, 889 F.2d 13 (1st Cir. 1989), *overruled by Edcuadores Puretorriqueños en Acción v. Hernández*, 367 F.3d 61 (1st Cir. 2004)............................................................68

*Davis v. Guardian Life Insurance Co.*, 2000 U.S. Dist. LEXIS 719 (E.D.Pa. 2000).............................................................49

*de Botton v. Marple Township*, 689 F. Supp. 477 (E.D.Pa. 1988) ...................................79

*Dill v. Runyon*, Civ. A. No. 96-3584, 1997 WL 164275 (E.D.Pa. 1997) ......................... 68

*DeGussa Construction Chemical Operations, Inc. v. Berwind Corp.*, 280 F. Supp. 2d 393 (E.D.Pa. 2003) ............................................................................. 55

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1988) .................... 68

*Fred's Modern Contracting, Inc. v. Horsham Township*, C.A. No. 02-cv-0918 (E.D.Pa. 2004) ........................................................................................ 60

*Harlen Associate v. Village of Mineola*, 273 F.3d 494 (2d Cir. 2001) ............................. 69

*Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997) ............................................................ 68

*Iacobelli Construction, Inc. v. County of Monroe*, 32 F.3d 19 (2d Cir. 1994) ................. 55

*Jabbar Al-Samad v. Horn*, 913 F. Supp. 373 (E.D.Pa. 1995) ........................................... 69

*Keystone Outdoor Advertising Co., Inc. v. West Whiteland Township,* 2003 WL 1914157 64 Fed.Appx. 333 (3d Cir. 2003) .................................................... 60

*Levin v. Upper Makefield Tp.*, 2004 U.S. App. LEXIS 4457, 2004 WL 449189 90, Fed. Appx. 653 (3d Cir. 2004) ................................................................. 60

*Leipziger v. Township of Falls*, No. Civ. A. 00-1147, 2001 WL 111611 ......................... 77

*Lindquist v. Buckingham Township,* 2003 WL 22757894, (E.D.Pa. 2003), *aff'd,* 2004 WL 1598735 (3d Cir. 2004)- ...................................................... 59, 60

*Littlefield v. City of Afton*, 785 F.2d 596 (8th Cir. 1986) .................................................. 78

*McDonald v. Village of Winnetka*, 371 F.3d 992 (7th Cir. 2004) ...................................... 69

*Mendes-Silva v. United States*, 980 F.2d 1482 (D.C. Cir. 1993) ....................................... 55

*Montanye v. Wissahickon School District*, Civ. A. 02-8537, 2004 WL 540489 (E.D.Pa. Mar. 17, 2004) ..................................................................... 67, 69, 70

*Parrett v. Taylor*, 451 U.S. 527 (1981) ............................................................................. 77

*Publicker v. Commissioner of Internal Revenue*, 206 F.2d 250 (3d Cir. 1953) ............... 69

*Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004) ...................................................... 50

*Shumway v. United Parcel Serv.*, 118 F.3d 60 (2d Cir. 1997) ........................................... 68

*Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441 (1923) ........................................66

*Singh v. Wal-Mart Stores, Inc*., No. Civ. A. 98-1613, 1999 WL 374184 (E.D.Pa. June 10, 1999)........................................................................................68

*Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003) ...........................................53, 54

*Teed v. Hilltown Township*, No. Civ. A. 03-CV-6040, 2004 WL 1149486 (E.D.Pa. 2004) ......................................................................................67

*Thomas v. Newton International Enterprises*, 42 F.3d 1266 (9th Cir. 1994)....................55

*Thornbury Noble. Ltd., v. Thornbury Township*, C.A. No. 99-cv-6460 (E.D.Pa., October 21, 2003) ...............................................................................60

*United Artists Theater Circuit, Inc. v. Township of Warrington*, 316 F.3d 392 (3d Cir. 2003)................................................................................................52

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)...................................................66

*Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 22 F.3d 1260 (3d Cir. 1994) ....................................................................................................5

## FEDERAL STATUTES

42 U.S.C. §1981..............................................................................................68

42 U.S.C. §1983.....................................................................................50, *passim*

## PENNSYLVANIA STATUTES

53 P.S. §10508..........................................................................................20, 39

53 P.S. §10601 .................................................................................................15

53 P.S. §10909.1 ..............................................................................................80

53 P.S. §11001-A, *et seq.* ................................................................................80

65 Pa. C.S.A. §708......................................................................................15, 16

## I.     INTRODUCTION

The record here demonstrates a pattern of shameful, deceitful and concerted conduct on the part of local government officials who abused legislative and administrative powers conferred on them by state law to stop an as-of-right land development.  A precipitous spot-zoning and the subsequent subversion of the administrative process constituted retaliation against a landowner for the exercise of the right to initiate and pursue the approval process for an office park and violation of the landowner's rights to substantive and procedural due process and the equal protection of the laws.

Plaintiff, Highway Materials, Inc., ("HMI") submitted an application to Whitemarsh Township for approvals of an as-of-right office park development.  The application generated superheated opposition from a "no-growth" *ad hoc* group of Township residents.  Fearing the political clout of the group, the supervisors retaliated against HMI for proceeding to obtain approvals for its development and took steps to stop the development at all costs.  Beginning in October 2001 and continuing until March 2002, the supervisors (a) unlawfully (and hastily) spot-zoned the property to prohibit the permitted office use and (b) deliberately subverted the approval process to precipitate an unwarranted denial of preliminary land development approval.

Because a landowner in Pennsylvania has a vested right to approvals for as-of-right uses, confirmed in and governed by the Municipalities Planning Code, HMI was free to proceed to obtain its approvals in due course under the land development regulations notwithstanding the *ex post facto* spot-zoning of the property.  Under pressure to stop HMI's development at all costs, defendants[1] repudiated their statutory obligations as quasi-judicial administrative officers to

---

[1]     Defendants are Whitemarsh Township, the Board of Supervisors of Whitemarsh Township, Supervisors Ann D. Younglove, Ronald J. DeRosa, William P. Rimel, Peter P. Cornog and Michael Zeock and Township Engineer Thomas F. Zarko.

evaluate submissions for land development approval, abdicated their responsibilities to uphold the Constitution and applicable law and perverted due process to serve the no-growth agenda of the opposition.  As one of the defendants admitted, "I don't think there's anybody here on the Board who wants to see it [HMI's property] developed."

In retaliation for HMI's filing of development plans for an office park, defendants in October 2001 rezoned HMI's property from one of the most permissive zoning classifications in the Township (HVY-X Industrial, which permitted office parks) to one of the most restrictive zonings, *i.e.*, large-lot single-family residential housing.  Lest there be any doubt that this action was a reaction to public pressure, the zoning ordinance passed by the Township was essentially taken verbatim from a proposed ordinance submitted to the Township by the no-growth opponents themselves.  In hastily enacting the new zoning, the Township Supervisors abandoned a previously promised "process" for determining the appropriate uses for the property, not even waiting for their outside land planner to complete his review and analysis of the appropriate zoning.  As a result of the Township's all-out rush to placate the opposition in advance of the November 2001 elections, the new zoning was procedurally defective and needed to be completely re-enacted in February 2002.

Having submitted its office park plans in advance of the October 2001 rezoning, HMI was entitled by state law to have the plans evaluated under the previous, long established zoning.  As all defendants acknowledged, HMI would only become subject to the new zoning if and when its pre-existing plans were denied.  In other words, one more critical act – denial of HMI's land development plans – was necessary for defendants to carry out their scheme.

So, on March 21, 2002, about six months after HMI filed its initial plans and only <u>two</u> days after HMI filed revised plans, the Board of Supervisors denied HMI's submission.  In

addition to the fact, which defendants have acknowledged, that there was no need to act so quickly, the reasons set forth for the denial of the plans were spurious.  For instance, one key reason for denial was that defendants contended that HMI was required to place a 15 foot high berm and six foot chain link fence (replete with barbed wire and warning signs) around its office park!  Tellingly, even defendants' own engineering expert admitted in his deposition that fencing was not required.

The procedure employed by defendants to deny the plans was also remarkable.  At the March 21 meeting at which the plans were denied, the Township took HMI by surprise and proceeded to place the plans "on trial."  The Township Solicitor had prepared a prepackaged denial resolution, pre-marked exhibits and arranged for a court reporter.  The solicitor proceeded to take sworn testimony from the Township Manager and the Township Engineer.  The Supervisors, who claimed they had not previously considered the merits of HMI's submission, declined to accept HMI's offer of a further extension of time, asked no questions of HMI, and then unanimously voted to deny the plans.  This precipitous action is all the more outrageous when one considers that the March 21 meeting was the first time the Board had considered the office park plans in a public setting.  At least one Supervisor had not even seen the plans before the meeting.

There is no doubt that HMI was singled out for this outrageous treatment.  First, the new zoning only targeted HMI's property.  In addition, the Township had never before declined a developer's offer of an extension of time.  And, most notably, since January 1, 1996 (the earliest date that HMI was permitted to examine the Township's files), the Township had never denied a land development plan of any sort.  Moreover, the plan denial had the most punitive consequences.  While most landowners could simply refile plans, HMI had no such option here

because the rezoning of its land coupled with the plan denial now relegated it to developing the property as large-lot single-family homes, if at all.

A careful review of the record at this juncture demonstrates that there are outstanding material issues of fact that preclude granting the defendants' motion for summary judgment. Read in a light favorable to plaintiff, the facts support claims of manifest violations of rights under the Fifth and Fourteenth Amendments. A reading of defendants' motion for summary judgment, however, would suggest that by adopting the "shocks-the-conscience" standard, the Court of Appeals has decided that landowners are no longer protected by the Fourteenth Amendment's guaranties of due process and equal protection. Of course, this is simply not true. There are limits to governmental conduct and federal courts must be ready to act when public officials exceed these limits. Whether defendants' conduct here – destroying HMI's property rights to the extent of $11.225 million – exceeds these limits should, with all due respect, be decided by a jury and not by the Court. Accordingly, defendants' motion for summary judgment should be denied.

## II.     STATEMENT OF FACTS [2]

### A.     The Property

HMI is the owner of a 309-acre tract of land in Whitemarsh Township, Pennsylvania (the "Property") that consists of three parcels. (*See* Deposition of Peter DePaul, the relevant portions of which are included in the Appendix [3] as Exhibit 1, at 39-40; Special Warranty Deed Between Corson Lime Company and Highway Materials, Inc., App., Exh. 2.) This lawsuit relates to one of these parcels, a 54-acre portion of the Property that was previously used as a quarry but which had been completely filled in when acquired by HMI in 1997 ("Parcel One"). The second parcel, "Parcel Two," is a 67-acre tract consisting largely of a quarry site that is in the process of being filled in. (*See* DePaul Dep., App., Exh. 1 at 42-43.) HMI also operates a concrete production business on this parcel. (*Id.* at 24-25.) "Parcel Three" is a 188-acre tract which contains an active quarry and a bituminous production business. (*See* Deposition of Patrick Callahan, App., Exh. 3 at 32-33.)

---

[2]     Each of the factual averments in this brief is supported by a specific citation to the record. This stands in stark contrast to defendants' brief, which contains "factual" averments with <u>no</u> citation to the record. HMI respectfully submits that defendants' "fast and loose" treatment of the so-called "facts" is reason in and of itself to deny their motion. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and <u>identifying</u> those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact") (emphasis added); *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 145-46 (3d Cir. 2004) (summary judgment for defendants partially reversed because of movant's failure to identify relevant parts of record); *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 22 F.3d 1260, 1273 (3d Cir. 1994) (same).

[3]     HMI has included its exhibits in an Appendix ("App."), filed herewith. Unless otherwise noted, exhibits cited in this memorandum of law are included in the Appendix and will be cited as "App., Exh. __."

For years, the Property had been zoned HVY-X Industrial. (*See* Defendants' Mem., Exh. D.) Exceptions are a small corner of Parcel One (zoned AA Residential) and about one-third of Parcel Three (zoned Limited-X or A Residential). (*See id.*) The HVY-X Industrial zoning permitted a broad range of uses, the principal exceptions being residential use and retail sales. (*See* Whitemarsh Code §116-155, Exhibit G to Defendants' Mem.) The Township Comprehensive Plan in effect at the time of HMI's acquisition of the Property and planned development also recommended a wide array of uses for the site, including "campus type limited industry, small site limited industry, heavy industry . . . and extractive industry." (*See* 1965 Whitemarsh Township Comprehensive Plan, App., Exh. 82)[4]

Because HMI planned to develop the Property, HMI carefully investigated the zoning and permitted uses for the Property before acquiring it. (App., Exh. 1 at 41-49.) HMI assembled a due-diligence team, comprised in part of outside consultants, including a lawyer and an appraiser, who appraised the Property, explored the development possibilities of Parcel One and reviewed the Township zoning ordinance and zoning map to determine what uses were permitted. (*Id.*) Based on this investigation, HMI determined that Parcel One could be profitably redeveloped as an all-office complex or "flex space," which is a combination of office and industrial uses. (*Id.* at 48-49.) Relying on this information, HMI acquired the Property in 1997. (*Id.* at 23, 39-40.)

**B.    The Development Process Begins.**

In 1999, HMI engaged a team of consultants including attorney James Garrity, engineer Timothy Woodrow, and land planner E. Van Rieker, to explore development of Parcel One.

---

[4]    In addition, the Township's draft comprehensive plan update dated June 2001 proposed light industrial and office park development for the Property. (App., Exh. 40.)

(Deposition of James Garrity, App., Exh. 4 at 47-50; Deposition of Timothy Woodrow, App., Exh. 5 at 13-14.)  As early as September 1999, representatives of HMI met with representatives of the Township to discuss HMI's "flex space" concept.  (*See* Declaration of James J. Garrity, App., Exh. 83 at ¶4.)  By early 2000, however, HMI's plans began to move away from "flex space" and towards an all-office-park plan.

### 1.    Without Notice, The Township Denies HMI's Stormwater Management Waiver Request.

As part of the preliminary planning process for the office park, Mr. Woodrow (on behalf of HMI) requested a waiver from one of the Township's stringent stormwater management requirements.[5]  (*See* Garrity Dep., App., Exh. 4 at 153-54; May 30, 2000 Letter from Woodrow to Ford, App., Exh. 6.)  HMI's consultant thought that knowing the outcome of the waiver request would enable HMI to more quickly and easily develop the project, since stormwater management is an important part of the land development process.  (*See* Garrity Dep., App., Exh. 4 at 154-55; Declaration of Timothy P. Woodrow, App., Exh. 84 at ¶5.)  Defendant Thomas Zarko, the Township Engineer, requested that Mr. Woodrow submit plans that would show what the site would look like if HMI complied with the existing requirements and what the site would look like if the waiver were granted.  (*See* Deposition of Thomas Zarko, App., Exh. 7; April 18, 2000 Letter from Zarko to Woodrow, App., Exh. 8.)  Mr. Woodrow did so, in fact submitting three plans, each of which depicted a detention pond on the small area of Parcel One zoned AA

---

[5]    Under the Township regulations, in calculating the required size of a planned development's stormwater facilities, a developer must account for the difference between the stormwater runoff the project will create and the runoff a hypothetical "meadow" would create at the site, regardless of the pre-development condition of the site.  (*See* App., Exh. 6.)  Because Parcel One was a hard-packed, virtually grassless surface (and nothing like a meadow), HMI requested a waiver from this "meadow" requirement.  The waiver, if granted, would have permitted HMI to build smaller stormwater facilities.  (*See* Woodrow Dec., App. Exh. 84 at ¶5.)

7

Residential.  (*See* June 23, 2000 Memorandum from Zarko to Gregan, App., Exh. 9, at Exhs. A-C.)  One plan showed the pond on the AA Residential portion <u>and</u> a sedimentation basin encroaching onto the adjoining Philadelphia Cricket Club property, which is also zoned AA Residential.  (*Id.* at Exh. C; Zarko Dep., App., Exh. 7 at 217.)

Engineer Zarko recommended that the Board of Supervisors deny the waiver request because options were available to HMI that would comply with the stormwater ordinance, including the two plans that showed the detention pond on the area zoned AA Residential and the plan that showed the pond and sedimentation basin on the Cricket Club property (also zoned AA Residential).  (Zarko Dep., App., Exh. 7 at 217.)  He made this recommendation notwithstanding that the Cricket Club – the entity which would receive the slightly greater stormwater runoff from Parcel One if a waiver were granted – had no objection to the waiver request.  (*Id.* at 212.)

On July 13, 2000, the Board voted unanimously to deny the waiver.  (*See* Minutes of July 13, 2000 Board of Supervisors Meeting, App., Exh. 10 at 6.)  It did so, however, without giving any notice to HMI that the waiver request was going to be acted on at the meeting.  (App., Exh. 71, ¶24.)  This lack of notice was particularly egregious because HMI had specifically requested to appear before the Board on this issue.  (*See* Woodrow letter to Ford dated May 30, 2000, App., Exh. 6.)  This was no mistake or oversight by the Supervisors; they specifically noted that HMI's representatives were  not present at the meeting and proceeded to deny the waiver request anyway.  (Zarko Dep., App., Exh. 7 at 225.)

### 2.     HMI's First Proposal Generates Strident Opposition.

Undeterred by the Township's denial of the waiver request, HMI submitted a sketch plan[6] to the Township on November 30, 2000.  (*See* November 30, 2000 Letter from Garrity to Whitemarsh Township Planning Commission, App., Exh. 11.)  The sketch plan showed a "mixed-use" development of high-end office space and luxury apartments.  (*Id.*)  Because of the residential component, HMI would require a change in its zoning in order to build the mixed-use project.  (*See* Deposition of Marc D. Jonas, Esq., App., Exh. 12 at 81-82.)

In early 2001, the extremely high level of opposition to the development of Parcel One became evident.  For instance, the Whitemarsh Township Residents Association ("WTRA"), an *ad hoc* civic association recently created to oppose development in the Township, requested a meeting with representatives of HMI to discuss the development.  (Zarko Dep., App., Exh. 4. at 236-37.)   WTRA was (and is) a large and influential organization, claiming about 1,500 members in a Township with about 4,400 registered voters.  (Cornog Dep., App., Exh. 43 at 23-24.)  In addition, a resident near the property – Intervenor Donald S. Cohan – hired the law firm of Kaplin Stewart Meloff Reiter & Stein (the "Kaplin Firm") to oppose development of Parcel One.  (February 23, 2001 Letter from Kaplin to Whitemarsh Township Board of Supervisors and Planning Commission, App., Exh. 13.)  Cohan also took the remarkable step of hiring his own land planner to develop an office park sketch plan for Parcel One.  (*Id.*)  These plans, which were submitted to the Township in February 2001, allegedly demonstrated that the site could

---

[6]     Under the Township Subdivision and Land Development Ordinance ("SALDO"), land development plans are submitted in three distinct phases:  (i) a sketch plan, which is optional; (ii) a preliminary plan; and (iii) a final plan.  *See* SALDO § 115-12.  A copy of the SALDO is Exhibit H to the defendants' memorandum of law.

accommodate no more than 450,000 square feet of office space. (*Id.*; *see also* Hans Stein Conceptual Plan dated February 19, 2001, App., Exh. 14.)

The Whitemarsh Township Planning Commission held a meeting on February 27, 2001 to discuss the sketch plan. (*See* Minutes of February 27, 2001 Whitemarsh Township Planning Commission Meeting, App., Exh. 15.) Marc Kaplin of the Kaplin Firm and Kim Sheppard of the WTRA spoke out against the proposed mixed-use development of Parcel One, as did numerous other residents. (*Id.*) In addition, Attorney Kaplin presented the plans prepared for Mr. Cohan showing the 450,000 square feet all-office development. (*Id.*)

The Board of Supervisors was quick to embrace the opposition's no-growth position. At a Board meeting on March 1, 2001, Chairman Kramer stated: "As I said, I don't think there's anybody here on the Board who wants to see it [Parcel One] developed or anything developed, for that matter." (*See* Transcript of March 1, 2001 Board of Supervisors Meeting, App., Exh. 16 at 96.) This simple statement spoke volumes about the events that were to follow.

HMI presented its mixed-use sketch plan to the Supervisors. (*See* Minutes of May 24, 2001 Board of Supervisors Meeting, App., Exh. 17.) Members of the public and WTRA, as well as Marc Kaplin on behalf of Mr. Cohan, spoke out against the plan. (*Id.* at 1-3.) The Board's comments on the proposal could not have been less instructive or helpful. Chairman Kramer stated that he would like to see the Property zoned AAA Residential (one-acre minimum residential lots), Supervisors Graf and Rimel opined that the plan was "too dense," Supervisor DeRosa stated that "the plan is just one big parking lot," and Supervisor Younglove "concurred" that the proposal was "unacceptable." (*Id.* at 3.)

C.      **Spot Zoning of the Property**

      1.      **The Township Initially Promises A Comprehensive "Process" To Evaluate The Zoning On The Property.**

The next critical event occurred on July 3, 2001, when the Kaplin Firm, which by now represented WTRA as well as Mr. Cohan, submitted a proposed ordinance to the Township that would rezone the entire Property.[7]  (July 3, 2001 Letter from Marshall to Board of Supervisors, App., Exh. 18.)  That ordinance, which was accompanied by a petition signed by hundreds of people, proposed to restrict the Property to single-family houses on one-acre minimum lots.  (*Id.*)  The parties' legal experts agree that an effort by a group of neighbors to rezone a neighboring property is a rare occurrence indeed:  HMI's expert Marc Jonas described it as "highly unusual" and defendants' expert Gilbert High had never "seen it before."  (*See* Jonas Expert Report, App., Exh. 19 at 4; Deposition of Gilbert P. High, Jr., App., Exh. 20 at 59.)

At its July 12 meeting, the Board acknowledged receipt of the neighbors' petition.  (*See* Minutes of July 12, 2001 Board of Supervisors Meeting, App., Exh. 21.)  Because Section 116-239 of the Township Zoning Code (*see* Def. Mem. Exh. G) requires that the Board schedule a public hearing on such a petition only if certain numerical prerequisites are met, Township staff researched this issue to see whether a hearing was required.  (*See* July 18, 2001 Memorandum from Gregan to Board of Supervisors, App., Exh. 22.)  The staff concluded that the numerical prerequisites were not met, and advised the Board that no action was required on the neighbors' petition.  (*Id.*)  The staff also advised the Board that "[a]s written, the proposed Ordinance would

---

[7]      The influence of WTRA in Whitemarsh Township cannot be overstated.  For instance, earlier this year the Kaplin Firm, counsel for WTRA, was appointed Township Solicitor.  (*See* Minutes of January 5, 2004 Board of Supervisors Meeting, App., Exh. 85.)

require substantial revision before it could be advertised for consideration at a public hearing." (*Id.*)

Accordingly, the Board did not vote on the neighbors' petition. Rather, on July 13, 2001, the Township embarked on a course of action to engage land planners to "evaluate the appropriate zoning" for the Property and the adjoining KYW property which was similarly zoned HVY Industrial. (*See* July 13, 2001 Letter from Gregan to Garrity, App., Exh. 23.) Part of the land planner's duties was to review the neighbors' petition. (*Id.*; Deposition of Peter Simone, App., Exh. 24 at 21-22.)

The issuance of a request for proposals to professional planners, in the words of Chairman Kramer, was part of a "process" being undertaken by the Board:

> The Board of Supervisors has also been considering a process to evaluate the appropriate zoning for the site and its future development impact and to identify any options or zoning options that are compatible with the surrounding community and its uses.
>
> As a result, we are preparing, actually, an RFT [*sic*] for consideration at this meeting to solicit proposals from outside planning consultants to perform a study of the rezoning of the tract.

(*See* Transcript of July 26, 2001 Board of Supervisors Special Meeting, App., Exh. 25 at 4) (emphasis added). Chairman Kramer further stated that the Board felt that this approach would provide a "more comprehensive and thoughtful process for evaluating the future zoning" and that it "would be prudent to hire a full-time expert to consider this situation." (*Id.* at 6-7.) Indeed, hiring a land planner to evaluate the zoning on the Property was particularly prudent because the Supervisors did not believe that they personally had the expertise necessary to determine the appropriate zoning for an area. (*See* Deposition of Ann Younglove, App., Exh. 26 at 59-60; Deposition of Ronald DeRosa, App., Exh. 27 at 75; Deposition of William Rimel, App., Exh. 28 at 62-63.) In sum, at the outset the Township took a reasonable approach to the comprehensive

planning issues, notwithstanding the political pressure being applied by the opposition.  This reasonable approach, however, the so-called "process," was soon to be jettisoned by the Township.

Also at the special July 26 Board meeting, Chairman Kramer and Engineer Zarko discussed how long the land development process typically takes in Whitemarsh Township and the typical interaction between the developer and the Township:

> MR. KRAMER:  I don't think there's any development in any township that I know of that gets done in six months or gets through the process in six months, let alone start construction, unless it's a very small land development.
>
> Something of this size [Parcel One], I would imagine, might take as much as a year just to get the approvals.  But Tom Zarko's a Township Engineer and he can explain the process . . . Tom do you have a comment on that?
>
> MR. ZARKO:  Well, the subdivision land development process, the developer would require to submit a plan to the township staff to review . . . .
>
> Typically plans don't come in completely clean.  There are a number of comments that are made during the initial review that may be sent back to a developer or their engineer.  Usually there are a number of meetings to try and resolve issues, and the process goes on and on before a plan can even be considered for approval by the Board of Supervisors.  That's usually a several month process.  One of the plans needs preliminary approval and then it has to go to another phase, a final approval, where they go back and do the same thing all over again.
>
> And I think as Mr. Kramer had said, for significantly sized land development, I don't think a one-year time period to go through the various approvals would be unreasonable.

(App., Exh. 25 at 15-17) (emphasis added).

A review of other Whitemarsh Township land development applications reveals that significant projects can take years to complete.  And there is no doubt that HMI's project was significant – defendants have testified that it was to be as big as any other project in the Township's recent past, if not the biggest.  (*See* Zarko Dep., App., Exh. 7 at 100-01; Younglove Dep., App., Exh. 26 at 129; Deposition of William Kramer, App., Exh. 29 at 119-20.)  For

instance, Garrison Greene, a ninety-unit apartment complex, took almost 4 years to reach final approval. (*See* Board of Supervisors Resolution #2001-12, App., Exh. 30; Zarko Dep., App., Exh. 7 at 146.) Whitemarsh Chase, with twenty houses, took over 4½ years. (*See* Board of Supervisors Resolution #2001-21, App., Exh. 31; December 2, 1996 Letter from Zarko to Ford, App., Exh. 86.)

### 2. To Retaliate For HMI's Filing of Preliminary Plans, Defendants Abandon The "Process" And Rezone the Property.

Shortly after the July 26 meeting, HMI attorney James Garrity informed Township staff that HMI had decided to file an all-office plan and to forego the mixed-use proposal that would have required a zoning change. (*See* August 7, 2001 Memorandum from Gregan to Board of Supervisors, App., Exh. 32.) In what appears to be a patent act of retaliation, on or about August 1 Township staff (including Solicitor Weiss and Engineer Zarko) began to prepare an ordinance to rezone the Property to the one-acre minimum lot residential zoning submitted by the neighbors. (*See* August 1, 2001 Memorandum from Gregan to Weiss, Zarko, and Ford and related faxes, App., Exh. 33.) The Township decided to take this action <u>less than one week</u> after assuring HMI and the residents of the Township that the Board was going to engage a land planner as part of a "comprehensive and thoughtful process." (App., Exh. 25 at 6.) In addition, in order to keep HMI in the dark Solicitor Weiss assured Mr. Garrity that nothing was being done with the neighbors' petition, notwithstanding that Township staff was secretly moving forward to revise the neighbors' draft ordinance for the Board's consideration. (Zarko Dep., App., Exh. 4 at 82-83.)

An August 7, 2001 memorandum from Manager Gregan to the Board acknowledges that the Township's hurried efforts to rezone the Property were prompted by Mr. Garrity's advice that HMI was planning to file as-of-right development plans: "<u>As a result of that conversation</u>

[with Mr. Garrity], Ross [Weiss] and I have been discussing an option for the Board [to rezone the Property]."  (*See* App., Exh. 32.)[8]  Manager Gregan attached a draft ordinance to the memorandum and stated:  "It is basically the same as the draft submitted with the [neighbors'] petition . . . ."  (*Id.*) (emphasis added).  Less than a month earlier Gregan had advised the Board that the ordinance "would require substantial revision before it could be advertised for consideration at a public hearing."  (App., Exh. 22.)

The Township was now determined to rezone the Property.  In the August 7 memorandum Mr. Gregan advised the Board that the new ordinance could be authorized for advertisement as early as August 13.[9]  (*See* App., Exh. 32.)  As part of defendants' effort to hide the rezoning from HMI, the Board met in executive session twice to "discuss" the issue notwithstanding that at the public meetings the Board stated the sessions were to discuss "personnel" and /or "potential litigation" matters.  (*See* Minutes of August 9, 2001 Board of Supervisors Meeting, App., Exh. 34 at 4; Minutes of August 21, 2001 Board of Supervisors Meeting, App., Exh. 35 at 14.)  Proposing zoning ordinances are what townships are authorized to do under the Municipalities Planning Code  *See* 53 P.S. §10601.  Rezoning is neither a personnel matter nor a potential litigation matter.  Therefore, the announcement was not only intentionally deceptive, the actual discussion of the rezoning in executive session constituted a violation of the Sunshine Act.  *See* 65 Pa. C.S.A. §708.

---

[8]    The Court will recall that during discovery defendants fought unsuccessfully against the production and use of this memorandum.

[9]    Authorizing a proposed ordinance for advertising is the first step in the zoning process.  The proposed ordinance is then advertised, including notice of the date on which the board will consider it.  Finally, the board votes on the proposed ordinance.  (*See* Zoning Code § 116-237, Def. Mem. Exh. G; Gregan Dep., App., Exh. 38, at 42-43.)

Unaware of the Township's surreptitious steps to rezone the Property, HMI continued to prepare its land development plans for submission and, on September 10, submitted its preliminary plans for Parcel One (the "Preliminary Plans"). (*See* Creekside Commons Preliminary Land Development Plan, App., Exh. 36.) HMI proposed to develop "Creekside Commons," an office park consisting of 500,000 square feet of office space. Having no residential component, Creekside Commons was a permitted, "by-right," use under the HVY-X Industrial zoning. (*See* App., Exh. 71, ¶7.) As part of its submission, HMI representatives completed a Township document entitled "Application and Plan Requirements Checklist – Preliminary Plan." (*See* Checklist, App., Exh. 37.) This "checklist" purports to include the documents a developer must submit at the preliminary plan stage. (*See id*.; Deposition of Lawrence Gregan, App., Exh. 38 at 148.)

What happened next is truly remarkable. At the September 20, 2001 Board meeting, just <u>ten</u> days after the plans were filed, the Supervisors unanimously authorized the rezoning ordinance based on the neighbors' petition for advertisement. (*See* Minutes of September 20, 2001 Board of Supervisors Meeting, App., Exh. 39.) Amazingly, when confronted at their depositions with this "about-face" from the previous assurance of a "process," each of the defendants testified they had no idea how or why this item was placed on the September 20 agenda. (*See* Rimel Dep., App., Exh. 28 at 117; DeRosa Dep., App., Exh. 27 at 88-91; Kramer Dep., App., Exh. 29 at 49-50.) Even Mr. Gregan, who wrote the August 7 memorandum suggesting the rezoning and who prepared the agendas for the meetings, testified that he could not remember how the matter came up. (Gregan Dep., App., Exh. 38 at 98-100.) Supervisor Rimel, however, admitted in his deposition that the motive for the rezoning was retaliation:

Q.     Okay.  Well, what happened between July of '01 and September of '01 that necessitated or led to the Board of Supervisors advertising this ordinance for vote?

A.     The plan that Mr. DePaul submitted.

Q.     Is that the only thing?

A.     Yes.

(Rimel Dep., App., Exh. 28 at 90.)  Supervisor Younglove confirmed the retaliatory motive of

the Supervisors:

Q.     Okay.  But you'll agree with me that the KYW properties were not rezoned in October with the DePaul properties?

A.     The KYW properties were not rezoned, correct.

Q.     So why was there a time urgency to rule on the DePaul plans – the DePaul properties, I should say – and not on the KYW property?

MR. MAHONEY:  Objection to the form of the question.

Go ahead.

THE WITNESS:  Because the KYW property is – nothing – nothing was happening to the KYW property.

(Younglove Dep., App., Exh. 26 at 90-91.)  That this rush to rezone was retaliatory is made even

clearer when it is remembered that just two months earlier Township staff had concluded that no

action on the neighbors' petition was required by law.  (*See* App., Exh. 22.)

In addition to being retaliatory, the proposed rezoning was inconsistent with the draft

Whitemarsh Township Comprehensive Plan distributed in June 2001 to neighboring townships,

local school boards and other entities.  (*See* Whitemarsh Township Comprehensive Plan Draft

dated June 2001, a copy of the relevant portions of which is App., Exh. 40.)  The draft plan

explicitly endorsed the use proposed by HMI, recommending that the zoning on the Property be

changed "to permit light industrial and office park development."  (*Id.* at 50.)  The plan, authored

by the Montgomery County Planning Commission ("MCPC"), noted that this zoning "could be more compatible with the nearby residential uses." (*Id.*)

On October 15, the MCPC sent the Township a "report of our review and recommendations" in connection with the proposed rezoning. (October 15, 2001 Letter from Sandberg to Ford, App., Exh. 41.) The MCPC candidly recognized the "dramatic change" in the zoning and the legal issues that might result. It also recommended that the rezoning be considered "temporary":

> The current proposal is a dramatic change from what is currently permitted. Regarding any legal issues pertaining to this change we defer to the judgment of the Township Solicitor and Board of Supervisors. Recently the township interviewed consultants to develop a land use plan for this site, complete with zoning recommendations. Therefore we recommend that this zoning change be viewed as a temporary one and that once the consultants have developed a scenario that is acceptable to the township that the property be rezoned accordingly.

(*Id.* at 1) (emphasis added).

Two Supervisor seats were at stake in Whitemarsh Township in Fall 2001. Two of the candidates were defendants Peter Cornog and Michael Zeock. In his position statement, defendant Cornog described himself as "[o]ne of the early organizers and former Strategy Committee member" of the WTRA. (WTRA Issues Spotlight, App., Exh. 42 at 1). Defendant Zeock described his agenda as follows: "I believe the township should use all of its resources to find ways of stopping and preventing development in the interest of open space." (*Id.* at 5) (emphasis added). Both men were elected in November 2001 and took their seats in January 2002. (*See* Deposition of Peter Cornog, App., Exh. 43 at 11; Deposition of Michael Zeock, App., Exh. 44 at 9-10.)

With elections but two weeks away, the Board, under immense pressure, rezoned the Property on October 18, 2001 to a new and novel EX-Extraction District (the "Rezoning"), using

the same language, with very minor deviations, of the opposition's petition.[10]  (*See* Minutes of

October 18, 2001 Board of Supervisors Meeting, App., Exh. 45.)  The Rezoning purported to

restrict development of Parcel One to single-family detached homes on one-acre minimum lots

(and to restrict Parcels Two and Three in the same fashion once quarrying operations ceased).

(*Id.*)  That same night, immediately <u>after</u> and despite the Rezoning, the Supervisors took the

remarkable step of hiring the firm of Simone Jaffe Collins, Inc. ("Simone") to conduct the study

of the appropriate zoning for the Property and of the adjoining KYW transmission facility also

zoned HVY Industrial.[11]  (*Id.*)  The Board gave no reason why it had abandoned its "process"

and rezoned the Property without the benefit of the land use study.  (*Id.*)  **The Rezoning**

**targeted only the Property.**  Neither the KYW facility nor any other Township property zoned

for industrial use were rezoned.  (*Id.*)

Rushed and ill-advised – and intended to stop development on Parcel One – the Rezoning

was procedurally defective and had to be re-enacted four months later at the February 28, 2002

Board meeting.  (*See* Minutes of 2/28/02 Board of Supervisors Meeting, App., Exh. 46; Zeock

Dep., App., Exh. 44 at 32-33; Cornog Dep., App., Exh. 43 at 43-44.)  The land-use study

commissioned on October 18, 2001 had not yet been produced.  (*See* Cornog Dep., App.,

---

[10]  The speed with which defendants acted is amazing.  In the scant 28 days between the September 20 authorization and the October 18 vote, defendants prepared the legal notices relating to the proposed ordinance, arranged for the newspaper advertisement, posted the Property and received reviews from both the Township and Montgomery County Planning Commissions.  (*See* Gregan Dep., App., Exh. 38 at 114-17.)

[11]  At the October 18, 2001 meeting, Attorney Kaplin stated:  "I am leery to hire a planner to re-look at what you did today because I am scared that that gives a basis for a challenge that doesn't exist."  (*See* Transcript of October 18, 2001 Board of Supervisors meeting, App. Exh. 47, at 29.)  Attorney Kaplin also "strongly, strongly" urged the Board to "table the motion with regard to the planner, and reconsider it after you [the Board] have had a chance to talk to Ross [Solicitor Weiss] about what the effect of the two things [the Rezoning and the hiring of the land planner] happening on the same night might be."  (*Id.* at 30.)

Exh. 43 at 42-43; Simone Dep., App., Exh. 24 at 99.)    Indeed, the Simone study was not presented at a Board meeting until July 18, 2002.    (*See* Simone Dep., App., Exh. 24 at 94; Minutes of July 18, 2002 Board of Supervisors Meeting, App., Exh. 48.)  The Simone study offered several different alternatives for rezoning the Property, including one for an office park development.  (*See* April 9, 2003 Letter from Simone to Helfer and attached Land Use Study, App., Exh. 49.)  Finally, at the July 18 meeting, the Simone firm faulted the Rezoning because it "does not encourage flexibility."  (App., Exh. 48.)  However, no action was ever taken on any of the recommendations of the Simone study, presumably because they were inconsistent with defendants' scheme to block development of Parcel One.  (*See* Rimel Dep., App., Exh. 28 at 217.)

### D.    The Township "Reviews" HMI's Preliminary Plans.

Meanwhile, the Township began its review of HMI's Preliminary Plans.  So long as HMI's submission for land development was proceeding in the ordinary course, the Rezoning, being after the submission of the Preliminary Plans, was too late to apply to the Property. 53 P.S. §10508 (4)(i).  Accordingly, HMI was entitled to have its plans fairly evaluated under the Township's SALDO and the HVY-X Industrial zoning regulations.  (*Id.*)  Thus, in order to stop development of the Property, defendants needed to find a way to reject the Preliminary Plans. Once the plans were denied, Creekside Commons would be dead in the water, barring judicial intervention.  Any new plans would be restricted to single-family residential use under the new zoning.

### 1.    The Initial Review

In the normal course, a Township must act on land development plans within ninety days after the first Planning Commission meeting after the filing of the plans.  (Jonas Dep., App., Exh. 12 at 129-30.)  If no action is taken within the statutory time frame, the land development

plans are deemed approved. (*Id.* at 129-30; Rimel Dep., App., Exh. 28 at 142.) However, in the normal course of land development in Whitemarsh Township, the developer and the Township agree to an extension of this 90-day period. (Rimel Dep., App., Exh. 28 at 143; DeRosa Dep., App., Exh. 27 at 110-12.) In accordance with normal practice, HMI afforded the Township the routine extension of time. (Rimel Dep., App., Exh. 28 at 144; Letter of Extension dated 8/20/01, App., Exh. 50.) Accordingly, the Township did not need to be concerned that due consideration of the Preliminary Plans would result in a deemed approval. [12]

On October 11, 2001, Engineer Zarko submitted his first review of HMI's Preliminary Plans. (*See* October 11, 2001 Letter from Zarko to Ford, App., Exh. 51.) Four items that would eventually become major issues in this case were raised by the review: (i) despite the review and denial of HMI's stormwater management waiver request discussed at 7-8 above, the review stated that HMI's proposed detention pond was now <u>not</u> permitted in the area of Parcel One zoned AA Residential; (ii) Engineer Zarko applied more stringent <u>final</u> plan requirements to the Preliminary Plans, rather than the <u>preliminary</u> plan requirements set forth in the Township SALDO (and reflected in the preliminary plan checklist provided by the Township); (iii) Engineer Zarko stated that the office park had to be surrounded by a berm and a chain link fence replete with barbed-wire and warning signs; and (iv) certain sewer issues needed to be worked out. (*Id.*)

Addressing the sewer issue, Mr. Woodrow wrote Manager Gregan and Engineer Zarko on November 14 to request a meeting with Township staff "to discuss with you how we should

---

[12]    The extension essentially gave the Township an unlimited amount of time to act on HMI's plans. (*See* Exh. 50.) It also provided, however, that if HMI notified the Township that it wished to proceed with its plans or if HMI filed new or revised plans, the Township would have ninety days to act. (*Id.*)

proceed with providing sewer to our proposed project." (*See* November 14, 2001 Letter from Woodrow to Gregan and Zarko, App., Exh. 52.) Having received no response from the Township, Mr. Woodrow wrote on November 27 again to request a meeting with the Township to discuss sewer issues. (*See* November 27, 2001 Letter from Woodrow to Gregan and Zarko, App., Exh. 53.) For the first time, Mr. Woodrow specifically raised the possibility of HMI's constructing an on-site treatment plant for Creekside Commons.[13] (*Id.*) The on-site option presented a major advantage for the Township and its residents because it would obviate the need to rip up a portion of heavily traveled Stenton Avenue to connect Parcel One with the existing sewer lines. (*See* Garrity Dec., App., Exh. 83 at ¶5..) Still having heard nothing from the Township, Mr. Garrity wrote Manager Gregan and Solicitor Weiss on December 7 to request a response from the Township as to whether the Township preferred the on-site option or a connection to the public sewers. (*See* December 7, 2001 Letter from Garrity to Gregan and Weiss, App., Exh. 54.)

The Township's silence on the sewer matter – a major policy issue for the Township and a crucial feature of the development proposal – was consistent with a near total lack of cooperation from the Township once the Preliminary Plans were filed. Indeed, although defendants acknowledged in their depositions that the Township has a legal duty to cooperate with developers in connection with land development plans and put this requirement into effect in their standard procedures (Younglove Dep., App., Exh. 26 at 92; Cornog Dep., App., Exh. 43

---

[13] The Preliminary Plans had originally provided for public sewer service. (*See* App., Exh. 36; Woodrow Dep., App., Exh. 5 at 77-78; Garrity Dep., App., Exh. 4 at 179-80.) Consistent with the direction in Engineer Zarko's October 11, 2001 review letter and Pennsylvania Department of Environmental Protection rules, HMI had been exploring alternate sewer options for the project. (*See* Woodrow Dep., App., Exh. 5 at 78; Garrity Dep., App., Exh. 4 at 180-81.)

at 63-64; Zeock Dep., App., Exh. 44 at 58; Zarko Dep., App., Exh. 7 at 67-68), Solicitor Weiss has admitted that normal cooperation was being withheld from HMI. (*See* Transcript of 2/26/03 State Court Oral Argument, App., Exh. 55 at 30, 41.) At oral argument before Judge Albright of the Montgomery County Court of Common Pleas (in connection with HMI's state court appeal), Solicitor Weiss acknowledged that the Township had had no intention of cooperating with HMI and that he had responded to questions from Mr. Garrity as follows: "Jim, this is a controversial property. It's a controversial application. Do what you have to do. Don't ask me questions." (*Id.* at 30) (emphasis added). Solicitor Weiss also stated that he had told Mr. Garrity "repeatedly": "The Township is not going to work with you and help you on a controversial development for such a large piece of property. Do what you have to do." (*Id.* at 41) (emphasis added).[14]

### 2.    The Revised Preliminary Plans

HMI continued to proceed in good faith, however, and responded to Engineer Zarko's review letter by submitting revised plans on December 21 (the "Revised Preliminary Plans").[15] (*See* Letter from Woodrow to Zarko of 12/21/01, App., Exh. 56.) In his cover letter, Mr. Woodrow asked for clarification of the detention basin and berm/barbed wire comments and once again asked for a meeting to discuss sewer issues. (*Id.* at 1-2.) That same day, Mr. Garrity called Manager Gregan and Solicitor Weiss requesting a meeting to discuss sewer issues (for the

---

[14]    Mr. Garrity testified at his deposition that between October 2001 and January 2002, he requested a meeting with Township staff to discuss issues relating to Creekside Commons at least ten times. Finally, as discussed below, the Township scheduled a meeting for January 16, 2002. (Garrity Dep., App., Exh. 4 at 178-79.)

[15]    As Engineer Zarko acknowledged at the July 26, 2001 Board meeting discussed above, this interactive process – the Township making comments on plans and the developer trying to address them – is the typical practice in land development in Whitemarsh Township. (*See* App., Exh. 25 at 16-17.)

fifth time) and inquiring as to whether the Township might be interested in seeing another, less-intense, mixed use plan.  (*See* Garrity Dep., App., Exh. 4 at 139.)  Finally, the Township agreed to meet with HMI representatives on January 16, 2002.  (*Id.* at 139-40; Gregan Dep., App., Exh. 38 at 153-54.)  At the meeting, Township officials told the HMI representative that they would discuss the sewer options and the proposed mixed-use plan with the Board and get back to HMI.  (Garrity Dep., App., Exh. 4. at 185, 188, 196.)

Defendants' assertion that HMI never intended to build Creekside Commons, but rather was merely using it as a negotiating tool to procure the change in zoning necessary to build the mixed-use plan, is not supported by the evidence and is hotly disputed by plaintiffs.  To begin with, HMI would be delighted to proceed with Creekside Commons today.  Indeed, HMI principal Peter DePaul and the key members of the HMI team all testified that HMI would have been entirely satisfied to build the by-right Creekside Commons at all times and that they were proposing alternate mixed-use development because that use would generate less traffic and because the Township seemed to prefer it to an all-office plan.  (DePaul Dep., App., Exh. 1 at 6-7; Garrity Dep., App., Exh. 4 at 51-52, 97-98; Woodrow Dep., App., Exh. 5 at 166-67.)  Of course, since defendants' wrongful conduct prevented HMI from building Creekside Commons or, for that matter, anything other than single-family, one-acre minimum lots, HMI was not able to follow through with its office park.

Later, in January, 2002, Manager Gregan and Solicitor Weiss called Mr. Garrity.  (*See* Garrity Dep., App., Exh. 4 at 188) and advised that HMI should continue to show both sewer options (*i.e.*, using public sanitary sewers and using an on-site system) on their land development

plans for Creekside Commons so that the Board could decide which option it preferred.[16]  (*Id.* at

190.)   During the conversation, Messrs. Gregan and Weiss also advised that the Board had

agreed to schedule a public meeting on HMI's revised mixed-use plan.  (*Id.* at 196.)   In

accordance with Township direction, HMI submitted a mixed-use plan on February 12, 2002,

and a public meeting was scheduled for March 7, 2002.  (*Id.*)

In the meantime, on January 24, Engineer Zarko issued his review letter on the Revised

Preliminary Plans (*see* Letter from Zarko to Ford of 1/24/02, App., Exh. 59), which followed his

typical format.  (*See* Zarko Dep., App., Exh. 7 at 113-16 and 183-86.)   Specifically, the letter

began with a section entitled "Preliminary Plan Approval Requirements," which included many

comments about the plans.   He prefaced this list of items by stating:   "We [Engineer Zarko]

strongly recommend that the following issues be addressed by the applicant <u>prior to</u>

<u>consideration of preliminary plan approval by the Township.</u>"    (App., Exh. 59) (emphasis

added).   Engineer Zarko testified at his deposition that the Township <u>always</u> accepted this

recommendation and  <u>never</u> considered preliminary plans until the "preliminary plan approval

requirements" had been "addressed by the applicant."  (Zarko Dep., App., Exh. 7 at 184.)   The

review letter had two additional sections, "Waiver Requests" and "Preliminary Plan Approval

Considerations."   (App., Exh. 59 at 6.)   With respect to the 29 items listed under the latter

---

[16]    Defendants' claim that they told HMI that the Township had no preference as to what
sewer option was chosen is disputed by HMI and defies belief.  (*See* Def. Mem. at 22.)  First, in
connection with its motion to dismiss, the Township submitted an affidavit from Assistant
Township Manager Robert A. Ford in which he stated that the Township communicated to HMI
its alleged position of "no-preference" with respect to the sewer options.  (*See* Ford Affidavit,
App., Exh. 57.)   However, at his deposition Assistant Manager Ford stated that <u>he had no</u>
<u>personal knowledge (and indeed had never been told by anybody else) that such a</u>
<u>communication had in fact occurred.</u>  (*See* Deposition of Robert Ford, App., Exh. 58, at 154-56.)
Second, it should be obvious that no rational developer would place two sewer options on its
plans after being told it could pick whatever option it wanted.

category, Engineer Zarko wrote that "we believe these issues/items may be considered as conditions of preliminary plan approval." (*Id.*) (emphasis added). Notwithstanding this statement, most of these items eventually became reasons the Township used to deny HMI's plans. (*Compare* App., Exh. 59 *with* Resolution #2002-17 (the "Denial Resolution"), App., Exh. 60.)

In a memorandum transmitting the review letter to the Board and others, Assistant Manager Ford echoed Engineer Zarko's recommendation that the plans not be scheduled for a vote until HMI had addressed the outstanding issues. Assistant Manager Ford wrote: "The issues identified within this memorandum and the attached Township Engineer's Report . . . must be resolved by the applicant before Staff will schedule this before Planning Commission and Board of Supervisors." (*See* January 31, 2002 Memorandum from Ford to Board of Supervisors, *et al.*, App., Exh. 61 at 2) (emphasis added).

In his second review letter, Engineer Zarko once again raised the sewer issue, the issue of the detention pond in the area zoned AA Residential, and the alleged requirement that the office park be surrounded by a tall berm and barbed-wire fences with warning signs.[17] (*See* App., Exh. 59 at 1-3, 6.) Given the Township's direction a few days later that HMI should show both sewer options on its next set of plans, the sewer issue seemed to be coming to a resolution. In a letter to Solicitor Weiss on February 15, Mr. Garrity pointed out, *inter alia*, that Engineer Zarko's zoning interpretations were obviously incorrect: (i) the Zoning Ordinance clearly did not require a large berm and barbed-wire fence (with warning signs) to be placed around an

---

[17]   In so doing, Engineer Zarko completely ignored Mr. Woodrow's December 21, 2001 cover letter in which Mr. Woodrow specifically requested clarification of the detention pond and berm/fencing comments contained in Engineer Zarko's first review letter. (*See* App., Exh. 56.)

office park; and (ii) the detention basin was properly located on the AA Residential area.[18]  (*See* February 15, 2002 Letter from Garrity to Weiss, App., Exh. 62.)  Mr. Garrity concluded his letter by stating that "We appreciate your review of the thoughts expressed in this letter and we would be happy to discuss any of these issues [with the Township]."  (*Id.*)  Mr. Weiss did not respond, continuing the Township's refusal to cooperate with HMI due to the "controversial" nature of the project.  (App., Exh. 55 at 30, 41.)

In fact, the opposition and the defendants were so joined in their efforts to stop development that on February 4, the Kaplin Firm, counsel for Mr. Cohan and the WTRA, had taken the unprecedented step of secretly sending a legal memorandum to Township Solicitor Weiss to co-enable the Supervisors to turn the preliminary plan approval process against HMI. The memorandum purported to provide the Township with authority to cut short the normal review process and deny the plans before all the issues being raised in the Township Engineer's letters could be addressed by HMI.  (*See* February 4, 2002 Letter from Kaplin to Weiss and enclosed memorandum, App., Exh. 63.)  The memorandum even discussed the possibility that an amended plan submitted by HMI could be interpreted as a "new" plan, thereby immediately stripping HMI of rights vested before the retaliatory Rezoning.  (*Id.* at 4-6.)

This *ex parte* communication with the Township Solicitor concerning a pending plan was not brought to the attention of HMI by anyone from the Kaplin Firm or the Township until the existence of the memorandum slipped out during Mr. Kaplin's speech to the Planning Commission on March 19, 2002, in which he advocated refusing HMI's offer of an extension of

---

[18]    As mentioned, Engineer Zarko's comment that the detention pond is not permitted in the area of Parcel One zoned AA Residential is a complete reversal of his actions when he recommended denial of HMI's request for a stormwater management waiver.  There, Engineer Zarko endorsed the use of a detention pond in that very same area of Parcel One.

time and immediately denying the plans.[19]  (Garrity Dep., App., Exh. 4 at 231-35.)  The *ex parte* legal memorandum (and the care that was taken to keep it hidden from HMI) is just one further indication of a conspiracy among WTRA, the Kaplin Firm and defendants in looking for ways to subvert the approval process to stop HMI's development of Creekside Commons.  Interestingly, the very legal theory and case law advocated in the Kaplin Firm memorandum has found its way into defendants' Memorandum of Law now before this Court. (Defendants' Mem. at 65-66.)

On February 18, Mr. Woodrow responded to Engineer Zarko's review of the Revised Preliminary Plans.  (*See* February 18, 2002 Letter from Woodrow to Gregan, App., Exh. 64.) Mr. Woodrow updated the actions HMI was taking to deal with the Township's concerns and explained HMI still needed input from the Pennsylvania Department of Environmental Protection ("DEP") and defendants (on the sewer issues) and the Pennsylvania Department of Transportation ("PennDOT") and defendants (on changes to Stenton Avenue, which runs in front of Parcel One).  He also explained that HMI had just received the mandatory traffic study by the Township's consultant and was in the process of incorporating those comments into HMI's plans.  Mr. Woodrow concluded his letter with the following:

> Hopefully, when all of the necessary input from outside agencies (DEP, PennDOT, the Township's traffic consultant, etc.) is received we will be able to resubmit plans which comprehensively deal with all the issues raised in Mr. Zarko's recent letter and we will not need to impose upon the township with two or three sets of interim plans.  If, however, it is the Township's desire to see interim plans even though the necessary information from outside agencies is not currently available, we will be happy to do so.  Please let us know how the Supervisors and Mr. Zarko would like us to proceed.  If we do not hear from you to the contrary, we will assume that the procedure suggested in this letter is satisfactory.

---

[19]    While citizens may communicate with their Supervisors regarding legislative matters, the land development approval process is administrative, in the nature of judicial process, and *ex parte* communications are therefore improper.

(App., Exh. 64 at 2-3) (emphasis added.)  To this day, defendants have not advised HMI, either

orally or in writing, whether the procedure suggested in Mr. Woodrow's letter was satisfactory.[20]

> **E.    Defendants Schedule HMI's Revised Preliminary Plans "For Action" Without Warning or Explanation.**

The public hearing on HMI's compromise mixed-use sketch plan, scheduled for March 7,

2002, was held at Plymouth-Whitemarsh High School rather than the Township Building

because the Township was expecting a big crowd.  (Gregan Dep., App., Exh. 38 at 213.)  Indeed,

Mr. Gregan, the Township Manager for over 20 years, agreed that the proposed development of

Parcel One was "the single biggest project in terms of community interest in [his] tenure as

manager":

> Q.    Do you recall a public meeting on March 7th, 2002, in which some plans for the DePaul property were presented to the public?
>
> A.    Yes.
>
> *       *       *
>
> Q.    I gather you chose the high school as the site for this meeting because you knew that you'd be getting a big crowd?
>
> A.    We had a big crowd for every one of these meetings.
>
> Q.    Every one of the DePaul property meetings?

---

[20]    Defendants' contention that HMI somehow delayed requesting input from DEP and PennDOT is preposterous.  With respect to DEP, HMI had been requesting input from the Township on sewer options for months before the Township finally responded in late January 2002 that HMI should show both a sanitary sewer option and on-site system on its plans.  *See* discussion *supra* and *infra* at 24, 25, 26 and 46.  Upon receiving that direction, HMI promptly began pursuing a meeting with DEP.  *See* Letter from Woodrow to Gregan of 3/4/02, App., Exh. 65.  With respect to PennDOT, HMI did not even receive the Township's traffic study (paid for by HMI) until late February 2002.  (*See* Exh. 64 at 1; *see also* Woodrow Dep., App., Exh. 5 at 149.)  Upon receiving that study, HMI promptly began pursuing a meeting with PennDOT. (*See* App., Exh. 65.)

A.    DePaul property meetings.  We were on notice that there was a lot of people that were interested in these – any meetings involving this property and this project.

Q.    Is it fair to say that in your tenure as manager that this project generated as much community interest as any other project?

A.    Yes.

Q.    Would you classify it as perhaps the single biggest  project in terms of community interest in your tenure as manager?

A.    Yes.

(*Id.* at 213-14.)

The March 7 meeting on HMI's revised mixed-use sketch plan was well attended.  (*Id.* at 213.)   After HMI explained the mixed-use concept and how the concept would produce considerably less traffic than the all-office plan, the Supervisors made no comment whatsoever, but merely opened the floor for community reaction.  (*See* Minutes of March 7, 2002 Board of Supervisors Meeting, Exhibit S to defendants' memorandum.)  Many residents spoke against the plan.  (*Id.*)  Attorney Kaplin of the Kaplin Firm urged the Board to "level the playing field" by denying the pending as-of-right office park plans and then negotiating with HMI.  (*See* Garrity Dep., App., Exh. 4 at 103-04.)   The Board provided no substantive input on the plans. Supervisor Zeock noted that the project was "too intense" and that traffic and drainage were "big issues," and Supervisor DeRosa said that the project was "too intense" and that "he would prefer single-family development on the site."   (Defendants' Mem., Exh. S.)   The other three supervisors did not comment at all.  (*Id.*)

The very next day, the Township faxed to HMI's attorney a letter stating that the HMI plans for the as-of-right Creekside Commons development were scheduled "for action" by the Township Planning Commission, just eleven days later, on March 19, 2002.  (*See* March 8, 2002 Letter from Gregan to Garrity and Woodrow, App., Exh. 66.)  Apparently, the Supervisors had

decided to follow Mr. Kaplin's suggestion that the HMI plans be quickly denied before they could be brought into compliance, thus giving the defendants a huge advantage in any resulting negotiations over the future development of the Property. The March 8 letter also stated that the matter was scheduled "for action" by the Board at its meeting on March 21. (*Id.*) Inexplicably, the March 8 letter also, for the first time, authorized Engineer Zarko to meet with HMI, PennDOT and DEP regarding the improvements to Stenton Avenue and the sewer issues. (*Id.*) According to defendants, the only reason that the letter was sent when it was and set such a short time frame for decision was that 90 days was about to run from the filing of the Revised Preliminary Plans.[21] (*See* DeRosa Dep., App., Exh. 27 at 136-37; Rimel Dep., App., Exh. 28 at 176-77; Gregan Dep., App., Exh. 38 at 216-17.) Given the events of the two weeks leading up to the March 21 meeting, this testimony rings hollow.

Mr. Garrity testified about his reaction to the March 8, 2002 letter:

Q.    What was your initial reaction to reading Mr. Gregan's letter?

\*     \*     \*

A.    I guess, first, I found his letter a little bit confusing since it contained, in my opinion two mutually exclusive ideas:  one, that our plan would be scheduled for action in just a few weeks hence; and, two saying it was okay for their engineer to meet with us and PennDOT and DEP.  Those two provisions in Mr. Gregan's letter made no sense to me, that they were there together.

Q.    What was your other reaction?

A.    My other reaction was one of surprise, because I had no idea why the supervisors would be even thinking about that type of step only six months into a huge plan such as this without them or the planning commission having ever seen or discussed the plan in a public meeting.

---

[21]    As discussed *supra* at 21 n. 12, pursuant to the form extension agreed to by HMI and the Township, the Township had to act within 90 days of the receipt of revised plans.  (*See* App., Exh. 50.)

*      *      *

A.      I guess I was particularly shocked – shocked is the only word – at the timing of the letter, being that it came immediately the next day after the March 7th hearing; because the board of supervisors didn't have to give us a hearing on March 7th. And I had been cautiously optimistic after the January 16th meeting and the scheduling of the March 7th meeting that we were potentially on the road to a solution and to something that the township would find palatable.

And then the conduct at the March 7th meeting and this letter on March 8th seemed to completely and totally slam the door on any kind of amicable, reasoned calm solution.

(Garrity Dep., App., Exh. 4 at 203-04.)

On March 12, 2002, Mr. Garrity responded to Manager Gregan by confirming Mr. Woodrow's earlier comments about the essential need for input from PennDOT and DEP, and offering the Township a further extension of time so that the opinions of DEP, PennDOT and the Township could be obtained and incorporated into HMI's plans.[22]  (*Id.*)  (*See* March 12, 2002 Letter from Garrity to Gregan, App., Exh. 67.)  If the true reason for suddenly scheduling action on the Revised Preliminary Plans on short notice was the supposed expiration of the 90-day extension period, Garrity's offer of a further extension eliminated the need for immediate action.  Tellingly, the defendants did not accept the offer of an extension, but refused to budge from the March 21 meeting date and their plan to reject HMI's plans on that date, thereby

---

[22]    Defendants attempt to make much of Mr. Garrity's statement that HMI's Revised Preliminary Plans were not ready "for action," arguing that this is some sort of concession that the plans were deficient.  (Defendants' Mem. at 28-29.)  Defendants are wrong.  First, as discussed *infra*, HMI submitted Second Revised Preliminary Plans on March 19, 2002 that addressed many of the supposed deficiencies described by Engineer Zarko.  Second, as also discussed *infra*, the Second Revised Preliminary Plans were approvable.  Third, Mr. Garrity has testified that he did not investigate the merits of all of Engineer Zarko's review comments but left that to Mr. Woodrow.  (Garrity Dep., App., Exh. 4 at 208-09.)  Thus, he had no personal knowledge of whether the plans were in technical compliance with SALDO requirements.

depriving HMI of the right to develop Parcel One under the HVY-X zoning classification and imposing on HMI the single family residential zoning adopted several months previously.

Mr. Garrity also had several discussions with Solicitor Weiss in the time period between Manager Gregan's March 7 letter and the March 21 Board meeting:

> Q.    Did you contact Mr. Weiss to express your displeasure upon receiving the letter?
>
> A.    Yes.
>
> Q.    And tell me the conversation you had with him.
>
> A.    Between March 8 and March 21, there were many conversations between Mr. Weiss and I. I'm not sure if I remember what was specifically said on each of those. I think my initial one upon receiving Mr. Gregan's letter of March 8th would have been something to the effect of, "What the hell is going on?"
>
> Q.    What was his response?
>
> A.    <u>His response was, "You've got to take the heat off the supervisors. You've got to do something with your plans. Slow them down. Stop them. Put them on hold. Agree to a stay. Do something to get the heat off them, because I don't know what's going to happen otherwise."</u>
>
> And I said, "Well, look, there's no way these plans should be moving forward, and I'll grant you extensions, whatever is needed, but this plan has only been here six months. You guys haven't cooperated at all with giving us the information and direction that we need, and you have a legal responsibility to do that under Raum versus Tredyffrin Township," and you know, I said Raum versus Tredyffrin Township to Ross by then 10 times.
>
> And I was just – I just couldn't believe the township was going to act in the fashion, apparently, indicated by Mr. Gregan's letter. I was shocked.

(Garrity Dep., App., Exh. 4 at 205-06) (emphasis added).  Even in the face of Mr. Garrity's offers of an extension of time, however, the Township continued to hold the March 19 and 21 "for action" dates.

### F.    Defendants Prepare To Deny the Revised Preliminary Plans.

On or around March 18, Township staff began preparing a resolution to deny the Revised Preliminary Plans.  (*See* Draft Denial Resolutions, App., Exh. 68.)  Engineer Zarko, who was

central to this process, testified that he created the resolution on his computer system, basing it upon his January 24 review letter.[23]  (Zarko Dep., App., Exh. 7 at 179.)  It is telling that staff did not create a draft resolution that would approve the Revised Preliminary Plans.  (*Id.* at 176.)

Some defendants have testified that the Township gave HMI repeated chances to address Engineer Zarko's comments on the plans and that somehow this makes the denial of HMI's plans appropriate.  (*See* DeRosa Dep., App., Exh. 27 at 158-66; Rimel Dep., App., Exh. 28 at 137-39.) This testimony is not credible, however, because the Township obviously was getting ready to deny the plans after just one revision.  Multiple revisions are standard practice for a project so large as Creekside Commons.  (*See* Garrity Dec., App., Exh. 83 at ¶7; Woodrow Dec., App., Exh. 84 at ¶6.)  Moreover, as will be discussed *infra*, Engineer Zarko's comments were in any event invalid reasons for preliminary plan denial.

In preparation for the March 19 Planning Commission meeting and the March 21 Board meeting, HMI's Engineer Tim Woodrow filed a revised set of plans (the "Second Revised Preliminary Plans") with the Township on the afternoon of March 19.  (*See* March 19, 2002 Letter from Woodrow to Gregan, App., Exh. 69.)  The Township directed Mr. Woodrow to deliver a copy of the Second Revised Preliminary Plans to Township Engineer Zarko's office in Doylestown.  (*See* Gregan Dep., App., Exh. 38 at 263-64.)  Although not legally required to do so, Mr. Woodrow delivered the Second Revised Preliminary Plans to Engineer Zarko on the morning of March 20.  (*See* Zarko Dep., App., Exh. 7 at 152-53.)

On March 19, in the first public review of the Creekside Commons plans in any version since they were filed on September 10, 2001, the Planning Commission recommended denial of

---

[23]    Engineer Zarko stated that this was the only time in his tenure at Whitemarsh Township that he had <u>ever</u> created a denial resolution.  (Zarko Dep., App., Exh. 7 at 179-80.)

the plans. (*See* Transcript of March 19, 2002 Whitemarsh Township Planning Commission Meeting, App., Exh. 70 at 43-45.) The Commission did so without specifying even one instance where the plans failed to comply with Township ordinances or, as is customary, advising what steps would be necessary to bring the plans into compliance. (*See* Affidavit of James J. Garrity, Esq. dated September 6, 2002, App., Exh. 71, at ¶ 18.) Before the vote, Mr. Garrity had reiterated both his written offer of an extension of time and his offer of a "freeze" of all further action on the Creekside Commons plans in order to permit the Township to propose (and HMI to make) any changes, modifications or additions the Township deemed necessary to assure compliance. (*Id*.; App., Exh. 70 at 7-8.) These offers were ignored by the Planning Commission, just as they were being ignored by the Board and Township staff.

Remarkably, Engineer Zarko was able to review the Second Revised Plans in about 30 hours, completing another review letter by the late afternoon of March 21. (*See* March 21, 2002 Letter from Zarko to Ford, App., Exh. 72.) However, this letter deviated from his normal review letters in two respects. First, it was not divided into the typical sections entitled "Preliminary Plan Approval Requirements," and so on. (*See* discussion *supra* at 25-26.) Secondly, Zarko intentionally "jumbled" the items in the letter so that they appeared in an order different from the January 24 review letter. (*Compare* App., Exh. 72 *with* App., Exh. 59.) Engineer Zarko admitted that this deceptive change in format was directed by Solicitor Weiss: "It was the format that was suggested to me by the Solicitor." (Zarko Dep., App., Exh. 7 at 118; *see also* 111-13 and 185-86.) Engineer Zarko testified that he had never before been given such direction. (*Id*. at 114-16.)

Solicitor Weiss's direction (which Engineer Zarko followed) was critical to the Township's scheme because it had the effect of deleting from the letter Engineer Zarko's normal

"strong" recommendation that "Preliminary Plan Approval Requirements" be addressed by the applicant <u>prior</u> to consideration of preliminary plan approval by the Township" (*compare* App., Exh. 71 *with* App., Exh. 59), which would have been inconsistent with the rush to denial. Indeed, Engineer Zarko testified that whenever he made such a recommendation, the Board would not consider an applicant's plans:

> Q.      So this doesn't shake your confidence in your previous testimony . . . that, the Township doesn't act on items if you tell them that things need to be resolved first.
>
> A.      No, it doesn't shake my confidence.
>
> Q.      You still believe that?
>
> A.      Yes.

(Zarko Dep., App., Exh. 7 at 166; *see also* 184.)  Simply stated, by directing Engineer Zarko to change his normal review letter format to remove his usual recommendation, Solicitor Weiss paved the way for the vote of denial on the plans on March 21.[24]

Before the March 21 Board meeting, Township staff somehow created still another denial resolution based on Zarko's March 21 review letter, even though Zarko's overnight review of HMI's Second Revised Plans was only received hours before the meeting.  (*See* Zarko Dep., App., Exh. 7 at 186-89; Gregan Dep., App., Exh. 38 at 241-42.)  Once again, Township staff did <u>not</u> prepare a resolution approving the Second Revised Preliminary Plans.  (Younglove Dep., App., Exh. 26 at 16-17; Ford Dep., App., Exh. 58 at 209-10.)  Nor did the Township prepare a

---

[24]    The "jumbling" of the alleged plan deficiencies is just another indication that the Township knew its actions would result in immediate litigation.  Because of this "jumbling," it is very difficult to ascertain what the differences are between the January 24 and March 21 review letters, *e.g*., what are new items, what items had been deleted, and so on.  (*Compare* App., Exh. 59 *with* App., Exh. 72.)  None of defendants' witnesses have suggested any other purpose behind this obvious effort by defendants to conceal their wrongdoing.

resolution to extend the time to consider the plans.  (Ford Dep., App., Exh. 58 at 209-10.)

Clearly, the determination to deny the plans was not going to be sidetracked.

### G.      The Township Denies HMI's Plans.

Before the Board meeting, Mr. Garrity wrote Solicitor Weiss to offer the Township a

"freeze" of all activity on the Creekside Commons project and discussed (once again) his client's

willingness to work with the Board:

> Finally, I offered still another alternative to the Planning Commission at Tuesday night's meeting and I will offer that alternative to the Board of Supervisors at their meeting this evening.  Specifically, my client has authorized me to offer the Township a stay or a "freeze" of all activity on our plans for a period of forty-five (45) days.  During that freeze, the Township would have no responsibility to review or take any action upon our plans and we would have no responsibility to further revise the plans.  During this freeze, my client would be willing to meet as quickly and as often as the Township would like with a committee selected by the Board of Supervisors which could include members of the Board of Supervisors, members from the Planning Commission, a representative from the consulting firm hired by the Township to study appropriate zoning for the quarry areas, and perhaps one or two representatives from the community groups which have expressed interest in the development of our property.
>
> *          *          *
>
> My client remains more than willing to meet with the Supervisors under either of the extensions of time described above or under the freeze I have also suggested in this letter.  We have been ready and willing to participate in those discussions for almost two years and the Supervisors refusal to open a dialogue has both surprised and disappointed us.

*See* Letter from Garrity to Weiss of March 21, 2002, App., Exh. 73 at 2.[25]

---

[25]   Mr. Garrity also pointed out to Solicitor Weiss that the filing of the Second Revised Preliminary Plans on March 19 automatically triggered a 90-day extension of time (until June 19, 2002) under the extension HMI had signed in 2001.  (App., Exh. 50.) At his deposition, Solicitor Weiss agreed that the filing of the plans started a new 90-day period for defendants to act. (Deposition of Ross Weiss, Esq., App., Exh. 74 at 157.)  This fact also belies any testimony that there was any urgency for the Board to act on March 21.

### 1.    The Show Trial.

The March 21 Board meeting was a travesty.  Months of duplicity culminated in what proved to be the final step in defendants' conspiracy to deprive HMI of its as-of-right development of Creekside Commons.  Defendants' actions that day remove any doubt that their conduct was shameful and shocking.

First, in a sure sign of things to come, Engineer Zarko faxed Mr. Garrity a copy of his seven-page March 21 review letter at 5:20 p.m., only two hours before the meeting.  (Garrity Dep., App., Exh. 4 at 229.)  There had been no indication whatsoever to HMI that a review letter on the March 19 plans was being prepared for the March 21 meeting.  (*See* Garrity Declaration, App., Exh. 83 at ¶9.)  This late submission of the review letter that would form the basis for the resolution denying HMI's plans, coupled with the "jumbling" of the purported plan deficiencies, gave HMI no realistic chance of addressing alleged deficiencies that appeared for the first time in the letter.

At the meeting, Mr. Garrity made a short presentation on the plans, since they had never before been discussed at any public meeting of the Board.  (*See* Transcript of March 21, 2002 Board of Supervisors Meeting, App., Exh. 75 at 2-11.)  At the conclusion of the presentation, the Supervisors had no comments and asked no questions.  (*Id.* at 11.)  This conduct is almost unbelievable because at least one of the Supervisors represented that they had not even seen the by-right all-office plans before the meeting.  (Younglove Dep., App., Exh. 26 at 7-8.)[26]

At the end of Mr. Garrity's presentation, and with absolutely no prior notice to Mr. Garrity or any other representative of HMI, the defendants proceeded to put HMI's Second

---

[26]    Supervisor Cornog could not remember the first time he saw the all-office plans. (Cornog Dep., App., Exh. 43 at 78.)

Revised Preliminary Plans "on trial."  (*See* Garrity Dep., App., Exh. 4 at 223-24, 227.)  Solicitor Weiss had arranged for a court reporter, and proceeded to call witnesses (Manager Gregan and Engineer Zarko) and to take sworn testimony.  (*See* Transcript of March 21, 2002 Board of Supervisors Meeting, App., Exh. 75.)  Solicitor Weiss had even prepared pre-marked exhibits that he used with the witnesses.  (Garrity Dep., App., Exh. 4 at 227.)  Having received no notice from the Township that a hearing would be held, HMI had no opportunity to call or prepare witnesses or to submit exhibits to rebut the testimony of the Township witnesses.  (App., Exh. 71, ¶21.)  Although Mr. Garrity did conduct brief cross-examinations of the Township witnesses, lack of notice prevented him from preparing any witnesses of his own to rebut the Zarko review letter that had been faxed to him just two hours previously.  (*Id.*)

The Township's failure to give notice of this hearing is a direct violation of Section 508 of the MPC, 53 P.S. §10508(5), which requires that notice be given of a public hearing. Although the Township denies that the March 21 proceeding was a "hearing," its own legal expert conceded that the proceeding had all the hallmarks of a "hearing":

> Well, certainly the marking of all documents as exhibits takes place at a hearing. It would not normally take place at a meeting.  The cross-examination of witnesses is unusual when it's conducted in a meeting form, not unusual when it's conducted as a hearing.

(High Dep., App., Exh. 20 at 198-99; *see also* pp. 199-201.)

## 2.    The Prepackaged Denial

After the "trial" – <u>and with no deliberation or discussion whatsoever</u> – the Board unanimously rejected the Second Revised Preliminary Plans.  (*See* Tr. of March 21, 2002 Board of Supervisors Meeting, App., Exh. 75 at 110.)  It passed Resolution 2002-17 (the "Denial Resolution"), which was taken virtually verbatim from Engineer Zarko's review letter that was completed earlier in the day.  (*See* Denial Resolution, App., Exh. 60.)  Indeed, Engineer Zarko

had provided an electronic version of his letter to Manager Gregan so that Manager Gregan could use it to create the resolution. (*See* Zarko Dep., App., Exh. 7 at 189.) Taken at face value, defendants claim that Township staff and the Solicitor, acting in a vacuum – without direction from the defendant Supervisors – prepared a detailed denial resolution that the Supervisors happened to adopt without comment or review. Defendants' recounting of the events defies belief.

By voting on the plans, the Board rejected HMI's numerous offers of a further extension of time or a freeze that would have permitted HMI to address the concerns of the Township with respect to Creekside Commons. (*See* Tr. of March 21, 2002 Board of Supervisors Meeting, App., Exh. 75 at 85-89.) This is the only time the Township has ever rejected an offer of an extension of time from a developer. (*See* Gregan Dep., App., Exh. 38 at 140; DeRosa Dep., App., Exh. 27 at 111-12.) This decision not to accept the extension is noteworthy not only due to its unprecedented character, but also because the Supervisors have acknowledged that there would have been absolutely no disadvantage had the Township accepted the extension. (*See* Cornog Dep., App., Exh. 43 at 75; DeRosa Dep., App., Exh. 27 at 150-51.) And, conversely, there was no advantage to the Township in denying the extension. (*See* Zarko Dep., App., Exh. 7 at 64-66.)

The denial of the Second Revised Preliminary Plans was a unique occurrence in Whitemarsh Township. Indeed, no land development plans of any sort have been denied by the Township since the beginning of 1996.[27]

---

[27]    Defendants' claim that HMI has "conveniently overlooked" a 1995 plan denial is outrageous. (Defendants' Mem. at 73.) In discovery, defendants objected to HMI's request for Township land development files going back to 1980. (*See* Defs.' Objections and Response to HMI's First Request for Documents, App., Exh. 87, Nos. 24-26.) The parties reached an agreement that only files beginning with 1996 would be produced. (*See* March 28, 2003 Letter

(continued...)

### H.    The Supervisors State "Reasons" For The Plan Denial.

The Board members each gave similar reasons for voting against the Second Revised Preliminary Plans. Supervisor DeRosa stated he voted against the plans because in his view HMI had not made progress in the plans and because in his view HMI had no real intention of building Creekside Commons. (DeRosa Dep., App., Exh. 27 at 160-61, 165.) Supervisor Cornog gave the same reasons. (Cornog Dep., App., Exh. 43 at 87.) Supervisors Younglove, Rimel and Zeock stated that their reason for voting against the Second Revised Preliminary Plans was that they had not witnessed any progress on the project. (Zeock Dep., App., Exh. 44 at 98-99; Younglove Dep., App., Exh. 26 at 126; Rimel Dep., App., Exh. 28 at 183-84.)

In addition to being suspiciously consistent, HMI respectfully submits that a jury will not accept this testimony as credible. First, voting against a land development plan because of a belief that the owner was not really intending on building a project is simply nonsensical. Even putting aside the hundreds of thousands of dollars that HMI had invested in planning for Creekside Commons (*see* Supplemental Answer to Interrogatory No. 1, App., Exh. 104.), there is no reason to rush to deny a plan if it is not going to be pursued. The reason given by all of the Supervisors – that there had not been progress on the plans – is belied by the fact that six months is a <u>very</u> short period of time in which to complete plan review for a large project like Creekside Commons (indeed, virtually unheard of). (*See* Garrity Dep., App., Exh. 4 at 204-05; Jonas Dep., App., Exh. 12 at 118-20.) For instance, no large project in Whitemarsh Township has ever been

_____

(...continued)

from Einhorn to Mahoney, App., Exh. 88.) Having objected to producing land development files from 1995 and earlier, defendants should not now be permitted to introduce evidence of such files. If nothing else, defendants' effort to bring this 1995 file to the Court's attention shows the lengths to which they have gone to find <u>any evidence</u> of a developer being treated even slightly similarly to the unprecedented way that HMI was treated.

reviewed to completion in so short a time frame and, as mentioned, both Chairman Kramer and Engineer Zarko acknowledged that a one-year time frame was the norm. (*See* App., Exh. 25 at 15-17; and examples from SALDO files, *e.g.,* Resolution #98-28 (Andorra Glen Apartments), App., Exh. 89; Resolution #2001-21 (Whitemarsh Chase), App., Exh. 31.)  In the words of Chairman Kramer:  "I don't think there's any development in any township that … gets through the process in six months." (*See* App., Exh. 25 at 15.)

To the contrary, the evidence is sufficient for the jury to believe that the only real reason for the denial was to prevent development of the Property, consistent with the Board's stated desire in Summer 2001 and Supervisor Zeock's 2001 campaign promises. (App., Exh. 42; App., Exh. 16 at 96.)  The Township's own legal expert admitted that, in denying the plans when they did, the defendants ensured HMI would not be able to address the Township's concerns regarding Creekside Commons at some point in the future and thus would not be able to develop under the HVY-X Industrial zoning:

> The disadvantage to the township of continuing to process a plan that does not comply with its code is that at – and which is not in the best interest of the township, is that that plan may at some particular point in time be approved and its not in the best interest of the township.

*    *    *

> So the disadvantage to the community would be that a bad plan might eventually get approved because of the township codes being insufficient.

(High Dep., Exh. 20 at 211) (emphasis added).

What is clear, however, is that by rejecting the proffered extension of time and immediately voting to deny the plans, the Board knew that – absent judicial intervention – HMI would no longer be able to develop the Property under the HVY-X Industrial zoning.  To the contrary, HMI would now be subject to the highly restrictive one acre single-family zoning developed by the opposition and WTRA's counsel and enacted by the Board in a rush in October

2001.  (*See* Zeock Dep., App., Exh. 44 at 99; Rimel Dep., App., Exh. 28 at 102; Younglove Dep., App., Exh. 26 at 79-80.)  What is also clear is that the Supervisors did not ask Engineer Zarko a single question about his reasons for deeming the plans deficient.  (*See* DeRosa Dep., App., Exh. 27 at 154; Cornog Dep., App., Exh. 43 at 95.)  This is remarkable because:  (i) the Board knew that HMI was contending that Engineer  Zarko's comments were incorrect; and (ii) the Board members admitted that they themselves did not have the expertise to determine on their own whether Engineer Zarko's supposed plan defects were valid or not.  (*See* Cornog Dep., App., Exh. 43 at 97; Rimel Dep., App., Exh. 28 at 202; Gregan Dep., App., Exh. 38 at 244-45; Zeock Dep., App., Exh. 44 at 97.)  Obviously, the Supervisors were so determined to deny HMI's plans at any cost, to placate their constituents, that the fairness and appropriateness of the reasons for the denial were of no concern to them.

> **I.    The Defendants' Claims Of Plan Deficiencies Are False And Demonstrate Bad Faith.**

Throughout the litigation, the Township has continually focused on the alleged defects in HMI's plans relating to the fencing/berming around the office park, the detention basin in the area zoned AA Residential and the sewer to the project.  (*See, e.g.*, Def. Mem. at 20-27.)  For instance, Supervisor Rimel testified he would have "voted for an extension" had these issues been addressed.  (Rimel Dep., App., Exh. 28 at 137-39.) However, each so-called plan "defect" is patently spurious.   Defendants' claims are so far beyond the pale as to virtually eliminate any conclusion other than that the "defects" were simply pretexts for a prepackaged plan denial.

> **1.    Berming/Chain Link Fencing/Barbed Wire/Warning Signs.**

The first alleged zoning defect in the Second Revised Preliminary Plans does not, frankly, even pass the "straight-face" test.  Specifically, the Township contends that the plans were deficient because the proposed <u>office park</u> was not surrounded by:  (i) a berm with a

minimum height of 15 feet and a maximum height of 50 feet; and (ii) a chain link fence at least six feet in height, complete with three strands of barbed wire and warning signs every 100 feet." Zoning Code, Def. Mem. Exh. G, §116-156 B., C.  This contention is just as ridiculous as it sounds.

First, it is clear from the Zoning Code that these measures are only required when an extractive (quarry) use is contemplated.  Indeed, even the Township's own engineering expert admitted that these requirements did not apply to Creekside Commons.  (*See* James R. Majewski Dep., App. Exh. 76, at 70-71.)  In addition, since the berm must have planting "sufficient to screen the extractive industry operation," it too is obviously required only in the context of extractive uses.  (Zoning Code, Def. Mem. Exh. G, §116-156 B. (emphasis added); *see also* App., Exh. 19; Report of Joseph J. Viscuso, PE, PLS, App., Exh. 77).

Moreover, the very idea that a Township ordinance would require a 15-foot (minimum) berm and a 6-foot chain link fence (with barbed wire and warning signs) around an office park is absurd.  Engineer Zarko conceded that he had not seen such an arrangement "anywhere in the world."  (Zarko Dep., App., Exh. 7 at 262.)  In addition, Engineer Zarko had no idea what the warning signs would say in an office-park setting:

> Q.  Let me ask you this then:  what would the warning signs say?  What would you envision the warning signs to say on the fence around the office park?
>
> A.  I don't know what they would say.
>
> Q.  Danger, office park inside?
>
> A.  I don't know what they would say.

(*Id.* at 258.)

###### 2.    Detention Basin.

The Township's shocking conduct is also evident with respect to HMI's proposed detention basin on the triangular portion of Parcel One zoned AA Residential. According to defendants, the detention basin was not a "permitted use" in an area zoned AA Residential. However, a detention basin is not a permitted use in any zoning classification. (*See* Viscuso Dep., App., Exh. 90 at 38.) These basins, however, are a "required improvement" necessary in virtually all land development projects. (App., Exh. 77 at 1-2.) What's more, there are numerous detention basins in residential areas throughout the Township, including right next door to Parcel One on the Cricket Club property. (*See* Zarko Dep., App., Exh. 7 at 222-23.) Thus, there is no reason that the detention pond could not be placed in the area zoned AA Residential. (App., Exh. 77 at 1-2.)

Lest there be any doubt on this point, as mentioned, in Summer 2000 the Township denied HMI's request for a stormwater management waiver on the basis that HMI could place a detention basin in the area zoned AA Residential and additional storm water facilities on the Philadelphia Cricket Club (also zoned AA Residential). *See* discussion *supra* at 7-8. Simply stated, the idea that a Township would first deny a landowner's request for a waiver based upon the landowner's ability to place a detention basin in a particular area and then deny the landowner's development plans based on the assertion that the landowner could not place the basin in the same area is shocking.[28]

---

[28] Desperately trying to explain away this behavior, defendants assert that HMI somehow duped them by not properly showing on its plans (in 2000 and 2001) that the portion of the Property with the basin was zoned AA Residential. (Def. Mem. at 25.) This is wrong. First, all of the plans clearly do have a dotted line, identified as a "zoning boundary" line, between the area of Parcel One zoned HVY-X Industrial and the area zoned AA Residential. (*See, e.g.*, App., Exh. 9, Ex. 3, Def. Mem. Exh. RR.) Indeed, the Township's land planning expert had no problem identifying the zoning demarcation in the 2000 plans filed with the waiver request.

(continued...)

### 3.     Sewer For The Project.

The denial resolution also faulted the way that the Second Revised Preliminary Plans depicted the sewer to the site.  Once again, however, defendants' conduct on this issue is shameful.

First, with respect to the alleged plan deficiency that the plans showed <u>two</u> sewer options – a connection to the public sewer and an on-site treatment plant – HMI was simply doing what it was told by the Township.  Indeed, both Mr. Woodrow and Mr. Garrity testified that the Township specifically directed HMI to show both options on the plans so as to allow the Board to decide later which option it preferred.  (Garrity Dep., App., Exh. 4 at 187-88; Woodrow Dep., App., Exh. 5 at 154.)  Directing a landowner to put two sewer options on its land development plans for a major project – where denial could result in the loss forever of valuable, vested property rights – and then denying the plans for showing two options is governmental conduct that is reprehensible.[29]

The alleged deficiency regarding the setback violation is also frivolous.  This issue – that HMI's proposed on-site sewer system was less than 200 feet from the property line – was never raised by the Township until the last-minute March 21 review letter.  (Garrity Dep., App., Exh. 4

_____

(...continued)
(Charles L. Guttenplan Dep., App., Exh. 78 at 66-67.)  Likewise, Engineer Zarko had no problem identifying the two different zonings in the Preliminary Plans, as he identified the detention basin as an alleged deficiency in the plans in his first review letter.  (See App., Exh. 51.)  In addition, the Township zoning map in place in this time frame clearly shows the boundary between the HVY-X Industrial zoning and the AA Residential zoning.  (See Whitemarsh Township Zoning Map Revised April, 1995, App., Exh. 79.)

[29]     Defendants' argument on this point – that it never directed HMI to show both options (Def. Mem. at 22) – seems to overlook the fact that this is a motion for summary judgment.  Quite simply, this is a disputed issue of fact that cannot be resolved on a motion for summary judgment.

at 229.)  Engineer Zarko testified that  he "missed" this violation in his January 2002 review letter, notwithstanding that the sewer system was located in the exact same location on the Revised Preliminary Plans filed in December 2001.  (Zarko Dep., App., Exh. 7 at 253-54.)  Thus, HMI had no meaningful opportunity even to respond to this alleged deficiency.

This failure to give HMI a realistic chance to move the location of its on-site sewer system is critical because HMI could have easily done so.  (*See* Woodrow Dec., App., Exh. 84, at ¶8.)  Even defendants' engineering expert conceded that he knew of no reason HMI could not have relocated the sewer system had it been afforded a chance to do so.  (*See* Majewski Dep., App., Exh. 76 at 72.)

## J.    HMI's Second Revised Preliminary Plans Were Approvable.

Joseph J. Viscuso, P.E., engaged by HMI to provide the Court expert engineering testimony, stated in his report that the Creekside Commons plans filed on March 19, 2002 satisfied the requirements of SALDO Section 105-21, the Township provision that governs preliminary plans.  (App., Exh. 77, Executive Summary.)  Accordingly, defendants' denial of the Second Revised Preliminary Plans had no legitimate basis.

Mr. Viscuso also stated in his report that many of the so-called reasons for denial cited by the Township were <u>final</u>, not <u>preliminary</u> plan requirements.[30]  (*Id.*)  This opinion is consistent with the Township SALDO, which sets forth the differing purposes and requirements between a sketch plan (Section 105-13, 105-20), a preliminary plan (Sections 105-14, 105-21), and a final plan (Sections 105-15, 105-22).  As these provisions make clear, each step requires different levels of detail and completeness.  (*Id.*)

---

[30]    Marc Jonas, Esquire, HMI's legal expert, also opined that defendants wrongfully applied final plan requirements to HMI's Second Revised Preliminary Plans.  (App., Exh. 60 at 13.)

Defendants' position on this point is desperate and preposterous.  Apparently recognizing that they used <u>final</u> plan requirements to deny <u>preliminary</u> plans,[31] defendants contend that <u>any</u> plan must comply with <u>all</u> of the SALDO requirements.  (Majewski Dep., App., Exh. 76 at 28-29; Zarko Dep. at 84-87.)  Amazingly, defendants' engineering expert went so far as to say that sketch plans and preliminary plans must comply even with SALDO Section 105-22, despite the fact that that section is entitled "Final plan for major subdivision or land development." (Majewski Dep., App., Exh. 76 at 79; Def. Mem., Exh. H, §105-22.)  This "interpretation" of the SALDO must be rejected as an absurd, after-the-fact rationalization of defendants' conduct.

Indeed, even defendants' land planning expert Charles L. Guttenplan "questioned" whether the Township had applied final plan requirements to the Second Revised Preliminary Plans:

> A.    . . . When it gets into many of the other ones [reasons for denial] from the Subdivision and Land Development Ordinance or the grading and erosion control ordinance, there are some there that I would have a question about.
>
> Q.    What do you mean you have a question about?
>
> A.    Their applicability, those are the ones that I put in that questionable category.
>
> *    *    *
>
> Q.    Right.  Anything else?
>
> A.    It's just some that talk about the need for permits and certain documentation that, in my mind, were questionable and, therefore, might or might not be pertinent.
>
> Q.    So it's questionable in your mind as to whether those particular sections required compliance at the preliminary plan stage?

---

[31]    For instance, defendants denied the Second Revised Preliminary Plans because HMI failed to obtain a highway occupancy permit from PennDOT.  (App., Exh. 60, ¶2.3.)  However, the Township SALDO requires that the application to PennDOT be submitted <u>after</u> preliminary plan approval.  (Def. Mem. Exh. H, §105-22(B)(8)(e).)

A.     That's correct.

(Guttenplan Dep., App., Exh. 78 at 12-14.)  In sum, there is abundant evidence upon which a jury may find that HMI's Creekside Commons plans were approvable, and that they were denied by defendants solely to stop HMI's by-right development of Parcel One.

### K.     Defendants' Actions Have Caused HMI Great Harm.

As defendants knew, their conduct of unconstitutionally taking away HMI's development rights on Parcel One caused HMI great monetary damage.  By comparing the value of HMI's property rights before and after defendants' conduct, HMI's damages expert Michael Samuels, a respected and experienced real estate appraiser, calculates HMI's damages as $11.225 million. (*See* Clarion/Samuels Real Estate Consulting Report, App. Exh. 80 at 98.)  Even defendants' own damages expert, John Coyle, concedes that defendants' conduct damaged HMI in excess of $2 million.  (John Coyle Dep., App., Exh. 81 at 108.)

## III.   ARGUMENT

### A.     Summary Judgment Standards

As the United States Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and <u>identifying</u> those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  (Emphasis added.)  Defendants have failed to carry this burden because many of the so-called "facts" in their Memorandum are not supported by any citations to the record.  *See* page 1 n. 2, *supra*.

Even assuming that the defendants carried their initial burden, the Court's function on a motion for summary judgment is not to <u>decide</u> issues of fact, but rather "to determine if there is a genuine issue of material fact to be <u>tried</u>."  *Davis v. Guardian Life Ins. Co.,*  2000 U.S. Dist.

Lexis 719 (E.D.Pa. 2000) at *5 (emphasis added). HMI has set forth above, in detail, numerous issues of fact which ought to be decided by a jury after trial and not by this Court on motion, including defendants' conspiracy to take away HMI's property rights by the Rezoning and by engineering a prepackaged denial; defendants' departures from normal practice on applications for preliminary plan approval; defendants' refusals to cooperate with HMI; and defendants' retaliatory actions. None of these issues is appropriate for summary judgment.

In addition, expert opinions by themselves can demonstrate the existence of material issues of fact. *See* cases cited below at page 55, and summaries of the expert opinions of HMI's experts Marc D. Jonas, Esquire, and Joseph J. Viscuso, P.E., at pages 56-59. Here, the opinions of HMI's experts further establish that defendants' conduct represented a gross and egregious departure from normal practice on land use applications which, in Mr. Jonas's opinion, "shocks the conscience." Such conduct raises a triable issue of material fact as to whether defendants' conduct "shocks the conscience." *See Rivas v. City of Passaic,* 365 F.3d 181, 196 (3d Cir. 2004) (§1983 action decided under the "shocks-the-conscience" standard) where the Third Circuit concluded that the "contrasting facts" presented by the parties were sufficient to "satisfy us that summary judgment should not be granted at this stage," and that "A jury could find, depending on whose testimony it credits, that such conduct shocks the conscience." *Id.*

As discussed above and below, defendants' efforts – in conspiring to strip away HMI's property rights by virtue of a string of unprecedented acts – could easily lead a juror to conclude that HMI's constitutional rights were violated, even under the "shocks-the-conscience" standard. Indeed, that same juror could easily discount defendants' testimony as to the reason for these acts and find that the true basis was retaliatory in nature, meant to stop development and placate a

vocal no-growth opposition group constituency.    Accordingly, summary judgment is not appropriate here.

### B.    Summary Judgment Should Be Denied With Respect To HMI's Substantive Due Process Claim.

To state a substantive due process claim, a plaintiff must prove:  (i) an interest protected by the Fourteenth Amendment; and (ii) governmental deprivation of that protected interest. (Def. Mem. at 47-48.)  In land development cases in the Third Circuit, the governmental action must be such that it "shocks the conscience."  (*Id.*)  Here, defendants concede the first element of a substantive due process violation, that HMI has a protected interest.  (*Id.* at 48.)  Thus, the only issue before the Court is whether a reasonable juror could conclude that defendants' conduct "shocks the conscience."

HMI's proof satisfies this standard.  In the Statement of Facts above, HMI has marshaled the substantial evidence that demonstrates that defendants intentionally schemed and acted to injure HMI's business and to strip away HMI's right to develop the Parcel One property; and that defendants' conduct was not justifiable by any legitimate governmental land use planning interest.  Moreover, as discussed *infra* at pages 53-55, defendants' conduct was deliberate and calculated, and was not made in the "hyperpressurized" circumstances that characterize many of the §1983 cases cited by defendants.  Rather, defendants' scheme was played out over months. It is well-settled that the "shocks-the-conscience" standard can be more easily satisfied in cases like this one, where defendants had the opportunity to deliberate.  Therefore, for these and other reasons more fully discussed below, defendants' motion must be denied.

1.    **For Purposes Of Evaluating A Substantive Due Process Violation, Defendants Who Have Time To Deliberate Are Judged Differently From Defendants In A "Hyperpressurized Environment."**

As defendants concede, and as many cases confirm, the "shocks-the-conscience" standard for substantive due process violations "is not a calibrated yardstick." Def. Mem. at 58.  *See, e.g., County of Sacramento v. Lewis,* 523 U.S. 833, 847 (1998) ("*Lewis*"); *United Artists Theater Circuit, Inc. v. Township of Warrington,* 316 F.3d 392, 399 (3d Cir. 2003) ("*United Artists*"). Thus, "the conduct that is sufficiently egregious to shock the conscience varies depending on the context" and "the meaning of this standard varies depending on the factual context." *United Artists,* 316 F.3d at 399 n.5 and 400.

In *United Artists,* the Court of Appeals decided that the "shocks-the-conscience" standard did apply to land use cases,[32] and that the "shocks-the-conscience" standard was more "demanding" than the former "improper motive" standard (316 F.3d at 400), but emphasized that the application of the standard would vary with the factual context.  Indeed, in *United Artists,* the Court of Appeals did not even attempt to define the new standard for the case that was before it. Rather, the court remanded the case to the district court "for further proceedings to determine whether United Artists can survive the Supervisors' summary judgment motion in light of *Lewis.*" 316 F.3d at 402.  On remand, the Township filed a new motion for summary judgment

---

[32]    While HMI recognizes that this Court is obliged to follow Third Circuit precedent, HMI respectfully submits that *United Artists* was wrongly decided, and that the "shocks-the-conscience" standard should not be applied in this case.  The United States Supreme Court has never held that the "shocks-the-conscience" standard applies in a land use case.  Indeed, *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the Supreme Court case on which the panel relied in *United Artists,* arose out of a high speed police chase.  Moreover, since *Lewis,* the Supreme Court has elsewhere characterized the conduct necessary for a substantive due process development with other words such as "arbitrary,"  *e.g., City of Cuyahoga Falls v. Buckeye Community Hope Foundation,* 538 U.S. 188, 198 (2003), and defendants' conduct here was both "conscience-shocking" and arbitrary.

based on the "shocks-the-conscience" standard, but the district court did not rule on the motion. Subsequently, the parties entered into a Stipulation and Consent Decree on the eve of a scheduled trial, and the case was closed.

In another recent Third Circuit case, *Estate of Smith v. Marasco,* 318 F.3d 497 (3d Cir. 2003), the court reversed in part a grant of summary judgment in a substantive due process case, and explained that the "shocks-the-conscience" standard is sensitive to the exigency of the circumstances. *Smith v. Marasco*, which was decided after *United Artists*, involved a police response to a "barricaded gunman" situation, where survivors claimed that the gunman suffered a fatal heart attack because of police actions following a neighbor's complaint. Police responded to the neighbor's complaint with a "SERT" (Special Emergency Response) Team, including 30 armed team members wearing riot and camouflage gear, and a helicopter hovering overhead. 318 F.3d at 502-05. Thus, the situation in *Smith v. Marasco* clearly allowed less time for deliberation than the defendants' actions here. Nevertheless, the Court of Appeals emphasized that the case did not involve a "hyperpressurized environment" like other §1983 cases (*e.g.,* a prison riot or high speed chase), and therefore, the plaintiffs' burden was less than in such a "hyperpressurized case." 318 F.3d at 508-09.

Significantly, the court in *Smith v. Marasco* also distinguished that case from cases in which "officials have the luxury of relaxed deliberation." *Id.* at 509. The case at bar is clearly such a case in which "relaxed deliberation" was possible. No one was threatened here with physical harm. More than six months elapsed from the filing to the denial of HMI's Second Revised Preliminary Plans. Defendants had as much time as they needed to come to a decision. HMI offered an open-ended extension of time to allow for more deliberate review of the application; defendants spurned the offer of more time and sought to create a false sense of

53

urgency not warranted by the circumstances.  Thus, the burden on plaintiffs here to show "conscience-shocking" behavior is even less here than in *Smith v. Marasco*.

    *Associates in Obstetrics & Gynecology v. Upper Merion Township,* 270 F.Supp.2d 633 (E.D.Pa. 2003) is a case in which – like the case at bar – the defendants did have the opportunity to deliberate.  *Associates* is far more similar to the case at bar than any of the cases cited by defendants.  In *Associates,* the Court denied in part a motion to dismiss a substantive due process claim, holding that:

> Allegations of enforcing zoning regulations with the intent to harm Plaintiffs' business interests and to restrict their practice of lawful medical procedures states a claim that shocks the conscience.  *See Lewis*, 523 U.S. at 849, 118 S.Ct. 1708 ("conduct intended to injure in some way unjustifiable by any governmental interest is the sort of official action most likely to rise to the conscience-shocking level.").  Thus, Plaintiffs have pled facts sufficient to support a substantive due process claim for deprivation of property rights.

270 F.Supp.2d at 656.  Here, defendants did not merely "enforc[e] zoning regulations" with the intent to harm HMI; to the contrary, they and HMI's neighbors created <u>new</u> zoning regulations, and then they rejected HMI's Second Revised Preliminary Plans, all with the intent and knowledge that this conduct would strip HMI of its property rights in Parcel One.  Here too, as in *Associates,* the defendants acted with deliberateness, and not in a hyperpressurized situation:

> What shocks the conscience . . . is a flexible standard that depends on the factual context of the particular case at hand.  [*United Artists*] at 400.  For example, <u>when a state actor has time to deliberate prior to committing the offending behavior, the standard for conscience-shocking behavior is lower than it would be in "hyperpressurized situations" that afford no time to consider the action</u>.  *Estate of Smith v. Marasco*, 318 F.3d 497, 509 (3d Cir. 2003).

270 F.Supp.2d at 654 (emphasis added).  Here, defendants not only had time to "deliberate," but their actions – which extended over at least the six month period between the filing and denial of HMI's plans – were calculated to deprive HMI of constitutionally protected rights.

In sum, in judging defendants' conduct here, it must be remembered that conduct that "shocks the conscience" in the deliberative environment of zoning and land development need not rise to the level of what "shocks the conscience" in exigent circumstances involving threat of physical harm.

> **2.    The Opinions Of HMI's Experts Demonstrate That There Are Genuine Issues Of Material Fact Preventing Summary Judgment.**
>
> **(a)    An Expert Opinion By Itself Can Demonstrate The Existence Of Genuine Issues Of Material Fact.**

An expert opinion by itself, when adequately supported, can demonstrate the existence of genuine issues of material fact that preclude summary judgment. *Thomas v. Newton Int'l. Enterprises,* 42 F.3d 1266, 1270 (9th Cir. 1994): *See also Mendes-Silva v. United States,* 980 F.2d 1482, 1488 (D.C. Cir. 1993); *Iacobelli Construction, Inc. v. County of Monroe,* 32 F.3d 19, 25-26 (2d Cir. 1994) ("Not only do the Heuer and Eller affidavits appear to rely on relevant data and employ conventional methods of analysis, they also raise factual issues that, if true, tend to support Iacobelli's claim"). Naturally, the expert opinion must have a factual basis, *see Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191 (3d Cir. 1995), but even an expert opinion with a "slim" factual basis is "sufficient to raise a genuine issue of material fact requiring a trial." *DeGussa Constr. Chem. Operations, Inc. v. Berwind Corp.,* 280 F.Supp.2d 393, 404 (E.D.Pa. 2003) (Baylson, J.).

Here, the comprehensive and factually supported expert opinions of Marc D. Jonas, Esquire, and Joseph J. Viscuso, P.E., discussed in the next section, by themselves, establish an ample basis on which this Court must determine that there are genuine issues of material fact to be tried.

> **(b)**    **The Jonas And Viscuso Opinions Demonstrate That There Are Genuine Issues Of Material Fact Preventing Summary Judgment**
>
> **(i)**    **Opinion Of Marc D. Jonas, Esquire**

Based upon a detailed, seven and a half page (single-spaced) analysis of the facts of this case, HMI's expert Marc D. Jonas, Esquire ("Jonas"), a distinguished land use attorney,[33] opined that defendants' conduct was "sufficient to shock one's conscience." (Jonas Report, App., Exh. 19 at 12.)  Mr. Jonas then set forth 24 acts by defendants that supported this opinion.  (*Id.* at 12-13.)  Mr. Jonas further stated:

- "[T]he Township and the other named defendants disregarded the law and their prior pattern and practice of fair, evenhanded, and open communications with applicants as a reaction to the political pressure and noise generated by individual and organized Township residents whose sole goal was to thwart Landowner's proposed development of Creekside Commons."

- "Unlike its prior pattern and practice, the Township and other defendants shut the door to communications about the application and its claimed deficiencies, depriving the Landowner of an opportunity to respond to objections and to modify its plans accordingly."

- "Despite the efforts of the Landowner, through expert legal counsel known to the Township, the Township refused to give fair consideration to the application, instead employing its resources to unlawfully obstruct and ultimately eviscerate the land use process envisioned by the MPC, the Township SALDO, and the Township's own prior practice."

- "The Township and the other defendants consciously singled out and retaliated against the Landowner, its application, and its Property in the effort to prevent the proposed development and the vesting of rights conferred by MPC upon subdivision and land development applications filed prior to the enactment of [the rezoning]."

- "The Township raced to get ahead of and destroy the Landowner's right to develop its plans in accordance with an application filed before the rezoning of the Property.  There is no other explanation for a rezoning that so drastically

---

[33]    Mr. Jonas's impressive resume, which includes 5 municipal solicitorships, is attached to his expert report.  (*See* App., Exh. 19.)

metamorphosed the zoning of the Property in a manner that was viewed as temporary by the Montgomery County Planning Commission, inconsistent with the previously enacted Township comprehensive plan, and which affected only the Property of the Landowner."

- "The Township departed from its prior uniform pattern and practice of fair and open dealing by its denial of the preliminary plan application, referring to terms and provisions of the Township's own ordinances applicable to final, not preliminary plan applications."

- "The Township rushed to deny a plan despite a previously accepted extension of time, despite an offered open-ended extension of time, and despite a history of always accepting extensions of time in order to allow an applicant to move through the process and ultimately gain approval."

- "In this matter, the Township breached [its] duty of good faith, yielding to an irrational public outcry which led the Township to transform a filled quarry site zoned under the most permissive, non-residential zoning district into a conventional, but restrictive, one acre minimum lot, single family home district."

(Jonas Report, App., Exh. 19 at 9-11.)

In short, a jury could easily accept Mr. Jonas's view of defendants' conduct and find a substantive due process violation.

### (ii)    Opinion Of Joseph J. Viscuso, P.E.

HMI's engineering expert is Joseph J. Viscuso, P.E. ("Viscuso"), a licensed professional engineer with an M.S. degree in Civil Engineering who currently serves as municipal engineer or special consultant for seven municipalities and authorities.[34]  Mr. Viscuso, a partner in the well-known firm of Vollmer Associates LLP, opined that:  "As submitted, [HMI's Preliminary Land Development Plan for Creekside Commons, dated March 19, 2002] is in compliance with and satisfies the requirements of [Whitemarsh Township] SALDO Section 105-21 [the section governing preliminary plans]."  (Viscuso Report, App., Exh. 77, Executive Summary.)

---

[34]    Mr. Viscuso's impressive resume is attached to his expert report.  (*See* App., Exh. 77.)

Mr. Viscuso supported his opinion by reviewing both HMI's plans and each of the review comments of Engineer Zarko that formed the basis for the denial resolution adopted on March 21, 2002. Mr. Viscuso's review is documented in detail in his 51-page report, and includes the following additional conclusions:

- Defendants' objection to the use of a retention basin in the portion of Parcel One that is zoned AA Residential was incorrect because "[b]asins by default are allowed in the AA zoning district whether the runoff comes from a commercial development or a residential development, as a required public improvement." (Viscuso Report, App., Exh. 77 at 2.)

- Defendants' objection that "[d]etails/design specifications concerning the proposed on-site sewage treatment plant depicted on the Plan were not submitted" was incorrect. (*Id.* at 3.)

- Defendants' objection that HMI failed to provide a "suitably sized berm and chain link fencing" was incorrect because that provision was clearly written for the "extraction" use and was "inappropriate for the proposed use," an office park. (*Id.* at 5-6.)

- Defendants' objection to the placement of the proposed on-site sewage treatment plant was premature, and defendants did not give HMI any opportunity to respond. (*Id.* at 7.)

- Defendants' objections to the lack of Pennsylvania DEP permits, a Water Service Agreement, Montgomery County Conservation District approval, Sedimentation Control Plan, DEP approval for modifications to the pumped water bypass system, PennDOT Highway Occupancy Permit, fire flow information, copies of easement agreements, Geotechnical Investigation Report, proposed grading setbacks, profiles of proposed storm sewer lines, detailed construction plans for Stenton Avenue roadway improvements, final quarry closure plan, construction details for sanitary sewer, water systems and storm water management and piping for a drainage ditch were inappropriate at the preliminary approval stage. (*Id.* at 8-18, 23-27, 32-35, 38-39, 43-46 and 51.)

- Defendants' objection to lack of comments from the Planning Commission and Health Department concerning the sewage planning modules was inappropriate and premature, as it is the responsibility of the municipality – not the applicant, HMI – to obtain such comments. (*Id.* at 19-22, 49-50.)

- In numerous instances, the review comments provided by the Township Engineer on March 21, 2002 – only two hours prior to the meeting where defendants voted to reject HMI's plans and thereby to strip away HMI's right to develop Parcel

One as an office park – were provided for the first time that day, and HMI never had an opportunity to respond. (*Id.*, at 7, 28, 36, 43-44, 49 and 51.)

Thus, Mr. Viscuso's thorough review of the so-called reasons for the denial of the Second Revised Preliminary Plans demonstrates that, at the very least, there is a factual issue as to whether the reasons were valid or merely a pretext.

> **3.  None Of The Substantive Due Process Land Use Cases Cited By Defendants Is Even Remotely Similar To This Case.**

Defendants attempt to support their motion by an artificial analysis of isolated events that simply ignores the calculated and combined effect of what defendants did.  Thus, defendants analyze the punitive rezoning of HMI's property as though it took place in isolation from defendants' rejection of HMI's Second Revised Preliminary Plans; it did not.  Likewise, defendants analyze their rejection of the proffered extensions of time as though it took place in isolation from the rejection on March 21, 2002 of revised plans that HMI had filed only two days earlier; it did not.  None of these events can properly be considered in isolation, and none of the cases cited by defendants involves a like combination of punitive actions.

As described above in HMI's Statement of Facts, and particularly at 14-20 and 38-40, the end result of defendants' actions here was to strip away HMI's vested right to develop Parcel One.  By contrast, in all of the Third Circuit "shocks-the-conscience" land development cases cited by defendants, the plaintiffs (i) were asking the municipality for relief from, or a change to, municipal ordinances or for some other relief to which the plaintiff was not entitled by-right; and/or (ii) had already secured the approvals or governmental action being sought.  Indeed, none of these cases entailed the "one-two" punch of a rezoning followed by a plan denial with the resulting loss of property rights.  *See Lindquist v. Buckingham Township,* 2003 WL 22757894, (E.D.Pa. 2003), *aff'd,* – Fed.Appx. – (3d Cir. July 19, 2004) (not precedential) (*Lindquist I*), (plaintiffs had received the relief that they had sought and, therefore, the action was merely one

for delay damages);[35] *Keystone Outdoor Advertising Co., Inc. v. West Whiteland Township,* 2003 WL 1914157, *2, 64 Fed.Appx. 333, 335 (3d Cir. 2003) (not precedential) (plaintiffs needed relief from existing zoning to erect a freestanding billboard); *Corneal v. Jackson Township*, 313 F.Supp.2d 457 (M.D.Pa. 2003), *aff'd*, 2004 WL 790315, 2004 U.S.App. LEXIS 7198 (3d Cir. 2004) (not precedential) (plaintiff seeking subdivision approval); *Levin v. Upper Makefield Tp.*, 2004 U.S.App. LEXIS 4457, 2004 WL 449189 (3d Cir. 2004) (not precedential) (plaintiffs were seeking approval to build on a floodplain and, despite delays, had secured approvals to build); *Thornbury Noble. Ltd., v. Thornbury Township,* C.A. No. 99-cv-6460 (E.D.Pa., October 21, 2003) (plaintiff was denied zoning relief to build a supermarket, but did not lose pre-existing right to build a shopping center); *Fred's Modern Contracting, Inc. v. Horsham Township,* C.A. No. 02-cv-0918 (E.D.Pa. 2004) (rights not stripped away but merely delayed); *Blain v. Township of Radnor,* C.A. No. 02-CV-6684 (E.D.Pa. 2004) (state court granted plaintiffs the subdivision approval they sought, and the federal court action was only for delay).

In contrast, as of the filing of the Preliminary Plans on September 10, 2001, <u>there is absolutely no question that HMI had the right to build an office park on its Property.</u>  No zoning change or zoning variance was required.  Indeed, HMI did not require any action from the Township other than to apply the SALDO fairly.  Instead, the Township took <u>affirmative action</u> – first the Rezoning and then taking the unprecedented steps of refusing HMI's proffered extension and denying the Second Revised Preliminary Plans only six months after filing – in an unabashed attempt to appease certain constituents and stop development.  In short, the Township

---

[35] *Lindquist v. Buckingham Township,* 2003 WL 21357247, *1, 68 Fed.Appx. 288, 289 (3rd Cir. 2003) (not precedential) (*Lindquist II),* also cited by defendants, is a separate action which is even more irrelevant since the Court of Appeals merely affirmed the dismissal of a different claim on statute of limitations grounds.

deliberately concocted and then executed a scheme to deprive HMI of its constitutionally protected property rights.

While this conspiratorial scheme is "conscience-shocking" in and of itself, many of defendants' actions in the course of the scheme are also notable:

- denying HMI's stormwater management waiver request (without notice) based upon HMI's ability to build a detention basin in the area zoned AA Residential and then denying HMI's plans based upon in part a claim that HMI could not put the basin there; (*supra* at 7-8; *see also* Denial Resolution, App., Exh. 60);

- in Solicitor Weiss's own words, refusing to fulfill their duty and practice of cooperation with developers (*supra* at 23);

- rezoning the Property in retaliation for HMI having taken the legal step of filing by-right plans, from a very permissive zoning that permitted a myriad of uses to a highly restrictive zoning permitting only large-lot residential development (*supra* at 11-20);

- rezoning only HMI's Property, without any basis, without awaiting the land planner's study, and without following the "thoughtful and comprehensive process" promised by the Board (*supra* at 14-20);

- using bogus reasons for denying HMI's plans, some of which the Township engineer and defendants' experts concede are not valid, questionable, or should have only been conditions of approval (*supra* at 41-47);

- denying the plans in the extraordinarily short period of six months, when even the Board and Engineer Zarko acknowledged the process would take much longer (*supra* at 13-14, 41-42);

- using final plan requirements to deny HMI's preliminary plans (*supra* at 47-49);

- denying the plans in part because of lack of input from PennDOT and DEP, when the Township knew full well that meetings with those entities were scheduled for the very next week after the denial resolution was passed (*supra* at 30-32);

- conspiring with the Township Engineer so he departed from his usual format for review letters (*supra* at 35);

- denying the all-office plans at the very first meeting at which the Board viewed them, without even asking any questions of, or giving any direction to, HMI (*supra* at 38-39);

- attempting to legitimize its abrupt action by invoking an imminent "deadline" that was in fact no deadline, notwithstanding that HMI had repeatedly offered extensions of time to consider its plan (*supra* at 31-33, 40);

- ambushing HMI by holding a hearing at which HMI's plans were put "on trial" (with sworn witnesses, pre-marked exhibits and a court reporter), all without giving HMI the notice required by the Pennsylvania Municipalities Planning Code (*supra* at 38-39);

- claiming they had not discussed or reviewed HMI's plans, while authorizing Township staff to prepare a prepackaged denial resolution (by clear inference); and

- violating the Sunshine Act by holding secretive meetings in executive session about the Rezoning, all the time while telling HMI that the Township was taking no action on rezoning and that the executive sessions were being held for litigation and personnel matters (*supra* at 14-15).

Under these circumstances, especially with the support of expert testimony from pre-eminent professionals in their fields, a reasonable juror could well find this conduct "shocking," especially when viewed in the appropriate context of land development. Accordingly, the Court should not grant summary judgment.

### 4.    The Individual Defendants Are Not Entitled To Qualified Immunity.

The individual defendants argue that they are entitled to qualified immunity because they reasonably "could have believed [the challenged action] to be lawful in light of clearly established law and information the officers possessed." (Def. Mem. at 78.) But the facts set forth above at pages 5-49 demonstrate that each of the individual defendants played a critical role in the conspiracy to strip away HMI's right to develop Parcel One in accordance with the HVY-X Industrial zoning. Simply stated, defendants' conduct shocks the conscience – or, at the very least – a reasonable juror could so find. No Township official could "reasonably believe" that this egregious, "conscience shocking" conduct was lawful.

In addition to their overall participation in this conspiracy to deprive HMI of its right to develop its Property in accordance with Township ordinances, each defendant committed discrete acts that defeat any claim that he or she reasonably believed the conduct was lawful:

### (a)    Engineer Zarko Is Not Entitled To Qualified Immunity

Defendants' assert that Engineer Zarko was merely following "instructions given to him by Township officials" (Def. Mem. at 81.)   However, it is clear that Engineer Zarko was a willing and knowing participant in unconstitutional conduct.   Among other things:

- Engineer Zarko participated in the preparation of both the draft denial resolution of the Revised Preliminary Plans and the denial resolution that did deny the Second Revised Preliminary Plans (*supra* at 33-36);

- Engineer Zarko knew that his March 21 letter was going to be used as the basis for the rejection of the Second Revised Preliminary Plans (*id.*);

- Engineer Zarko was asked to, and did, e-mail an electronic copy of his review letter to Manager Gregan to be used as the basis of the Denial Resolution (*supra* at 39-40);

- Engineer Zarko complied with Solicitor Weiss's direction to remove from his review letter for the Second Revised Preliminary Plans his customary recommendation that the Supervisors should not act until the applicant could address his review comments (*supra* at 35-36);

- Engineer Zarko included new comments in his rushed review of HMI's Second Revised Preliminary Plans, knowing that HMI would not have an opportunity to respond before the Supervisors' meeting at which the Supervisors were set to reject those plans and which was scheduled for only two hours after Engineer Zarko sent the review letter to HMI's attorney, and knowing that the Supervisors' vote would be based in part on the new comments to which HMI could not respond (*supra* at 38);

- Engineer Zarko knew that the Supervisors did not have the expertise to independently review the plans (*supra* at 43);

- Engineer Zarko knew that many of his review comments, *e.g.,* rejecting a stormwater waiver request on the theory that HMI could use a detention pond, and then objecting to HMI's preliminary plans because they called for the same detention pond, and contending that HMI was required to put barbed wire and "warning signs" around an office park, were patently spurious and absurd (*supra* at 43-49);

- Engineer Zarko must have known that he was unfairly and unlawfully applying strict <u>final</u> plan requirements to HMI's preliminary plans (*id.*);

- Engineer Zarko accepted directions to produce in only 30 hours a rushed review letter for HMI's Second Revised Preliminary Plans, knowing that it was to be used to create the Denial Resolution and to strip away HMI's rights to develop Parcel One under the HVY-X zoning only six months after the initial version of HMI's plans were submitted, even though he had previously agreed that a one-year time frame for review of HMI's plans would be customary (*supra* at 35-36); and

- Engineer Zarko knew that the effect of rezoning the Property, and then rejecting HMI's Second Revised Preliminary Plans which were grandfathered under the old zoning, was to strip away HMI's right to develop Parcel One under the HVY-X zoning classification. (Zarko Dep., App., Exh. 7 at 104, 189-90).

Moreover, defendants' argument that Engineer Zarko was only "following orders," and that the Supervisors were only relying on Engineer Zarko's expertise (Defs. Mem. at 81 84, 85), is obviously circular – and frivolous. Under this logic, a Board of Supervisors and its appointed officials could never be held accountable for their actions. Suffice it to say, there are, at the least, numerous factual issues that preclude finding qualified immunity for Engineer Zarko.

### (b) The Supervisors Are Not Entitled To Qualified Immunity.

The Statement of Facts shows that Supervisors Cornog, Zeock, Younglove, Rimel and DeRosa, the Township Supervisors, created and carried out a "conscience-shocking" plan to deprive HMI of its constitutional rights. Each of the Supervisors acknowledged at his or her deposition that he or she understood the combined effect of the Rezoning – following illegal Executive Session discussions in plain violation of the Sunshine Law – and then rejecting HMI's Second Revised Preliminary Plans was to eliminate HMI's right to develop Parcel One on the basis of the HVY-X Industrial zoning classification. Moreover, although the Supervisors also make the circular argument that they cannot be responsible because they were only following Engineer Zarko, and Engineer Zarko cannot be responsible because he was only following orders, the fact is that the Supervisors knew that they did not have the knowledge to evaluate

HMI's plans without expert assistance, such as that supposedly provided by Engineer Zarko. Nonetheless, knowing that HMI disputed Zarko's comments, the Supervisors never questioned Engineer Zarko about his comments.  Rather they simply "rubber-stamped" his review letter after putting HMI's Second Revised Preliminary Plans "on trial."

The list goes on:

- Three of the Supervisors (Rimel, Younglove and DeRosa) voted to rezone the Property twice (in October 2001 and in February 2002), and two of the Supervisors (Cornog and Zeock) voted to rezone the Property once, in obvious retaliation for HMI's filing of its plans (*supra* at 18-19);

- The Supervisors voted to rezone the Property without awaiting the results of their self-proclaimed "thoughtful and comprehensive process," including the Simone study, for evaluating the appropriate zoning (*id.*);

- By providing HMI with Engineer Zarko's review letter just hours before the March 21, 2002 Board meeting, the Supervisors gave HMI no realistic chance to address that review letter (*supra* at 38);

- As admitted by Solicitor Weiss, the Supervisors withheld cooperation from HMI, notwithstanding that the Supervisors testified that they had a duty and practice of providing cooperation to developers (*supra* at 23);

- The Supervisors duped HMI by telling its representatives to place both sewer options on the plans, and then denying the plans because they showed two sewer options (*supra* at 46-47);

- Without notice, the Supervisors denied HMI's 2000 request for a stormwater management waiver based on the assertion that HMI could place a detention basin on the area of Parcel One zoned AA Residential and then denied the Second Revised Preliminary Plans on the basis that HMI could <u>not</u> place the basin in that area (*supra* at 7-8, 45); and

- The Supervisors denied HMI's plans in only six months, despite acknowledgements by Chairman Kramer and Engineer Zarko that the land development process, in Whitemarsh Township takes much longer than six months (*supra* at 13).

In short, Supervisors Cornog, Zeock, Younglove, Rimel and DeRosa did not have a reasonable basis to believe that their conduct was lawful.

### C.     Summary Judgment Should Be Denied With Respect To HMI's Equal Protection Claim.

The Township's request for summary judgment with respect to HMI's equal protection claim should be denied because the factual record developed in discovery shows manifest unlawful discrimination against HMI, which occurred without rational justification.  Not only was HMI's Property the only one in Whitemarsh Township that was hurriedly rezoned in response to the filing of a land development application, but its preliminary plan application was the <u>only one that was denied in Whitemarsh Township since 1996</u>.  In the case of HMI's plan application, the evidence demonstrates the defendants' clear departure from the typical land development process in Whitemarsh Township.  This evidence of illicit discriminatory treatment under color of state law raises inferences of animus and presents genuine issues of material fact that must be resolved at trial.

### 1.     Equal Protection Standards

The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *see Congregation Kol Ami v. Abington Township*, 309 F.3d 120, 133 (3d Cir. 2002) (same).  The purpose of the Equal Protection Clause is to "secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*) (*quoting Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923)).

As the Supreme Court recently reaffirmed, a person who has been targeted for discriminatory treatment at the hands of the state for reasons other than membership in a particular class may proceed as a "class of one."  *Olech*, 528 U.S. at 564.  To establish a

violation of one's equal protection rights proceeding as a "class of one," a plaintiff must allege and demonstrate that he or she was intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Id.*; *Teed v. Hilltown Township*, No. Civ. A. 03-CV-6040, 2004 WL 1149486,*6 (E.D.Pa. May 20, 2004); *Montanye v. Wissahickon School Dist*., __ F.Supp.2d __, No. Civ. A. 02-8537, 2004 WL 540489, *8 (E.D.Pa. Mar. 17, 2004) ("to proceed on a 'class of one' theory in an equal protection claim, a plaintiff must allege sufficient facts demonstrating that: (1) defendants, acting under color of state law, intentionally treated plaintiff differently from others similarly situated; and (2) there is no rational basis for the difference in treatment") (collecting cases).

Here, there is ample evidence of record that the Township intentionally treated HMI, its plan applications, and the Property differently from the way it treated similarly situated developers, their plan applications and their properties. The Township punitively rezoned HMI's property in retaliation for HMI's filing of its Preliminary Plans, something that the Township surely had never done before. The Township then completely and utterly abandoned its standard land development practices, withheld cooperation, and acted with undue and irresponsible haste to deny HMI's plans on trumped up and misapplied predicates, a course of action without precedent in Whitemarsh Township. The plan application was improperly denied shortly after the Rezoning in order to subject the property to restrictions enacted after the plan application was submitted. This same evidence gives rise to inferences that the Township acted with animus and antipathy in intentionally discriminating against HMI. In short, viewing the evidence in a light most favorable to HMI and giving HMI the benefit of all reasonable inferences, as the Court must in this summary judgment context, it is clear that HMI's equal protection claim presents genuine issues of material fact for trial.

## 2. HMI Is Similarly Situated To Other Developers In Whitemarsh Township.

The defendants first contend that they are entitled to summary judgment because HMI's property is unique and therefore not similarly situated to any other property in Whitemarsh Township: "It is undisputed that there are no other active quarry properties in Whitemarsh Township." (Def. Mem. at 71.) This is a distinction without a difference. Defendants fail to cite any controlling authority in support of their radically restrictive view of equal protection law in the land use context. Indeed, the bulk of the authority on which they rely derives from inapposite employment discrimination cases.[36] The proper focus of the equal protection inquiry in the land use context is not whether HMI's property is different from other properties in Whitemarsh Township, but whether HMI is similarly situated to other developers who submitted plan applications.

Indeed, defendants' theory of what constitutes "similarly situated" is illogical. Under their theory, just because HMI operates the only quarry in Whitemarsh Township, it has no Equal Protection rights (because there are no "similarly situated" landowners). Likewise if there were only one golf course owner in the Township, that hypothetical owner would be precluded

---

[36] The cases cited by defendants at page 70 of their memorandum of law are not equal protection cases. *Singh v. Wal-Mart Stores, Inc.*, No. Civ. A. 98-1613, 1999 WL 374184 (E.D.Pa. June 10, 1999), is not an "equal protection" case as defendants misrepresent it to be. Rather, it was a race discrimination action brought against a private party pursuant to 42 U.S.C. §1981. The remaining cases are matters involving discrimination claims principally brought pursuant to Title VI or VII of the Civil Rights Act ("Title VI" or "Title VII" respectively) and the Age Discrimination in Employment Act ("ADEA"). *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1988) (ADEA claim); *Shumway v. United Parcel Serv.*, 118 F.3d 60 (2d Cir. 1997) (Title VII claim); *Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997) (Title VII claim); *Dill v. Runyon*, Civ. A. No. 96-3584 (E.D.Pa. April 3, 1997) (Title VII and ADEA); *Dartmouth Review v. Dartmouth College*, 889 F.2d 13 (1st Cir. 1989), *overruled by Edcuadores Puretorriqueños en Acción v. Hernández*, 367 F.3d 61 (1st Cir. 2004) (Title VI and 42 U.S.C. §1981).

from asserting equal protection rights. The sole car dealer, the sole banquet hall owner and the sole baker – all would have no equal protection rights because, under defendants' theory, there would be no "similarly situated" landowner. This obviously is not the law.

There is "no precise formula to determine whether an individual is similarly situated to comparators." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004) (*citing Barrington Cove, LP v. R.I. House & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001)). As a general rule, the question of whether a plaintiff is similarly situated to a comparator is a question for the trier of fact. *Id.* (citing *Harlen Assoc. v. Village of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)). Moreover, it is clearly established in equal protection jurisprudence that similarly situated does not mean identically situated. *See Montanye*, __ F.Supp.2d at __, 2004 WL 540489 at *8; *Jabbar Al-Samad v. Horn*, 913 F.Supp. 373, 376 (E.D.Pa. 1995). Quite simply, whether a party is similarly situated to a comparator is a matter that varies given the issues relevant to each case.

In the context of the present litigation, HMI is similarly situated to other developers who filed plan applications to develop their properties in Whitemarsh Township since January 1, 1996.[37] Unlike the situations presented in the employment discrimination cases cited by defendants, equal protection in the land use context necessarily involves properties that will differ from one another in various respects because each parcel of land, by its very nature, is unique. *See, e.g.*, *Publicker v. Commissioner of Internal Revenue*, 206 F.2d 250, 253 (3d Cir. 1953) ("Every piece of land and many paintings are unique."). The inquiry whether HMI was treated differently than similarly situated developers must focus on the ways in which developers

---

[37]    As mentioned, January 1, 1996 is the starting point for this analysis because defendants objected to producing land development files prior to this date. (*See supra* at 40 n. 27.) Accordingly, the jury should not be permitted to hear any evidence about pre-1996 plan denials.

with land development plans were treated, not on the fact that the Property features the only active quarry operation in the Township.

For example, in *Montanye*, *supra*, the plaintiff was a special education teacher at Wissahickon High School.  2004 WL 540489 at *1.  A student with severe emotional issues was assigned to her class.  The School District subsequently brought disciplinary proceedings against the teacher because of complaints by other staff members about such things as the plaintiff taking the student to therapy sessions (with the consent of the student's parents).  The District also subjected the plaintiff to a "*Loudermill* [disciplinary] hearing."[38]  *Id.* at *2-4.  Following the hearing, the District issued a "Notice of Directives" that stated she was guilty of serious wrongdoing and that she had to comply with various conditions to maintain employment.  *Id.* at *4.  Plaintiff believed that no teacher could comply with the conditions set forth in the Notice of Directives.  *Id.*  Plaintiff filed a complaint, which, as amended, alleged violations of her constitutional rights, including an equal protection claim in which she was proceeding as a class of one.  *Id.* at *5-7.  When the defendants moved to dismiss, in part arguing that the plaintiff failed to identify similarly situated comparators, the court denied the motion.

The defendants in *Montanye* argued that the plaintiff failed to sustain her burden of proof because she did not identify any other teacher who engaged in the same allegedly wrongful behaviors (*e.g.*, counseling a student and her family concerning rules at home, recommending a psychologist, attending psychotherapy sessions and transporting student to them, and visiting the student in a mental health facility).  *Id.* at *8.  The court rejected this argument, holding instead that the relevant body of comparators was <u>all of the other teachers in the school district</u>.  *Id.*  The

---

[38]    A "*Loudermill* hearing" is a due process procedure required by *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).  It gives one accused of improper conduct an opportunity to respond to allegations before discharge from employment.  *Id.* at 542-43.

plaintiff had alleged a series of "firsts," in which she identified ways in which the defendants had treated her differently than other teachers (*e.g.*, she was the first teacher to be subject to arbitrarily applied stricter standards; the first to be subjected to a *Loudermill* hearing; the first to receive a disciplinary "directives" letter; and the first to be disciplined in a more formal and harsh way than another teacher who had engaged in similar behavior). The court found that the teacher's allegations, if proven, would sustain an equal protection claim.

Like the teacher in *Montanye*, HMI has through discovery developed a list of "firsts" that demonstrate the defendants intentionally singled it out among developers for improper treatment. Similarly, like the teacher in *Montanye*, HMI can identify ways in which it was treated less favorably than other developers who had submitted plans that had some of the same purported compliance "defects." *See* discussion *infra* at 73-77.

The only equal protection land use case example offered by defendants, *Bell v. Duperrault*, 367 F.3d 703 (7th Cir. 2004) is not to the contrary. There, the court found that the plaintiff's application for a permit to extend a pier was not similarly situated to other applicants' permit applications. Most significantly, it was the only application that did not include a "flow through" in the pier design, *id.* at 707, which was directly relevant to the Wisconsin Department of Natural Resources' ("DNR") stated reason for requiring an administrative hearing. Moreover, at the time the plaintiff had made his application, the DNR had determined it was following stricter standards. *Id.* at 707-08.

These are not issues here. The purported deficiencies identified as a predicate for denying HMI's plans are the same purported deficiencies that were subjects of conditional approval for other developers' plans. This is unlike *Dupperault*, where the "deficiency" in the applicant's plan was not present in any of the plans that had been approved. Moreover,

Whitemarsh Township cannot point to any across-the-board decision to apply more rigorous standards; indeed, on the same night it denied HMI's plan application, it granted approval to another development that contained a number of the same purported deficiencies. (*See* Resolution #2002-16, App., Exh. 91.)

In short, HMI is similarly situated to other land owners who submitted land development plans in Whitemarsh Township from January 1, 1996 to the present. We now turn to examining the ways in which HMI was treated differently than those landowners.

### 3.    Defendants Subjected HMI To Unprecedented Treatment:  The "Firsts."

In their rush to thwart HMI's development plans, the defendants systematically withheld the cooperation invariably afforded other developers in Whitemarsh Township and which was legally due to HMI. They did so in numerous respects, all of which are evident because they are unprecedented based on review of the SALDO materials that the defendants made available for inspection during discovery in this matter.

Among the ways in which the process applied to HMI's development plans departed from standards are:

- HMI's Property was the only property affected by the Rezoning; even the adjacent KYW property zoned HVY Industrial was not rezoned (*supra* at 18-20);

- No other land development plan has been denied in Whitemarsh Township in the time period January 1, 1996 to the present (*supra* at 40);

- No other land developer has been subjected to the "one-two" punch of having its property rezoned and then having its pre-existing land development plan rejected (*supra* at 11-20, 29-43);

- No other land developer has had its offers of extension of time rejected (*supra* at 40);

- No other land developer had plans reviewed and denied in two days (*supra* at 34-40);

- <u>No other land developer</u> had a mere <u>two hours</u> to address alleged plan deficiencies in a review letter (*supra* at 38);

- <u>No other land developer</u> was denied cooperation in the land development process (*supra* at 22-23);

- <u>No other land developer</u> was subjected to a "trial" with no notice at all and in violation of the Pennsylvania Municipalities Planning Code (*supra* at 37-40); and

- <u>No other land development</u> of this size was resolved (let alone denied) in a mere six months (*supra* at 13, 41-43).

There are no rational justifications for these departures from the customary procedures in Whitemarsh Township, and the arbitrary application of more stringent procedures to HMI. HMI was the only developer intentionally singled out for such unfavorable treatment.

    **4.     A Review Of Other Land Redevelopment Files Demonstrates Defendants' Disparate Treatment of HMI.**

In addition to the series of "firsts" detailed above, there is no shortage of evidence demonstrating that defendants treated HMI's plans differently than any other plan application between January 1, 1996 and March 21, 2002. The record is replete with examples of defendants' differential treatment of purported plan deficiencies in other developers' plans, including on plans that were approved the same evening that HMI's plan application was denied. Purported deficiencies in other plans were typically the basis for conditional plan <u>approval</u>; however, in HMI's plans, the same purported deficiencies were used as predicates to <u>deny</u> the Second Revised Preliminary Plans.

For example, on March 21, 2002, the very same night HMI's Second Revised Preliminary Plans were denied, the Board of Supervisors adopted Resolution 2002-16, which granted plan approval of another developer's plan application subject to satisfaction of various conditions, including conditions outlined in a March 11, 2002 review letter drafted by Engineer

Zarko. Many of these conditions pertained to purported deficiencies that were cited as predicates for denial of HMI's Second Revised Preliminary Plans.

First, HMI's Second Revised Preliminary Plans were denied for failure to submit copies of easements; that was a condition of approval in Resolution 2002-16. (*See* Resolution 2002-16, App., Exh. 91; March 11, 2002 Letter from Zarko to Ford, App., Exh. 92, ¶I.2; Denial Resolution, App., Exh. 60, ¶3.c.) Second, Resolution 2002-16 also made receipt of a PennDOT Highway Occupancy Permit a subject of conditional approval, though the same issue was used as a predicate for denying HMI's Second Revised Preliminary Plans. (*See* Resolution 2002-16, App., Exh. 91, 6; Denial Resolution, App., Exh. 60, ¶2.e) Third, the Township also granted waivers in Resolution 2002-16 on matters such as grading and existing features requirements that were used the same evening to deny HMI's Second Revised Preliminary Plans. (*Compare* Resolution #2002-16, App., Exh. 91, Waivers ¶¶1, 3 *with* Denial Resolution, App., Exh. 60, ¶4.b & g.)

There are several similar examples with respect to other plan approvals:

- In Resolution 1998-20, the Township granted preliminary plan approval to a project involving alterations to Whitemarsh High School subject to satisfaction of various comments in the Engineer's review letter dated January 29, 1998. (*See* Resolution 1998-20, App., Exh. 93.) Those comments included items such as supplying fire flow information and off-site easement agreements as well as copies of service agreements with utilities, geotechnical report supplementation, grading and stormwater issues, right of way reviews by PennDOT, and suitable easement agreements for stormwater management. (*See* January 29, 1998 Letter from Zarko to Ford, App., Exh. 94, at ¶¶I.1, I.2, III.1.d, III.3, III.4, III.10, and III.11.) However, the same issues were made predicates for denial in HMI's case. (*See* Denial Resolution, App., Exh. 60, ¶¶3.b, 3.c, 2.b, 3.d, 3.f and 4.h.)

- In Resolution 1997-40, the Township granted preliminary plan approval to a project to develop an apartment complex conditioned on satisfying various items specified in Engineer Zarko's review letter. (*See* Resolution 1997-40, App., Exh. 95.) Among those items were issues relating to landscaping and trees, transportation studies and obtaining agency approval for roadway improvements, and stormwater management calculations. (*See* August 12, 1997 Letter from

Zarko to Ford, App., Exh. 96, at ¶¶I.2, I.3, I.4, and I.5.a, b, and c.) Other items included issues regarding procurement of highway occupancy permits, procurement of Department of Environmental Protection permits, procurement of approval from the Montgomery County Conservation District for erosion and sedimentation controls, the need to show utility crossings for storm and sanitary sewer, the need to extend a silt fence, the need to present easement agreements for all storm drainage facilities, the need to show the appropriate quantity of plantings, and the need to show detention basin fencing detail. (*Id.,* ¶¶III.2, III.4, III.7.a, b, & h, III.8, III.14, and III.15.) These same or nearly identical purported deficiencies were used as predicates to deny HMI's plans. (*See* Denial Resolution, App., Exh. 60, ¶¶1.c, 2.c, 2.d, 2.e, 3.c, 3.e, 4.a, 4.c., 4.d, 4.3, 4.k.(12) and 4.l.) [39]

- In Resolution 2001-21, the Township granted conditional preliminary *and* final plan approval for a subdivision development, subject to compliance with several items set forth in Engineer Zarko's review letter dated February 16, 2001. (Resolution 2001-21, App., Exh. 31.) Among the conditions set forth were submission of easement agreements (*id.,* ¶1.g), procurement of a utility service agreement for public water service and Township Fire Marshal approval of same, procurement of a highway occupancy permit, procurement of Montgomery County Conservation District approval for proposed erosion and sedimentation control, correction of various stormwater management and erosion issues, and correction of issues relating to dedication of rights of way and landscaping. (*See* February 16, 2001 Letter at from Zarko to Ford, App., Exh. 97, at ¶¶III.1.b, III.7, III.9.a-i, III.11, III.12, and III.14.) Again, the same or nearly identical issues were presented as predicates for denying HMI's plan application. (*See* Denial Resolution, App, Exh. 60, ¶¶2.b, 2.c, 2.e, 3.b, 3.c, 3.e, 3.f, 4.e, 4.h and 4.k.)

- In Resolution 2000-34, the Township granted preliminary plan approval for a development including 90 townhouses. (Resolution 2000-34, App., Exh. 98.) As usual, the preliminary plan approval was conditional subject to compliance with various items raised in Engineer Zarko's review letter of July 11, 2000. Among the items identified by Engineer Zarko were issues relating to operation and ownership of the sanitary sewer facilities, which Engineer Zarko strongly recommended be addressed prior to consideration of the preliminary plans. (*See* July 11, 2000 Letter from Zarko to Ford, App., Exh. 99, ¶1.2.) Engineer Zarko additionally identified issues relating to necessary sewage planning module revisions previously requested by the Township, procurement of grading easements and rights of way agreements, landscaping issues, procurement of copies of easement agreements, inclusion of necessary construction details on plans pursuant to SALDO §105-65.B, procurement of Montgomery County

---

[39] Though Resolution 1997-40 references a Zarko review letter dated September 5, 1997, this appears to be a mistake. The Zarko review letter is dated August 12, 1997 and the SALDO file contains no September 5, 1997 letter for this project.

Conservation District approval for proposed sedimentation and erosion control plan, resolution of stormwater management and grading issues, resolution of various sanitary sewer issues, procurement of a water service utility agreement and inclusion of all water system layout details on plans (including addressing various issues raised by the Township Fire Marshal in a separate review letter dated five months earlier that had not yet been addressed), and plantings to be removed from utility easement areas. (*Id.*, ¶¶III.1.b, III.3, III.5, III.8, III.9, III.10.a-f, III.13, III.15, and III.17.) Identical or virtually identical purported deficiencies and issues were presented as predicates for denying HMI's plans. (*See* Denial Resolution, App., Exh. 60, ¶¶2.b, 2.c, 3.a.(4), 3.c, 3.e, 4.e, 4.j and 4.k.)

- In Resolution 1999-16, the Township granted conditional preliminary plan approval to a development with 239,000 square feet of office use area. (Resolution 1999-16, App., Exh. 100.) The preliminary plan approval was conditioned on satisfaction of requirements and items set forth in Engineer Zarko's review letter dated February 24, 1999. Engineer Zarko's review letter identified issues including the need to show a compliant water system and its details on the plans, the need to document easements and show them on the plans, the need to address various stormwater management report issues, the need to address various drainage and erosion/sedimentation control issues (including the need to procure approval from the Montgomery County Conservation District for the erosion and sedimentation control plans), the need to address landscaping issues, the need to show easements for stormwater management and sanitary sewer facilities, the need to show all construction details as required by SALDO §105-65B., the need to revise the plans to show the existing site features, and the need to place details concerning sanitary sewer system service on the plans. (*See* February 24, 1999 Letter at  from Zarko to Ford, App., Exh. 101, ¶¶III.1, III.3, III.4, III.8.e, III.8.l, III.8.m, III.9, III.12, III.20, III.25, and III.26.a.) The same or virtually identical purported issues were used as the basis to deny HMI's plan application. (*See* Denial Resolution, App., Exh. 60, at ¶¶2.c, 3.a.(1)-(3), 3.b, 3.c, 3.e, 4.e, 4.g, 4.j and 4.k.)

- By Resolution 1998-52, the Township granted conditional approval of preliminary plans for a development featuring three new buildings. (Resolution 1998-52, App., Exh. 102.) The preliminary plan approval was conditional on compliance with various items identified in a November 6, 1998 review letter from Engineer Zarko. Engineer Zarko recommended that the Township not consider the preliminary plans until the applicant addressed several issues, including provision of a written statement concerning the developer's intentions with respect to implementing recommendations set forth in the traffic impact study pertinent to the project, stormwater computation issues, and the need for time of concentration calculations to be submitted for review. (*See* November 6, 1998 Letter from Zarko to Ford, App., Exh. 103, at ¶¶I.1, I.3 & I.3(b).) Engineer Zarko also noted that several other issues would have to be addressed, including items relating to grading and stormwater management, the need for a public utility water service agreement, the need for a stormwater easement agreement, the need

for a highway occupancy permit, the need for sanitary sewer details conforming to Township standards to be set forth on the plans, and the need for all construction details to be placed on the plans. (*Id.,* ¶¶III.2, III.4, III.6, III.7, III.9, and III.14.) Once again, the same or virtually identical purported deficiencies were cited as predicates for denying HMI's plans. (*See* Denial Resolution, App, Exh. 60, ¶¶2.b, 2.e, 3, 3.c, 3.f, 4.a and 4.j.)

There is simply no rational justification for this disparate treatment of HMI's Second Revised Preliminary Plans. Just like any other developer in Whitemarsh Township, HMI should have been afforded the right to meet various conditions before having its plans denied.

### D.    Summary Judgment Should Be Denied With Respect To HMI's Procedural Due Process Claim.

Defendants again argue, just as they did in their motion to dismiss, that there can be no procedural due process claim where there are post-deprivation procedures that might remedy legal errors committed by a municipality. However, defendants cite no new law and offer no authority to counter the proposition that post-deprivation remedies are adequate to satisfy due process "only when the circumstances surrounding the deprivation require quick action by the state, or when pre-deprivation procedures are impractical." *C&M Group, Inc. v. New Britain Township*, No. Civ. A. 90-4375, 1991 WL 25684, *3 (E.D.Pa. Feb. 14, 1991) (Gawthrop, J.) (*citing Parrett v. Taylor*, 451 U.S. 527, 539 (1981)). Defendants' argument that the existence of post-deprivation remedies justify any pre-deprivation lack of procedure, no matter how severe or unwarranted, does not hold water.

To sustain a claim under 42 U.S.C. §1983 for violation of procedural due process, a plaintiff must prove that a person acting under color of state law deprived him of a protected property interest and that the procedure for challenging the deprivation does not satisfy the requirements of procedural due process, that is, notice and a meaningful opportunity to be heard. *Leipziger v. Township of Falls*, No. Civ. A. 00-1147, 2001 WL 111611, at *4 (E.D.Pa. Feb. 1, 2001). Clearly, within the context of zoning and land use plan review, there is no need for quick

action by the state, nor are pre-deprivation procedures impractical. *C&M Group, Inc.* 1991 WL 25684, at *3 (rejecting argument that post-deprivation appeal to Common Pleas Court is adequate due process where pre-deprivation procedures may be provided, such as in the context of zoning review or the denial of a land-use permit); *see also Littlefield v. City of Afton*, 785 F.2d 596 (8th Cir. 1986) (overruled on other grounds).

Here, there is no dispute that the defendants were acting under color of state law. Nor is there any dispute about the existence of HMI's protected property interest. The undisputed facts demonstrate that the defendants unnecessarily rushed to judgment and failed to afford HMI appropriate, practical due process procedures.

For example, numerous of the Township Engineer's review comments provided on March 21, 2002 concerned issues that had never been raised before, though they could have been. (*See* Viscuso Report, App., Exh. 77 at 7, 28, 36, 43-44, 49 and 51.) Given that they were furnished to HMI only two hours prior to the meeting where the defendants put HMI's Second Revised Preliminary Plans on trial and rejected them, and given that HMI was offering to grant an extension of time for the defendants to consider its plans,[40] the defendants' last minute disclosure of these purported defects in the preliminary plan application and subsequent action upon them (*i.e.*, they were included in the denial resolution as predicates for denial) unquestionably presents issues of fact as to whether the defendants denied HMI a meaningful opportunity to respond. This is especially so when one considers that HMI was not notified in advance that the defendants would be holding a full blown and unprecedented hearing on its

---

[40]     Moreover, as mentioned, the submission of the Second Revised Preliminary Plan, on March 19, 2002 started the 90 day review period anew. (*See supra* at 37 n.25.)

plans, not just a <u>meeting</u>, which are completely distinct under the Pennsylvania Municipalities Planning Code. (*See supra at* 38-40; *see also* Jonas Report, App., Exh. 19, at 7-8.)

The defendants have not – and, indeed, cannot – explain why such rushed actions were required and why sufficient notice could not be given to HMI. They have not offered any record evidence to establish that pre-deprivation procedures were impractical. To the contrary, the circumstances in which HMI's plan application was denied demonstrate that the defendants could have taken more time and made sure that HMI received the requisite due process. In their frenzy to deny the plan application, a matter on which they had made up their minds before even holding their show trial, the defendants ran roughshod over HMI's protected property interests.

Moreover, the mere availability of a post-deprivation remedy was insufficient to satisfy procedural due process requirements in *de Botton v. Marple Township*, 689 F.Supp. 477 (E.D.Pa. 1988). There, the township effectively denied the plaintiff's challenge to a zoning ordinance when it refused to conduct a hearing within the period required by the MPC. *Id.* at 481. Notwithstanding that the plaintiff in *de Botton* had an appellate process available to it to contest this denial (indeed, plaintiff actually prevailed on appeal), the Court found that plaintiff had stated a claim for denial of its procedural due process rights. *Id.* at 479, 481.

Under the facts here, the counterpart to the hearing <u>withheld</u> from the plaintiff in *de Botton*, is the preliminary land development process itself. Just as Mr. de Botton had a right to an administrative hearing before the Board of Commissioners on his claim that the Marple Township Ordinance was unconstitutional, here HMI was entitled to fair consideration in the administrative process of its request for preliminary plan approval of an as-of-right development. By the time of the formal hearing before the Board, HMI had lost any opportunity for a fair administrative review because of defendants' actions. Simply put, a process that yields denial by

pretext is no process at all.  The March 21 show trial, therefore, was no more a "hearing" than the hearing of which Mr. de Botton was deprived.

Finally, even if defendants' argument regarding post-deprivation procedures had merit, there are <u>no</u> statutory appellate procedures in Pennsylvania that permit HMI to challenge in full measure the specific conduct alleged here.  HMI does not merely challenge the denial of its preliminary plans, but rather pleads an overarching scheme to deprive HMI of its property rights that consisted of the Rezoning followed by the rejection of the Second Revised Preliminary Plan. While Pennsylvania provides an appellate procedure in the Court of Common Pleas to challenge the denial of land development approval[41] and a separate procedure in the Zoning Hearing Board to challenge spot zoning, [42] it does not provide a single statutory appeal to challenge in one forum a scheme that incorporates <u>both</u> actions.  Therefore, the post-deprivation procedures defendants rely upon fail to provide adequate process to satisfy due process.

---

[41]   53 P.S. §§11001-A, *et seq.*

[42]   53 P.S. §10909.1.

**IV.     CONCLUSION**

For the reasons stated above, defendants' motion for summary judgment should be denied.

Respectfully submitted,

_____
Michael Sklaroff (ID No. 03287)
Walter M. Einhorn, Jr. (ID No. 48733)
Lawrence D. Berger (ID No. 16028)
Arleigh P. Helfer, III (ID No. 84427)
Corey Field (ID No. 88650)
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

Attorneys for Plaintiff
Highway Materials, Inc.

Date:  August 11, 2004

## Certificate of Service

I hereby certify that plaintiff's proposed Order, Opposition To Defendants' Motion for

Summary Judgment, Brief and Appendix were served on August 11, 2004 as follows:

**By hand delivery**
Harry G. Mahoney, Esquire
Deasey, Mahoney & Bender, Ltd.
1800 John F. Kennedy Boulevard, Suite 1300
Philadelphia, PA 19103-2978

Attorneys for Defendants Whitemarsh Township, Board of Supervisors of Whitemarsh
Township, Ann D. Younglove, Ronald J. DeRosa, William P. Rimel, III, Peter B. Cornog,
Michael A. Zeock, and Thomas F. Zarko

**By first class mail, postage prepaid**
Kevan Francis Hirsch
Kaplin Stewart Meloff Reiter & Stein PC
350 Sentry Parkway East Building 640
Blue Bell, PA  19422

Attorneys for Intervenor Defendants

_____
Lawrence D. Berger