**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                          :
HIGHWAY MATERIALS, INC.,                  :        CIVIL ACTION
                                          :
        Plaintiff,                       :
                                          :
    v.                                   :        No. 02-3212
                                          :
WHITEMARSH TOWNSHIP,                       :
MONTGOMERY COUNTY,                         :
PENNSYLVANIA, et al.,                      :
                                          :
        Defendants.                      :
_____   :

**<u>MEMORANDUM</u>**

**ROBERT F. KELLY, Sr. J.**                    **OCTOBER 4, 2004**

**I.    <u>INTRODUCTION</u>**

      Presently before this Court is the Defendants', Whitemarsh Township, the Board

of Supervisors of Whitemarsh Township, Ann D. Younglove ("Younglove"), Ronald J. DeRosa

("DeRosa"), William P. Rimel ("Rimel"), Peter P. Cornog ("Cornog"), Michael A. Zeock

("Zeock") and Thomas F. Zarko ("Zarko"), Motion for Summary Judgment Pursuant to Rule

56(b) of the Federal Rules of Civil Procedure.  On May 24, 2002, the Plaintiff, Highway

Materials, Inc. ("HMI"), filed its Complaint against the Defendants.  Plaintiff's Complaint

contains three counts; specifically, Plaintiff asserts that the Defendants violated its substantive

and procedural due process rights under Counts I and II of the Complaint. Additionally, in Count

III, the Plaintiff asserts that the Defendants denied it equal protection under the law.  The instant

Motion asks this Court to enter summary judgment in favor of the Defendants as to all three

Counts.  For the following reasons, the Defendants' Motion will be granted.

## II.   **BACKGROUND**

This case arises from a land use dispute.  HMI is the owner of a 309-acre tract of land in Whitemarsh Township, Montgomery County, Pennsylvania that consists of three parcels. The property was previously known as the Corson Limestone Quarry.   The Plaintiff purchased this property on June 21, 1997.  The portion of HMI's property that is the subject of this lawsuit is a fifty-four-acre portion of the HMI owned property (hereinafter referred to as "Parcel One").[1] Up until late 2001/early 2002, the majority of Parcel One was zoned HVY-X Industrial except for a small portion which was zoned AA-Residential.  The parties are in agreement that the HVY-X zoning designation permitted a wide array of uses, the principal exception being that residential development was not permitted under the HVY-X zoning regulations.  (See Defs.' Mem. Law in Supp. of Mot. for Summ. J., at 7; Brief of Pl. in Opp'n to Defs' Mot. for Summ. J., at 6).  To the east, north and south of Parcel One is the Philadelphia Cricket Club Golf Course.

The Whitemarsh Township's subdivision and land development procedures, requirements and standards are set forth in the Township's Subdivision Land Development Ordinance ("SALDO").  Section 105-12 of the Whitemarsh SALDO provides a general outline of

---

[1] For the purposes of this Memorandum, the other two parcels of HMI's property shall be known as Parcel Two and Parcel Three respectively.  As stated by the Plaintiff, "Parcel Two is a 67-acre tract consisting largely of a quarry site that is in the process of being filled in.  HMI also operates a concrete production business on this parcel.  Parcel Three is a 188-acre trace which contains an active quarry and a bituminous production business."  (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 5)(internal citations omitted).  With one exception, all the properties surrounding HMI's property is zoned residential.  Indeed, the only property near HMI's property that cannot be considered residential, agricultural or a golf course is a fifteen-acre parcel of land located to the west of Parcel Two which is zoned HVY-X.  This fifteen-acre parcel is owned by KYW and has a radio transmitting tower and a small building on the property.

township land development procedures.[2]  As the SALDO states, there are three steps in the land

development process.  The filing of a sketch plan constitutes the first step.  This step is optional.

As stated by Section 105-13 of the SALDO:

> (1)     [t]he purpose of the sketch plan, which is an optional
>         submission, is to afford the applicant the opportunity to
>         consult early and informally with both the Planning
>         Commission and the Township Planner before the

---

[2] Section 105-12 of the Whitemarsh SALDO states the following:

> A.     There are three (3) stages in the procedure for approval of
>        subdivision and land development plans.  These stages are
>        necessary to enable the Planning Commission and the
>        Board of Supervisors to have an adequate opportunity to
>        review the submissions and to ensure that their formal
>        recommendations are reflected in the final plans.
> B.     The separate stages of approval include the submission of
>        an optional sketch plan, a preliminary plan and a final plan.
>        These plans differ in their purpose and required level of
>        detail. . . .
> C.     Sketch plans shall require no more than a sixty-day review
>        period.  The review process required for preliminary and
>        final plans shall include no more than ninety (90) days
>        starting from the date of the regular meeting of the Planning
>        Commission next following the date the application is
>        accepted by the Manager and ending with the applicant
>        being notified of the decision of the Board of Supervisors.
> D.     The presentation of the preliminary plan and a final plan
>        shall each be considered a separate submission and the
>        maximum ninety-day review period may be required for
>        each.  A sixty-day review period may be required for a
>        sketch plan.  No limitations for the action of any public
>        official or agency set forth in this Article shall be construed
>        as mandatory.
> E.     The applicant is encouraged to meet informally with the
>        Township Planner and the Planning Commission to obtain
>        information regarding zoning and subdivision requirements
>        and development alternatives prior to the initial submission.

(Defs.' Mot. for Summ. J. at Ex. H).

3

preparation of the preliminary plan and formal application for approval.

(2)  During the sketch plan procedure, the applicant can advantageously make use of the services of the Planning Commission and the Township Planner to help him analyze the problem of the development and plan more adequately for its sound coordination with the community. The sketch plan procedure also affords the opportunity to give informal guidance to the applicant at a stage when potential points of difference can be more easily resolved. It can also simplify official action and safe unnecessary expense and delay.

(Defs.' Mot. for Summ. J. Ex. H). The filing of a preliminary plan is the second step of the process. Section 105-14 of the SALDO states that "[t]he purpose of the preliminary plan is to obtain formal conditional approval in order to minimize changes and revisions before final plans are submitted." (Id.). Finally, Section 105-15 of the Whitemarsh SALDO states that "the final plan shall conform to the preliminary plan, as approved." (Id.). Stated differently, "when a preliminary application has been duly approved, the applicant *shall be entitled* to final approval in accordance with the terms of the approved preliminary application as hereinafter provided." 53 Pa. Cons. Stat. Ann. § 10508(4)(i)(emphasis added).

A.   **INITIAL LAND USE DISCUSSIONS**

While most of the facts giving rise to this case occurred in late 2001 and early 2002, HMI's interactions with the Township began several years before the most relevant facts giving rise to this case occurred. In 1999, the Plaintiff retained E. Van Rieker, a land planner to explore development possibilities for Parcel One. In early 2000, HMI requested a waiver from one of the Township's stormwater management requirements. As stated by the Plaintiff, "[u]nder Township regulations, in calculating the required size of a planned development's stormwater facilities, a developer must account for the difference between the stormwater runoff

4

the project will create and the runoff a hypothetical 'meadow' would create at the site." (Br. Pl. in Opp'n to Defs. Mot. for Summ. J., at 7 n.5). After a request from the Township's engineer requesting as to what the site would look like if HMI complied with the existing requirements, HMI submitted three plans to the Township, each of which depicted a detention pond on a small area of Parcel One. As would become an issue later, this dentention basin was apparently depicted on a portion of Parcel One zoned AA-Residential. Ultimately, the Board rejected the wavier request because the Board found that options were available to HMI that would comply with the stormwater ordinance.

As this was going on, the Plaintiff was in the process of preparing a sketch plan for Parcel One. On November 30, 2000, Plaintiff submitted a sketch plan to the Township. This sketch plan was for what the parties have described as a "mixed-use" plan. The sketch plan proposed 450,000 square feet of office space along with 600 apartment units. Because this sketch plan called for residential units, as well as office space, it did not conform with the HVY-X zoning of Parcel One that was in place at the time of the sketch plan submission. Thus, if this "mixed-use" plan was to ever be approved, Parcel One would have to be rezoned or HMI would have to seek a variance from the Township's Zoning Hearing Board.

On January 29, 2001, the Montgomery County Planning Commission reviewed the "mixed-use" sketch plan.[3] Overall, the Montgomery County Planning Commission found that the "mixed-use" sketch plan was "too intense in both its impervious coverage and density for

---

[3] Upon review of the sketch plan, the Montgomery County Planning Commission issued a letter stating that "the review comments and recommendations contained in this report are advisory to the municipality and final disposition for the approval of any proposal will be made by the municipality." (Defs.' Mot. for Summ. J. at Ex. L).

[Parcel One] and the surrounding area." (Defs.' Mot. for Summ. J. at Ex. L). Additionally, the

County Planning Commission recommended that:

> the applicant and the township work together to draft a new zoning
> district that would allow office buildings and apartments in a
> campus setting, with appropriate dimensional requirements. To
> develop this site as proposed under the HVY-X District
> dimensional requirements will create a new, dense, village
> surrounded by a semi-rural area, disconnected from other dense
> areas of the township.

(Id.). Subsequently, on February 27, 2001, the Whitemarsh Township Planning Commission

reviewed the "mixed-use" sketch plan proposal at an open meeting attended by the public. At

this meeting, Plaintiff's attorney, James Garrity ("Garrity"), made a presentation regarding the

"mixed-use" sketch plan and "indicated that [HMI was] seeking comments from the Planning

Commission." (Id. at Ex. N). Additionally, at this meeting, several people from the community

spoke out against the proposal detailed in the "mixed-use" sketch plan. (Id.).

On May 24, 2001, the Plaintiff presented the "mixed-use" sketch plan to the

Board of Supervisors at an open meeting. Once again, Garrity appeared on behalf of the Plaintiff

to discuss the "mixed-use" sketch plan. As in the Planning Commission meeting, members of

the Township spoke out against the development of Parcel One, or at least the proposal as set out

in the "mixed-use" sketch plan.[4] For example, the Township citizens expressed concerns about

additional traffic and that the HMI proposal was to large. Additionally, members of the Board of

Supervisors also expressed their concerns about the HMI proposal. For example, Supervisors

---

[4] Some of the people that spoke out against the "mixed-use" sketch plan identified
themselves as members of the Whitemarsh Township Residents Association ("WTRA"). The
Plaintiff asserts that the WTRA was an ad hoc civic association "created to oppose development
in the Township." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 9). Apparently, the
WTRA has grown into quite a large civic organization comprising 1,500 members.

Elizabeth W. Graf and Rimel expressed concerns that the proposal was too dense.

## B.    REZONING

After sensing the reluctance of the Township and its citizens to its "mixed-use" sketch plan, HMI set to work on formulating a preliminary plan that would not require any rezoning of the property. Specifically, during the summer of 2001, HMI began to prepare a preliminary plan for an office park. According to the HVY-X zoning that Parcel One was under during the summer of 2001, if HMI were to submit an all office space plan, then no rezoning would be required since such a proposal would lack any residential component that was prohibited under the HVY-X regulations. Thus, during the summer months of 2001, HMI began to prepare a preliminary plan for an all office space development in Parcel One that would conform with the HVY-X zoning regulations. Subsequently, on September 10, 2001, HMI submitted its preliminary plan for Parcel One (hereinafter referred to as the "Initial Preliminary Plan"). The Initial Preliminary Plan submitted by HMI consisted of 500,000 square feet of office space. This office park was to be called "Creekside Commons." Since this plan lacked any residential space, no rezoning by the Township was required before the Board of Supervisors could approve Creekside Commons.

During the summer of 2001, the Township also began the process to rezone HMI's property. The Whitemarsh Township zoning ordinances allow individuals to submit proposals to change the Township's zoning map. Section 116-239 of Whitemarsh's zoning regulations states:

> [w]henever the owners of fifty per centrum (50%) or more of the property owners within any district or the property fronting on the same street or streets or abutting on the property sought to be

changed, and situate within one thousand (1,000) feet of the property sought to be change, shall present to the Board of Supervisors a petition duly signed and acknowledged, requesting an amendment, supplement, change, modification or repeal of the regulations prescribed, or of the Zoning Map, including such district, it shall be the duty of the Board of Supervisors to hold a public hearing thereon and cause notice thereof to be given in the manner prescribed in § 116-237.

(Id. at Ex. G). Subsequently, on July 3, 2001, an attorney representing a neighbor to HMI's property submitted a petition to rezone HMI's property to EX-Extraction.[5] As will be explained, HMI's property was properly rezoned in Feburary of 2002.

At a Board of Supervisors meeting on September 20, 2001, the Whitemarsh Board of Supervisors voted to authorize the rezoning of Parcel One. Then, at their October 18, 2001 meeting the Board voted to rezone HMI's property to EX-Extraction. However, this action by the Board was procedurally improper, and HMI filed a challenge to the rezoning with the Township's Zoning Hearing Board. Ultimately, the October 18, 2001 rezoning was deemed procedurally defective and the rezoning was re-enacted on February 28, 2002.

---

[5] As stated by the Defendants regarding changing the property from HVY-X to EX-Extraction:

> [t]he overall effect of the [proposed] changes in the Zoning Ordinance and Zoning Map was to rezone major portions of Plaintiff's three parcels, including the 54 acre parcel [Parcel One] (with the exception of the portion zoned AA-Residential) to EX-Extraction which . . . as stated before, permitted the extractive quarry use to continue, but once abandoned and the property reclaimed, the land could be used for residential purposes. Previously, under the HVY-X Industrial District land use regulations, any use except those restricted (including residential), were permitted in the HVY-X District. Permitted uses in a HVY-X District would include administrative and executive offices.

(Defs.' Mem. of Law in Supp. of their Mot. for Summ. J. at 17).

It is important to note the timing of HMI's preliminary plan submission. As stated previously, HMI submitted their preliminary plan proposal for Creekside Commons on September 10, 2001. Since HMI's preliminary plan proposal for Creekside Commons was filed with the Township before the Board of Supervisors had enacted the EX-Extraction rezoning ordinance for Plaintiff's property, the preliminary plan proposal would be governed by the HVY-X zoning regulations. Pennsylvania Law states that:

> [f]rom the time an application for approval of a plat, whether preliminary or final, is duly filed as provided in the subdivision and land ordinance, and while such application is pending approval or disapproval, no change or amendment of the zoning, subdivision or other governing ordinance shall affect the decision on such application adversely to the applicant and the applicant shall be entitled to a decision in accordance with the provisions of the governing ordinances or plans as they stood at the time the application was duly filed. In addition, when a preliminary application has been duly approved, the applicant shall be entitled to final approval in accordance with the terms of the approved preliminary application as hereinafter provided. However, if an application is properly and finally denied, any subsequent application shall be subject to the intervening change in governing regulations.

53 PA. CONS. STAT. ANN. § 10508(4)(i).

### B.   REVIEW AND ULTIMATE DENIAL OF HMI'S PRELIMINARY PLAN

As both parties recognize, "a Township must act on land development plans within ninety days after the first Planning Commission meeting after the filing of the plans. If no action is taken within the statutory time frame, the land development plans are deemed approved." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J. at 20-21)(internal citations omitted). However, HMI afforded the Township a routine extension of time.

After the preliminary plans were submitted on September 10, 2001, "in

accordance with the provisions of the SALDO, the Township administrative staff distributed

copies of the application and/or plans to various individuals and organizations, including the

Montgomery County Planning Commission and . . . Zarko, the Township's consulting engineer."

(Defs.' Mem. of Law in Supp. of their Mot. for Summ. J., at 18).  The Montgomery County

Planning Commission reviewed the Initial Preliminary Plan for Creekside Commons and stated

the following in a November 20, 2001 letter to Whitemarsh Township:

> [a]s we stated in our January 29, 2001 letter, we believe that this
> project is too intense for this site.  The HVY-X zoning, under
> which the plan was submitted, was developed many years ago for
> heavy industrial uses.  Hence, its development standards are not
> appropriate for redevelopment of this site.  When applied to
> suburban-style office buildings the coverage of the site becomes
> excessive, resulting in buildings surrounding by acres of paving.
> As we previously stated in our earlier letter, we believe that this
> results in a project that, while initially attractive because of its
> newness, will not age well.

(Defs. Mot. for Summ. J. Ex. BB).  The Montgomery County Planning Commission

recommended the following:

> [w]e recommend that the applicant work with the township and
> their consultant on development scenarios for this site and the rest
> of the quarry.  While we recognize that the applicant has vested
> property rights with the site, a project developed to this scale and
> intensity will have a deleterious effect on the surrounding area and
> will eventually lose its appeal for tenants as better designed
> projects with site amenities become available.

(Id.).  As with the January 29, 2001 letter, the Montgomery County Planning Commission noted

that its comments and recommendations were merely advisory and that final authority for

disposition of the preliminary plan remained with the municipality.

Even before the Montgomery County Planning Commission issued its advisory

report and recommendations, Zarko reviewed the Initial Preliminary Plan for Creekside

Commons.  On October 11, 2001, Zarko submitted his first review of HMI's Initial Preliminary

Plan for Creekside Commons.  This review detailed areas where the Initial Preliminary Plan was

non-compliant with the SALDO, zoning ordinance and the grading ordinance.

As both sides attest, it is normal practice for a preliminary plan to undergo

revisions before it is finally approved or denied.  Indeed, in responding to Zarko's October 11,

2001 review letter, HMI submitted a revised preliminary plan for Creekside Commons on

December 24, 2001 (hereinafter referred to as the "First Revised Preliminary Plan").  Engineer

Zarko reviewed the First Revised Preliminary Plan, and while this plan had less deficiencies than

the September 10, 2001 Initial Preliminary Plan proposal, Zarko continued to find deficiencies

and non-compliances when compared to the Township's ordinances.[6]  After this review letter by

Zarko, the purported deficiencies as stated by the Defendants became evident.  Indeed, the

Defendants assert that "none of the three major zoning issues had been dealt with" in the First

Revised Preliminary Plans.  (Defs. Mem. of Law in Supp. of their Mot. for Summ. J., at 20).

According to the Defendants, the First Revised Preliminary Plan failed to address the lack of a

berm and fence to surround Creekside Commons as required by the HVY-X regulations, the

continued location of a stormwater retention basin on the portion of Parcel One that was zoned

AA-Residential and the selection of a sanitary stormwater option.  The Plaintiff contests the

impact or relevancy of these three items.  First, HMI states that after its Initial Preliminary Plan

was reviewed by Zarko in October of 2001, HMI constantly requested meetings with the

---

[6] The Defendants assert that the Initial Preliminary Plan had ninety items of non-compliance and that the First Revised Preliminary Plan had seventy-three.

Township on how best to move forward on the storm sewer issue.  Additionally, the Plaintiffs

assert that on January 16, 2001, representatives of the Township contacted Garrity and advised

HMI to continue to show both a public sanitary sewer and on-site sewer option on the

Preliminary Plan so as to allow the Board to elect which option it preferred.  Additionally, the

Plaintiff asserts that as to the berm/fence requirement and the location of the detention basin,

Zarko's zoning interpretations were simply incorrect.

As the preliminary plan process continued for Creekside Commons, there was

also movement toward revisiting the "mixed-use" plan for Parcel One.  The Plaintiff asserts that

Gregan and Weiss advised Garrity that the Board of Supervisors had agreed to schedule a public

meeting on HMI's "mixed-use" plan.  HMI then submitted a "mixed-use" plan on February 12,

2002 and a public meeting to discuss the "mixed-use" plan was scheduled for March 7, 2002.  As

set out in the minutes of the March 7, 2002 meeting, "Mr. Garrity presented an alternative mixed

use sketch plan for the site which he opined was less intense than the office use.  The "mixed

use" sketch plan proposed 308,000 sq. ft. of office space in four three-story buildings and 380

apartments in ten four-story buildings of 38 apartments each."  (Defs. Mot. for Summ. J. Ex. S).

As with the previous "mixed-use" sketch plan discussed at meetings in early and mid-2001, the

"mixed-use" plan discussed at the March 7, 2002 meeting met with significant opposition from

the public as well as from some Board members.[7]

A day after the March 7, 2002 Board meeting discussing the "mixed-use" concept,

the Township Manager ("Gregan") sent a letter to Garrity stating that HMI's all-office

[7] For example, "Supervisor Zeock opined that the project is too intense and that, in his opinion, the two big issues are traffic and drainage."  (Defs. Mot. for Summ. J. Ex. S).

12

preliminary plan proposal was going to be scheduled "for action" by the Whitemarsh Township

Planning Commission on March 19, 2002 and would be acted upon by the Board of Supervisors

Regular Meeting on March 21, 2002.  The Defendants assert that since the First Revised

Preliminary Plan was filed on December 24, 2001:

> the Board of Supervisors was legally obligated to act on the [First
> Revised Preliminary Plan] by March 24, 2002 not only in
> accordance with the Municipalities Planning Code, but pursuant to
> HMI's offered extension which was accepted by the Board of
> Supervisors.  If the Board did not act on the plans within that time
> frame, it ran the risk that the [First Revised Preliminary Plans], as
> deficient as they were, would be "deemed approved" in accordance
> with section 508 of the Municipalities Planning Code.  53 P.S. §
> 10508(3).  That section of the Code provides for an automatic
> approval of plans if not acted upon within the 90 day period.
> Because the last Supervisors' meeting before the deadline was
> March 21, 2002, the [First Revised Preliminary Plans] had to be
> acted upon by that date, absent a further extension accepted by the
> Township.

(Defs.' Mem. of Law in Supp. of their Mot. for Summ. J., at 27).  The Plaintiff responds by

providing this Court a letter dated March 12, 2002.  In that letter, Garrity offered an extension of

time for the Board of Supervisors to act so that the First Revised Preliminary Plans would not be

deemed approved by a lack of Board action.  As Plaintiff notes, even with an offer to extend the

time for Board action, the Board refused to accept the Plaintiff's offer of an extension.  Instead,

the [First Revised Preliminary Plans] were to be ready "for action" at the March 19, 2002

Township Planning Commission meeting and then ready "for action" at the Board of Supervisors

meeting two days later on March 21, 2002.

Leading up to the March 21 Board of Supervisors meeting, the Plaintiff prepared

and ultimately filed a new revised preliminary plan for Creekside Commons on March 19, 2002

13

(hereinafter referred to as the "Second Revised Preliminary Plan").[8]  Since the Second Revised

Preliminary Plans were filed on the same day as the Planning Commission meeting, the Planning

Commission had no statement from the Township's engineer as to the adequacy of the newly

submitted plan.

After receipt of the Second Revised Preliminary Plan, Zarko began to review it in

preparation for the March 21, 2002 Board of Supervisors meeting.  Zarko issued his review and

report of the Second Revised Preliminary Plan on March 21, 2002, a few hours before the Board

of Supervisors meeting was to take place.  A copy of Zarko's report was faxed to Garrity

approximately two hours before the Board of Supervisors meeting was to begin.  In his report,

Zarko set forth the areas he felt the Second Revised Preliminary Plan failed to comply with the

Township's SALDO, zoning ordinance and grading ordinance.  For example, Zarko once again

noted HMI's proposal for a retention basin in the area of Parcel One that was zoned AA-

Residential.  Zarko also noted that the specifications concerning the Second Revised Preliminary

Plan failed to provided details concerning the proposed on-site sewage treatment plant.

Additionally, Zarko once again stated that the plan failed to provide a berm and chain link fence

around the perimeter of the proposal.[9]  The Plaintiff contends that the Township Solicitor, Weiss,

---

[8] The filing of the Second Revised Preliminary Plans on March 19, 2002 started a new
ninety-day period for the Defendants to act.

[9] Specifically, Zarko provided the following comments in his March 21, 2002 review
letter:

1.    The plan that was submitted for the Project is inconsistent
      with the following provisions of Chapter 116 "Zoning" of
      the Whitemarsh Township Code:
      a.    The applicant proposes to construct a retention
            basin on the southeasterly portion of the Project site,

instructed Zarko to deviate from his normal routine in making his report.  Specifically, the

Plaintiff asserts that Zarko's letter was not divided into sections entitled "Preliminary Plan

Approval Requirements" as previous reports were noted and that Zarko intentionally jumbled the

items on the March 21, 2002 report so they differed in order from the January 24, 2002 report.

    At the start of the March 21, 2002 Board meeting, Garrity made a short

presentation of the plans and again reiterated HMI's request for an extension of time.[10]  The

Supervisors ultimately rejected Garrity's request for an extension of time and moved forward to

vote on the Second Revised Preliminary Plan.  At their depositions, the Board members testified

as to the reasons for denying the preliminary plan.  First, the members stated that they felt that no

---

which is located within the AA Residential Zoning District, which is not a permitted use within the aforementioned District.  (Sections 116-35 and 116-48)

b.   Details/design specifications concerning the proposed on-site sewage treatment plant depicted on the Plan were not submitted to the Township for review.  (Section 116-152.A.4)

c.   A suitably sized berm and chain link fencing were not provided around the perimeter of the proposed land development site in the specific locations required by the Whitemarsh Township Code. (Sections 116-156.B and C)

d.   The applicant proposes to construct the on-site sewage treatment plant on the southeasterly portion of the project site, within the 200 ft. setback from the AA-Residential Zoning District, which is not permitted.

(Defs. Mot. for Summ. J. Ex. WW).  The letter also details other problems/deficencies associated with the Second Revised Preliminary Plan.  (Id.).

[10] It should be noted that Weiss had arranged for a court reporter to document the proceedings, as well as chose to have the Township witnesses sworn.

real progress had been made on the Creekside Commons all-office proposal and that the proposal

was going nowhere. Thus, members of the Board thought an extension of time would be futile.

Additionally, the Board members stated that they relied on the report issued by Zarko earlier in

the day which stated that the plans did not conform to the Township Ordinances. Thus, the

Defendants assert there were valid, legal reasons for denying the plans as well as denying

Plaintiff's request for additional time.

By refusing to grant the extension as requested by HMI, and rejecting the Second

Revised Preliminary Plan, the Board of supervisors essentially locked HMI into a plan that would

have to be governed by the EX-Extraction zoning requirements. The parties are in agreement

that any new submission made by HMI to the Township would be deemed a new plan and,

therefore, would not be considered under the previous HVY-X zoning requirements. This is

because such a new submission would be deemed a new plan and, therefore, would not be

grandfathered in under the old zoning ordinance. As stated previously, the all-office space

Creekside Commons proposal was allowed under the HVY-X zoning, but not under the new EX-

Extraction zoning implemented initially in October of 2001, and then re-enacted in February of

2002.

III.    **STANDARD**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is

proper "if there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(c). Essentially, the inquiry is "whether the

evidence presents a sufficient disagreement to require submission to the jury or whether it is so

one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Anderson, 477 U.S. at 249.  A factual dispute is material only if it might affect the outcome of the suit under governing law.  Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)(citing Celotex, 477 U.S. at 325 (1986)).  Further, the non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim.  Celotex, 477 U.S. at 322-23.  If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper.  Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

## IV.  DISCUSSION

Plainitff's Complaint contains three counts.  The Plaintiff asserts that through their actions, the Defendants violated its procedural and substantive due process rights under the Fourteenth Amendment.  Additionally, the Plaintiff asserts that the Defendants did not afford it equal protection guaranteed under the law.  Throughout its Brief, the Plaintiff refers to the actions of the Defendants as a "one-two punch."  The Plaintiffs assert that "punch one" was the

rezoning of its property from HVY-X to EX-Extraction. "Punch two" was the deficient process of consideration, and ultimate denial of its preliminary plans for Creekside Commons. Thus, this Court will analyze whether one or both of these "punches" can substantiate a procedural or substantive due process claim, and/or whether one or both of these "punches" can substantiate an equal protection claim. As will be discussed, after reviewing the Brief's and exhibits of the parties, this Court finds that summary judgment is proper as to all three claims and, therefore, Defendants' Motion will be granted.

### A.    PROCEDURAL DUE PROCESS

It is important to first note the elements that are necessary to satisfy a procedural due process claim. As stated by the United States Court of Appeals for the Third Circuit ("Third Circuit"), "[t]o establish a cause of action for violation of procedural due process, a plaintiff in addition to proving that a person acting under color of state law deprived it of a protected property interest, must establish that the state procedure for challenging the deprivation does not satisfy the requirements of procedural due process." Midnight Sessions, Ltd. v. City of Phila., 945 F.2d 667, 680 (3d Cir. 1991), overruled on other grounds, United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392 (3d Cir. 2003)(citing Parratt v. Taylor, 451 U.S. 527, 537 (1981)).[11] The parties agree that the Defendants were acting under color of state law and that the Plaintiff has a protected property interest. Both sides, however, do contest whether the Plaintiff has satisfied the other requirements of substantiating a

---

[11] As will be explained, the standard for establishing a substantive due process claim was fundamentally changed by the Third Circuit in United Artists Theatre Circuit. See infra Part IV.B. However, cases predating United Artists Theatre Circuit remain good law on the issue of substantiating a procedural due process claim including Midnight Sessions and similar cases.

18

procedural due process claim so as to defeat the Defendants Summary Judgment Motion. First, this Court will analyze whether the purported "punch one" substantiates a procedural due process claim. Then, this Court will analyze whether the purported "punch two" substantiates a procedural due process claim.

1.    "Punch One"

Regarding the rezoning issue, or "punch one," the Third Circuit has stated that

> [t]he Pennsylvania legislature has enacted a system for processing challenges to zoning ordinances . . . . A landowner who wishes to challenge the validity of a zoning ordinance or amendment that restricts the use or development of its land may file a challenge with the zoning hearing board and may appeal from any decision by the zoning officer applying the ordinance.

Rogin v. Bensalem Township, 616 F.2d 680, 694-95 (3d Cir. 1980). Additionally:

> [i]f the landowner is dissatisfied with the Board's decision, it then has the right to appeal to the Court of Common Pleas. The appeal may take the form of direct judicial review of the Board's decision, or the court may take new evidence and enter its own findings of fact after trial de novo. The Court is authorized to declare any ordinance or map invalid and to set aside or modify any action, decision, or order of the Township, Zoning Officer, or Zoning Hearing Board.

Id. at 695 (footnotes omitted).

After the initial rezoning of HMI's property in October of 2001, the Plaintiff filed an appeal with the Township's Zoning Hearing Board. As was stated previously, the Township re-enacted the rezoning on February 28, 2002 due to procedural deficiencies associated with the October, 2001 rezoning. In Rogin, the Third Circuit affirmatively stated that "[i]n Pennsylvania the procedure for challenging zoning ordinances substantially conforms with the general due process guidelines enunciated by the Supreme Court." Id. at 695. There is clearly a full judicial

19

mechanism from which HMI could have availed itself and, as one court has noted, "when a state affords a 'full judicial mechanism' with which to challenge administrative decisions of the type at issue, the state provides adequate procedural due process, regardless of whether the plaintiff avails herself of that appeal mechanism." The Development Group, LLC v. Franklin Township Bd. of Supervisors, No. 03-2936, 2003 WL 22358440, at *8 (E.D. Pa. Sept. 24, 2003). Here, even though it appears as if HMI did not avail itself of the appeals procedures after the February, 2002 zoning re-enactment, the Pennsylvania process for challenging zoning ordinances satisfies the procedural due process requirements under the Constitution. Thus, as to "punch one," this Court cannot find any violation of Plaintiff's procedural due process.

     2.     **"Punch Two"**

     The thrust of Plaintiff's procedural due process claim relates to "punch two" or the lead up to and ultimate denial of the Second Revised Preliminary Plan for Creekside Commons. Similar to the procedure for appealing the rezoning of a property, Pennsylvania provides a party with a full judicial mechanism to review the denial of a preliminary plan. Indeed, Pennsylvania allows a party to appeal a land use decision to the Court of Common Pleas where the land is located. See 53 PA. CONS. STAT. ANN. § 11001-A et seq. As the Third Circuit has noted, "[i]t is the law in this Circuit that a state provides adequate due process when it provides reasonable remedies to rectify a legal error by a local administrative body." Bello v. Walker, 840 F.2d 1124, 1128 (3d Cir. 1988), overruled on other grounds, United Artists Theatre Circuit, 316 F.3d 392. In Bello, the Plaintiff argued that the township denied it procedural due process by denying a building permit. Id. at 1127. As the Third Circuit noted, "Pennsylvania affords a full judicial mechanism with which to challenge the administrative decision to deny an

application for a building permit." Id. at 1128. The Third Circuit found that the plainitffs did not show that decision to deny the building permit was made pursuant to a constitutionally defective procedure. Id. Indeed, the Third Circuit reiterated this point in Midnight Sessions, by stating that "[t]he availability of a full judicial mechanism to challenge the administrative decision to deny an application, even an application that was wrongly decided, precluded a determination that the decision was made pursuant to a constitutionally defective procedure." 945 F.2d at 681.

Even though HMI clearly has a full judicial mechanism with which to challenge the Board of Supervisor's decision to deny its Second Revised Preliminary Plans, HMI still argues that the Defendants have violated its procedural due process guarantee. Principally, the Plaintiff relies on C & M Group, Inc. v. New Britain Township, No. 90-4375, 1991 WL 25684 (E.D. Pa. Feb. 14, 1991). Plaintiff quotes C & M Group which states that "post-deprivation remedies are adequate to satisfy due process only when the circumstances surrounding the deprivation require quick action by the state, or when pre-deprivation procedures are impractical. Id. at *3. However, the Plaintiff fails to consider the full breadth of C & M Group.

At the outset, C & M Group resolved a 12(b)(6) motion to dismiss. In C & M Group, the court noted that "[c]ourts have thus held that pre-deprivation procedures must be provided prior to the denial of a land-use permit." Id. at *3. Continuing, the court noted that Plaintiff's averments as to its procedural due process claim were that the board failed to provide a decision on the record and that the board failed to give the land development plan fair consideration. Id. However, the court noted that "even if the Board acted arbitrarily and failed to base its decision on the applicable law and the facts, that goes to substance rather than procedure.

21

It does not amount to a failure to provide adequate procedure."[12]  Id. (citing Rogin, 616 F.2d at

692-94).  Additionally, the court noted that "the standard of procedural due process is not

whether the municipality deviates from established procedure, but whether it deviates from

constitutionally mandated procedure."  Id. (citing Eguia v. Tompkins, 756 F.2d 1130, 1139 (5th

Cir. 1985)).

          In the case currently before this Court, there were pre-deprivation procedures

utilized.  These included meetings and conversations with Township officials as well as three

reports issued by the Township's engineer.  Each of the Zarko's reports detailed deficiencies with

HMI's proposal as it related to the Township's ordinances.  The Plaintiff states that the third and

final Zarko report was issued only two hours before the Board ultimately denied the Second

Revised Preliminary Plan and that this third and final report by Zarko raised new issues not

present in his other reviews.  However, what is clear is that this third report issued on March 21,

2001 also detailed deficiencies that were present in previously submitted preliminary plans by the

Plaintiff.  While the Plaintiff vigorously states that its Second Revised Preliminary Plan was

approvable, this goes to the substance rather than the procedure.  The Board's reliance on an

allegedly incorrect engineer's report attacks the substance of the decision and not the procedure

with which it was made.  Pennsylvania clearly has a scheme in place that allows HMI to appeal

_____

[12] Indeed, in their Reply Brief, the Defendants make a similar point by arguing that
Plaintiff's complaints about how it was treated during the land development process and
rezoning amount to substantive rather than procedural due process challenges since the Plaintiff
was afforded pre and post deprivation procedures pursuant to the Township SALDO and
Pennsylvania law.

the denial of its preliminary plan.[13]  Therefore, Plaintiff's procedural due process claim is

knocked out.

      **B.**     **SUBSTANTIVE DUE PROCESS**

      This Court will now turn its attention to Plaintiff's substantive due process claim.

"To succeed in a substantive due process claim under Section 1983, a plaintiff must establish as a

threshold matter that he has a protected property interest to which the Fourteenth Amendment's

due process protection applies." Corneal v. Jackson Township, 313 F. Supp.2d 457, 465 (M.D.

Pa. 2003), aff'd, 94 Fed. Appx. 76 (3d Cir. 2004)(non-precedential)(internal quotation marks and

citations omitted).  Here, since HMI is the owner of a property interest that is subject to a local

land use regulation, HMI is entitled to substantive due process protection.  Id. (citing DeBlasio v.

Zoning Bd. of Adjustment for the Township of West Amwell, 53 F.3d 592, 600 (3d Cir. 1995)).

      Next, the Plaintiff must show that the government violated the relevant standard

in depriving the plaintiff of that protected property interest.  Until recently, Third Circuit

precedent stated that if a Township's actions were governed by an improper motive, that was

enough to establish a substantive due process violation.  See e.g., DeBlasio, 53 F.3d at 598;

Midnight Sessions, 945 F.2d at 683; Bello, 840 F.2d at 1129; Rogin, 616 F.2d at 689.  However,

in United Artists Theatre Circuit, the Third Circuit raised the standard for a substantive due

process violation in the land use context.  After analyzing County of Sacramento v. Lewis, 523

U.S. 833 (1998), the Third Circuit held that the new standard to determine whether a substantive

due process violation has taken place is whether the purported government action "shocks the

---

     [13] Indeed, HMI has taken advantage of these procedures by filing an appeal of the
Township's denial of its Second Revised Preliminary Plan with the Montgomery County Court
of Common Pleas in the spring of 2002.

conscience." <u>United Artists Theatre Circuit</u>, 316 F.3d at 400-01.  With this holding, the

"improper motive" test for substantive due process enunciated in <u>Bello</u> and its progeny was no

longer good law.  <u>Id.</u> at 401.  Indeed, the Third Circuit noted that "[l]and use decisions are

matters of local concern, and such disputes should not be transformed into substantive due

process claims based only on allegations that government officials acted with 'improper

motives.'"  <u>Id.</u> at 402.

        The "shocks the conscience" test is not a precise test "and it also 'varies

depending on the factual context.'"  <u>Eichenlaub v. Township of Indiana</u>, — F.3d —, No. 03-

2707, 2004 WL 2093439, at *9 (3d Cir. Sept. 21, 2004)(quoting <u>United Artists Theatre Circuit</u>,

316 F.3d at 400).  As a result, it is necessary to delve into the factual context of this case to see if

the Defendants have satisfied their summary judgment burden.  It should also be noted however,

that as the Third Circuit recently stated, "[w]hat is clear is that this ["shock the conscience"] test

is designed to avoid converting federal courts into super zoning tribunals.  What 'shocks the

conscience' is only the most egregious official conduct."  <u>Id.</u> (internal quotation marks and

citations omitted).

        Once again, Plaintiff asserts that the Defendants' purported "one-two punch" of

rezoning and subsequent denial of the Second Revised Preliminary Plans on March 21, 2002

violated its substantive due process rights.  First, this Court will examine whether "punch one,"

the rezoning of the HMI property from HVY-X to EX-Extraction, "shocks the conscience."

Then, this Court will analyze whether "punch two," the process and ultimate denial of HMI's

Second Revised Preliminary Plan, "shocks the conscience."

1.    **"Punch One"**

As the Third Circuit has noted, "[t]he federal courts largely defer to legislative judgment on such matters as zoning regulation 'because of the recognition that the process of democratic political decisionmaking often entails the accommodation of competing interests, and thus, necessarily produces laws that burden some groups and not others.'" Pace Res., Inc. v. Shrewsbury Township, 808 F.2d 1023, 1035 (3d Cir. 1987)(quoting Rogin, 616 F.2d at 697).  As to the rezoning of Plaintiff's property, this Court cannot say that the Defendants' actions were "conscience shocking."  The steps that the Defendants undertook in rezoning the property from HVY-X to EX-Extraction were legitimate steps so as to conform HMI's property with the surrounding area.  The Defendants rationale for the rezoning related to land use planning.

In Pace Resources, the Third Circuit determined whether the rezoning of property constituted a substantive due process violation.  Id. at 1034-35.  The Third Circuit stated that the plaintiff "does not present a case involving actions aimed at this developer for reasons unrelated to land use planning.  Rather, the case involves a difference of opinion on how much industrial development is in the best interest of the Township and how that quantum of industrial development should be achieved."  Id. at 1035.  The Third Circuit continued by stating that "[t]he complaint states that the Township acted to curb industrial development within the Township.  One can easily articulate a rational connection between each of the Township's actions and this legitimate purpose."[14]  Id.  Even though the Third Circuit was acting under the less stringent improper motive standard in Pace Resources for substantiating a substantive due process claim, it

---

[14] It should be noted that Pace Resources was decided in 1987, and thus was decided under the old, less stringent, and now defunct improper motive test for substantiating a substantive due process claim.

affirmed the district court's dismissal the substantive due process claim.  As the Third Circuit

noted, "[r]eduction of the amount of land zoned industrial and standards and procedures that

allow the Township to closely monitor any industrial development that does occur are measures

rationally related to the goal of restricting industrial presence in the Township for the benefit of

the general welfare." Id.

As in Pace Resources, the Whitemarsh Township's actions in rezoning related to

the goal of conforming HMI's property with the surrounding area, as well as other concerns

relating to commercial development in the Township.  Certainly, therefore, the Township's

actions in rezoning cannot meet the more stringent "conscience shocking" test.  Thus, the

Township's rezoning of Plaintiff's property does not amount to a substantive due process

violation.

### 2.    "Punch Two"

Next, the Plainitff asserts that the purported "punch two" violated its substantive

due process guarantee.  As previously mentioned, "punch two" relates to the process by which

HMI's Creekside Commons plan was reviewed and ultimately denied by the Township's Board

of Supervisors.  For the following reasons, "punch two" does not amount to a substantive due

process violation.

The Plaintiff argues that the Defendants conspired and executed a scheme

intended to deprive HMI of its property rights.  The Plaintiff cites to a number of actions that

took place during the course of this supposed scheme designed to thwart the development of

HMI's property.  However, based on the case law decided in this Circuit after United Artists

Theatre Circuit, this Court concludes that the facts as set out in supra Part II as it relates to

"punch two"do not amount to a substantive due process violation. First, this Court will analyze the relevant case law decided after United Artists Theatre Circuit so as to determine how the courts have grappled with the new "shocks the conscience" standard in a land use dispute. This step is important since the "shock the conscience" standard is relatively new to this Circuit as it relates to substantiating a substantive due process violation in the land use context. Then, using those cases as a backdrop, this Court will determine whether there is a material issue of fact outstanding as to whether the process and ultimate denial of HMI's Second Revised Preliminary Plan "shocked the conscience."

Perhaps most important for purposes of deciding this Motion is the recently decided case of Eichenlaub v. Township of Indiana, — F.3d —, 2004 WL 2093439. In Eichenlaub, the plaintiffs asserted many of the same complaints against the defendants as HMI asserts here. As the Third Circuit noted:

> [b]asically, the Eichenlaubs assert that zoning officials applied subdivision requirements to their property that were not applied to other parcels, that they pursued unannounced and unnecessary inspection and enforcement actions; that they delayed certain permits and approvals; that they improperly increased tax assessments; and that they maligned and muzzled the Eichenlaubs . . . . these complaints are examples of the kind of disagreement that is frequent in planning disputes. As counsel for appellants acknowledged during argument, there is no allegation of corruption or self-dealing here.

Id. at *10. The Third Circuit concluded by stating that the "District Court judge applied the correct legal standard ["shocks the conscience"] and did not abuse its discretion in dismissing the substantive due process claim." Id Many of the complaints HMI has levied against the Defendants are similar to those the Third Circuit examined in Eichenlaub. For example, the

Plaintiff asserts that the Township officials deviated from the requirements and standards the Township followed as compared to other preliminary plans. Additionally, the Plaintiff asserts that the delay and tactics of the Defendants caused the Second Revised Preliminary Plan to be denied. However, as both the District Court and the Third Circuit found in Eichenlaub, this does not meet the "shocks the conscience" test. Importantly, as was the case in Eichenlaub, there is simply no evidence in this case of corruption or self-dealing so as to find that the Defendants' actions were so egregious as to "shock the conscience."

It should also be noted that Eichenlaub clearly distinguishes a case principally relied upon by HMI in its Brief in Opposition to the Defendants' Summary Judgment Motion. Specifically, the case relied upon by the Plaintiff in its Brief in Opposition to Defendants' Motion for Summary Judgment is Associates in Obstetrics & Gynecology v. Upper Merion Township, 270 F. Supp.2d 633 (E.D. Pa. 2003). At the outset, it should be noted that Associates in Obstetrics & Gynecology dealt with a Rule 12(b)(6) motion to dismiss rather than one for summary judgment. Id. at 655. Quite obviously, the court in Associates in Obstetrics & Gynecology was dealing with a much more difficult standard for the Defendants to overcome than the one currently before this Court. Additionally, as stated by the Third Circuit, in Associates in Obstetrics & Gynecology, that case implicated

> more than just a disagreement about conventional zoning or planning rules. In Obstetrics, the District Court denied a motion to dismiss a claim that municipal defendants denied substantive due process when they selectively closed plaintiff's medical office for the purpose of blocking the provision of abortion services. Because the municipal action there implicated abortion rights, the District Court's analysis of the "shocks the conscience" standard proceeded largely under those judicial decisions that address protection of abortion services under the Fourteenth Amendment.

Eichenlaub, 2004 WL 2093439, at *9.  Thus, as the Third Circuit found in Eichenlaub, this Court

also finds that Associates in Obstetrics & Gynecology is also distinguishable from the present

dispute between HMI and the Defendants since what is at issue in the present case is a

disagreement about rezoning and land use planning rules as applied to the Plaintiff.

          Other land use substantive due process cases decided in this District and recently

affirmed by Third Circuit are also helpful in resolving the instant Motion.  A land use dispute

arose in Lindquist v. Buckingham Township, No. 00-1301, 2003 WL 22757894 (E.D. Pa. April

15, 2003), aff'd 2004 WL 1598735 (3d Cir. July 19, 2004)(non precedential).  Similar to the

current case before this Court, Lindquist involved a denial of a preliminary plan after the Board

amended the zoning ordinance.  Specifically, the preliminary plan filed by the plaintiffs in that

case sought to develop their property as a cluster subdivision using transferable development

rights that would have included 216 lots for single family homes.  Id. at *1.  Based on a sketch

plan, the plaintiffs submitted their phase one preliminary plan on March 29, 1996.  Id. at *2  This

preliminary plan called for clustered subdivisions in cul-de-sacs then permitted by the SALDO.

Id.  Additionally, at the time the March 29, 1996 plan was submitted, "the Zoning Ordinance

permitted the subdivision of the property into cluster subdivision as a 'by right' use in the AG-1

zoning district without the need for a public hearing or 'conditional use' approval by the Board."

Id. at *2 n.8.  After the preliminary plan was submitted to the Board,

          on February 26, 1997, the Board enacted an amendment to SALDO
          which prohibited cul-de-sacs streets within subdivisions.  The
          concept of such a change had arisen years earlier.  However, were
          the amendment to apply to Lindquists' Original Phase I
          submission, the plan proposed would be prohibited.  On June 11,
          1997, the Board enacted an additional amendment to the Zoning
          Ordinance which eliminated cluster subdivisions as a "by-right"

29

use in AG-1 zoning districts and provided for cluster subdivisions
only as a "conditional use."

Id. at *4.  Ultimately, the Board denied the plaintiffs' preliminary plan even though the Plaintiff

requested an extension.  Id.  Thus, "[a]s a result of the denial, the Lindquists were subject to the

amended zoning ordinances and could not develop their property as a single family detached

cluster development as a 'by-right' use."  Id.  After this denial, the Plaintiffs commenced an

action in state court.  However, this state court lawsuit was resolved by a settlement which

allowed the plaintiffs to resubmit a revised preliminary plan under the old zoning ordinance.  Id.

After another round of revised preliminary plans were submitted, the Board again rejected the

preliminary plans.  Id. at *5.  By doing so, the Board again passed on the plaintiffs offer to extend

the time for review, even though the Board had agreed to such extensions in the past.  Id. at *5.

Thereafter, the board of supervisors passed additional resolutions so as to correct legal errors in

the earlier denial resolution.  Id.

          The district court in Lindquist found that the plaintiffs "failed to meet their burden

of establishing a substantive due process violation."[15]  Id. at 8.  As the court stated:

> [t]he development of the Lindquist farm was an extremely complex
> project, involving numerous governmental approvals from a
> variety of public bodies and agencies and requiring compliance
> with numerous ordinances, regulations, and laws on the local and
> state level.  Not surprisingly, missteps, mistakes, and prolonged
> delay occurred as a result.  It is true that the Township and Board
> decisions contributed at least some, but certainly not all, of the
> difficulties that the Lindquists encountered during the protracted

---

[15] It should be noted that the Lindquist decision by the District Court were findings of fact
and conclusions of law after a trial without jury was held.  However, the case initially went to
trial under the old "improper motive" standard and it was only after trial that the Third Circuit
changed the standard to the more stringent "shock the conscience" standard in United Artists
Theatre Circuit.  See Lindquist, 2003 WL 22757894, at *7.

> subdivision approval process.  In addition, the defendants may
> have been negligent at times and in 1998 may have acted with an
> improper motive toward the Lindquists and their representatives.
> However, there is nothing in the facts we have found to prove that
> the defendants conduct was so egregious as to be "conscious
> shocking."

Id.  Indeed, the Third Circuit agreed with the District Court's conclusion, albeit in a non-

precedential opinion, by stating "[t]he District Court concluded that while the Township 'may

have been negligent' and 'may have acted with an improper motive,' *desirous of thwarting*

*development of the property*, its conduct did not shock the conscience.  We concur."  Lindquist,

2004 WL 1598735, at *5 (emphasis added).  Therefore, as in the present dispute between HMI

and the Defendants, Lindquist also involved the purported "one-two punch" of 1) submission of

a preliminary plan; 2) rezoning; and 3) denial of the preliminary plan so as to force the plaintiff

to file a new preliminary plan that conformed to the new zoning regulations.  Similar to the

District Court's holding in Lindquist, this Court cannot find any disputed facts which if proven

would satisfy the "shock the conscience standard."  Rather, as the District Court held in

Lindquist, the Defendants' actions in the case currently before this Court is not so egregious as to

be "conscience shocking."

      As the Third Circuit noted in its non-precedential Lindquist opinion, "without

more, a violation of state law, even a bad faith violation of state law, will not support a

substantive due process claim in a land-use dispute."  Id. at *5 (citing Baker v. Coxe, 230 F.3d

470, 474 (1st Cir. 2000); Natale v. Town of Ridgefield, 170 F.3d 258, 262 (2d Cir. 1999)).  Here,

the record indicates that there are disputed issues of fact as to whether the Defendants properly

applied the state and local ordinances to HMI's Creekside Commons proposal, and whether the

Defendants deviated from their usual procedure in analyzing the Creekside Commons proposal. However, as the case law previously cited illustrates, this, without more, does not amount to actions by the Defendants that "shocks the conscience."

Another case that is instructive and helpful in this Court's analysis of the instant Motion is Corneal, 313 F. Supp.2d 457. In Corneal, the plaintiffs sought to subdivide and sell a portion of a tract of land they recently purchased. Id. at 459. They had the tract surveyed for such a purpose. Id. at 459-60. During this time however, the Township placed a "temporary moratorium on subdividing property pending the enactment of a formal ordinance governing subdivision and land development" in January of 2000 since the Township had no subdivision ordinance to govern land development. Id. at 460 Subsequently, in February of 2000, the plaintiffs presented their original subdivision plan to the board. Id. In April of 2000, Mr. Corneal requested that the board sign five sewage modules, but the board refused. Id. Mr. Corneal had argued that he needed the sewage modules to begin to build his own personal house on the property, but the board stated that this would constitute a subdivision since the property already had an existing dwelling on it. Id. at 460-61. Later, the plaintiffs prepared a revised plan that reflected only subdividing the property into two lots. The plaintiffs would then sell one of the lots to a buyer. However, the plaintiffs never submitted the revised preliminary plan to the Township because of the moratorium that was in place. Id. at 461. The plaintiffs subsequently began to develop the land and constructed a 1.5 mile driveway through the tract in the spring of 2000. Id.

Later, Mr. Corneal requested a building permit from the township's building permit officer to build his garage. Id. at 461-62. The building permit officer refused to issue the

permit because the board had instructed him not to issue any permits to the Corneals.  At his

deposition, the township's building permit officer stated that although he had

> never refused to provide any other person in the Township with a
> permit, he refused to even provide the Corneals with a permit
> application.  During his conversations with Mr. Corneal [the
> township's building permit officer] referred to Mr. Corneal as a
> "trouble making yuppie from over the mountain." [The township's
> building permit officer] used this term to describe Mr. Corneal
> because Mr. Corneal "just behaves like someone who wants to get
> their own way and his age group."

Id. at 462 (internal citations omitted).  Ultimately, the buyer for the other tract pulled out of the

agreement to purchase due to difficulties with the township associated with obtaining subdivision

approval.  Id.  Additionally, after the buyers pulled out of the agreement to purchase, a board

member's nephew approached the plaintiffs about purchasing the tract of land.  Id.  Ultimately,

the Corneals brought a substantive due process claim against the township and the board.[16]  As

the district court noted:

> [t]he crux of the Conreal's substantive due process claim is that
> Defendants acted in concert to frustrate the Conreals' effort to
> subdivide and develop their ninety-five acre tract of land.
> According to the Conreals, Defendants needlessly complicated and
> delayed the Conreals' applications for permits and subdivision,
> thereby causing the Buyers to cancel their sales contract with the
> Conreals.  Drawing all genuine factual disputes in favor of the
> Conreals, it appears that Defendants intentionally opposed the
> Conreals' efforts, at least in part, because they did not like the
> Conreals . . . . Finally, the Conreals also contend that Defendant
> Wilson [a board member] intentionally held up the subdivision
> process so that the Conreals would be unable to convey a portion
> of the tract to the Buyers on June 30, 2000.  According to the
> Conreals, Defendant Wilson wished to prevent this contract from
> culminating so that he or his nephew could purchase the property,

---

[16] The Corneals also brought other claims, but for purposes of this Court's analysis, only
the substantive due process discussion is relevant.

33

which belonged to Defendant Wilson's grandfather until 1960.

Id. at 464-65 (footnotes omitted).

Ultimately, the district court in Corneal granted summary judgment in favor of the defendants on plaintiffs' substantive due process claim. Id. at 470. The court began by setting out the relevant "shock the conscience test" and then stated that:

> unless the evidence indicates that a challenged decision is
> completely unrelated in any way to a rational land use goal, there is
> no violation of substantive due process. The corollary of that rule
> being that where the locality's decision is related in any way to
> some rational goal, then no due process violation occurs even if the
> locality may have exceeded the scope of its jurisdiction.

Id. at 466. The court continued by stating that it uncovered only "a single case where a plaintiff's substantive due process challenge to a local land use decision survived a summary judgment motion under the 'shocks the conscience' test." Id. (citing Collier v. Town of Harvard, CV No. 95-11652-DPW, 1997 U.S. Dist. LEXIS 23582 (D. Mass. Mar. 28, 1997)). In the case currently before this Court, even HMI has come forward with no case arising in the land use context where a party overcame the stringent "shocks the conscience" standard so as to defeat a summary judgment motion.[17] As to the once case the court in Conreal found defeated a summary judgment

_____

[17] Indeed, aside from their expert reports, HMI cites to only a relatively few number of cases to support its substantive due process claim. First, Plaintiffs rely on Associates in Obstetrics & Gynecology, 270 F. Supp.2d 633. As previously stated, while a land use case, the decision by the district court arose out of a 12(b)(6) motion to dismiss rather than a summary judgment motion. Id. at 655-56. Additionally, for similar reasons that the Third Circuit distinguished Associates in Obstetrics & Gynecology in its recently decided Eichenlaub opinion, this Court has already distinguished Associates in Obstetrics & Gynecology. Additionally, the Plaintiffs rely on Estate of Smith v. Marasco, 318 F.3d 497 (3d Cir. 2003). At the outset, it should be noted, that Estate of Smith was not a land use case. The Plaintiffs argue that Estate of Smith stands for the proposition that a plaintiff's burden is less where the defendants actions are not in the context of a "hyperpressurized environment." However, in the precedential and non-precedential opinions that have been issued by the Third Circuit after United Artists, the Third

34

motion, the court noted,

> [e]ssentially, <u>Collier</u> involved an allegation of governmental
> extortion.  That is, the plaintiffs' applications would have been
> approved if they simply capitulated to the public official's request
> for an easement across their property.  As a result, the court found
> that a reasonable jury could have concluded that the [Zoning Board
> of Appeal's] decision to deny the plaintiffs' application was fueled
> solely by personal motivations totally devoid of any rational land
> use planning concerns.  Thus, <u>Collier</u> fell within the very narrow
> class of challenges to local land decision which are "truly
> horrendous."

<u>Id.</u> at 467 (citing <u>Welch v. Paicos</u>, 66 F. Supp.2d 138, 169 (D. Mass. 1999)).  In <u>Conreal</u>, the

court found that the facts viewed in the light most favorable to the Plaintiffs only established that

the Defendants might have acted with mixed motives; "one related to a legitimate land regulation

purpose (preserving land development status quo during the final approval process of the

subdivision ordinance), the other related to illegitimate personal animus."  <u>Id.</u> at 468.  However,

the court noted that "the plaintiff must demonstrate that the land use decision or regulation was

so totally irrational that it could not possibly be the real reason for the locality's action, or

alternatively, that the locality applied its decision selectively so that its land use concern could

not have been legitimate despite the rational basis for it."  <u>Id.</u> at 469.  Indeed, albeit in a non-

precedential opinion affirming the district court in <u>Corneal</u>, the Third Circuit stated that "[a]s

noted by the district court, unless the defendants' actions were 'completely unrelated in any way

to a rational land use goal,' there is no violation."  94 Fed. Appx. 76, 78 (citing <u>Lewis</u>, 523 U.S.

833).

---

Circuit has made no such distinction as it applies to a substantive due process challenge arising
from a land use/zoning dispute.  <u>See</u> <u>e.g.</u>, <u>Eichenlaub</u>, — F.3d —, 2004 WL 2093439; <u>Lindquist</u>,
2004 WL 1598735; <u>Corneal</u>, 94 Fed. Appx. 76.

In the case currently before this Court, the Defendants did have rational reasons for denying the Second Revised Preliminary Plan. Most notably, the Board relied on Zarko's report which set forth the deficiencies in the Second Revised Preliminary Plan for Creekside Commons. Even if Zarko did in fact apply the wrong legal standard to these plans, this Court reiterates that an error in applying state or local law, even a bad faith mistake, does not amount to a violation of substantive due process. See Conreal, 313 F. Supp.2d at 470 (citations omitted). Additionally, as set out previously, the mere failure of the Defendants to agree to Garrity's request for more time was not completely irrational when coupled with the fact that the Board believed that the plans for Creekside Commons were not progressing in an adequate fashion.

### 3.    Plaintiff's Expert Reports

The Plaintiff additionally relies on the reports of two of its experts, Joseph J. Viscuso, P.E. ("Viscuso") and Marc D. Jonas, Esq. ("Jonas") to defeat Defendants' Summary Judgment Motion. For the following reasons, however, these two expert reports do not create a material issue of fact so as to defeat Defendants' Summary Judgment Motion.

Viscuso is "a licensed professional engineer with an M.S. degree in Civil Engineering who currently serves as municipal engineer or special consultant for seven municipalities and authorities." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 57). The report issued by Viscuso states that as submitted, the Second Revised Preliminary Plan is in compliance with the Township's SALDO. Such an opinion by Viscuso does not substantiate a substantive due process claim. Rather, Viscuso's report simply amounts to a difference of opinion he has with Zarko's interpretation of the Township's SALDO as it relates to the Second Revised Preliminary Plan for Creekside Commons. Even a bad faith violation of state law

remains only a violation of state law.  United Artists Theatre Circuit, 316 F.3d at 402 (citing

Chesterfield Development Corp. v. City of Chesterfield, 963 F.2d 1102, 1104-05 (8th Cir.

1992)).  Thus, since Viscuso's report only goes to whether Zarko applied the correct legal

standard under the local ordinance in his denial recommendation, it does not create a material

issue of fact so as to preclude the Defendants' Summary Judgment Motion.

Plaintiff additionally submits the report of Jonas which it contends creates a

material issue of fact as to its substantive due process claim.  As the Plaintiff sets forth, Jonas is a

distinguished land use attorney.  Jonas' report sets forth twenty-four circumstances/actions by the

Defendants that he believed could be considered "conscience-shocking."  (Br. Pl. in Opp'n to

Defs. Mot. for Summ. J. Ex. 19).  By doing so, Jonas is stating a legal conclusion drawn by

applying the law to the facts.  A similar issue regarding an expert report occurred in VIM, Inc. v.

Somerset Hotel Association, 19 F. Supp.2d 422, 427 n.4 (W.D. Pa. 1998), aff'd 187 F.3d 627 (3d

Cir. 1999).  The issue in VIM was whether the defendants tactics in prosecuting an opposition to

the building of a Hampton Inn was objectively baseless.  Id.  Before the court was a report by a

former President Judge of the Commonwealth Court of Pennsylvania which purported to state

that the Defendants land use appeals were not objectively baseless as a matter of law.  Id. at 427

n.4.  As the court observed however:

> that lack of objective baselessness is not the sort of issue that lends
> itself to expert testimony under Fed. R. Evid. 702 and 704.  While
> testimony in the form of an opinion or inference otherwise
> admissible is not objectionable because it embraces an ultimate
> issue to be decided by the trier of fact, an expert may not state his
> or her opinion as to legal standards nor may he or she state legal
> conclusions drawn by applying the law to the facts.

Id. (emphasis added)(internal quotation marks omitted)(citing Okland Oil Co. v. Conoco, Inc.,

144 F.3d 1308, 1328 (10th Cir. 1998); accord Burger v. Mays, 176 F.R.D. 153, 156-57 (E.D. Pa.

1997); Haberern v. Kaupp Vascular Surgeons, Ltd., 812 F. Supp. 1376, 1378 (E.D. Pa. 1992);

Rich v. Bailey, No. 95-6932, 1996 WL 745290, at *5 (E.D. Pa. Dec. 23, 1996), aff'd mem. 135

F.3d 766 (3d Cir. 1997)).  Ultimately, then District Court Judge Smith ruled that "because such

testimony would not assist the jury to determine a fact in issue, I cannot consider it as factual

evidence on the motion for summary judgment." VIM, 19 F. Supp.2d at 427 n.4.  However,

Judge Smith did treat the report as additional legal argument.  Id.

          Similar to Judge Smith's analysis in VIM, Jonas' report cannot create a material

issue of fact merely because he states that the Defendants' actions "shocked the conscience."

Specifically, this amounts to a legal conclusion clearly within the purview of this Court's

decision making power rather than a party's expert.  This Court has already applied the factual

scenario giving rise to this case to the "shock the conscience" standard and found that the

Defendants' actions did not rise to such a stringent level.  Thus, Jonas' report fails to create a

material issue of fact on this point.

          For the reasons previously stated, and in light of the relevant case law in this

Circuit, this Court has specifically found that there is no issue of material fact as to whether the

Defendants' actions "shocked the conscience."  Therefore, based on the relevant case law, the

facts currently before this Court and that the Plaintiff's expert witnesses have failed to present a

material issue of fact that could substantiate a substantive due process claim, Plaintiff's

substantive due process claim must also be knocked out.[18]

_____

          [18] In support of their summary judgment motion, the individual Defendants also argue
they are entitled to qualified immunity.  However, as the court noted in Corneal, because there is
no material issue of fact outstanding as to whether the Defendants' conduct "shocked the

C.    **EQUAL PROTECTION**

The final claim being brought by HMI against the Defendants is that the Defendants violated HMI's equal protection rights under the Fourteenth Amendment. The Fourteenth Amendment to the United States Constitution states that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Where the state law does not classify by suspect class, "the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 440 (1985). Here, HMI does not argue that it is a member of a suspect class. Instead, it pursues its equal protection claim under a "class of one" theory. As the United States Supreme Court ("Supreme Court") has noted, "cases have recognized equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in the treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)(per curium)(citations omitted). Additionally, "a 'class of one' can attack intentionally different treatment if it is 'irrational and wholly arbitrary.'" Eichenlaub, 2004 WL 2093439, at *10 (quoting Olech, 528 U.S. at 564).

The Third Circuit recently had the opportunity to compare an equal protection and substantive due process claim in the context of a land use/zoning dispute. As the Third Circuit noted:

> [t]he "irrational and wholly arbitrary" standard is doubtless

---

conscience," it is unnecessary for this Court to determine whether the individual Defendants are entitled to qualified immunity. 313 F. Supp.2d at 470 n.11 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).

> difficult for a plaintiff to meet in a zoning dispute, and we do not
> view an equal protection claim as a device to dilute the stringent
> requirements needed to show a substantive due process violation.
> It may be very unlikely that a claim that fails the substantive due
> process test will survive under an equal protection approach.

Id. (internal citation omitted).  The Third Circuit in Eichenlaub, however, remanded the equal

protection claim because the District Court had failed to address the equal protection claim.

Thus, now that the relevant standard for HMI's equal protection claim has been set, this Court

will now turn to analyzing whether an equal protection claim can be substantiated at this

summary judgment stage so as to defeat the Defendants' Summary Judgment Motion.

As previously stated, there are two elements necessary to establish an equal

protection claim under a "class of one" theory.  First, a party has to show that they were

intentionally treated differently than others who were similarly situated.  If a party satisfies this

first step, the second step requires a party to show that there was no rational basis for the

difference in treatment.  Both steps are required to substantiate an equal protection claim.  The

parties vigorously contest both steps.  For the following reasons, this Court will decline to

address step one of the equal protection analysis because step two has failed to create a material

issue of fact necessary to overcome Defendant's Summary Judgment Motion.[19]

---

[19] Initially the parties dispute whether HMI and its property is similarly situated.  At the crux of this dispute is determining how to make such a comparison to determine whether HMI is similarly situated.  HMI suggests that it should be compared to all other developers who filed plan applications to develop their properties in Whitemarsh Township.  The Defendants assert that the proper comparison should be whether HMI's property is similarly situated to other properties in Whitemarsh Township.  However, in the case currently before this Court, "it is undisputed that there are no other active quarry properties in Whitemarsh Township."  (Defs.' Mem. of Law in Supp. of their Mot. for Summ. J., at 71; Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 68).  Thus, as Plaintiff notes, it would be impossible for them to be similarly situated since no other properties are even remotely similar to their parcel.  However, since step two of the equal protection analysis has not been substantiated at this summary judgment stage, it

Even assuming <u>arguendo</u>, that the Plaintiff can show that it was intentionally treated differently from others similarly situated, the Plaintiff has not shown that there was no rational basis for the treatment.  As the Supreme Court has noted, the issue is whether the Defendants' decision to rezone and ultimately deny HMI's Second Revised Preliminary Plan "so lack rationality that they constitute a constitutionally impermissible denial of equal protection." <u>City of New Orleans v. Dukes</u>, 427 U.S. 297, 305 (1976)(per curium).  More specifically and more recently, the Supreme Court has noted:

> [w]hether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.  In the areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

<u>Fed. Communications Comm'n v. Beach Communications, Inc.</u>, 508 U.S. 307, 313 (1993)(citations omitted).  As with the procedural and substantive due process claims, this Court will analyze whether the purported "one-two punch" substantiates Plaintiff's equal protection claim.

### 1.    "Punch One"

"The equal protection clause affords the states particularly wide latitude with respect to zoning."  <u>Acierno v. New Castle County</u>, No. 92-385, 2000 WL 718346, at *6 (D. Del. May 23, 2000)(citing <u>City of Cleburne</u>, 473 U.S. at 440).  Thus,

> a zoning ordinance not affecting suspect classes "cannot run afoul of the Equal Protection Clause if there is a rational relationship

---

is unnecessary for this Court to consider the issue what is the proper comparison.

> between the disparity of treatment and some legitimate
> governmental purpose.  Further, a legislature that creates these
> categories need not actually articulate at any time the purpose or
> rationale supporting its classification.  Instead a classification must
> be upheld against equal protection if there is any reasonably
> conceivable state of facts that could provide a rational basis for the
> classification."

Id. (quoting Heller v. Doe, 509 U.S. 312, 320 (1993)).  As stated previously in supra Part IV.B.1,

the Defendants did have a rational basis to rezone HMI's property.  Here, the Township had a

legitimate concern as to how the reclaimed quarry properties were going to interact and conform

with the surrounding neighborhood.  This is particularly the case where the entire surrounding

neighborhood was residential, a golf course or agricultural properties.[20]  Since rezoning the

property to conform it to the immediate surrounding area is a rational reason for rezoning, the

rezoning of HMI's property does not violate the Equal Protection Clause.

　　　　2.　　　　"Punch Two"

　　　　As previously discussed in supra Part IV.B.2, the Defendants have set forth a

rational basis for which they denied the Second Revised Preliminary Plan for Creekside

Commons.  Most notably, according to the Defendants, the Second Revised Preliminary Plan did

not comport with the Township SALDO's requirements for approving a preliminary plan.

Additionally, while the Plaintiff requested an extension, the denial of that proposal also had a

rational basis since the Defendants believed that the proposal for Creekside Commons was not

making any significant progress toward approval.  Thus, there was a rational basis for denying

the Second Revised Preliminary Plan, and since the rezoning of Plaintiff's property also had a

---

[20] This of course excludes the small 15-acre KYW property which had a radio antennae
and a small building.

rational basis, Plaintiff's equal protection claim must also be knocked out.[21]

## V.    CONCLUSION

_____In conclusion, this Court has analyzed the Defendants' Motion for Summary Judgment under the relevant legal standards. The Defendants moved for summary judgment on all three counts of the Plaintiff's Complaint. The claims were procedural due process, substantive due process and equal protection. This Court has found that as to all three claims, the Defendants have met their burden and there are no material issues of fact outstanding requiring this Court to deny Defendants' Motion. As such, Defendants' Motion will be granted.

An appropriate Order follows.

_____

[21] Additionally, the Plaintiff states that the Township implemented procedural "firsts" in reviewing the plan for Creekside Commons, which it asserts help to substantiate its equal protection claim. However, as one court has noted, "as a matter of logic and law a plaintiff may not convert a procedural due process claim into an equal protection claim by expediently alleging that he was denied procedural rights by an official who has accorded such rights to others in the past." Stop-Save Township Open Places, Inc. v. Bd. of Supervisors of Montgomery Township, No. 96-7325, 1996 WL 663875, at *3 (E.D. Pa. Nov. 15, 1996)(citations omitted). As set out in supra Part IV.A, this Court has already examined and knocked out Plaintiff's procedural due process claim.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                                    :
HIGHWAY MATERIALS, INC.,             :          CIVIL ACTION
                                                    :
          Plaintiff,                               :
                                                    :
          v.                                       :          No. 02-3212
                                                    :
WHITEMARSH TOWNSHIP,             :
MONTGOMERY COUNTY,                 :
PENNSYLVANIA, et al.,                    :
                                                    :
          Defendants.                           :
_____:

**ORDER**

          **AND NOW**, this 4th day of October, 2004, upon consideration of Defendants'

Motion for Summary Judgment (Doc. No. 64) as to all three claims of Plaintiff's Complaint, the

Response and Replies thereto,  it is hereby **ORDERED** that Defendants' Motion is **GRANTED**.


                                                    BY THE COURT:


                                                    _____
                                                    Robert F. Kelly,                    Sr. J.